IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

U.S. HOME CORPORATION  :

                                        :

    v.                          :   Civil Action No. DKC 08-1863

                                          :

SETTLERS CROSSING, LLC, et al.  :

                                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this contract dispute is an objection filed by Plaintiff/Counter-Defendant U.S. Home Corporation and Counter-Defendant Lennar Corporation (together, "Lennar") to an order entered by United States Magistrate Judge William G. Connelly on June 21, 2013, granting an emergency motion for protective order filed by Defendant/Counter-Plaintiff iStar Financial, Inc. ("iStar"). (ECF No. 545). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the objection will be overruled.

## I. Background

On June 7, 2013, iStar filed a motion for protective order seeking, *inter alia*, to quash a subpoena served by Lennar on iStar's testifying expert, Geosyntec Consultants, Inc.

("Geosyntec"). (ECF No. 519).[1] In support of its motion, iStar attached the declaration of its attorney, John A. Rosans. (ECF No. 519-3). Lennar opposed the motion, relying on the attached declaration of its general counsel, Mark Sustana. (ECF No. 523-1, at 4-7). The competing declarations and associated exhibits set forth the relevant facts as follows.[2]

iStar contacted Geosyntec's office in Columbia, Maryland, on or about March 11, 2010, "for the purpose of discussing whether Geosyntec could provide consultant services to assist [iStar] in preparing for trial." (ECF No. 519-3 ¶ 3). After conducting a conflicts check, Geosyntec advised iStar that it "had done work for Lennar and its holding companies in the past" and "had some active but completely unrelated Lennar projects on the west coast," but that "none of the former or then current work for other Lennar-related entities posed a conflict of interest with respect to this litigation." (*Id.* at ¶¶ 3, 6).

---

[1] Geosyntec is "a specialized consulting and engineering firm that works with private and public sector clients to address new ventures and complex problems involving our environment, natural resources, and civil infrastructure." (ECF No. 519-4, at 6). It has "a staff of more than 800 engineers, scientists, and related technical and project support personnel serving clients from more than 50 offices throughout the U.S. and locations in Australia, Canada, Ireland, Malaysia, and the United Kingdom." (*Id.*).

[2] Due to inconsistent pagination, references to page numbers in these documents are to those designated by the court's electronic case management system.

On or about August 11, 2010, iStar engaged Geosyntec as a "consulting expert" in this matter. (*Id.* at ¶ 7).

In March 2013, iStar approached Geosyntec "for the purpose of discussing whether [it] would be suited to serve as a testifying expert on matters unrelated to Geosyntec's previous work product, which had been conducted and prepared pursuant to the [consulting] engagement letter." (*Id.* at ¶ 8). During a meeting on March 22, Geosyntec reconfirmed that its "work for Lennar was unrelated to this litigation and the substantive issues raised therein and that it otherwise did not pose any conflict of interest for Geosyntec." (*Id.*). iStar engaged Geosyntec as a "testifying expert" on or about April 12. (*Id.*).

On May 15, counsel for iStar served its expert reports on Lennar and other parties, including a report prepared by a Geosyntec environmental engineer.[3] Soon thereafter, counsel for Lennar contacted iStar's attorney to advise that "Geosyntec[] is and has been a consultant with Lennar on a variety of matters and, as a result, has a conflict that precludes Geosyntec from

_____

[3] According to the report, Geosyntec was retained by iStar (1) "to review and evaluate information in documents related to the development of certain specified properties in Maryland for which evidence of prior biosolids application was identified and to compare such evidence to information related to past biosolids application at the . . . property"; (2) "to conduct additional research related to this subject and to prepare this report on our findings"; and (3) "to review information related to [the property] as well as [other] properties" (*i.e.*, for comparison). (ECF No. 519-4, at 5).

acting adverse to Lennar's interest in this case." (ECF No. 519-5). On the same date, Lennar's counsel directly contacted general counsel for Geosyntec and "made inquiry about Geosyntec's work for iStar in this litigation[.]" (ECF No. 519-3 ¶ 10).[4] Geosyntec reported this conversation to counsel for iStar, advising that "it would revisit its historical retention in this litigation and its conflict of interest processes." (*Id.*).

The next day, Geosyntec's general counsel sent the following email to counsel for Lennar:

> Please be advised that I have looked into the history of this matter. When the engagement was commenced in 2009,[5] a conflicts check was conducted. Geosyntec concluded that there was no conflict of interest because it had done no work for Lennar at or near the site in question, the Geosyntec personnel involved have never been

---

[4] Counsel for Lennar asserts that he contacted Geosyntec's counsel "to disclose the situation" and "to assess how it might impact Lennar." (ECF No. 523-1 ¶ 10). He recalls that Geosyntec's counsel "was not personally aware of Geosyntec's representation of iStar" at the time and that "nothing even remotely touching upon iStar's confidential information was or could have been discussed." (*Id.* at ¶ 11).

[5] There are numerous references in the record to the initial contact between iStar and Geosyntec occurring in 2009, rather than 2010, as iStar's counsel asserts in his declaration. Lennar suggests that inconsistencies such as these are evidence of iStar's deceptive motive in retaining Geosyntec. In truth, however, whether the initial contact was made in 2009 or 2010 is of no real significance. The declarations provided by counsel for iStar and general counsel for Geosyntec both reflect that iStar first engaged Geosyntec in 2010. (ECF No. 519-3 ¶ 7; ECF No. 528-1 ¶ 3).

contracted to any work whatsoever for Lennar, and there was no potential breach of confidentiality obligations that were in place with Lennar when this project commenced.

Geosyntec's understanding of conflict rules applicable to engineers and scientists (where projects are approached on the basis of objective and technical expertise) is that they are different from those applicable to lawyers. The mere existence of a client relationship on unrelated project assignments does not necessarily present a conflict as long as there is no breach of confidentiality.

There is of course a possibility that the existence of the client relationship could make it difficult to express an opinion that could be adverse to the relationship and it is considered necessary to disclose the client relationship at the time of the subsequent engagement. Therefore, the fact that Geosyntec had a relationship with Lennar was disclosed to [iStar's counsel] at the time of the engagement, and [iStar] elected to retain Geosyntec nevertheless.

Because we believe that no conflict exists, and because of our commitment in undertaking engagement with [iStar's counsel], we feel that we are obligated to continue to perform that engagement. Our approach in dealing with these engagement issues has evolved with time and our current procedures would require notification to Lennar prior to accepting an expert witness role where Lennar is an adverse party – not because we view it as a conflict in our profession, but because of the relationship issues involved. This was not the policy at the time of the engagement in question.

(ECF No. 519-6, at 2).

A string of accusatory communications between counsel for iStar and Lennar followed. iStar expressed its "deep concern" regarding Lennar's direct contact with Geosyntec, which it viewed as constituting "a clear violation of Federal Rule 26(b)(4) and, by extension, rais[ing] significant ethical considerations." (ECF No. 519-7, at 2). Lennar complained that iStar had "known about Geosyntec's engagement by Lennar since 2009 and that [it] nevertheless elected to employ Geosyntec as an expert . . . , even as Geosyntec continued to accept substantial new matters from Lennar, including confidential assignments involving [the office of Geosyntec's general counsel]." (ECF No. 519-8).

The parties were required by Judge Connelly – to whom the case was referred for resolution of discovery disputes and other non-dispositive pre-trial matters – to submit weekly status reports advising of their progress. In a status report dated May 24, counsel for iStar represented to the court, in relevant part:

> As indicated in last week's update, iStar served three expert reports on May 15, 2013. Among iStar's experts was an environmental engineer from Geosyntec Consultants, a firm with offices nationwide and that employs over 1,000 engineers, geologists, scientists, and other technical specialists. Geosyntec has done no work for Lennar related to this property or this litigation. iStar, however, has learned the Lennar's general counsel, Mark Sustana, contacted

Geosyntec directly on Monday regarding
Geosyntec's retention and work in this
matter.

Also on Monday, counsel for Lennar
separately wrote to our office and claimed
that Geosyntec "is and has been a consultant
with Lennar on a variety of matters and, as
a result, has a conflict that precludes
Geosyntec from acting adverse to Lennar's
interest in the case." We, along with
Geosyntec, steadfastly disagree. Prior to
our retention of Geosyntec on this matter in
2009, it is our understanding that Geosyntec
conducted an internal conflicts check and
concluded that there was no conflict of
interest. It is also our understanding that
Geosyntec has never done work for Lennar
related to the Bevard site or this
litigation, that the Geosyntec personnel
involved in this matter had never been
contracted to any work for Lennar, and that
Geosyntec internally ensures that its
confidentiality obligations to Lennar (and
to iStar) are maintained. By email on
Tuesday – as necessitated by Lennar's
counsel's direct contact with Geosyntec –
Geosyntec confirmed to Lennar directly that
no conflict exists.

(ECF No. 523-1, at 22).

By a letter to Judge Connelly dated May 30, Lennar

responded:

Geosyntec has served as a consultant to
Lennar since at least 2006. Since that
time, Geosyntec has represented Lennar in a
variety of matters, including confidential
matters directly for the office of Lennar's
General Counsel, for which Lennar has paid
Geosyntec hundreds of thousands of dollars.
Geosyntec has continued to accept new
matters from Lennar through the present –
Geosyntec currently is working with Lennar
on highly sensitive projects. The

> relationship between Geosyntec and Lennar is
> so significant that Geosyntec currently
> identifies Lennar as a representative client
> on its website.

(ECF No. 519-10, at 2). Citing its "surprise" to learn that iStar was aware of Lennar's relationship with Geosyntec at the time of initial engagement, as well as its concern regarding the change in conflict policy referenced in the letter from Geosyntec's counsel, Lennar complained that it did not know "when [Geosyntec's] policy changed, when it began working on its expert engagements for [iStar] (as opposed to simply being retained), or why [Geosyntec] continued to accept matters from Lennar without any communication regarding its adverse retention by [iStar's counsel]." (*Id.* at 3). Counsel for Lennar advised that, "[a]s a result of these events, including the fact that we now have received directly contradicting statements from [iStar] and Geosyntec,[6] Lennar is forced to seek discovery from Geosyntec and [iStar] relating to Geosyntec's engagement and potential discovery abuses that may have occurred." (*Id.* at 4).

---

[6] Counsel for iStar initially told Lennar that "Geosyntec for the first time disclosed that it had done work for Lennar on other matters in other states" in 2013 (ECF No. 519-9, at 2), but later recalled that "someone from Geosyntec's Tennessee office . . . had done a conflicts check in 2010 and, in so doing, had mentioned . . . that Geosyntec had done unrelated work for Lennar-related entities on the west coast, but which did not pose a conflict" (ECF No. 523-1, at 35).

On or about May 31, Lennar served a subpoena *duces tecum* on Geosyntec, seeking production of a number of documents described in an attached schedule, including:

> 1.   All conflict of interest policies and procedures in effect from 2007 to present . . . [;]
>
> 2.   All document security and document retention policies from 2009 to the present[;]
>
> 3.   All documents, including communications with [iStar] related to conflict of interest checks performed by Geosyntec for its work on the [] [l]itigation[;]
>
> 4.   All documents from January 2009 to present related to efforts to screen individuals working on the [] [l]itigation from information obtained in connection with Geosyntec's work for Lennar[;]
>
> 5.   All communications to and/or from any individual working on the [] [l]itigation regarding information Geosyntec obtained in connection with its work for Lennar[;]
>
> 6.   All invoices issued by Geosyntec to iStar . . . related to the [] [l]itigation[;]
>
> 7.   All engagement and/or retention letters with iStar . . . related to the [] [l]itigation[; and]
>
> 8.   All communications with iStar . . . regarding Geosyntec's work for Lennar[;]

(ECF No. 519-11, at 11).

iStar's emergency motion for protective order followed approximately one week later.  iStar's primary argument was that

"the subpoena served on Geosyntec by Lennar must be quashed because it seeks documents that are not relevant to any party's claim or defense." (ECF No. 519-2, at 13). Lennar countered that the requested documents were "particularly relevant in light of the conflicting statements made by Geosyntec and iStar" regarding the circumstances of the engagement. (ECF No. 523, at 14). Specifically, Lennar cited the fact that "an affiliated company" of Lennar retained Geosyntec in 2009 in relation to "a very large development project in California" that was to "continue for as long as fifteen years." (ECF No. 523-1 ¶ 4). The underlying consulting contract provides, in relevant part, that "neither Consultant nor any partner, director, employee, or agent of Consultant . . . shall, without specific written authorization of Owner . . . [e]ngage in any employment or enter into any contract or agreement which conflicts with Consultant's obligations under this Agreement[.]" (*Id.* at ¶ 5).[7] According to Lennar, "the evidence suggest[ed] that Geosyntec [] breached these obligations," which – along with iStar's inconsistent representations regarding the circumstances of the engagement

_____

[7] The declaration of Geosyntec's general counsel, Paul J. Sanner, attached to iStar's reply papers, addressed this contract: "[t]he sweeping nature of the proposed restriction was specifically addressed and narrowed in the negotiations with the end result that it restricted activities only adverse to Lennar with respect to the two California projects in question," which was "an approach consistent with the Code of Ethics for Engineers focus[ed] on project by project conflicts evaluations." (ECF No. 528-1 ¶ 4).

and/or when it first learned of the relationship between Geosyntec and Lennar – "entitled [Lennar] to discovery regarding the facts." (ECF No. 523, at 15).

On June 21, the parties participated in a telephonic motions hearing before Judge Connelly. After the parties summarized the arguments set forth in their motion papers, Judge Connelly ruled as follows:

> I find that in 2010 [] iStar retained Geosyntec's Columbia, Maryland[,] office for consulting services in this case. And looking at Geosyntec's website it is apparent that they employ approximate[ly] a thousand engineers, geologists, scientists and other technical specialists and have dozens of offices across the country and overseas.
>
> Recently, specifically in March and April of 2013, iStar changed the relationship from one of a consulting relationship to one of a testifying expert relationship and they therefore went ahead and retained Geosyntec as a testifying expert.
>
> While this was going on and even before, it is apparent from the papers that since 2006 and maybe even before, Geosyntec has done work on behalf of Lennar[,] [w]hich is not unreasonable to expect because I believe that Lennar is the second largest home builder in the United States. This work was done apparently on other unrelated matters. I have been told in the papers that Geosyntec had performed a conflicts check and informed iStar that there was no conflict of interest [].
>
> Con[flict] rules of engineers and scientists are different from those

applicable to lawyer[s]. And the mere existence of a client relationship on an un[related] project, assignment, does not necessarily present a conflict as long as there is no breach of confidentiality.

And in this matter Geosyntec had done, according to their papers or what their representations were and their e-mail and the like, no work for Lennar at or near the [site] in question for this litigation . . . [a]nd that Geosyntec personnel from the Columbia, Maryland[,] office, which is apparently doing the work for iStar, had never been contracted to do any work whatsoever for Lennar.

Now, Lennar has invited my attention to a 2009 contract in which a Lennar affiliate engaged Geosyntec for a real estate development project in California. And the agreement provides, among other [things, that] neither Geosyntec nor any partner, director, employee or agency of Geosyntec shall without specific authorization of owner − which I assume refers to the affiliate of Lennar − . . . engage in any employment or enter into any contract or agreement which conflicts with consultant's obligation under this agreement.

The [c]ourt does not find this contract controlling as there has been no analysis of how Geosyntec's performance under its agreement with regards to the property in California, with an affiliate of Lennar, in any way relates to the expert service being related by the separate Geosyntec office here in Columbia, Maryland, and personnel associated with that office.

And I find that there has not been any specific use of confidential information obtained from Lennar by Geosyntec. Nor do I find that there has been any conflict of interest that has been proven up in this case.

As a result I am going to go ahead and
grant the [m]otion to [q]uash the May 30th,
2013[,] subpoena served on Geosyntec
Consultants and direct that the [d]eposition
of Geosyntec, which is apparently occurring
right now, . . . be completed [by] not later
than July 1st of 2013.

(ECF No. 545-2, at 23-25). By a paperless order entered on the

same date, the court granted iStar's motion for protective

order, quashing Lennar's subpoena. (ECF No. 532).

On July 8, Lennar filed the pending objection to Judge

Connelly's ruling. (ECF No. 545). iStar filed opposition

papers on July 25 (ECF No. 554) and Lennar submitted a reply on

August 12 (ECF No. 565).

## II.  Standard of Review

Under 28 U.S.C. § 636(b)(1)(A), non-dispositive pretrial

matters may be referred to a magistrate judge for hearing and

determination. A district judge may modify or set aside any

portion of a magistrate judge's non-dispositive ruling "where it

has been shown that the magistrate judge's order is clearly

erroneous or contrary to law." *Id.; see also* Fed.R.Civ.P.

72(a); Local Rule 301.5.a. "The [district] judge may also

receive further evidence or recommit the matter to the

magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

Under the clearly erroneous standard, the
reviewing court is not to ask whether the
finding is the best or only conclusion
permissible based on the evidence. Nor is

13

it to substitute its own conclusions for
that of the magistrate judge. *See Tri-Star
Airlines, Inc. v. Willis Careen Corp.*, 75
F.Supp.2d 835, 839 (W.D.Tenn. 1999).
Rather, the court is only required to
determine whether the magistrate judge's
findings are reasonable and supported by the
evidence. *Id*. "It is not the function of
objections to discovery rulings to allow
wholesale relitigation of issues resolved by
the magistrate judge." *Buchanan v. Consol.
Stores Corp.*, 206 F.R.D. 123, 124 (D.Md.
2002).

*Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Matsuda*,
390 F.Supp.2d 479, 485 (D.Md. 2005).

## III. Analysis

Lennar contends that the court did not make "the findings
requisite for the issuance of a protective order." (ECF No.
545, at 8). More specifically, it argues, "iStar did not
articulate any specific injury it would suffer as a result of
the subpoena, and Magistrate Judge Connelly did not find any
injury." (*Id*. at 8-9). Lennar also faults Judge Connelly for
finding that "there has not been any specific use of
confidential information obtained from Lennar by Geosyntec" and
that no "conflict of interest [had] been proven up in this case"
because those findings "were not raised in or necessary to the
resolution of iStar's motion, and . . . were not supported by
any evidence in the record." (*Id*. at 9). It further maintains
that "[t]he Protective Order [] is contrary to law because it is

implicitly and incorrectly premised on a finding that the subpoenaed information was not relevant." (*Id*. at 10).

It is true that Judge Connelly's ruling was "premised on a finding that the subpoenaed information was not relevant," but that finding was neither "contrary to law" nor "incorrect," as Lennar suggests. Pursuant to Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." "Information is relevant, for discovery purposes, if it 'bears on, or . . . reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'" *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350 (1978)); *see also* Fed.R.Civ.P. 26(b)(1) (information sought must be "reasonably calculated to lead to the discovery of admissible evidence").

Under Rule 26(c)(1), "[a] party or any person from whom discovery is sought may move for a protective order . . . to protect [itself] from annoyance, embarrassment, oppression, or undue burden or expense" and "[t]he court may, for good cause, issue an order to protect a party or person" when such a showing is made. Similarly, Rule 45(c)(3)(A)(iv) requires a court to quash a subpoena that "subjects a person to an undue burden." "This undue burden category 'encompasses situations where the

15

subpoena seeks information irrelevant to the case.'" *HDSherer LLC v. Natural Molecular Testing Corp.*, --- F.R.D. ----, ----, 2013 WL 4427813, at *2 (D.S.C. July 31, 2013) (quoting *Cook v. Howard*, 484 Fed.Appx. 805, 812 n. 7 (4ᵗʰ Cir. 2012) (per curiam)).[8] Thus, "if the discovery sought has no bearing on an issue of material fact" – *i.e.*, if it is not relevant – "a protective order is proper." *Tilley v. United States*, 270 F.Supp.2d 731, 735 (M.D.N.C. 2003); *see also Baron Financial Corp. v. Natanzon*, 240 F.R.D. 200, 203 (D.Md. 2006) (citing *Tilley* for the same proposition).

Despite Lennar's present argument to the contrary, the court was bound to assess the relevance of the documents sought by the subpoena and any such assessment necessarily entailed consideration of whether a potential conflict of interest was presented. If a potential conflict were shown, the documents would be relevant, and potentially discoverable, to the extent that they could support disqualification of the expert. If, on the other hand, no potential conflict was presented, the subpoena would not relate to any material issue in the case, thus militating in favor of a protective order.

---

[8] "Although Rule 45(c) sets forth additional grounds on which a subpoena against a third party may be quashed[,] . . . those factors are co-extensive with the general rules governing all discovery that are set forth in Rule 26." *HDSherer LLC*, 2013 WL 4427813, at *2 (quoting *Cook*, 484 Fed.Appx. at 812).

Lennar's position is essentially premised on the erroneous notion that its existing relationship with Geosyntec gives rise to a *prima facie* conflict of interest. In its view, the duty Geosyntec owes is akin to an attorney who undertakes concurrent representation of adverse clients. As Judge Connelly correctly noted, however, "[c]on[flict] rules of engineers and scientists are different from those applicable to lawyer[s]." (ECF No. 545-2, at 24). Indeed, an attorney owes a "fiduciary duty of undivided loyalty and allegiance" to his client. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976). Thus, "[w]here an attorney takes part in a suit against an existing client, the propriety of the conduct 'must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients.'" *Stratagem Dev. Corp. v. Heron Intern. N.V.*, 756 F.Supp. 789, 792 (S.D.N.Y. 1991) (quoting *Cinema 5*, 528 F.2d at 1386). But the same rules do not apply to non-attorney expert witnesses. *See W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61, 65 (D.Md. 1993) ("the duties of an attorney-expert are greater than the ordinary expert"). As one commentator explained:

> An expert is not the client's "champion," pledged faithfully to seek the client's goals. Indeed, in many ways the expert's role is precisely the opposite. She must remain independent of the client and

> detached, if not wholly aloof, from the
> client's goals. There is no reason that an
> objective expert could not conclude – and
> explain – that a party is correct in one
> case and wrong in another. Consequently,
> there is no general ethical principle that
> prevents an expert from accepting concurrent
> engagements both for and adverse to the same
> party.

Steven Lubet, *Expert Witnesses: Ethics and Professionalism*, 12 Geo. J. Legal Ethics 465, 474 (1999) (internal footnotes omitted); *see also Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 164 (3d Cir. 1995) ("despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise").

While non-attorney testifying experts do not have absolute freedom of action, any potential conflict of interest must be assessed in terms of whether the concurrent relationship relates to the same subject matter and whether an exchange of confidential information is involved. In this regard, the opinion of the United States District Court for the Eastern District of Virginia in *Wang Laboratories, Inc. v. Toshiba Corporation*, 762 F.Supp. 1246 (E.D.Va. 1991), is instructive. *Wang*, 762 F.Supp. at 1246, was a patent infringement suit in which first the plaintiff and then the defendant "engaged the same expert for the same purpose, namely to furnish an opinion on the validity of the patents in issue." When the plaintiff

learned that the defendant would be calling the expert to testify at trial, it filed a motion "to disqualify the expert and for leave to conduct discovery aimed at ascertaining what use, if any, the expert made of [the plaintiff's] putatively confidential information." *Id*.[9]  In addressing the motion to disqualify, the court initially noted that "no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention." *Id*. at 1248.  "Less clear," it continued, "are those cases where, as here, the parties dispute whether the earlier retention and passage of confidential information occurred." *Id*.  Nevertheless, the court found a toehold in a

_____

[9] In the instant case, Lennar did not move to disqualify the expert or for leave to take discovery in support of such motion. Rather, it simply served its subpoena independently in the hope that it might thereby uncover information that would support a future motion to disqualify.  Procedurally, this tactic puts the proverbial cart before the horse.  Lennar cites no authority demonstrating that, absent leave of court, discovery may be sought from an opposing party's testifying expert to establish whether there is a basis for filing a motion to disqualify, nor is the court aware of any.  Indeed, its subpoena was based entirely on the speculative notion that Geosyntec's alleged breach of the California contract and iStar's inconsistent representations regarding the circumstances of the engagement "entitled it to discovery regarding the facts." (ECF No. 523, at 15).

"two-step inquiry" set forth in *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277 (S.D.Ohio 1988). *Id.* In this analysis, courts are to consider:

> First, was it objectively reasonable for the first party who claims to have retained the consultant . . . to conclude that a confidential relationship existed?
>
> Second, was any confidential or privileged information disclosed by the first party to the consultant?

*Wang*, 762 F.Supp. at 1248; *see also W.R. Grace*, 152 F.R.D. at 64 (applying the two-part *Paul* analysis). The court explained that "[a]ffirmative answers to both inquiries compel disqualification," which is "likely inappropriate if either inquiry yields a negative response." *Id.* In other words, "even if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed." *Id.* (citing *Paul*, 123 F.R.D. at 279 (expert not disqualified where there was a "lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney client privilege")). Otherwise, the court explained, "lawyers could then disable potentially troublesome experts merely by retaining them, without intending to use them as consultants," which would constitute an "attempt[] only to prevent opposing lawyers from

obtaining an expert" that "should not be countenance[d]." *Id.;
see also W.R. Grace*, 152 F.R.D. at 64 (recognizing that
"sometimes disqualification motions are brought for purely
strategic purposes").

In applying the *Paul* analysis to the facts presented, the
*Wang* court found "affirmative responses to both questions." *Id.*
at 1249. In that case, it was "indisputable that [plaintiff's
counsel] disclosed confidential work product material to [the
expert]" and "the totality of circumstances point[ed]
convincingly to the conclusion that [plaintiff's counsel] was
reasonable in assuming the existence of a confidential
relationship with [the expert]." *Id.* Thus, the plaintiff's
motion to disqualify was granted, thereby rendering moot the
discovery request.

In the instant case, by contrast, it is undisputed that
Geosyntec has had no involvement with Lennar with respect to the
subject matter of the litigation. Moreover, both Geosyntec and
iStar have repeatedly represented to the court that the
particular Geosyntec office retained by iStar has never had any
relationship with Lennar and that no one from Geosyntec who
worked on the case had previously done work for Lennar. Even
assuming, as Lennar suggests, that it reasonably believed it had
a confidential relationship with Geosyntec based on the contract
for unrelated services in California, there is no indication

that there was, or could have been, any confidential information disclosed by Lennar to Geosyntec in the context of that relationship that could have had any bearing on Geosyntec's competence to serve as iStar's expert in this case. Nor is there even an allegation that such information was, in fact, disclosed to iStar.

In sum, as Judge Connelly properly found, "there has not been any specific use of confidential information obtained from Lennar by Geosyntec," nor was there "any conflict of interest that [was] proven up in this case." (ECF No. 545-2, at 22). Consequently, the subpoena was not "reasonably calculated to lead to the discovery of admissible evidence," Fed.R.Civ.P. 26(b)(1), and because responding to a request for irrelevant documents self-evidently constitutes an "undue burden or expense," Rule 26(c)(1); Rule 45(c)(3)(A)(iv), Judge Connelly properly found good cause for the issuance of a protective order.

## IV. Conclusion

For the foregoing reasons, Lennar's objection will be overruled. A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge