# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| U.S. HOME CORPORATION,<br><br>Plaintiff/Counterdefendant,<br><br>and<br><br>LENNAR CORPORATION,<br><br>Counterdefendant,<br><br>v.<br><br>SETTLERS CROSSING, L.L.C., et al.,<br><br>Defendants/Counterplaintiffs,<br><br>and<br><br>STEVEN B. SANDLER,<br><br>Defendant. | **Civil Action No. 8:08-cv-01863-DKC** |

## PROPOSED FINAL PRETRIAL ORDER

The parties to this action, U.S. Home Corporation ("U.S. Home") and Lennar Corporation (collectively with U.S. Home, "Lennar"), Settlers Crossing, L.L.C. ("Settlers Crossing"), Washington Park Estates, L.L.C. ("WPE"), Bevard Development Company ("Bevard Development"), Steven B. Sandler, and iStar Financial, Inc. ("iStar"), by and through their undersigned counsel, in accordance with Local Rule 106.2 and the Court's letter Order dated February 14, 2014 (ECF No. 633), respectfully submit the following proposed Final Pretrial Order for this non-jury trial scheduled to commence on March 31, 2014 and continue to work through matters relating to this Order, including stipulations and objections.

I.   **Brief Statement of Facts in Support of Affirmative Claims**

    A.   U.S. Home Corporation

    1.   U.S. Home is a wholly-owned subsidiary of Lennar Corporation, a public, nationwide homebuilder and provider of residential financial services. Lennar's homebuilding operations include the sale and construction of single-family attached and detached homes, as well as the purchase, development, and sale of residential land on its own and through partnership interests. Lennar and its subsidiaries are involved in all phases of planning and building in residential communities, including land acquisition, site planning, preparation and improvement of land, and design, construction, and marketing of homes.

    2.   Settlers Crossing is a Virginia limited liability company whose members are Steven Sandler and Arthur Sandler.

    3.   WPE is a Maryland limited liability company, and its sole member is Settlers Crossing.

    4.   Bevard Development is a Virginia Corporation whose shareholders are Arthur Sandler, Steven Sandler, and Daniel Colton.

    5.   iStar is a public finance and investment company focused on the commercial real estate industry, providing custom-tailored investment capital to high-end private and corporate owners of real estate, and investing directly across a range of real estate sectors.

    6.   On June 9, 2004, WPE entered into a contract with various parties, including John R. Bevard and members of his family, to purchase approximately 1,180 acres of unfinished and undeveloped land in Prince George's County, Maryland, consisting of three non-contiguous parcels known as Bevard West, Bevard East, and Bevard North. Bevard West, Bevard East, Bevard North, and a separate 69-acre parcel that was subsequently acquired by an

entity owned by Steven Sander and Arthur Sandler (the "Kalapacha Property"), are referred to collectively as the "Bevard Property."

7. Rodney Faller was the previous owner of most of Bevard North and Bevard East, the bulk of which he sold to the Bevard family prior to WPE's purchase from the Bevards.

8. From at least 1975 to 1989, the Bevard Property was used extensively as a sewage sludge disposal site pursuant to, among other things, agreements between the then-owners of the property and Washington Suburban Sanitary Commission. Under those agreements, hundreds of thousands of tons of sewage sludge were dumped, spread, buried, plowed into, and injected into large portions of each of the parcels that comprise the Bevard Property, and the owners of the Bevard Property were paid for such use based on such factors as the acreage use and/or the amount of sludge that was deposited.

9. The sewage sludge deposited on the Bevard Property came from different wastewater treatment plants in the area, including Blue Plains, Piscataway, Parkway, Western Branch, Marlboro Meadows, Seneca, and Damascus.

10. Beginning in or about 1975, members of the Bevard family operated a sludging operation through their trucking company, The Bevard Brothers, Inc. ("Bevard Brothers"), in a joint venture with Bio Gro Systems, Inc. ("Bio Gro"), a company that applied and disposed of sludge on land. Under the joint venture, Bevard Brothers was paid to transport sludge from wastewater treatment plants to the Bevard Property (in addition to the compensation the Bevards received for allowing the sludge to be dumped on the Bevard Property), and Bio Gro applied sludge to the Bevard Property.

11.     On October 5, 2004, Settlers Crossing entered into a contract to purchase the membership interests in WPE and, as a result, Settlers Crossing became the sole member of WPE.  On October 27, 2004, Settlers Crossing caused WPE to close on the purchase of the Bevard Property pursuant to a Contract of Sale dated June 9, 2004.

12.     In September 2005, U.S. Home expressed its interest in purchasing the Bevard Property for an anticipated purchased price of $200 million (subject to adjustments) based on U.S. Home's understanding that the Bevard Property would be re-zoned and plats would be recorded to allow for the construction of approximately 1,867 residential dwelling units, including one acre estate lots, various sized single family detached dwelling units, single family attached dwelling units, and active adult units.

13.     On November 15, 2005, U.S. Home, Settlers Crossing, and WPE (Settlers Crossing and WPE are referred to collectively as "Sellers") entered into an Agreement for Purchase and Sale of Membership Interests (the "PSA") under which U.S. Home would acquire the membership interest in WPE for $160 million (subject to adjustments).

14.     Also on November 15, 2005, U.S. Home and Bevard Development entered into a Contract for Services under which Bevard Development would perform certain development work related to the PSA for $40 million.

15.     The outside settlement (or closing) date under the PSA was September 30, 2006, but under the PSA, Settlers Crossing could extend the outside settlement date for up to six months on written notice to U.S. Home.

16.     The PSA included several provisions that are relevant to U.S. Home's affirmative claims in this case, including Sellers' agreement pursuant to Section 11 of the PSA

that U.S. Home's obligation to purchase the membership interest in WPE was subject to Sellers' satisfaction, not later than the Settlement Date (as defined in the PSA), of certain conditions.

17.     Section 11 of the PSA, entitled "Conditions Precedent to Purchaser's Obligations," states that U.S. Home's "obligations with respect to the transaction contemplated by this Agreement are subject to the satisfaction, not later than the Settlement (unless otherwise provided), of the following conditions . . . ."  The first subsection, Section 11(a), relates to the accuracy of Sellers' representations and warranties.

18.     Sellers' representations and warranties included an environmental representation and warranty set forth in Section 12.2(d) of the PSA.

19.     The "environmental report(s)" delivered by Sellers to U.S. Home, as referenced in Section 12.2(d), included a Phase I Environmental Site Assessment prepared by Schnabel Engineering North, LLC, dated May 25, 2001 and a Phase I Environmental Site Assessment Update prepared by Schnabel Engineering North, LLC, dated September 16, 2004. Sellers also provided the following reports: a Preliminary Subsurface Investigation for Bevard West, prepared by Hardin-Kight Associates, Inc. dated April 8, 2005; a Preliminary Subsurface Investigation for Bevard North, prepared by Hardin-Kight Associates, Inc. dated April 12, 2005; a Preliminary Subsurface Investigation for Bevard East, prepared by Hardin-Kight Associates, Inc. dated May 20, 2005; a Report of Subsurface Investigation for Bevard West prepared by Hardin-Kight Associates, Inc. dated July 25, 2005; a Report of Subsurface Investigation for Bevard North prepared by Hardin-Kight Associates, Inc. dated July 26, 2005; a Report of Subsurface Investigation for Bevard East prepared by Hardin-Kight Associates, dated July 26, 2005; and a Phase I Archaeological Survey prepared by URS Corporation, Inc. dated June 2005.

20.     The Phase I Archeological Survey states that "[i]n 1980-1981 the Environmental Protection Agency landfarmed an 8 acre plot with sludges, in the northwest corner of the Bevard property."

21.     With the exception of what was stated in the Phase I Archeological Survey, none of the reports or any other information provided to U.S. Home by Sellers, or any other information provided by Sellers, revealed that the Bevard Property had been used as a sewage sludge disposal site or that tons of sewage sludge had been dumped, spread, buried, plowed into, and/or injected into large portions of each of the parcels that comprise the Bevard Property.

22.     None of the reports or any other information provided to U.S. Home by Sellers revealed the presence of heavy metal contamination on the Bevard Property.

23.     None of the environmental reports provided to U.S. Home by Sellers recommended further environmental testing other than geotechnical investigations (*i.e.*, investigations that are not intended to identify environmental contaminants) in areas that had previously been subject to mining.

24.     In Section 13(a) of the PSA, Sellers agreed that U.S. Home would have access to the Bevard Property until the settlement or closing of the transaction.

25.     Upon entering into the PSA and the Contract for Services, U.S. Home tendered a $20 million deposit to an escrow agent ($16 million was deposited pursuant to the PSA and $4 million was deposited pursuant to the Contract for Services).  The $16 million deposit was subsequently released by the escrow agent to Settlers Crossing, and the $4 million deposit was subsequently released by the escrow agent to Bevard Development.

26.     Section 15(b) of the PSA provides that, upon an uncured breach of any of Settlers Crossing's covenants or representations and warranties, U.S. Home had the right to terminate the PSA and receive the return of its $20 million deposit.

27.     Section 4(b) of the PSA and Section 2(b) of the Contract for Services provide for interest on the Deposit and/or the Development Fee Deposit at the rate of 12 percent per annum in the event that Settlers Crossing wrongfully fails to return the Deposit and/or Bevard Development wrongfully fails to return the Development Fee Deposit.

28.     The return of U.S. Home's $20 million deposit was personally guaranteed by Steven Sandler as set forth in two separate guaranty agreements – both titled "Guaranty of Refund of Deposit" – in which Mr. Sandler agreed to "unconditionally and absolutely" refund the deposit paid by U.S. Home if Settlers Crossing and Bevard Development failed to refund the deposits as required by the PSA and the Contract for Services.

29.     Section 18(K) of the PSA and Section 8 of the Contract for Services provide that the prevailing party in a litigation arising under the agreements "shall be entitled to recover its reasonable attorneys' fees and costs of litigation."

30.     On September 26, 2006, Settlers Crossing provided U.S. Home with notice that it was extending the outside settlement date under the PSA for six months (*i.e.*, to March 30, 2007) because Sellers acknowledged that they had not satisfied certain conditions to closing.  Sellers were not able to satisfy the conditions to closing by the outside settlement date of March 30, 2007, and U.S. Home exercised its right to terminate the PSA.  Despite the termination, the parties negotiated an amended agreement.

31.     U.S. Home and Sellers entered into a Second Amendment to the PSA dated May 16, 2007 (the "Second Amendment") and a First Amendment to Contract for Services

dated May 16, 2007, which, among other things, reduced the total amount that U.S. Home would be required to pay Sellers and Bevard Development from $200 million to $134 million and added, as one of Settlers Crossing's sole and exclusive remedies, that Settlers Crossing would be entitled to specific performance and injunctive relief against U.S. Home if U.S. Home wrongfully failed to settle under the PSA (as amended) for any reason other than a default by Sellers.

32.     Section 14 of the Second Amendment provides that "in the event this Agreement is terminated for any reason, other than as a result of a default by Purchaser hereunder beyond any applicable notice and cure period," then Sellers "shall reimburse Purchaser for the Development Work performed by or on behalf of Purchaser."

33.     Except as modified by the Second Amendment, the provisions, terms, and conditions of the PSA remained in full force and effect.

34.     By letter agreement dated May 16, 2007, Sellers withdrew a prior notice that "all conditions under Section 11 of the Agreement have been satisfied," and U.S. Home withdrew its prior notice of termination.

35.     Settlement under the Second Amendment was scheduled to take place on December 5, 2007, but, in the event Sellers did not satisfy all conditions by that date, the settlement would be "automatically extended to that date which is thirty (30) days after all conditions precedent" were met – up to the outside settlement date of March 15, 2009.

36.     On June 19, 2007, following completion of its own due diligence, iStar extended a $69.7 million loan to Sandler at Bevard, LLC and a $30.3 million loan to WPE and Kalapacha Holdings LLC.  As security for the loan, Sellers and Bevard Development collaterally assigned their interests in their agreements with U.S. Home to iStar through a Collateral

Assignment of Purchase Contract and a Collateral Assignment of Contract for Services.  Steven Sandler consented to those assignments and confirmed that his guaranty obligation to U.S. Home would not be affected by the assignments.  Copies of the assignments were provided to Lennar.

37.     Lennar, iStar, and Sellers entered into a Consent and Estoppel Agreement dated June 19, 2007 (the "Consent and Estoppel"), and iStar, Sellers, and U.S. Home entered into the Third Amendment to the PSA dated June 19, 2007, relating to iStar's rights in the event of a foreclosure on the Bevard Property.  The Consent and Estoppel states that Steven Sandler "shall remain liable for any and all of his obligations contained in the guaranty agreements each dated December 2, 2005, which guaranty agreements are hereby ratified and confirmed by Steven B. Sandler."

38.     At all times relevant to this dispute, Lennar satisfied its obligations under the PSA and was financially capable of closing on the Bevard Property upon Sellers' satisfaction of the conditions to closing.

39.     As part of its normal business operations, Lennar routinely considered various strategies when executing upon the purchase of real estate, including joint ventures and the involvement of land banks.  Lennar also considered whether to "mothball" particular development projects depending upon a project's anticipated profitability at a given point in time, meaning that Lennar might not spend money to develop a project for some period of time after acquisition until market conditions improved.  Each of these strategies anticipated Lennar's acquisition of a property.

40.     Given the decline in the real estate market, particularly in 2007, Lennar reviewed each and every transaction to determine, among other things, when and how to pursue a transaction and whether to "walk away" from a transaction in circumstances in which an

agreement provided that a seller could retain Lennar's deposit as a remedy in the event a transaction did not close.  Lennar also undertook a systematic review of contracts for the acquisition of real estate to determine whether Lennar was required to close (or walk away from a deposit) depending upon the particular terms of the transaction.  Lennar also reviewed such obligations to determine whether it was required to close.

41.    In October 2007, Lennar decided to stop discretionary spending on development of the Bevard Property and to assess whether Sellers satisfied the conditions to closing.

42.    At all times prior to the termination of the PSA, Lennar complied with its obligations under the PSA and was able and willing to close on the Bevard Property if Sellers satisfied those conditions.

43.    Through the date of termination of the PSA, Lennar spent $6,742,514 relating to development of the Bevard Property, including pre-development activity such as obtaining grading permits and bonds and performing site work, and costs incurred after suspending discretionary spending relating to the Bevard Property.

44.    In November 2007, U.S. Home advised Sellers that they had not satisfied all conditions to closing and, therefore, that the initial settlement date of December 5, 2007 under the Second Amendment to the PSA would be extended, and the parties exchanged a series of letters on the issue of whether the conditions had been satisfied.

45.    On December 6, 2007, Sellers filed a complaint against U.S. Home in the United States District Court for the Eastern District of Virginia seeking a determination of which conditions precedent remained unsatisfied.  Sellers' complaint did not allege that U.S. Home was

in default of any obligations under the PSA or that U.S. Home had breached any provisions of the PSA.

46.     On January 3, 2008, U.S. Home notified Sellers that, among other things, U.S. Home was "concerned with the accuracy of Seller's representations and warranties" and requested access to the Bevard Property pursuant to Section 13(a) of the PSA and Rule 34 of the Federal Rules of Civil Procedure to permit its environmental consultants to perform investigations, studies, and tests.

47.     On January 4, 2008, Sellers confirmed that they had not declared U.S. Home to be in breach of the PSA, but they rejected U.S. Home's request for access.

48.     Sellers decision to deny U.S. Home's request for access for the purpose of investigating the environmental condition of the Bevard Property was made by Steven Sandler based on his distrust of U.S. Home and his concern that U.S. Home could have placed contaminants (uranium) on the Bevard Property.

49.     U.S. Home reiterated its request for access to the Bevard Property in March 2008, but Sellers again rejected U.S. Home's request.

50.     In May 2008, U.S. Home advised Sellers that they were in default of their obligations under the PSA due to their refusal to permit U.S. Home access to the Bevard Property, and U.S. Home further advised Sellers that, among other unsatisfied conditions, Sellers' representation regarding the environmental condition of the Bevard Property was untrue. Sellers again denied U.S. Home's request for access.  Later that month, Sellers advised U.S. Home that they considered U.S. Home's failure to make settlement a default under the PSA.

51.     By letter dated July 3, 2008, U.S. Home terminated the PSA due to Sellers' refusal to provide access to the Bevard Property.  U.S. Home subsequently demanded

the return of its $20 million deposit, but neither Sellers nor Steven Sandler returned the deposit. U.S. Home filed this action on July 17, 2008.

52.     In the summer of 2008, Lennar learned that the Bevard Property had been extensively used as a sewage sludge disposal site.

53.     On September 24, 2009, iStar initiated foreclosure proceedings as a result of the default by Sellers and their affiliates on iStar's $100 million bridge loan, and, on November 17, 2009, Piscataway Road – Clinton MD LLC ("Piscataway Road"), an affiliate of iStar, purchased the Bevard Property in a foreclosure sale.

54.     U.S. Home gained the right to access the Bevard Property through a series of motions in the initial action commenced by Sellers, which was transferred to this Court.  The Honorable William Connelly, U.S.M.J., determined that U.S. Home had a contractual right to inspect the Bevard Property.  However, Sellers, and subsequently iStar, continued to resist U.S. Home's requests, first by arguing that they had the right to deny access for any reason, and then by failing to unlock gates to the Bevard Property in violation of the Court's Order – conduct for which the Court imposed sanctions.

55.     U.S. Home's requests for access to the Bevard Property did not require any action or expense by Sellers or iStar, and Lennar did not prevent Sellers from complying with any of their obligations under the PSA.

56.     In 2010, Environ International Corporation ("Environ") conducted a field investigation of conditions at the Bevard Property on behalf of Lennar, which involved collecting samples of surface and near-surface soils from shallow soil borings that were generally advanced to a depth of four feet.  Environ collected 293 soil samples from thirty six locations, including twenty sites on Bevard East, six sites on Bevard North, and ten sites on Bevard West.

57.     Environ's testing revealed the presence of contamination on the Bevard Property, including the presence of arsenic and vanadium at levels that exceed the background levels (levels indicating that these heavy metal concentrations are not naturally occurring) established by the Maryland Department of the Environment ("MDE"), the presence of at least one "hot spot" for arsenic, and the presence of polychlorinated biphenyls (PCBs).  Defendants do not dispute the sampling data collected by Environ.

58.     Sellers and iStar have not disclosed any sampling data for the Bevard Property obtained after Sellers acquired the Bevard Property despite the fact that Sellers conducted sampling and collected such data.

59.     Neither Sellers, iStar, nor Piscataway Road has notified MDE or any other environmental authority of any sampling data collected from the Bevard Property, despite the fact that the MDE has the authority to require, and in the past has required, remediation of such property even after development commences.

60.     On September 22, 2011, iStar and Steven Sandler, Arthur Sandler, and L.M. Sandler & Sons, Inc. entered a Confidential Settlement and Covenant Not to Sue or Execute (the "Confidential Settlement") pursuant to which iStar agreed to compromise the amount due under the $100 million loan and the Sandlers made various representations and warranties.  On March 20, 2013, iStar and the Sandlers entered into a Letter Agreement to Amend the Confidential Settlement pursuant to which iStar agreed to reduce the amount due under the Confidential Settlement.

61.     Section 10(a) of the PSA required WPE to "use commercially reasonable, good faith diligent efforts to prosecute to approval the Preliminary Plan for the Bevard North Land, a site plan for the Bevard North Land and the Record Plat(s) for the Bevard North Land."

The Preliminary Plan was appended to the PSA and required a change in the permissible density of Bevard North in order to be approved.

62.     In July 2005, the Prince George's County Council enacted a text amendment, CB-53-2005, permitting planned retirement communities in the County's R-E (Residential Estate) Zone under certain circumstances.  The 2005 text amendment permitted the construction of a planned retirement community and more housing units, including both attached and multi-family dwellings, on Bevard North through approval of a detailed site plan with the Prince George's County Planning Board, without having to obtain a special exception from the County Planning Department or County Council.

63.     WPE subsequently submitted and received approval for a detailed site plan for Bevard North allowing a density of 2.9 dwelling units per acre.  The detailed site plan approved by the county Planning Board allowed for 191 single family detached dwellings, 273 townhouses, and 351 multifamily units in a planned retirement community on Bevard North.

64.     On April 9, 2013, by a vote of 9-0, the Prince George's County Council enacted CB-4-2013 (effective May 24, 2013), which revoked the 2005 text amendment.  iStar appeared at the hearing through counsel (including litigation counsel in this case) and acknowledged that any change to such zoning could create an issue in this action.

65.     Neither iStar nor Piscataway Road notified Lennar of the revocation of the 2005 text amendment or the resulting impact of that revocation, nor did they take any steps to preserve the zoning pursuant to the text amendment.

66.     Sellers represented and warranted in Section 11(g) of the PSA that the final non-appealable re-zoning of Bevard East had been obtained modifying the zoning for the

Bevard East land from the zoning category of R-E (Residential Estate) Zone to R-L (Residential Low Development) Zone.

        67.    On July 24, 2013, the Prince George's County Council enacted CR-81-2013, which rezoned Bevard East from R-L to R-E, thereby reducing the permitted density on Bevard East and rendering ineffective the comprehensive design plan approved in 2006.

        68.    iStar has appealed CR-81-2013, but neither iStar nor Piscataway Road notified Lennar of the change in zoning or the resulting impact of that change, nor did they take any steps to preserve such zoning.

        69.    As a result of the zoning changes impacting the Bevard Property, the plats that had been recorded for Bevard North and Bevard East are invalid.

        B./C.   <u>Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial, Inc.</u>

        Defendants incorporate by reference and refer the Court to the statement of facts contained in the respective supporting memoranda for iStar's Cross-Motion for Partial Summary Judgment (ECF No. 575-1) and the Cross-Motion for Summary Judgment by Defendants Settlers Crossing L.L.C. and Washington Park Estates, LLC (ECF No. 574) for a more complete statement of the facts.

        1.    Lennar, through its wholly-owned subsidiary U.S. Home, executed the Agreement of Purchase and Sale of Membership Interests ("PSA") with the Sellers on November 15, 2005, through which Lennar would acquire 100% of the membership interest in Washington Park Estates LLC ("WPE") and therefore the Bevard Property.  On that same day, Lennar also entered into a separate Contract for Services relating to the Bevard Property ("Contract for Services").

2.      The PSA and the Contract for Services had a total purchase price of $200 million.  Paragraph 13 of the PSA provided a feasibility study period, and if Lennar determined during that period that the Bevard Property was not suitable for its purposes of residential development, then Lennar could terminate with a Notice of Termination and obtain back its deposit of $20 million.  Lennar did not send any Notice of Termination to Sellers, and therefore "any right of termination" relating to  Paragraph 13 was "null and void."

3.      The PSA provided Sellers with the right to cure any default within ten (10) business days after receipt of written notice from Lennar of such default.  Similarly, the PSA separately provided Sellers with the right to cure any material breach of its representations, warranties or covenants within ten (10) business days after receipt of written notice from Lennar of such breach.

4.      Lennar and its consultants, contractors and representatives had unfettered access to enter the Bevard Property and conduct whatever sampling, testing, evaluations, studies or other investigations it wanted from September 2005 to December 5, 2007.  In 2006, Lennar's independent environmental consultants and experts concluded that further environmental testing, such as a Phase 2 Environmental Site Assessment, was not necessary and that the property was suitable for residential development under applicable environmental laws and regulations.

5.      In 2006 and 2007, Lennar effectively controlled the decision-making process and availability of information about what was being done on the Bevard Property, including any soil sampling and testing, environmental assessments, consultants and contractors, environmental remediation, geotechnical evaluations, and development work.

6.      Because of the softening economy, Lennar conducted negotiations from June 2006 to May 2007 to restructure the purchase price and other terms of the Bevard Property

purchase.  The negotiations between Lennar and Sellers culminated in the Second Amendment to the PSA dated May 16, 2007.  In return for a price reduction to $134 million, Lennar became contractually bound to close on the Bevard Property in the form of a specific performance guaranty by its wholly-owned subsidiary U.S. Home.  The specific performance of U.S. Home was fully backed by a corporate guaranty from Lennar – meaning if U.S. Home for some reason did not close on the property then Lennar would provide the funds or otherwise cause U.S. Home to close.

       7.    Moreover, because Lennar had been on the land for almost two years and had decided that the Bevard Property was suitable for residential development, Lennar also negotiated and received the contractual right in the Second Amendment to enter the property at any time, in its sole and absolute discretion, for development work.  The development work included clearing, grading and conducting other activities for residential development of the property.

       8.    Mr. Steven Sandler did not actively consent in his capacity as guarantor to the Second Amendment, nor to any other amendments to either the PSA or the Contract for Services.

       9.    On June 19, 2007, iStar and Lennar entered into a Consent & Estoppel Agreement ("Consent & Estoppel").  iStar negotiated and executed the Consent & Estoppel with Lennar to receive assurances that Lennar had made "due inquiry" – that, as a sophisticated national homebuilder, it had completed the due diligence necessary to understand and be satisfied with the condition and feasibility of the Bevard Property – and that Lennar itself was going to close on the Bevard Property consistent with its specific performance guaranty.  iStar understood the Consent & Estoppel to mean Lennar knew of no reason why it would not close on

the Bevard Property or otherwise perform its contractual obligations after conducting due diligence, and to the extent it knew or should have known of any such reason, that Lennar would be estopped from raising it in the future.

10.     The Consent & Estoppel in Section 10 required Lennar to provide iStar with a reasonable period of time to cure any default under the PSA, and that reasonable time period was at least a thirty (30) day period commencing after the expiration of the Sellers' cure period under the PSA.  Lennar was required to provide iStar with this additional cure period before taking any action against Sellers or terminating the PSA. There was a parallel additional cure period provided for any default under the Contract for Services in Section 11.

11.     Because iStar was underwriting the loan based on Lennar's specific performance guaranty and corporate guaranty in the PSA as well as its creditworthiness, Lennar represented and warranted that it knew of no basis to terminate the PSA after making due inquiry, and that it had not assigned its rights under the PSA to any other person or entity.  In other words, Lennar itself or its wholly-owned subsidiary U.S. Home was going to close on the Bevard Property.

12.     Internally and unbeknownst to iStar or Sellers, starting as early as September 2006, Lennar issued a corporate directive to reduce assets on book and improve return on net assets ("RONA").  Mr. Robert Jacoby, the then President of Lennar's Maryland Division, identified taking the Bevard Property "off-book" as key to reducing assets in fiscal year 2007.  To keep the Bevard Property "off-book," a third party had to actually close on the property, not Lennar.

13.     Mr. Jacoby repeatedly reminded senior management that the strategy for asset reduction was dependent on being able to persuade LandSource to step in and purchase the

Bevard Property before the end of the fiscal year, which was November 31, 2007.  If this did not

happen, Mr. Jacoby acknowledged that Lennar may have to terminate the PSA and seek a return

of the deposit.  LandSource elected not to step in and purchase the Bevard Property for Lennar.

        14.    On September 6, 2007, Lennar CEO Stuart Miller and senior management

held a Q3 "Ops" meeting and addressed the Bevard Property.  Mr. Miller said, "In the past we

have been reluctant to walk away from deals…now we must change our strategy."   Every

contract was reviewed by lawyers and consultants, specifically General Counsel Mark Sustana or

trusted local counsel, to determine whether Lennar could walk away from a property under

contract.

        15.    By September 2007, Lennar started to track assets in spreadsheets called

"Core & Hit List Communities Spreadsheet."  "Core" communities were ones that Lennar

believed were "financially viable," and "Hit List" communities were ones that were cash flow

negative and did not make financial sense.

        16.    The "Core & Hit List Communities Spreadsheet" dated September 30,

2007, listed the Bevard Property as a "Hit List" community.  Conceding that Lennar already was

searching for a way out of the PSA, the notes section for the Bevard Property had the entry "Re-

review contract for escape clause."

        17.    The very next day, on October 1, 2007, Lennar CEO Stuart Miller

attended a meeting in Maryland and directed Beth May to find "someone to come in and buy it

for us" and "generate a way to off-load this" property.  A few days later, on October 3, 2007,

CEO Stuart Miller directed that all work, consultants, contractors and development expenditures

on the Bevard Property be shut down.  Mr. Miller directed a member of Lennar's CIC to follow

up with the Maryland Division to confirm that the Bevard Property had been "completely shut

down."  Ms. Copeland informed Mr. Jacoby that "she was 100% certain that any attempt to revive it would be met in Miami with great anger."  Mr. Jacoby directed that all work on the Bevard Property stop.

18.    Lennar began to receive pre-closing documents from the Sellers, but Lennar did not respond as a purchaser in good faith or work with the Sellers toward closing. Rather, the pre-closing documents sent by Sellers in good faith were forwarded to "Lennar associates, local counsel and [David Sager at] Day Pitney" in bad faith to search for "questionable documents" –  more "escape clauses" –  to get out of the PSA.  And, after years of regular and open communication, Lennar began a pattern of silence and avoidance towards Sellers.

19.    Lennar's internal documents make it clear that inside and outside attorneys were reviewing the PSA for an "escape clause" from September 2007 forward.  A spreadsheet entry for the Bevard Property noted that "Contract documents were e-mailed to David Sager at Day Pitney on 10/8/07."  Moreover, the handwritten meeting minutes from the October 1, 2007, meeting with Lennar CEO Stuart Miller also indicated that "Mark will look at contract again." In October 2007, Lennar General Counsel Mark Sustana and at least one outside litigation counsel were actively looking for an "escape clause" from the PSA.  Given that the decision had been made to try to get out of the PSA, both Mr. Jacoby and Lennar's project manager for the Bevard Property, Mr. Chris Lannin, were in fear for their jobs.  Mr. Lannin announced he would leave the company before the end of the fiscal year.

20.    In November 2007, in a last-ditch effort to find a third party to purchase the Bevard Property for it, Lennar tried to include the Bevard Property in a pool of "non-core" or "Hit List" assets being sold to Morgan Stanley.  The transaction was set to close by fiscal year

end on November 30, 2007, and would meet the planned goal of having a third party step in and purchase the Bevard Property before the end of the fiscal year.

21.    On November 13, 2007, Lennar prepared a summary of the Bevard Property for Morgan Stanley's due diligence which represented that the Bevard Property was fully entitled and suitable for residential development. Lennar President Rick Beckwitt acknowledged that Lennar "gave it a pretty good go" to place the Bevard Property in the Morgan Stanley transaction before fiscal year end, but Morgan Stanley within days declined to include it.

22.    By November 15, 2007, Lennar knew that its potential third party purchasers, including LandSource and Morgan Stanley, had declined the invitation to step in and spend their own capital to purchase the Bevard Property for Lennar. With virtually no time left before the contractual closing date of December 5, 2007, Lennar had to use a lawyer-created "escape clause" to avoid closing on the PSA at any cost.

23.    On November 15, 2007, Mr. Lannin made arrangements to meet Mr. Danny Colton at Dewberry & Davis, in part to introduce him to Mr. Marty Collier, a senior vice president of Lennar. The inclusion of Mr. Collier was a last-minute addition to the meeting, and the very next day, November 16, 2007, was Mr. Lannin's last day at Lennar. Outside the presence of Mr. Collier but still at Dewberry, Mr. Lannin warned Mr. Colton that Lennar was going to attempt to avoid closing at any cost and specifically may use off-site easements as an excuse to avoid closing on the Bevard Property. Mr. Lannin used terms like "watch your back" in his conversation with Mr. Colton.

24.    Mr. Colton called both Mr. Steven Sandler and Mr. James Brennan after his conversation with Mr. Lannin, and conveyed that Lennar was going to create an excuse not to

close on the Bevard Property. He mentioned specifically off-site easements as that possible excuse.

25.     Just a few days after Mr. Lannin's verbal warning at Dewberry, on November 21, 2007, Lennar simply advised Sellers in writing that it would not be coming to the contractual closing on the Bevard Property scheduled for December 5, 2007, because it alleged with no detail that unspecified "conditions relating to certain off-site easements" had not been satisfied.  Lennar made no effort to identify which off-site easements it was referencing.

26.     On November 27, 2007, in response to a written request from Sellers, Lennar identified four off-site easements at the remote intersection of Piscataway Road and Old Branch Avenue as the particular off-site easements that were the subject of the November 21, 2007 letter.   Lennar alleged these four off-site easements remained unsatisfied.   No other conditions precedent or issues were identified by Lennar.

27.     For months prior to litigation commencing, Lennar secretly had been researching, reviewing, evaluating and generating sham, bad faith excuses to escape the PSA.  In the fall of 2007, Lennar requested additional copies of the plats and additional copies of its own environmental reports to provide to its expensive team of lawyers because Lennar had no legitimate basis to simply "walk away" from the PSA.  Lennar asked outside lawyers to find any escape mechanism, even if it meant using extracontractual and completely unrelated but very serious allegations of violations of securities laws to get out of the PSA.  Senior management at Lennar internally discussed the myriad of ways Lennar might invalidate or terminate the PSA..

28.     As an example, Lennar General Counsel Mark Sustana requested that the law firm of Rosenberg Martin research and complete a legal memorandum evaluating the use of allegations of securities laws violations against the Sellers as a means to invalidate the PSA.  It

was clear that Rosenberg Martin was tasked to find any possible legal leverage against Sellers, even if it had questionable basis in fact or law.

29.     The efforts by Rosenberg Martin included drafting a sham request for access to the Bevard Property under Section 13 of the PSA, which was circulated internally in December 2007 prior to Lennar being served with any litigation.   The sham request was held and not sent to Sellers until it was rewritten and sent almost a month later under Greenberg Traurig's letterhead.  Lennar has conceded that when the sham request for access was drafted it had no new information about any potential recognized environmental conditions on the Bevard Property.  Thus, Lennar and its counsel had no legitimate basis to draft the request for access and it was just one of many potential mechanisms being considered to try to generate a way out of the PSA.

30.     In December, Mr. Jacoby acknowledged that, even after the Sellers addressed Lennar's "concerns" involving the four off-site easements, Lennar had no intent to close.  In an email to Mr. Beckwitt, Mr. Jacoby said that he was "inundated" with calls from Mr. Nathan Benson of Sellers wanting to know what was going on.  Mr. Jacoby informed Mr. Beckwitt that it was "not easy (also not impossible) to stonewall a colleague of 10 years with only the suggestion that they meet the pre-closing conditions and no answer to the question of what happens after that."

31.     On December 12, 2007, Mr. Sustana and Mr. Jacoby worked on "alternative theories" to get out of the PSA with lawyers at three law firms – Mr. Matt Wineman (Rosenberg Martin), Mr. Tim Bass (Greenberg Traurig) and Mr. David Sager (Day Pitney).   In an email to Mr. Jacoby, Mr. Bass admitted that a circulated list of all contractual conditions "is ultimately more important [as it] will give us a means of getting out of the contract."

32.     Concurrently, Lennar was completing work on-site at the Bevard Property as required by MDE after removal of USTs and detection of some contaminants in the soil under or around the USTs.  Lennar and its contractors and consultants entered the Bevard Property with Sellers' permission on multiple occasions from August 2007 to January 2008 to address these issues, and on January 18, 2008, came onto the property to remove some contaminated soil relating to the USTs.  These requests for access were granted without incident because they were legitimate requests to enter the property.

33.     In a letter to Sellers dated January 3, 2008, Tim Bass, new outside counsel to Lennar from Greenberg Traurig, set forth purported environmental concerns.  These included a bald eagle habitat, a historic/scenic road, mining, hazardous materials, floodplains, USTs and cemeteries.  This letter was created and sent in bad faith.  Lennar knew it had studied or investigated all of these "concerns," especially USTs given that it had just months before removed the USTs and sampled and tested the soil under and around them at the MDE's direction.  Lennar in bad faith used these purported environmental "concerns" as the basis to request for the first time permission to enter and access the land under Section 13 of the PSA.

34.     Lennar supplemented its sham request for access and inspection by a letter dated March 7, 2008, in which Lennar claimed to have "recently discovered evidence suggesting that there was extensive mining" in a portion of the Property.  Contrary to that statement, Lennar had actual knowledge of the extent of mining on the Bevard Property since 2005, and even had two of its engineering firms, Hardin-Kight and American Infrastructure, do extensive soil boring, test pits and other soil investigations in the mining areas.

35.     On March 25, 2008, Lennar moved in this Court to compel discovery from Sellers and sought access to inspect the Bevard Property.  The Motion to Compel, as well as

ongoing briefing and requests to access the Bevard Property, were not done in good faith because Lennar already had decided to avoid closing and to terminate the PSA no matter what happened.

36.     In the March 31, 2008, Core and Hit List Communities Spreadsheet, the Bevard Property was listed as "Hit List" and the "Action Plan" circulated among senior management of Lennar now read very simply "**Terminate contract and get deposit back via legal action**."  Lennar had no intent to close on the Bevard Property, even if i) access was provided by Sellers, ii) the Court ordered access for inspection through a discovery order, iii) Lennar's inspection and environmental testing demonstrated suitable land for residential development, or iv) the Sellers demonstrated all conditions precedent had been satisfied.

37.     In a letter dated April 28, 2008, Sellers informed Mr. Jacoby that all conditions precedent had been satisfied and submitted proof that the four specific off-site easements had been satisfied in the manner requested by Lennar, which Sellers believed were over and above the PSA requirements and for which Sellers expended their own funds to acquire off-site properties prior to closing under the PSA.  Sellers informed Lennar that closing would occur on May 26, 2008, which later was moved to May 27, 2008 due to a holiday.

38.     Lennar stuck to its course of terminating the contract no matter what, even after presented with evidence that all conditions precedent had been met by Sellers.  Two days later, Lennar again confirmed internally that it would not come to closing and instead would terminate the contract.  In an April 30, 2008, Core and Hit List Communities Spreadsheet, Lennar again listed the Bevard Property as "Hit List" and provided the very simple "Action Plan" to "**Terminate contract and get deposit back via legal action**."

39.     Despite having made the decision to terminate, Lennar pretended it still needed access to the Bevard Property to conduct certain investigations, studies and tests.  By a

letter dated May 16, 2008, Lennar sent the Sellers a letter that stated "your refusal to permit access for [conducting certain investigations, studies and tests] constitutes a default under the Agreement."  The request for access under Section 13, and Sellers' refusal to grant that request, was the sole basis for Lennar's notice of default.

40.     On May 23, 2008, Lennar continued to raise sham excuses in bad faith to avoid closing, sending Sellers a letter outlining purported unsatisfied conditions precedent, including raising issues with the very plats that Lennar had approved in the Second Amendment of the PSA and had ordered recorded in August 2007.  The Court has already found that "the condition precedent to settlement contained in § 11(m) was satisfied at the time the approved plats were originally recorded - well in advance of the May 27, 2008, settlement date."  (ECF No. 624 at 81.)  However, in contrast to Lennar's bad faith, Sellers continued to perform above and beyond their contractual duties and arranged for Dewberry to modify and rerecord the plats, as demanded by Lennar.

41.     On June 27, 2008, the Court granted Lennar's Motion to Compel Inspection and by Order provided Lennar with immediate access to the Property for six (6) weeks, consistent with the investigation and testing scope of work Lennar had submitted to the Court.  Sellers and iStar made it clear to Lennar in writing that such immediate access would be provided consistent with the Court's Order.  Even after obtaining access by the Order, Lennar elected not to access the Bevard Property, not to inspect, and not to conduct any of the testing outlined in its Motion to Compel.  Thus, after creating a sham request for access and using it wrongly to declare a default, Lennar was presented with the problem of getting exactly what it had requested.  But, if it exercised its right to access the Bevard Property and conduct testing as

provided by this Court, Lennar then could not continue its pattern of bad faith and terminate the PSA.

42.    On July 3, 2008, Lennar terminated the PSA stating that Lennar was not able to gain access to the Property under Section 13 for the purpose of conducting certain investigations, studies, and tests as it deemed necessary and appropriate.  The bad faith request for access under Section 13, and Sellers' denial of that request, were the only basis for Lennar's termination on July 3, 2008.  But the bad faith nature of Lennar's termination is demonstrated by both the Court's granting of access on June 27, 2008, and both Sellers and iStar confirming in writing that immediate access would be provided.  Simply put, access as specifically outlined and requested by Lennar was provided prior to the expiration of applicable contractual cure periods.  Moreover, by terminating the PSA without accessing the property and without identifying a single unsatisfied condition precedent to closing, Lennar wrongly deprived Sellers and iStar of their respective contractual cure rights.  Under the PSA, as amended, the outside date for satisfying conditions precedent was March 15, 2009, more than eight months after Lennar's wrongful termination.

43.    Even after terminating the PSA, Lennar continued to search for ways to buttress its bad faith refusal to close and its termination of the PSA.  One of Lennar's consultants, Mr. Richard Hynes, made a public records request to the MDE, requesting additional information on the "sludging" of the property.  Notably, he attached a publicly available document that he found on the MDE's website relating to the "sludging" on a portion of the Bevard Property to help guide MDE.  The information provided to Mr. Hynes by MDE was publicly available at all times relevant to this dispute.

44.     Federal, state and local government agencies have studied, evaluated, tested and monitored the application of biosolids on land for decades, and land application programs have used biosolids or biosolid products to improve nutrient levels and overall soil composition at agricultural farms, reclaimed mines, residential developments, golf courses, school grounds, parks, athletic playing fields, public facilities, government installations, municipal gardens, nurseries and home gardens.  The application of biosolids on land is widely recognized as a safe and accepted reuse or recycling of products from WWTPs and is regulated by the U.S. Environmental Protection Agency.  By federal and state law, the land application of biosolids or biosolid products does not result in the introduction of hazardous materials, hazardous wastes or hazardous substances on land.

45.     The WWTPs operated by the Washington Suburban Sanitary Commission ("WSSC") and the District of Columbia Water and Sewer Authority ("WASA") were the source of biosolids applied to the Bevard Property.  These WWTPs and their biosolids were well known, tested and documented throughout the 1970s, 1980s and 1990s, as many of the EPA's and U.S Department of Agriculture pilot programs and studies were conducted at these facilities. These WWTPs produced clean and consistent biosolids over these decades based on influent from homes, offices, schools and storm water.  Input sources for these WWTPs did not vary significantly over time, and none of these WWTPs were known for receiving industrial discharges.  Years of testing and data gathering by government agencies demonstrate that these WWTPs produced biosolids with low concentrations of heavy metals, many of which were below naturally occurring background levels found in native Maryland soils.  All biosolids applied to the Bevard Property were fully permitted and approved by state and local government agencies and complied with existing Maryland regulations.

46.     All of the metals found on the Bevard Property by Lennar occur naturally in soils, animals, humans, and the environment.  Naturally occurring, background concentrations of metals can vary by orders of magnitude, even in the same state or region without any external, anthropogenic reasons for such variation.

47.     Lennar made no effort to use any statistical analysis of the data from its testing on the Bevard Property to evaluate whether the concentrations of metals observed were naturally occurring, background levels.  Lennar in fact failed to conduct any systematic statistical analysis of the data from its testing to validate its protocols and data set, to check whether observed concentrations might reflect naturally occurring, background levels of metals, or to evaluate whether concentrations of metals were higher at depth across the data set.  Without a statistical analysis of the data set, Lennar simply cannot state that the application of biosolids had any adverse impact on the Bevard Property.

## II.     Brief Statement of Facts in Support of Defenses

### A.     U.S. Home Corporation and Lennar Corporation

1.      On January 3, 2008, following the extension of the December 5, 2007 settlement date but months prior to setting a new settlement date, U.S. Home requested access to the Bevard Property to conduct environmental investigations, studies, and tests pursuant to Section 13(a) of the PSA.  Settlement eventually was set by Sellers for May 27, 2008.

2.      On January 4, 2008, Sellers confirmed that U.S. Home was not in breach of any provision of the PSA, but Sellers rejected U.S. Home's request for access to the Bevard Property

3.      On March 7, 2008, U.S. Home again requested access to the Bevard Property pursuant to Section 13(a) of the PSA.  Sellers again rejected U.S. Home's request for access.

4.      Steven Sandler made the decision to reject U.S. Home's requests for access to the Bevard Property based on his distrust of U.S. Home and his concern that U.S. Home could have placed contaminants (uranium) on the Bevard Property.

5.      In or about July 2008, Lennar learned that the Bevard Property had been used as a sewage sludge disposal site.

6.      When U.S. Home gained access to the Bevard Property, testing revealed the presence of elevated levels of heavy metals such as arsenic and vanadium that exceed the background levels established by the Maryland Department of the Environment – including the presence of at least one "hot spot" for arsenic.

7.      In the normal course of business, Lennar considered various financial options for acquiring the Bevard Property.  At no time prior to the termination of the PSA had Lennar decided that it would not close on the Bevard Property.

8.      As of May 27, 2008, and at all other times relevant to this dispute, Lennar had the financial ability to close on the Bevard Property.

9.      Lennar incorporates by reference the statement of facts in Sections I.A and VI of this Order.

B.      Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, and Steven B. Sandler

Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, and Steven B. Sandler incorporate by reference the statement of facts in Section I.B. & C., *supra*, and the stipulated facts in Section VI.B. & C., *infra*.

C.      iStar Financial, Inc.

iStar incorporates by reference the statement of facts in Section I.B. & C., *supra*, and the stipulated facts in Section VI.B. & C., *infra*.  iStar otherwise states as follows:

1.      iStar is the sole member of Piscataway Road – Clinton MD LLC ("Piscataway").  Piscataway has no assets other than the Bevard Property and does not engage in any other business activity independent of its ownership of the Bevard Property.  iStar, as the sole member, controls Piscataway and could divest Piscataway of the Bevard Property or otherwise take any action required by the Court relating to the Bevard Property.

2.      At all relevant times, iStar has taken reasonable steps to preserve and maintain the Bevard Property, including paying taxes and protecting the entitlements and zoning. Any zoning changes affecting or potentially affecting the Bevard Property after Lennar breached and terminated the PSA have no bearing on this action.

### III.    Brief Statement of Legal Theories in Support of Claims and Defenses

      A.      U.S. Home Corporation and Lennar Corporation

1.      U.S. Home had no obligation to close on the PSA because, whereas U.S. Home had complied with all of its obligations, Sellers breached the PSA by, among other things, (a) improperly refusing U.S. Home's requests for access to make investigations, studies, and tests on the Bevard Property, in violation of Section 13(a) of the PSA, and (b) Sellers' environmental representation and warranty regarding the Bevard Property was untrue at the time of closing and at all times subsequent thereto, in violation of Sections 11 and 12.2(d) of the PSA.

2.      A full site characterization of the Bevard Property must be completed and MDE must determine the extent of remediation and other measures that are required at the Bevard Property.

3.      Sellers and Bevard Development have breached the PSA, as amended, and the Contract for Services by failing to return the $20 million deposit owed to U.S. Home.  Steven

Sandler has breached the "Guaranty of Refund of Deposit" agreements by failing to personally refund the $20 million deposit owed to U.S. Home.

4.     Access to the Bevard Property was necessary for Lennar to determine whether Sellers had breached their environmental representation and warranty in the PSA.

5.     U.S. Home negotiated for, and the PSA as amended includes, several conditions to the obligation to close, and Lennar's reasons for determining whether those conditions had been met are not legally relevant to Sellers' obligation to provide U.S. Home with access to the Bevard Property.

6.     iStar is not entitled to and cannot be awarded the sole and exclusive remedy of specific performance because iStar cannot tender the Bevard Property in the condition, form, or manner required by the PSA.  Among other reasons, iStar does not own the Bevard Property, and, through its acts and omissions, iStar failed to preserve the zoning of the Bevard Property, thus rendering the plats invalid, frustrating the intended and agreed upon purpose of the PSA, and substantially reducing the value of the Bevard Property.

7.     iStar's election not to seek to recover amounts relating to its $100 million in loans to the Sandler-related prevents iStar from recovering those amounts from Lennar.

8.     iStar cannot assert and has not asserted a claim for breach of the PSA, and iStar cannot recover damages based on such a claim.

9.     Having assigned all of their rights under the PSA to iStar, Sellers are not a real party in interest.

10.     As the owner of the Bevard Property, Piscataway Road is a necessary party to this action.

11.     Steven Sander has waived any argument that his obligations under his personal guaranties have been discharged.

B./C.   Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial

Defendants/Counterplaintiffs iStar, Settlers Crossing, WPE, and BDC intend to rely upon the following legal theories applicable to their claims and defenses:

1.     Lennar breached the PSA, and Defendants are entitled to specific performance.  Lennar was obligated to close on the PSA on May 27, 2008 because (i) all conditions to precedent to closing were satisfied, (ii) U.S. Home agreed to specifically perform and close on the PSA; and (iii) Lennar agreed to a corporate guaranty that either it or U.S. Home would close on the PSA.

2.     Defendants are entitled to the equitable remedy of specific performance because Lennar's refusal to close, sham excuses, and bad faith requests to access the Bevard property for environmental inspection in 2008 were a breach of Lennar's implied duty of good faith and fair dealing.  Sellers exercised their discretion reasonably in denying Lennar's 2008 access requests.

3.     Waiver.

4.     Estoppel.

5.     Unclean hands.

As to the damages for development costs that U.S. Home and Lennar purport to claim in VII. A.3 of this Pretrial Order, Settlers Crossing, WPE, and Bevard intend to rely upon the facts that (1) U.S. Home did not assert a breach of contract claim for failure to pay development costs in its complaint; (2) U.S. Home did not plead satisfaction of the conditions

required to make such a claim, even generally; and (3) U.S. Home did not in fact satisfy the requirements in the Second Amendment to the PSA to make such a claim.

Defendant Steven Sandler intends to rely upon the following legal theories in defense:

1.     U.S. Home failed to meet the requirements in subparagraphs 3(i) and 3(iii) of the guaranties and, as such, Mr. Sandler is not liable under those guaranties.

2.     Breach and uncured default by U.S. Home and Lennar in failing to come to closing in May 2008 and breach of the covenant of good faith and fair dealing.

3.     Discharge due to failure by U.S. Home to obtain Mr. Sandler's consent as guarantor to the Second Amendment to the PSA and First Amendment to the Contract for Services.

4.     Estoppel.

5.     Unclean hands.

6.     Waiver.

## IV.     Amendments Required of the Pleadings

A.     U.S. Home Corporation and Lennar Corporation

None.

B.     Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, and Steven B. Sandler

None.

C.     iStar Financial, Inc.

None.

## V.     Issues In The Pleadings To Be Abandoned

A.     U.S. Home Corporation and Lennar Corporation

U.S. Home is not abandoning any of the claims in its first amended complaint that remain following the Court's summary judgment Order dated January 30, 2014 (ECF No. 625). Lennar is not abandoning any of its defenses.

B.   Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, and Steven B. Sandler

None.

C.   iStar Financial, Inc.

None.  iStar is not abandoning any of its claims or defenses that remain following the Court's Memorandum Opinion and Order dated January 30, 2014, relating to the parties' respective cross-motions for summary judgment (ECF Nos. 624 and 625).  The Court remanded iStar's Rule 37 sanction motion to the magistrate judge because the magistrate's initial Orders granting the motion failed to address the relief sought by iStar, which includes evidentiary findings and issue and claim preclusion that would support iStar's crossclaims or could be dispositive of portions of them (including iStar's fraud and misrepresentation counterclaims). Specifically, iStar's pending Rule 37 sanctions motion sought, *inter alia*, a finding "that Lennar knew that it had to find a third party to close on the Property, and Lennar itself had no intent of closing on the Property from January 1, 2007, forward" and  "Any other just equitable and evidentiary findings . . . deemed just and appropriate by the Court." (ECF No. 427.)

VI.   **Proposed Stipulations of Fact**

A.   U.S. Home Corporation and Lennar Corporation

1.   U.S. Home is a wholly-owned subsidiary of Lennar, a public, nationwide homebuilder and provider of residential financial services.  Lennar's homebuilding operations include the sale and construction of single-family attached and detached homes, as well as the purchase, development, and sale of residential land on its own and through partnership interests.

Lennar and its subsidiaries are involved in all phases of planning and building in residential communities, including land acquisition, site planning, preparation and improvement of land, and design, construction, and marketing of homes.

2.      Settlers Crossing is a Virginia limited liability company whose members are Steven Sandler and Arthur Sandler.

3.      WPE is a Maryland limited liability company, and its sole member is Settlers Crossing.

4.      Bevard Development is a Virginia corporation whose shareholders are Arthur Sandler, Steven Sandler, and Daniel Colton.

5.      iStar is a public finance and investment company focused on the commercial real estate industry, providing custom-tailored investment capital to high-end private and corporate owners of real estate, and investing directly across a range of real estate sectors.

6.      On June 9, 2004, WPE entered into a contract with various parties, including John R. Bevard and members of his family, to purchase approximately 1,180 acres of undeveloped real estate in Prince George's County, Maryland, consisting of three non-contiguous parcels known as Bevard West (consisting of 410.53 acres), Bevard East (563 acres), and Bevard North (275.83 acres).

7.      Rodney Faller was the prior owner of large portions of Bevard North and Bevard East, and he sold most of this property to the Bevard family prior to WPE's purchase in 2004.

8.      In 2004, WPE retained Schnabel Engineering North, LLC ("Schnabel"), to update a 2001 Phase I Environmental Site Assessment that had been prepared by Schnabel.

Schnabel provided WPE with the update to the Environmental Site Assessment in September 2004.

9.      In October 2004, Settlers Crossing entered into a contract to purchase the membership interests of WPE, thereby becoming the sole member of WPE.  Soon thereafter, Settlers Crossing caused WPE to close on the purchase of the Bevard Property.

10.      Settlers Crossing relied upon the Environmental Site Assessment and update prepared by Schnabel, as well as the warranties of the sellers contained in the contract of sale, in purchasing the membership interests in WPE.

11.      WPE commissioned a Phase I Archaeological Survey dated June 2005 prepared by URS Corporation, Inc. ("URS").

12.      Sellers provided U.S. Home with: Schnabel's 2001 Phase I Environmental Site Assessment, the 2004 update, and the URS Phase I Archaeological Survey.  Sellers also provided U.S. Home with the following documents:  a Preliminary Subsurface Investigation for Bevard West, prepared by Hardin-Kight Associates, Inc. dated April 8, 2005; a Preliminary Subsurface Investigation for Bevard North, prepared by Hardin-Kight Associates, Inc. dated April 12, 2005; a Preliminary Subsurface Investigation for Bevard East, prepared by Hardin-Kight Associates, Inc. dated May 20, 2005; a Report of Subsurface Investigation for Bevard West prepared by Hardin-Kight Associates, Inc. dated July 25, 2005; a Report of Subsurface Investigation for Bevard North prepared by Hardin-Kight Associates, Inc. dated July 26, 2005; and a Report of Subsurface Investigation for Bevard East prepared by Hardin-Kight Associates, dated July 26, 2005

13.     On November 15, 2005, U.S. Home entered into the PSA with Settlers Crossing and WPE to purchase Settlers Crossing's membership interest in WPE, and thereby acquire the Bevard Property, for $160 million.

14.     On November 15, 2005, U.S. Home entered into the Contract for Services with Bevard Development pursuant to which U.S. Home was to pay $40 million at settlement on the purchase agreement for Bevard Development's performance of certain development work.

15.     U.S. Home tendered a deposit of $20 million on the two agreements – $16 million on the PSA and $4 million on the Contract for Services.  The escrow agents for these deposits released the deposits to Settlers Crossing and Bevard Development, respectively.

16.     Steven Sandler guaranteed the return of U.S. Home's $20 million deposit in two separate guaranty agreements, both titled "Guaranty of Refund of Deposit" and dated December 2, 2005.

17.     By letter dated September 26, 2006, Settlers Crossing exercised an option under the purchase agreement to extend the outside settlement date to March 30, 2007.

18.     In early 2007, Sellers and iStar commenced discussions regarding a loan related to the Bevard Property.

19.     By letter dated March 29, 2007, Settlers Crossing advised U.S. Home that all conditions under section 11 of the PSA had been satisfied.

20.     By letter dated March 30, 2007, U.S. Home notified Sellers that U.S. Home did not believe all conditions precedent under the PSA had been satisfied and terminated the PSA and Contract for Services.

21.     U.S. Home and Sellers entered into a Second Amendment to the PSA dated May 16, 2007, and U.S. Home and Bevard Development entered into a First Amendment

to the Contract for Services dated May 16, 2007.  Sellers, Bevard Development, and U.S. Home also entered into a letter agreement dated May 16, 2007.

22.     On June 19, 2007, iStar provided Sandler at Bevard, L.L.C., a Virginia limited liability company, with a loan in the amount of $69.7 million, and iStar provided WPE and Kalapacha Holdings, L.L.C. with a loan in the amount of $30.3 million.  As security, Sellers and iStar entered into a Collateral Assignment of Purchase Contract, dated June 19, 2007, and Bevard Development and iStar entered into a Collateral Assignment of Contract for Services, dated June 19, 2007.  Mr. Sandler consented in writing to the Collateral Assignment of Purchase Contract and the Collateral Assignment of Contract for Services.  Copies of the assignments were provided to Lennar.

23.     U.S. Home and Sellers entered into a Third Amendment to the PSA dated June 19, 2007.

24.     U.S. Home and Sellers exchanged correspondence dated November 2007 regarding conditions to closing that U.S. Home believed had not been satisfied.

25.     Settlers Crossing and WPE commenced a lawsuit in the United States District Court for the Eastern District of Virginia on December 6, 2007 seeking a declaratory judgment as to "the conditions precedent, if any, that [were] unsatisfied in order that the parties to the Agreement may proceed to settlement."

26.     By letter dated January 3, 2008, U.S. Home requested access to the Bevard Property.  Sellers responded by letter dated January 4, 2008 and advised that Sellers did not consent to the request for access.

27.     The decision to deny Lennar's request for access was made by Steven Sandler.

28.     By letter dated March 7, 2008, U.S. Home again requested access to the Bevard Property.  By letter dated March 14, 2008, Sellers denied this request.

29.     By letter dated April 28, 2008, Settlers Crossing stated that all conditions precedent had been satisfied and set a closing date of May 26, 2008.  Settlers Crossing later moved the closing date to May 27, 2008 because May 26 was a holiday.

30.     By letter dated May 16, 2008, U.S. Home provided Sellers with notice that they were in default of the PSA due to Sellers' denial of U.S. Home's requests for access to the property.

31.     By letter dated May 23, 2008, U.S. Home advised Sellers that settlement would not occur on May 27, 2008 because all conditions precedent were not satisfied.

32.     Settlers Crossing served a notice of default on U.S. Home dated May 30, 2008.

33.     By letter dated July 3, 2008, U.S. Home terminated the PSA and Contract for Services and demanded a return of the deposits.

34.     Settlers Crossing, Bevard Development and Mr. Sandler have not returned any portion of the deposits.

35.     As a result of the default on the iStar loan, iStar exercised its rights under the Collateral Assignment of Purchase Contract and Collateral Assignment of Contract for Services and initiated a foreclosure action in the Circuit Court for Prince George's County, Maryland.

36.     On November 17, 2009, the Bevard Property was sold to Piscataway Road – Clinton MD, LLC, a limited liability company formed by iStar, for $15 million.  Piscataway Road – Clinton MD, LLC is the current owner of the Bevard Property.

37.     At Lennar's direction, Environ International Corporation ("Environ") conducted testing on the Bevard Property.  Environ collected 293 soil samples from thirty-six locations, including twenty sites on Bevard East, six sites on Bevard North, and ten sites on Bevard West.

38.     In July 2005, the Prince George's County Council enacted a text amendment, CB-53-2005, permitting planned retirement communities in the County's R-E (Residential Estate) Zone under certain circumstances.  This text amendment permitted the construction of a planned retirement community and more housing units, including both attached and multi-family dwellings, on Bevard North through approval of a detailed site plan with the Prince George's County Planning Board, without having to obtain a special exception from the County Planning Department or County Council.

39.     On April 9, 2013, by a vote of 9-0, the Prince George's County Council enacted CB-4-2013 (effective May 24, 2013), which revoked the 2005 text amendment.

40.     On July 24, 2013, the Prince George's County Council enacted CR-81-2013, which re-zoned Bevard East from "R-L" (Residential-Low Development) to "R-E" (Residential-Estate), thereby reducing the permissible density on Bevard East.

41.     On August 23, 2013, counsel for iStar filed an Amended Petition for Judicial Review of CR-81-2013 that is pending before the Circuit Court for Prince George's County.

B./C.   Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial, Inc.

Based upon the Background portion of the Court's January 30, 2014, Memorandum Opinion (ECF No. 624), Defendants propose the following as their requested stipulations of fact:

1.      On June 9, 2004, Washington Park Estates, LLC ("WPE"), a Maryland limited liability company, entered into a contract with various parties – primarily, John R. Bevard and members of his family – to purchase approximately 1,180 acres of undeveloped real estate in Prince George's County, Maryland ("the property" or "the Bevard Property").

2.      As part of its due diligence, WPE retained an engineering firm, Schnabel Engineering North, LLC ("Schnabel"), to update a 2001 Phase I Environmental Site Assessment ("ESA") that it had previously prepared.

3.      The stated purpose of the 2001 Phase I ESA was "to obtain information that would allow the development of an opinion regarding the potential for 'recognized environmental conditions' being present on or near the site that could present major development difficulties, liability exposure, or the need for Phase II sampling and testing."

4.      Schnabel defined the term "recognized environmental conditions," in accordance with guidelines set by the American Society for Testing and Materials ("ASTM").

5.      The 2001 report noted that the property had been "used for agricultural and mining purposes since 1957, the date of the earliest available historical document," and that it was "last mined for sand and gravel approximately 10 years ago."

6.      The 2001 report further stated that, "[u]pon completion of the mining, the excavated area was replenished with a large amount of fill," which "may contain a variety of debris, sludge, and heavy metals."  The "potential fill material" was the  only "recognized environmental condition" found on the property, however, and the "extent and character" of that material was to be "identified upon completion of the geotechnical portion of [the] investigation."

7.      Otherwise, the report concluded that "the site does not pose a significant environmental risk" and "[n]o additional environmental investigations" were recommended.

8.      Schnabel provided WPE with an update to the Phase I ESA in September 2004.

9.      The update was "performed to document changes to the site and surrounding area that may have occurred since the previous report was issued."

10.     Regarding the geotechnical investigation in 2001, which consisted of "[t]wenty-two soil borings [] advanced to a maximum depth of twenty-five feet," the 2004 update reflects that "no debris, sludge, or heavy metals were noted."  Schnabel again conducted a site inspection and reviewed regulatory databases in 2004, identifying no concerns that "classif[y] as 'recognized environmental conditions' under ASTM guidelines."

11.     The update concluded that there were "[n]o significant changes to the [property] . . . since the previous assessment" and "no additional environmental investigations [were] recommended[.]"

12.     These findings were consistent with the representations of the prior owners of the property.  In the contract of sale with WPE, the prior owners warranted, *inter alia*, that:

> To the best of each Seller's actual knowledge (without independent investigation), except as disclosed in the Phase I Environmental Site Assessment for the Property prepared by Schnabel Engineering dated May 25, 2001 . . . , no part of such Seller's Parcel(s) has been used at any time for the manufacture, processing, distribution, use, treatment, release, discharge, storage, disposal, transport or handling of any substances now defined as or now included in the definitions of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal, state or local law, ordinance, statute, code, rule, or regulation in effect on or prior to the Settlement Date, including, but not limited to, the Comprehensive

Environmental Response Compensation and Liability Act ["CERCLA"], Resource Conservation and Recovery Act, and the Toxic Substance Control Act[.]

13.     The prior owners further represented that, to the best of their knowledge, there were no "underground storage tanks" on the property and that "no polychlorinated biphenyls ('PCBs') or PCB contaminated fluids or equipment are located under, or in any such Seller's Parcel(s)."

14.     At the same time that WPE contracted to purchase the property, Settlers Crossing, LLC ("Settlers Crossing") – a Virginia limited liability company with brothers Steven and Arthur Sandler ("the Sandler brothers") as its members – was planning to purchase the membership interests of WPE, thereby acquiring the contractual rights to the property.

15.     In contemplating this transaction, Settlers Crossing relied upon the Schnabel reports provided by WPE, as well as the warranties of the sellers contained in the contract of sale.

16.     Settlers Crossing became the sole member of WPE in October 2004 and, soon thereafter, caused WPE to close on the purchase of the Bevard Property.

17.     At settlement, the sellers (i.e., Mr. Bevard and the other prior owners) reaffirmed that all representations and warranties set forth in the contract were "true and correct in all material respects[.]"

18.     Settlers Crossing and WPE (hereinafter jointly referred to as "Seller") planned to develop the property for future sale to a homebuilder.

19.     In furtherance of that goal, Seller commissioned a battery of tests and surveys shortly after acquisition.  Among these was a Phase I archaeological survey conducted by URS Corporation, Inc.  ("URS").

20.     In addition to providing detail of the sand and gravel mining operation on the property, the URS report reflected that a small section was, for a short time, used as a test site for landfarming "sludges."

21.     On February 2, 2005, Nishan Topjian, on behalf of Engle Homes – a division of homebuilder Technical Olympic, USA ("TOUSA") – prepared a letter of intent proposing the purchase of a portion of the property.

22.     TOUSA retained the services of Matthew Wineman, an attorney with the law firm Rosenberg, Martin, Funk, and Greenberg, to handle "legal contract work" on the project and began conducting due diligence.

23.     An "Acquisition Submission Summary" prepared by Mr. Topjian in June 2005 for TOUSA's asset committee reflects that an "[e]xecutive summary of the Phase 1 environmental report" had been provided and that a "Geotechnical Report, survey[,] and other due diligence materials [would be] completed and satisfactory" prior to closing.

24.     The contract between Seller and TOUSA did not close, however, and Lennar Corporation ("Lennar") subsequently stepped in.

25.     Lennar, one of the nation's largest homebuilders, hired Mr. Topjian as its Director of Land Acquisition and retained the services of Mr. Wineman with the goal of consummating a considerably larger deal.

26.     On or about September 7, 2005, Mr. Topjian drafted a second letter of intent related to the property – this time on behalf of Lennar.

27.     The letter, which was agreed to on or about the same date, proposed a purchase price for the entire property of $200 million and the immediate start of a sixty-day

"study period," during which time Lennar was permitted "to go upon the [p]roperty and conduct such tests, studies and investigations, as it deems appropriate."

28.     During the same period, Seller provided Lennar with the reports, surveys, and studies in its possession, including Schnabel's 2001 Phase I ESA, the 2004 update, and the URS Phase I archaeological survey.

29.     Lennar had "free and unfettered access to the Bevard [P]roperty" during this time.

30.      On November 15, 2005, U.S. Home Corporation ("U.S. Home"), a wholly-owned subsidiary of Lennar (together with U.S. Home, "Purchaser"), entered into an agreement to purchase Settlers Crossing's membership interest in WPE – and, thereby, to acquire the Bevard Property – for the price of $160 million ("the purchase agreement").

31.     According to the purchase agreement, the property consisted of three non-contiguous tracts of land known as Bevard West (consisting of 410.53 acres), Bevard East (563 acres), and Bevard North (275.83 acres).  A small portion of Bevard North, referred to as the Kalapacha Property, was under contract for sale to Kalapacha Holdings, LLC, another entity controlled by the Sandler brothers, at the time the purchase agreement was executed.  Initially, WPE was to acquire that property prior to settlement with U.S. Home; thus, it was included in the purchase price.  Under the second amendment to the purchase agreement, however, the Kalapacha Property was to be conveyed to WPE, after U.S. Home became its sole member, with U.S. Home responsible for paying the purchase price of $4.2 million.

32.     Concomitantly with the purchase agreement, U.S. Home separately entered into a contract for services with Bevard Development Company ("BDC"), pursuant to

which U.S. Home was to pay $40 million at settlement on the purchase agreement for BDC's performance of certain development work.

33.     Purchaser tendered a deposit of $20 million on the two agreements – $16 million on the purchase agreement and $4 million on the contract for services.

34.     In return, Purchaser received guarantees of refund of deposit from Settlers Crossing's principal, Steven Sandler ("Mr. Sandler").

35.     The guarantees provided that "[i]f [Seller or BDC] fail[ed] to refund or pay over the . . . [d]eposit[s] or applicable portion thereof as required in accordance with the terms and conditions of the [purchase agreement and contract for services], then the Guarantor shall pay the . . . [d]eposit[s] to [] U.S. Home as required by the [agreements] within fifteen (15) days after written demand for payment."

36.     Although Purchaser had been on the property for several months, § 13 of the agreement provided an additional three-day "Feasibility Study Period":

> Purchaser shall have the right from the date hereof [*i.e.*, November 15, 2005] through 11:00 p.m. Eastern Time on November 18, 2005 (the "Feasibility Study Period"), and (so long as this Agreement remains in effect and Purchaser is not in default hereunder beyond any notice and cure period) thereafter, with the prior approval of WPE, in each instance, until Settlement, to make such investigations, studies and tests with respect to the Property as Purchaser deems necessary or appropriate. . . .
>
> In the event Purchaser's studies indicate, in [its] sole judgment and discretion, that the Property is [not] suitable . . . for [its] purposes, Purchaser will send written notice (the "Notice of Termination") to WPE and Settlers Crossing by no later than the expiration of the Feasibility Study Period terminating this Agreement whereupon (i) the Escrow Agent shall immediately return the Deposit and all interest thereon (if any) to Purchaser, (ii) Purchaser shall provide to WPE copies of the third party studies, reports, and plans obtained by [it] during the Feasibility Study Period including without limitation architectural, engineering and traffic, all of which shall be assigned to WPE without warranty, except for internal proprietary studies, reports, or plans, and Purchaser shall

return the Seller Deliveries; and (iii) the parties shall thereupon be released from any further liability or obligation to each other. . . . If Purchaser fails to send WPE and Settlers Crossing the Notice of Termination as required herein on or before the expiration of the Feasibility Study Period, this Agreement shall automatically remain in full force and effect and any right of termination of Purchaser under this Paragraph 13 shall be null and void.

37.     The purpose of the Feasibility Study Period was to provide time for Lennar's corporate investment committee to give final approval of the transaction.

38.     Purchaser did not conduct any additional testing on the property during this period, and the termination right under § 13 expired without incident.

39.     The parties initially worked collaboratively in their development efforts.

40.     In late 2005, for example, Purchaser identified a concern regarding the possible presence of a cemetery on the property.

41.     In response, Seller engaged URS to conduct a geophysical investigation of a portion of the property using ground-penetrating radar.

42.     URS found no evidence of a graveyard; its report was provided to Purchaser; and no further action was deemed necessary.

43.     Seller also freely granted U.S. Home and its consultants access to the property to conduct investigations.

44.     Among the consultants retained by Purchaser was Hardin-Kight Associates, Inc., an engineering firm that performed subsurface soil investigations in 2006 and 2007.

45.     During the same time period, Purchaser retained American Infrastructure to conduct test pit investigations and excavating and Dewberry & Davis ("Dewberry") – a firm that had been working with Seller on the property since 2004 – to implement the engineering design.

46.     From the time WPE first acquired the property, Dewberry hosted monthly planning meetings, in which representatives of both parties participated at various points, to address the status of approval processes and other issues related to development.

47.     Among those regularly in attendance was Norman Rivera, a land use attorney who worked on behalf of both parties to obtain approvals, permits, and-to address zoning issues.

48.     In early 2006, Purchaser engaged an environmental consulting firm, Environmental Consultants and Contractors, Inc.  ("ECC"), to conduct another Phase I ESA.

49.     The ECC report, issued May 8, 2006, identified "no evidence of recognized environmental conditions in connection with the Subject Property, except the following":

- Five underground storage tanks (USTs) are located on the western portion of Bevard West.  Soil quality in the vicinity of these tanks is not known.

- A farm dump covering approximately 1,200 square feet is located on the southeastern portion of Bevard East.  It is not known if debris in the farm dump has impacted native soil quality.

- Sand and gravel mining operations were conducted on the Subject Property until approximately fifteen years ago. Reportedly, excavated soil was combined with soil from off-site sources and used as backfill.

50.     ECC noted that its assessment did "not address naturally occurring hazardous substances such as elevated heavy metal concentrations"; that "[n]o soil or groundwater sampling was performed"; and that "no soil sampling appears to have been performed" by Schnabel in preparing the 2001 Phase I ESA or the 2004 update.

51.     ECC recommended "performance of a Limited Subsurface Investigation . . . to assess soil and groundwater quality and address the recognized environmental conditions

identified in this report," including "excavation of test pits or installation of soil borings in the vicinity of the former mines and in the vicinity of the farm dump . . . [to] evaluate the nature of fill material in the mined areas, characterize debris in the farm dump, and assess native soil quality in both areas."

52.     ECC further recommended either "installation of Geoprobe borings in the vicinity of the USTs" or "remov[al of the USTs] in accordance with Federal and State regulations."

53.     Purchaser later retained ECC to conduct "abandonment of potable wells and septic systems," "asbestos abatement," and "UST and AST [*i.e.*, above-ground storage tank] removals" on the property.

54.     This work was supervised and approved by the Maryland Department of the Environment ("MDE"); soil sampling and testing was conducted in the area of the removed tanks; and contaminated soil was removed.  A Phase II ESA, however, was not recommended by ECC.

55.     U.S. Home's obligation to proceed to settlement was contingent on Seller's satisfaction of numerous conditions precedent set forth in § 11 of the purchase agreement.

56.     These conditions included obtaining record plat approval for Bevard North and West and the favorable resolution of any appeals; identifying and obtaining off-site easements necessary for traffic and water/sewer capacity on Bevard North and West; obtaining the final, non-appealable rezoning of Bevard East; and WPE closing on the contract to purchase the Kalapacha Property.

57.     As of April 26, 2006, Purchaser saw "only one significant entitlement hurdle for [S]eller to clear" and "believe[d] strongly that [Seller would] meet all preclosing conditions sometime around the 10th of July," with settlement anticipated "in early August [2006]." In September 2006, however, Seller acknowledged that two conditions precedent – related to record plat approvals and rezoning – "still remain[ed] unsatisfied."

58.     Purchaser exercised an option under the purchase agreement "to extend the outside settlement date for a period of up to six (6) months in order for any of the unsatisfied conditions set forth in Section 11 to be satisfied." Accordingly, the closing date was extended to March 30, 2007.

59.     At around the same time, Purchaser sought to renegotiate the purchase agreement due to the weakening residential housing market.

60.     By November 2006, the parties had agreed in principle to a reduced purchase price of $165 million. This agreement was never reduced to writing, however, and negotiations continued.

61.     Internally, as of January 2007, Lennar had identified the Bevard Property as one of its top five contracts to be restructured and considered seeking termination of the purchase agreement if a new deal could not be reached – a remedy to which it was entitled if Seller failed to satisfy conditions precedent prior to the March 30, 2007, settlement date.

62.     Seller's incentive to renegotiate was largely focused on the addition of a specific performance guaranty by Lennar and "mak[ing] sure that it was a true guaranty of closing under the terms of a revised contract and not a continuing option where [Purchaser] could walk away from the deposit." This was particularly important because Seller was, at the

time, "in the process of refinancing the ground based on the strength of [Purchaser's] specific performance guaranty."

63.   In early 2007, Seller contacted iStar Financial, Inc. ("iStar"), regarding a loan related to the property.

64.   While iStar conducted its due diligence regarding the loan, Seller and Purchaser continued to negotiate the terms of an amended agreement.

65.   As the March 30 settlement date approached with no amended agreement in hand, they exchanged letters to preserve their respective rights under the existing contracts.

66.   The parties agreed that this exchange was merely a formality and, on May 16, 2007, withdrew their respective letters.

67.   Among other things, the second amendment substantially reduced the price for Settlers Crossing's membership interest in WPE in exchange for a guaranty of specific performance by Lennar.

68.   The second amendment reduced the purchase price to $103 million.  The first amendment to the contract for services reduced BDC's development fee to $26.8 million, which was also guaranteed by Lennar.  Adding the $4.2 million purchase of the Kalapacha Property by WPE at settlement (with U.S. Home as its sole member), the total purchase price was reduced to $134 million.

69.   On the same date, the parties separately entered into a letter agreement by which Seller "withdr[e]w [its] notice that all conditions under Section 11 of the Agreement have been satisfied, and any other statements contained in [its] letter to U.S. Home . . . dated March 29, 2007."  Purchaser, in turn, "withdr[e]w its notice of termination contained in the letter . . . to [Seller] dated March 30, 2007."

70.     Settlement under the second amendment was scheduled to take place on December 5, 2007.

71.     In the event that all conditions precedent were not satisfied by that date, the second amendment provided that settlement would be "automatically extended to that date which is thirty (30) days after all conditions precedent" were met, up to March 15, 2009 ("the outside date").  If all conditions were not satisfied by the outside date, Purchaser had the option of either waiving the unsatisfied conditions and proceeding to settlement within fifteen days or terminating the agreement and demanding a return of deposit.

72.     The day after execution of the second amendment, iStar contacted Mr. Jacoby regarding its contemplated loan to Seller.

73.     Mr. Jacoby represented to iStar that Purchaser was "bullish" on the Bevard deal, characterizing it as involving "a 'Class A' piece of property."  Regarding progress toward settlement, Mr. Jacoby told iStar that Purchaser was "satisfied that [Seller had] received all approvals necessary for the project" and that "he felt confident [that the pending acquisition of one off-site easement] would get done."  He further stated that Purchaser "would prefer not to close on the land" for eighteen months, but that it had "negotiated a contract with a price concession to close earlier" and was "prepared to move forward because of the specific performance aspects of [the] contract with [Seller]."

74.     On June 19, 2007, iStar provided Seller with a $100 million first mortgage bridge loan with repayment contemplated at the time of settlement on the purchase agreement.

75.     As security, Seller and BDC collaterally assigned their interests under the purchase agreement and contract for services to iStar.

76.     On the same date, U.S. Home and Seller entered into a third (and final) amendment to the purchase agreement, which provided, in the event iStar foreclosed upon the property, that the transaction would convert from a sale of Seller's membership interest in WPE to a sale of the Bevard Property.

77.     Also on June 19, iStar entered into a consent and estoppel agreement with Purchaser ("the consent and estoppel agreement"), by which Purchaser acknowledged Seller's assignment of rights to iStar and made certain representations regarding the property and the status of conditions precedent to settlement.  Among other things, Purchaser represented in the consent and estoppel agreement that, "to the best of [Purchaser's] knowledge, having made due inquiry," it had "no existing defenses, offsets, claims or credits with respect to performance of its obligations under the Purchase Contract or Contract [f]or Services" and that "each of the covenants and agreements in the [purchase agreement and contract for services] have, to the extent that such covenant or agreement is required to have been performed prior to the date hereof, [] been performed as required therein."

78.     Meanwhile, Purchaser was searching for "a [joint venture] partner or land banker to keep this acquisition off of [its] books and maximize leverage thereafter."

79.     As of May 2007, Lennar's strategy was to place the Bevard Property with LandSource – a joint venture it formerly controlled – by the end of its fiscal year – November 30, 2007 – thereby reducing the total asset value on its ledger by approximately 84 percent.

80.     Mr. Jacoby prepared an executive summary for presentation to the LandSource Executive Committee, which stated in part:

> A portion of Bevard West was once used as an uncontrolled fill site and careful design has minimized this impact.  Independent environmental assessments have not identified any hazardous

conditions requiring extraordinary measures or higher level studies.

> Lennar's purchase agreement required the seller to obtain all necessary project approvals except final engineering and seller has accomplished these tasks. All three communities are vested with full adequate public facilities approval, utility availability, preliminary site plan approval, specific design plan approval and final record plat approval. Individual lots for each of the home sites can be recorded at any time in the next six months.

81.    LandSource considered the proposed transaction at a meeting of its executive committee on July 13, 2007, but declined to accept it.

82.    As the end of its fiscal year grew closer – and with market conditions continuing to erode – Purchaser was internally reevaluating the status of its assets and outstanding contracts. The minutes of a Lennar third quarter operations meeting on September 6, 2007, recite, in relevant part:

> The bravado of preparation for the worst has dissipated into the despair of the market.
>
> Corrective forces don't come overnight. Many times you don't know things are getting better until you look back.
>
> Our company is "damaged." Our business is broken. . . .
>
> In the past we have been reluctant to walk from deals. . . . Now we must change our strategy to prepare for the worst.

83.    The same minutes reflect that Purchaser's strategy with respect to the Bevard Property shifted after the LandSource transaction fell through. As of September, Purchaser described the project as an "[a]bsolute mothball" and planned to "stop capitalizing interest" and "Mothball for 1 . . . maybe 2 years."

84.    On October 1, 2007, Lennar Chief Executive Officer Stuart Miller met with regional managers to conduct a "comprehensive asset review" of the Maryland division's contracts.

85.     According to the minutes of that meeting, Mr. Jacoby stated that $200,000 per month was being spent on the property and that Purchaser had spent a total of $5 million to that point.  Mr. Miller was "blown away" that any money was being spent and "vehemently disagreed" with Mr. Jacoby's suggestion that Purchaser would save money over the long-term by completing early development.

86.     Mr. Miller ordered that all spending related to the property be stopped, that counsel "look at [the] contract again," and that Lennar managers "generate a way to off-load this[.]"

87.     At around the same time, an internal spreadsheet used by Lennar to track assets designated as "Core & Hit List Communities" reflected that the Bevard Property was on the "Hit List."  According to Lennar Chief Operating Officer Jon Jaffe, the purpose of the "Hit List" was "to identify [properties] that were cash-flow negative or not making any financial sense" – meaning that it "didn't make sense to Mothball, didn't make sense to keep moving forward on the current plan" – and "to identify what alternative strategies there were."

88.     Lennar subsequently entered into a professional services agreement with Steven Engel of Seasons Financial Consulting, LLC, for consulting services regarding a number of contracts, including those related to the Brevard Property.

89.     With respect to Bevard, Mr. Engel's fee was structured so that he would earn the maximum amount if Lennar was able to terminate the purchase agreement and recover some or all of its deposit.  Lesser amounts were payable in the event that the purchase agreement was terminated and Lennar forfeited its deposit, and the lowest fee would be earned if Lennar was forced to purchase the property without paying interest – although, even in that circumstance, there was financial incentive for delay.

90. Moreover, after the October 1 meeting, Purchaser stopped all development work on the Bevard Property; hired "a team of high priced lawyers and consultants [to] work[] feverishly at . . . making a case for delaying . . . the Bevard closing"; and "cut off all communications" with Seller in the run-up to the scheduled December 5 settlement date.

91. In or around late October 2007, Purchaser identified a final opportunity to bring in a third-party partner prior to its self-imposed November 30 deadline. The Bevard Property was among a number of Lennar contracts included in a pool of "Hit List" assets that was proposed for sale to Morgan Stanley Rialto ("Morgan Stanley").

92. On or about November 13, Lennar prepared a one-page prospectus for Morgan Stanley, representing, *inter alia*, that the property was "fully entitled with all homesites recorded."

93. Ultimately, however, the property was not included in the Morgan Stanley sale. Thus, the contracts with Seller remained on Lennar's corporate books at the end of its fiscal year, at which point Lennar estimated its value at between $70 and $80 million.

94. Seller began forwarding closing documents to Purchaser in preparation for settlement on December 5, 2007, attempting to demonstrate satisfaction of all conditions precedent.

95. By letter dated November 21, 2007, Mr. Wineman advised of Purchaser's position that Seller had "failed to satisfy all [] conditions precedent to Settlement, including but not limited to those conditions relating to certain off-site easements, in accordance with the time frame set forth in the [purchase] [a]greement." "As a result," he stated, "the Settlement Date is automatically extended as provided in the [a]greement."

96.     Mr. Brennan provided Seller's response on November 27, insisting that "all conditions precedent to Settlement have been satisfied" and "demand[ing] that U.S. Home. . . specify each of the condition(s) precedent to Settlement that [it] claims ha[s] not been satisfied[.]"

97.     On the same date, Mr. Wineman identified Seller's purported failure to "obtain[] and record[] [four] Off-Site Easements, or in the alternative, Agreements to Grant Off-Site Easements," as being among the unsatisfied conditions.  He cautioned that this list was "not exclusive," but "merely [represented Purchaser's] understanding of the status of certain conditions precedent to Settlement based upon [the] sparse information made available to it by Seller."

98.     Purchaser continued to avoid Seller's attempts to make contact on and around the closing date, and the scheduled settlement did not occur.

99.     In a December 6 email to Mr. Beckwitt, Mr. Jacoby stated:

I am inundated by calls from Nathan [Benson] wanting to know where we're coming from and where we're going.  It is not easy (also not impossible) to stonewall a colleague of 10 years with only the suggestion that they meet the preclosing conditions and no answer to the question of what happens after that.

100.     Seller commenced a law suit in the United States District Court for the Eastern District of Virginia on December 6, 2007 ("the initial action").  Seller sought a declaratory judgment as to "the conditions precedent, if any, that [were] unsatisfied in order that the parties to the Agreement may proceed to settlement."

101.     On January 3, 2008, Purchaser first requested, pursuant to § 13 of the purchase agreement – *i.e.*, related to the Feasibility Study Period – that it "and/or its consultants be permitted to enter onto the Property to perform such further investigations, studies and tests on the Property that it deems necessary or appropriate."

102.    Specifically, Purchaser's litigation counsel sent a letter to Seller identifying a host of new concerns regarding the purchase agreement:

> Mr. Wineman [previously] itemized at least four easements which have not yet been obtained.  [He] also explained that this list of unsatisfied conditions was not exhaustive, and that additional information from [Seller] would be required….

> Additionally, U.S. Home is concerned with the accuracy of Seller's representations and warranties.   More specifically, Seller represents and warrants in Section 12.2 of the Agreement that, except as disclosed in reports Seller provided to the Purchaser, the Property is free from "Hazardous Materials" (defined to mean prohibited or regulated hazardous wastes, hazardous substances, and toxic materials, asbestos, petroleum, and PCBs), has not been used for the storage, use, generation, treatment, or disposal thereof, and does not contain any underground fuel tanks.  Section 11(a) further provides, *inter alia*, that this and all other representations "shall be true and correct" as of the Settlement date.  Section 11(b) then specifically states that, "Between the date [of the Agreement] and the Settlement Date there shall have been no material adverse change in the environmental condition of the Property."

> It is not clear that the Seller's representation in Section 12.2 is accurate now, or was correct at the time it was made.  Furthermore, the Seller's ability to satisfy the Agreement's "no material adverse change" condition is uncertain.   In this regard, U.S. Home has concerns about, among other things, the following:

> • The possible presence of endangered or protected plant and animal species on or about the Property that could interfere with development (for example, U.S. Home is concerned about the presence of [a] bald eagle habitat on or immediately near the proposed development area).

> • The impact of surrounding historic and scenic roads on the planned development and use of the Property.

> • The possible existence of cemeteries on the Property.

> • The deleterious residual effects on the Property's environmental condition due to historic sand and gravel mining.

> • The apparent disposal of solid and hazardous waste on the Property.

- The true and full potential impact of floodplains and watersheds on the proposed development.

- The presence of abandoned wells and/or septic tanks, and potential releases of hazardous substances associated therewith.

U.S. Home also has not had the opportunity to review various studies, surveys and other reports that we believe are in [Seller's] possession and which may disclose other areas of concern.

In order to investigate these issues and provide you with a more complete and accurate list of unsatisfied conditions, and in accordance [with] the provisions of Section 13 of the Agreement and Rule 34(a) of the Federal Rules of Civil Procedure, we request that U.S. Home and its consultants (including, but not limited to, environmental consultants and surveyors) be permitted to enter onto the property to perform investigations, studies and tests that we deem necessary or appropriate.  Given the size of the property in question, I suspect this will have to take place over the course of several visits.  Please advise if this is agreeable so that we can begin coordinating mutually agreeable dates and times for inspection.

103.    Purchaser again cautioned that its letter "should [not] be construed [as] an exhaustive list of unsatisfied conditions precedent" and advised that it "expect[ed] to supplement [its] response through the course of discovery [in the initial action] as additional information is revealed."

104.    Counsel for Seller responded the following day:

Let me address the conditions precedent that you have raised in your letter.  Matthew Wineman's letter dated November 27, 2007, regarding the off-site easements is referred to in paragraph 9 of the complaint [in the initial action].  On those issues, we can agree to disagree….

Your concern about the representations and warranties that the Property is free from "Hazardous Materials" seems implausible.  As [U.S. Home] well know[s], in paragraph 15 of the Second Amendment, [U.S. Home] confirmed that it has "no actual knowledge of any of the conditions to Settlement contained in Sections 11(a), (b), (c) or (i) of the Agreement are unsatisfied as of the date of this Amendment [May 16, 2007]."  If U.S. Home has

acquired information since then, [Seller is] unaware of it and we would appreciate your providing it to us immediately.

105.    As to the remaining points (e.g., the presence of a bald eagle habitat, the impact of surrounding historic and scenic roads, the existence of a cemetery, etc.), Seller generally asserted that these issues did not relate to its representations or warranties, nor did they concern any environmental condition that had not previously been disclosed and investigated by one or both parties.

106.    According to Seller, Purchaser was "attempting to create an unsatisfied condition precedent to settlement where none exists."  Seller repeated its request for "a complete statement of unsatisfied conditions precedent to settlement," adding that, upon receipt, it would "be in a position to assess what discovery needs to be done in this case."

107.    The decision to deny Purchaser's request to investigate was made by Mr. Sandler.

108.    With the initial action ongoing, Seller continued to push for settlement, working to address any conceivable doubt that it had fully performed its pre-closing obligations.

109.    Seller believed it had addressed all concerns previously identified by Purchaser as of April 28, 2008, when it sent a letter "confirm[ing] and provid[ing] notice that all the conditions of Settlement in the Agreement have been satisfied," attaching numerous exhibits in support.  Seller further advised, "although we believe that Purchaser has wrongfully failed to settle on December 5, 2007, according to Mr. Wineman's letter, Settlement is thirty (30) days after recordation of the Off-Site Easement Deeds, which is May 2[7], 2008."

110.    On April 30, 2008, after transfer of the initial action to this court, U.S. Home filed a fully-briefed motion to compel inspection of property.

111.    On May 20, United States Magistrate Judge William Connelly, to whom the case was referred for discovery, scheduled a hearing for June 24.

112.    By an order issued June 27, Judge Connelly granted that motion, permitting U.S. Home "to inspect the property for a six week period as detailed in the March 25, 2008 Proposed Scope of Work and Schedule by Environmental Resources Management, Inc."

113.    Purchaser did not inspect the property prior to dismissal of the initial action.

114.    On May 16, 2008, counsel for U.S. Home served a notice of default upon Seller related to its continued denial of requests for access to the property.

115.    This was followed, on May 23, by a letter advising Seller of Purchaser's position that "all conditions precedent to Settlement are, in fact, not satisfied, and as such, Settlement will not occur on May 27, 2008."   In this letter, Purchaser expanded on the list of purportedly unsatisfied conditions, omitted other previously-stated grievances, and again qualified that the list was not exhaustive.

116.    Among the unsatisfied conditions Purchaser identified was one related to the accuracy of Seller's representation and warranty concerning the environmental condition of the property found in § 12.2(d) of the purchase agreement:

> (a)    Despite the fact that you have refused to permit U.S. Home [] access to the Property to determine the status of the environmental representations and warranties contained in Section 12.2, U.S. Home [] has determined and you have stated in your various pleadings, that certain mining activities previously occurred upon the portions of the Bevard North Property (which mining activities may have involved the use of materials within the definition of Hazardous Materials).  It appears you had knowledge of these mining activities in Bevard North[;] however, these activities, or the extent of these activities, were not disclosed in the environmental reports provided to Purchaser.  As such, Seller is in breach of its representations and warranties contained in 12.2(d),

and the condition precedent to Settlement contained in Section 11(a) is not satisfied.

(b)    Based upon a review of the various planning commission files (e.g., zoning and subdivision resolutions and correspondence related thereto), it is evident that environmental [clean-up] efforts (including Hazardous Materials) were both required by various governmental authorities and performed on the Property during the term of this Agreement, some of which may have occurred without notice to Purchaser or an ability to review the issues surrounding such activities.  Without an ability to investigate the Property, U.S. Home [] is unable to determine whether such activities constitute or independently caused a material adverse change (and therefore would constitute an unsatisfied condition precedent to Settlement under Section 11(b))[.]  [H]owever, it is evident that Hazardous Materials existed on the Property[;] [that] the existence, or extent of the existence, of such Hazardous Materials was not disclosed in the environmental reports provided by Seller[;] [that] Seller had or acquired knowledge of such Hazardous Materials[;] and [that] Seller did not notify U.S. Home [] in violation of the Agreement.  As a result, Seller is in breach of its representation and warranty contained in Section 12.2(d)[;] [it is] in violation of [the] covenant in Section 12.1[;] and the condition[s] precedent to Settlement contained in Sections 11(a) and (c) are not satisfied.

117.    Seller continued to prepare for settlement on May 27.  Five days before, it forwarded an extensive list of closing documents to Purchaser and advised of its expectations at settlement.

118.    On May 30, after Purchaser failed to settle, Seller served its own notice of default, stating that "Purchaser has wrongfully failed to make Settlement under the Agreement and the Contract" and that "[t]his failure by Purchaser to settle is a default by Purchaser under the Agreement and Contract."

119.    On July 3, 2008, Purchaser terminated the parties' contracts – citing expiration of cure periods under the purchase agreement, contract for services, and consent and estoppel agreement – and, "in accordance with Section 15(b)(iii)(1) of the Agreement,

demanded] the immediate return of the deposit . . . in the total amount of Twenty Million Dollars ($20,000,000)."

       120.     Pursuant to § 15(b)(iii)(1):

> [i]f Settlers Crossing . . . breach[es] any of its representations, warranties or covenants set forth herein in any material respect and such breach continues for a period of ten (10) business days following receipt of notice of such breach, . . . [or] otherwise default[s] under this Agreement . . . then Purchaser shall have the right, as its sole and exclusive remedy, waiving all other remedies at law and in equity, to . . . terminate this Agreement and receive a return of its Deposit.

       121.     Settlers Crossing and Mr. Sandler did not return the deposit upon demand, and U.S. Home commenced this action approximately two weeks later.

       122.     On July 17, 2008, U.S. Home filed suit against Settlers Crossing, WPE, BDC, Mr. Sandler, and iStar ("the instant case").

       123.     In support of its allegation that "certain environmental inspection and testing of the Property was necessary and appropriate," U.S. Home stated its concerns about the environmental condition of the property as follows:

> The representations and warranties concerning the environmental condition of the Property were included in the Agreement to protect U.S. Home from, among other things, any existing or future liability arising from hazardous materials or other environmental conditions found on the Property, the presence of which could expose U.S. Home to extraordinary liability under state and/or federal law.

> This was a very real concern because, among other reasons, the Property was previously used for sand and gravel mining and tank cleaning operations.  In connection with the mining operations, Seller, through a declaration submitted by John R.  Bevard and filed in the initial [action], admitted that fill from unidentified offsite worksites was brought onto the Property.

> Moreover, after the parties executed the Agreement, the United States Environmental Protection Agency put into effect new regulations regarding the inspection and reporting requirements landowners and prospective purchasers of land needed to comply

with pursuant to [CERCLA], 42 U.S.C. § 9601 et seq. These regulations, set out in Part 312 of Title 40 of the Code of Federal Regulations, established a new standard for conducting defined "All Appropriate Inquiries" ("AAI") regarding the release and threatened release of hazardous materials on, in, or adjacent to subject properties. Without conducting such inquiries, a party – whether the landowner, bona fide prospective purchaser of land, or contiguous land owner – cannot shelter itself from CERCLA liability for subsequently detected hazardous materials upon the property in question.

As a bona fide prospective purchaser, U.S. Home must conduct certain AAI activities "within one year prior to the date of acquisition of the subject property," 40 C.F.R. § 312.20(a), and further AAI activities "within 180 days of and prior to the date of acquisition of the subject property." *Id*. § 312.20(b).

124.    In a motion for summary judgment filed December 23, 2008, U.S. Home presented a new argument regarding the environmental condition of the property:

[T]wo key environmental representations and warranties under Section 12.2(d) are not true, in fact. First, the Property "has been used for the . . . disposal of Hazardous Materials." Second, there are "Hazardous Materials . . . located on or within the Property." Because neither of these environmental conditions were disclosed in the environmental reports delivered to U.S. Home by Seller[], and because Hazardous Materials were dumped on the Property and remain on the Property, the environmental conditions precedent are not, and cannot be satisfied. Accordingly, under the terms of the Agreement, U.S. Home was not and is not obligated to proceed to settlement at any time.

125.    This purported breach of warranty did not relate to the historic sand and gravel mining operation on the property, but rather to the land application of "sewage sludge."

126.    During the pendency of the instant case, Seller defaulted on the iStar loan.

127.    As a result of Seller's default, iStar was permitted to exercise its rights under the collateral assignments of the purchase agreement and the contract for services, which it subsequently did by initiating a foreclosure action in the Circuit Court for Prince George's County, Maryland.

128.     On November 17, 2009, the Bevard Property was sold to Piscataway Road – Clinton MD LLC, a limited liability company formed by iStar, for $15 million.

129.     Having failed to avail itself of the right to access the property granted by Judge Connelly in the initial action, Purchaser renewed its efforts to do so in the instant case. Arrangements were made at a discovery hearing on May 4, 2010, following which Judge Connelly issued an order providing that "the inspection of the Property by [U.S. Home] must occur (commence and conclude) during June and July 2010[.]"

130.     Purchaser retained Environ International Corporation ("Environ") to conduct testing on the property.

## VII.     Damages Claimed and Any Other Relief Sought

A.     U.S. Home Corporation and Lennar Corporation

1.     A judgment awarding damages of $16,000,000 on its claim for breach of contract against Settlers Crossing, WPE, and Steven Sandler for their failure to refund U.S. Home's deposit under the PSA and the Guaranty of Refund of Deposit, plus pre-judgment interest of 12% per annum, calculated from termination of the PSA through the entry of judgment.

2.     A judgment awarding damages of $4,000,000 on its claim for breach of contract against Bevard Development and Steven Sandler for their failure to refund U.S. Home's deposit under the Contract for Services and the Guaranty of Refund of Deposit, plus pre-judgment interest of 12% per annum, calculated from termination of the PSA through the entry of judgment.

3.     A judgment awarding damages of $6,742,514 on its claim for breach of contract against Settlers Crossing, WPE, and Bevard Development, for development costs

incurred by U.S. Home, plus pre-judgment interest at the statutory rate of 10% per annum, calculated from termination of the PSA through the entry of judgment.

4.      A judgment awarding damages against all Defendants for its reasonable attorneys' fees as a prevailing party under Section 18(K) of the PSA, Section 8 of the Contract for Services, and Section 6 of the Guaranty of Refund of Deposit agreements, in an amount to be determined by the Court.

5.      Post-judgment interest at a rate to be determined by the Court.

6.      Costs of suit.

7.      A declaration that:  (1) Sellers' Notice of Default dated May 30, 2008 is ineffective and without legal effect; (2) U.S. Home was not in default under the PSA for failing to settle and purchase the Bevard Property on May 27, 2008; (3) U.S. Home's termination of the PSA and Contract for Services on July 3, 2008 was effective because Sellers were in material breach of Section 13(a) of the PSA and failed to cure their default; (4) Settlers Crossing and WPE failed to satisfy all of the conditions precedent in the PSA and, therefore, U.S. Home's obligations under the PSA did not come into effect; (5) U.S. Home is entitled to a return of its $20 million deposit; and (6) U.S. Home is entitled to attorneys' fees, costs, and pre- and post-judgment interest on its claims as provided in the PSA, Contract for Services, and Guaranty of Refund of Deposit agreements.

8.      Any other remedy to which U.S. Home may be entitled, including such other and further relief as the Court deems just and appropriate.

B.      Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, and Steven B. Sandler

1.      As to the Defendants/Counter Plaintiffs Settlers Crossing, LLC, Washington Park Estates, LLC and Bevard Development Company – The Second Amendment to

the PSA requires U.S. Home/Lennar to reimburse Parkway 1046, LLC, $2,249,999 at closing. Parkway 1046, LLC is an affiliate of Sellers controlled by Sellers' members.  The $2,249,999 is for reimbursement for right-of-way acquisitions.

2.     As to Defendant Steven B. Sandler – If Mr. Sandler were to prevail under the guaranties, he would be entitled to his reasonable attorney fees and costs of the suit pursuant to paragraph 6 of the guaranties.  Pursuant to Local Rule 109, such fees would be pursued by motion after entry of judgment.

C.     iStar Financial, Inc.

1.     A judgment for iStar and against U.S. Home and Lennar in the amount of $222,243,116.90, representing contract damages (including interest provided by the contract at 12% per annum, calculated from May 27, 2008, through March 10, 2014) because U.S. Home and Lennar breached the PSA and Contract for Services;

2.     A judgment for iStar and against U.S. Home and Lennar in the additional amount of $2,291,301.62,  representing costs incurred by iStar as a result of Lennar's failure to close on the Bevard Property on May 27, 2008, including but not limited to settlement expenses, real estate tax expenses, consulting expenses, insurance expenses, and administrative expenses incurred as the owner of the Bevard Property, plus pre-judgment interest at the statutory rate of 10% per annum through entry of judgment.

3.     A judgment for iStar and against U.S. Home and Lennar for its reasonable attorneys' fees as a prevailing party under Section 18(k) of the PSA and Section 8 of the Contract for Services, in an amount to be determined by the Court.

4.      Additional pre-judgment interest at 12% from March 10, 2014, to entry of judgment for the contract damages awarded to iStar, and post-judgment interest at a rate to be determined by the Court.

5.      Costs of suit.

6.      A declaratory judgment that:

i)      all conditions precedent to settlement of the PSA were satisfied on or before April 28, 2007, and U.S. Home and Lennar had an obligation to settle the PSA and pay the considerations due under the PSA and the Contract for Services on May 27, 2008;

ii)     U.S. Home and Lennar must perform under the specific performance and corporate guarantee provisions of the PSA and Contract for Services and purchase the Bevard Property from iStar for $222,243,116.90 (including interest provided by the contract at 12% per annum through March 10, 2014) plus additional pre-judgment interest;

iii)    U.S. Home and Lennar breached the implied convenant of good faith and fair dealing by creating serial bad faith excuses not to close and by failing to close on the Bevard Property on May 27, 2008;

iv)     U.S. Home and Lennar wrongly terminated the PSA and the Contract for Services in 2008, and failed to provide Sellers and iStar with a meaningful opportunity to cure any purported default;

v)      U.S. Home and Lennar were on actual and constructive notice of all issues relating to the Bevard Property that were raised prior to the wrongful termination of the PSA on July 3, 2008, and had every opportunity to conduct due

diligence on the Bevard Property and to study and address those issues without limitation for more than two years from August 2005 to December 5, 2007;

vi)      U.S. Home and Lennar waived the issues relating to the Bevard Property that were used as a basis for the January 3, 2008, request for access under Section 13(a) and therefore were the only basis for the wrongful termination of the PSA on July 3, 2008;

vii)      U.S. Home and Lennar are estopped under the terms of the Consent & Estoppel from raising the issues relating to the Bevard Property that were used as a basis for the January 3, 2008, request for access under Section 13(a) and therefore were the only basis for the wrongful termination of the PSA on July 3, 2008;

viii)      Based on years of testing data and investigation, the Bevard Property has no environmental conditions that would adversely impact the development for residential purposes.

7.      Any other relief or remedy available in equity or law to which iStar may be entitled, including such other and further relief as the Court deems just and appropriate.

## VIII.   Exhibits

Exhibits, other than exhibits expected to be used solely for impeachment and demonstrative exhibits, are identified on the parties' respective exhibit lists attached hereto at tabs A (Lennar's Exhibit List) and B (Defendants' Exhibit List).  The parties exhibit lists separately identify those exhibits that they intend to use and may offer at trial.

## IX.   Witnesses

A.      U.S. Home Corporation and Lennar Corporation

Lennar submits the following list of witnesses that it is likely to or may call at trial, other than solely for impeachment or rebuttal.  Lennar reserves the right to call at trial any witness on Defendants' witness lists.

1.    Witnesses Lennar Expects to Present at Trial:

| Witness | Address | Phone Number |
|---|---|---|
| Rick Beckwitt | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Stuart Miller | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |

2.    Witnesses Lennar May Call if the Need Arises:

| Witness | Address | Phone Number |
|---|---|---|
| Blake Copeland Drew | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Bruce Harvey | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Jon Jaffe | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Chris Marlin | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Daniel Melaugh | c/o Katten Muchin Rosenmann<br>2900 K Street NW<br>North Tower – Suite 200<br>Washington, DC 20007-5118 | (202) 625-3500 |
| Steven Sandler | L M Sandler & Sons, Inc.<br>448 Viking Drive # 220<br>Virginia Beach, Virginia 23452 | (757) 463-5000 |

| Witness | Address | Phone Number |
|---|---|---|
| Sam Sparks | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Mark Sustana | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |
| Matthew Wineman | c/o Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 | (973) 597-2500 |

**B./C.**   **Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial, Inc.**

Defendants submit the following list of witnesses that it expects to present at trial and those witnesses it may call if the need arises, other than those witnesses expected to be called solely for impeachment.  Defendants reserve the right to call at trial any witness on U.S. Home and Lennar's witness list(s).

1.   Witnesses Defendants expect to present at trial:

| Witness | Address | Telephone Number |
|---|---|---|
| Brennan, James | c/o Reed Smith LLP<br>3110 Fairview Park Drive<br>Suite 1400<br>Falls Church, VA 22042 | Reed Smith:<br>(703) 641-4200<br><br>Brennan:<br>(703) 641-4252 |
| Colton, Daniel | c/o Reed Smith LLP<br>3110 Fairview Park Drive<br>Suite 1400<br>Falls Church, VA 22042 | (703) 641-4200 |
| Hardy, Thomas | 43045 John Mosby Highway<br>Chantilly, VA 20152 | |
| Lannin, Christopher | 1635 La Salle Avenue<br>McLean, VA 22102 | (703) 734-1208 |
| Magee, Steven | c/o Katten Muchin Rosenman LLP<br>2900 K Street NW<br>North Tower - Suite 200 | Katten: (202) 625-3500 |

| | Washington, DC 20007-5118 | |
|---|---|---|
| Sandler, Steven | c/o Reed Smith LLP<br>3110 Fairview Park Drive<br>Suite 1400<br>Falls Church, VA 22042 | Reed Smith:<br>(703) 641-4200 |
| Topjian, Nishan | 468 Forest Beach Rd.<br>Annapolis, MD 21409 | (410) 647-7754 |

2.      Witnesses Defendants may call if the need arises:

| Witness | Address | Telephone Number |
|---|---|---|
| Benson, Nathan | c/o Reed Smith LLP<br>3110 Fairview Park Drive<br>Suite 1400<br>Falls Church, VA 22042 | Reed Smith:<br>(703) 641-4200 |
| Bevard, John | 204 Black Skimmer Court<br>Edgewater, MD 21037 | (410) 798-5334 |
| Bevard, Marion | 7284 Quaker Neck Road<br>Bozman, MD 21612 | (410) 745-3531 |
| Collier, Martin | 415 Hidden Way<br>Centerville, MD 21617 | |
| Harvey, Bruce | 10387 Wetherburn Road<br>Woodstock, MD 21163 | (410) 418-5515 |
| Kight, Stephen | 4012 Holly Knoll Drive<br>Glen Arm, MD 21057 | (410) 592-3731<br>(410) 592-3739 |
| King, Joseph | 3212 12 Street S.<br>Arlington, VA 22204 | |
| Kunkle, Fredrick | 12707 Maryvale Court<br>Ellicott City, MD 21042 | (410) 531-1651<br>(661) 347-6879 |
| Simon, Joel | 7006 Longwood Drive<br>Bethesda, MD 20817 | (301) 469-8911 |
| Snyder, Michael | 9835 Diversified Lane<br>Ellicott City, MD 21042 | (410) 788-4650<br>(410) 719-7543 |
| Villegas, Alejandro | 5638 Bradley Boulevard | (240) 252-7775 |

| | Bethesda, MD 20814 | |
|---|---|---|

**X.**      **Expert Witnesses Who May Testify at Trial and Concise Summary of Opinions**

     A.      <u>U.S. Home Corporation and Lennar Corporation</u>

     1.      B. Tod Delaney, First Environment, Inc.: Lennar expects that Dr. Delaney, based on the limited analytical results available, will testify regarding the likely scope and timing of a remedial investigation and remedial action plan for the Bevard Property.

     2.      Wayne M. Grip, Aero-Data Corporation: Lennar expects that Mr. Grip will testify regarding the interpretation of historical aerial photographs, maps, and permits as they pertain to the sludging operations on the Bevard Property

     3.      John P. Imse, Norwest Corporation: Lennar expects that Mr. Imse will testify regarding Environ's investigation of the Bevard Property, including the sampling and analysis plan and collection and testing and processing of samples.

     4.      Karl Kalbacher: Lennar expects that Mr. Kalbacher, based on the evidence of hazardous substances on the Bevard Property, will testify regarding the required environmental investigation and remediation for the Bevard Property to qualify as suitable for residential use under Maryland law and regulations, including but not limited to MDE guidelines, programs, and technical guidance.

     5.      Robin L. Richards, Environ International Corporation: Lennar expects that Ms. Richards will testify regarding Environ's investigation of the Bevard Property, including the design and implementation of the sampling and analysis plan and collection, testing, and processing of samples, the presence of hazardous substances at or within the Bevard Property, the historical disposal of sewage sludge at the Bevard Property and relevant regulations and

permits pertaining to such disposal, and that the extensive sludge disposal is the source of elevated concentrations of hazardous substances on the Bevard Property.

      B./C.   <u>Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial</u>

      1.     James C. Brennan, Reed Smith LLP, disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(C): Mr. Brennan is an experienced Maryland real estate attorney whose practice focuses on real estate and real estate development.  Mr. Brennan is expected to testify about materiality as that term is commonly understood in the real estate development industry; customary environmental and other due diligence; and customary practices with the exchange of information, specifying concerns about conditions precedent and proceeding to closing.

      2.     Daniel I. Colton, disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(C): Mr. Colton is an experienced Maryland real estate developer who has worked in the real estate development industry for over 30 years on approximately 60 real estate projects during his career.  Mr. Colton is expected to testify about materiality as that term is commonly understood in the real estate development industry; common practices of consultants and developers in the development process; environmental and entitlement due diligence by purchasers of large parcels of real estate; responsibilities of sellers of large parcels of real estate; feasibility study periods for purchases of large parcels of real estate; what conditions may or may not make a large parcel of real estate suitable for residential development; and rebuttal of Mr. Delaney's opinions.

      3.     Nicholas Basta, Ph. D., Ohio State University School of Environment and Natural Resources:  Dr. Basta is a Professor of Soil and Environmental Chemistry and specializes in risk-based environmental chemistry and bioavailability of contaminants and nutrients in soil with emphasis on human (e.g., public health), agronomic (e.g., crop, animal), and ecosystem pathways.  Defendants expect Dr. Basta to testify that soil sampling results taken

by Environ International Corporation ("Environ") show that soils taken from the Bevard Property by Environ are consistent with natural, uncontaminated soil requiring no remediation and are appropriate for residential development.

      4.     Michael H. Berman, P.E., CHMM, Geosyntec Consultants: Mr. Berman specializes in environmental investigation and assessments and developing remedial scenarios and designs for contaminated sites.  Defendants expect Mr. Berman to testify regarding comparative residential properties in Maryland, including land built on by Lennar, for which evidence of prior biosolids application was identified and to compare such evidence to information related to past biosolids application at the Bevard Property.  Mr. Berman is also expected to testify that the underlying information and environmental testing data for the Bevard Property do not support the conclusion that any remediation is necessary for the Bevard Property.

      5.     Sally Brown, Ph.D, University of Washington School of Environmental and Forest Sciences:  Dr. Brown specializes in soil science and the use of biosolids, including risks associated with contaminants, use of biosolids to restore metal contaminated soils, carbon balance for different end use options, and integration of biosolids use in green urban infrastructure.  Defendants expect Dr. Brown will testify as to the safety and benefits of land application of biosolids and the historical land application of biosolids to the Bevard Property, including but not limited to the source of those biosolids and compliance with relevant regulatory schemes.

      6.     W. Lee Daniels, Ph.D., Virginia Tech University and TerraScience LLC: Dr. Daniels specializes in soil-waste management and related fields, with his research programs focused on the areas of mined land reclamation, wetland impact mitigation, and soil-waste

management issues.  Defendants expect Dr. Daniels to testify regarding the sampling design used by Environ and the internal conflict among Lennar's experts as to which sampling sites historically received biosolids.  Dr. Daniels is also expected to testify that there is no statistical difference between concentrations of heavy metals when comparing areas that received biosolids application versus those that did not, that, in particular, arsenic (As), vanadium (V), and other metal levels are consistent with naturally occurring background levels for native soils in this region.

     7.  Shahrokh Rouhani, Ph.D., P.E., NewFields Companies, LLC: Dr. Rouhani is an environmental scientist, professional engineer, and tenured university professor who specializes in environmental statistics, modeling, and data analysis.  Defendants expect Dr. Rouhani to testify that there is no statistically significant difference between data sampled by Environ from inside- and outside-biosolid-areas on the Bevard Property and that the statistical modeling refutes any claim that historical biosolid applications in the property have caused widespread contamination.  He also will testify that the property is appropriate for residential development based on the environmental studies by Environ and other consultants.

     8.  Lisa L. Williams, CPSS, Williams Environmental Services, Inc.: Ms. Williams is a Certified Professional Soil Scientist (CPSS) and a Maryland licensed Nutrient Management Consultant who, from 1992 to 2012, managed the nationwide Technical Services Department for Bio Gro Systems (now Synagro), which encompassed over 600 land application operations in 34 different states.  Defendants expect Ms. Williams to testify about the generation, testing, regulation, permitting, and application of biosolids in Maryland including the historical land application of biosolids to the Bevard Property, and Maryland's current regulations and guidelines for permitting, spreading operations, and monitoring of contaminants.  Ms. Williams

is also expected to testify that the historical testing data for all potential biosolids applied to the Bevard Property (source data) and as applied to the Bevard Property (application data) indicates that the land application of biosolids complied with existing laws and regulations, and did not include excess heavy metals, polychlorinated biphenyl compounds (PCBs) or any other related material that would cause a risk to the environment or the health and safety of a resident in a residential development under current risk-based health and safety standards.

## XI.   **Deposition Designations and Counter-Designations**

### A.   U.S. Home Corporation and Lennar Corporation

Lennar intends to offer excerpts from depositions, other than solely for purposes of impeachment or rebuttal, as follows:

| Witness | Date | Designation | Objection |
|---|---|---|---|
| Abrams, Daniel | 01/08/2013 | 5:1-13 | |
| Abrams, Daniel | 01/08/2013 | 9:7-10:5 | |
| Abrams, Daniel | 01/08/2013 | 14:13-16:4 | |
| Abrams, Daniel | 01/08/2013 | 53:2-56:2 | Relevance |
| Abrams, Daniel | 01/08/2013 | 57:18-59:21 | Relevance |
| Abrams, Daniel | 01/08/2013 | 84:2-9 | |
| Abrams, Daniel | 01/08/2013 | 85:9-86:14 | |
| Abrams, Daniel | 01/08/2013 | 134:15-135:18 | |
| Abrams, Daniel | 01/08/2013 | 136:19-137:3 | |
| Abrams, Daniel | 01/08/2013 | 137:9-11 | |
| Abrams, Daniel | 01/08/2013 | 137:18-138:21 | |
| Abrams, Daniel | 01/08/2013 | 140:12-141:15 | |
| Abrams, Daniel | 01/08/2013 | 145:23-146:7 | Relevance |
| Abrams, Daniel | 01/08/2013 | 146:11-13 | Relevance |
| Abrams, Daniel | 01/08/2013 | 148:12-17 | Relevance |
| Berman, Michael | 06/21/2013 | 222:10-228:1 | |
| Bevard, John | 06/01/2011 | 6:1-10 | |
| Bevard, John | 06/01/2011 | 10:21-11:12 | |
| Bevard, John | 06/01/2011 | 12:4-9 | |
| Bevard, John | 06/01/2011 | 13:19-14:7 | |
| Bevard, John | 06/01/2011 | 16:21-17:1 | |
| Bevard, John | 06/01/2011 | 20:2-21:4 | |
| Bevard, John | 06/01/2011 | 22:10-23:8 | |
| Bevard, John | 06/01/2011 | 25:5-15 | |

| Witness | Date | Designation | Objection |
|---|---|---|---|
| Bevard, John | 06/01/2011 | 25:18-21 | |
| Bevard, John | 06/01/2011 | 28:7-19 | |
| Bevard, John | 06/01/2011 | 45:9-46:22 | |
| Bevard, John | 06/01/2011 | 78:15-79:2 | |
| Bevard, Marion | 06/01/2011 | 6:1-9 | |
| Bevard, Marion | 06/01/2011 | 12:7-13:1 | |
| Bevard, Marion | 06/01/2011 | 13:5-20 | |
| Bevard, Marion | 06/01/2011 | 17:5-14 | |
| Bevard, Marion | 06/01/2011 | 17:18-18:2 | |
| Bevard, Marion | 06/01/2011 | 54:8-56:17 | |
| Bevard, Marion | 06/01/2011 | 57:20-59:11 | |
| Bevard, Marion | 06/01/2011 | 59:22-60:7 | |
| Bevard, Marion | 06/01/2011 | 60:22-61:2 | |
| Bevard, Marion | 06/01/2011 | 81:2-3 | |
| Bevard, Marion | 06/01/2011 | 82:10-85:4 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 8:14-9:2 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 10:13-23 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 61:15-62:2 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 62:18-63:3 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 118:14-23 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 127:6-23 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 129:1-5 | |
| Brennan, James (30(b)(6)) | 04/23/2013 | 134:4-17 | |
| Brennan, James (30(b)(6)) | 04/24/2013 | 314:3-9 | |
| Brennan, James (30(b)(6)) | 04/24/2013 | 336:7-24 | |
| Brennan, James (30(b)(6)) | 04/24/2013 | 337:4-10 | |
| Brown, Sally | 06/28/2013 | 103:2-15 | |
| Burns, William | 12/21/2012 | 5:2-10 | |
| Burns, William | 12/21/2012 | 7:15-8:2 | |
| Burns, William | 12/21/2012 | 223:24-224:15 | |
| Burns, William | 12/21/2012 | 238:15-21 | |
| Burns, William | 12/21/2012 | 276:2-16 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 340:13-341:3 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 341:17-20 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 352:8-17 | |
| Burns, William (30(b)(6) | 5/23/2013 | 352:25-353:5 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 355:22-356:14 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 357:9-358:7 | Relevance |
| Burns, William (30(b)(6)) | 05/23/2013 | 364:12-18 | Relevance |
| Burns, William (30(b)(6)) | 05/23/2013 | 455:13-18 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 473:16-474:14 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 474:16-19 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 474:21-25 | |
| Burns, William (30(b)(6)) | 05/23/2013 | 475:2-12 | |

| Witness | Date | Designation | Objection |
|---|---|---|---|
| Burns, William (30(b)(6)) | 05/23/2013 | 475:15-476:1 | |
| Burns, William (30(b)(6)) | 05/09/2013 | 7:12-23 | |
| Burns, William (30(b)(6)) | 05/09/2013 | 14:7-16 | |
| Burns, William (30(b)(6)) | 05/09/2013 | 173:22-174:17 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 196:24-197:11 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 200:11-201:1 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 207:13-23 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 212:23-213:14 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 213:16-17 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 234:19-21 | |
| Burns, William (30(b)(6)) | 05/09/2013 | 234:23-236:17 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 237:4-23 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 238:1-25 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 239:12-240:10 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 240:12-12 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 242:13-243:14 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 243:16-245:21 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 247:19-248:3 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 250:13-16 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 255:1-19 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 260:21-261:7 | Relevance |
| Burns, William (30(b)(6)) | 05/09/2013 | 279:2-10 | Relevance |
| Colton, Daniel | 02/20/2013 | 175:13-23 | |
| Colton, Daniel | 02/20/2013 | 259:10-19 | |
| Colton, Daniel | 02/20/2013 | 262:15-20 | |
| Colton, Daniel | 02/20/2013 | 262:24-263:6 | |
| Colton, Daniel | 02/20/2013 | 324:17-325:6 | |
| Colton, Daniel | 02/20/2013 | 344:14-24 | |
| Colton, Daniel | 02/20/2013 | 346:8-14 | |
| Colton, Daniel | 02/20/2013 | 350:17-23 | |
| Colton, Daniel | 02/20/2013 | 351:4-18 | |
| Colton, Daniel | 01/31/2013 | 6:9-15 | |
| Colton, Daniel | 01/31/2013 | 151:23-152:3 | |
| Colton, Daniel (30(b)(6)) | 04/24/2013 | 420:15-21 | |
| Harvey, Bruce | 04/25/2013 | 6:10-13 | |
| Harvey, Bruce | 04/25/2013 | 8:8-10:9 | |
| Harvey, Bruce | 04/25/2013 | 136:1-142:3 | Form/Foundation: (as to 137:9-16); (140:3-14) Relevance: (as to 138:9-139:11) |
| Jacoby, Robert J. | 08/16/2011 | 11:4-20 | |
| Jacoby, Robert J. | 08/16/2011 | 21:24-22:5 | |
| Jacoby, Robert J. | 08/16/2011 | 23:11-24:6 | |

| Witness | Date | Designation | Objection |
|---|---|---|---|
| Jacoby, Robert J. | 08/16/2011 | 73:16-74:7 | |
| Ker, Mathew A. (30(b)(6)l) | 02/08/2011 | 8:14-9:1 | Form; calls for speculation; lack of foundation; lack of personal knowledge; leading; relevance; mischaracterizes evidence |
| Ker, Matthew A. (30(b)(6) | 02/08/2011 | 243:10-17 | Form; calls for speculation; lack of foundation; lack of personal knowledge; leading; relevance; mischaracterizes evidence |
| Ker, Matthew A. (30(b)(6) | 02/08/2011 | 246:3-253:22 | Form; calls for speculation; lack of foundation; lack of personal knowledge; leading; relevance; mischaracterizes evidence |
| Magee, Steven | 10/20/2011 | 7:11-22 | |
| Magee, Steven | 10/20/2011 | 18:12-15 | |
| Magee, Steven | 10/20/2011 | 18:24-19:8 | |
| Magee, Steven | 10/20/2011 | 28:20-29:14 | Relevance |
| Magee, Steven | 10/20/2011 | 109:3-8 | |
| Magee, Steven | 10/20/2011 | 109:23-110:14 | |
| Magee, Steven | 10/20/2011 | 143:5-9 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 6:4-17 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 7:20-22 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 47:12-19 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 50:24-51:14 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 53:5-54:22 | Relevance |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 56:11-24 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 67:8-12 | Form |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 68:3-18 | Privilege; instruction not to answer: (as to 68:14-18) |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 69:10-15 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 70:6-19 | Colloquy b/w counsel: (as to 70:9-17) |

| Witness | Date | Designation | Objection |
|---|---|---|---|
| Magee, Steven (30(b)(6)) | 05/21/2013 | 89:20-92:10 | Form; speculation: (as to 90:25-91:7) <br><br> Privilege; instruction not to answer: (as to 92:5-10) |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 159:9-13 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 167:15-169:2 | |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 186:17-187:4 | Relevance |
| Magee, Steven (30(b)(6)) | 05/21/2013 | 199:11-200:2 | Relevance |
| Matis, Nina | 02/28/2013 | 6:15-16 | |
| Matis, Nina | 02/28/2013 | 8:4-25 | |
| Matis, Nina | 02/28/2013 | 12:4-14 | Relevance |
| Matis, Nina | 02/28/2013 | 14:10-22 | Relevance |
| Matis, Nina | 02/28/2013 | 88:2-90:14 | Relevance: (as to 88:2-90:14) <br> Privilege: (as to 89:4-9; 89:17-90:14) |
| Matis, Nina | 02/28/2013 | 115:12-17 | Relevance and Privilege |
| Sandler, Steven | 01/24/2013 | 5:8-18 | |
| Sandler, Steven | 01/24/2013 | 7:14-8:9 | |
| Sandler, Steven | 01/24/2013 | 23:17-24:22 | |
| Sandler, Steven | 01/24/2013 | 46:13-22 | |
| Sandler, Steven | 01/24/2013 | 54:15-55:24 | |
| Sandler, Steven | 01/24/2013 | 109:18-110:5 | |
| Sandler, Steven | 01/24/2013 | 168:2-170:15 | |
| Sandler, Steven | 01/24/2013 | 186:20-187:6 | |
| Sandler, Steven | 01/24/2013 | 188:17-25 | |
| Sandler, Steven | 01/24/2013 | 194:25-195:7 | |
| Sandler, Steven | 01/24/2013 | 233:19-235:5 | Form; mischaracterizes document: (as to 233:19-234:9) |
| Sugarman, Jay | 02/27/2013 | 6:17-21 | |
| Sugarman, Jay | 02/27/2013 | 25:7-10 | Relevance |
| Sugarman, Jay | 02/27/2013 | 65:3-66:9 | Relevance |
| Sugarman, Jay | 02/27/2013 | 133:18-134:16 | |
| Sugarman, Jay | 02/27/2013 | 138:25-139:9 | |
| Sugarman, Jay | 02/27/2013 | 187:25-188:3 | |
| Welch, Joseph | 02/28/2011 | 4:10-13 | |
| Welch, Joseph | 02/28/2011 | 17:16-21 | |
| Welch, Joseph | 02/28/2011 | 28:1-11 | |
| Welch, Joseph | 02/28/2011 | 29:25-30:9 | |

| Witness | Date | Designation | Objection |
|---------|------|-------------|-----------|
| Welch, Joseph | 02/28/2011 | 44:8-17 | Relevance |
| Welch, Joseph | 02/28/2011 | 50:18-51:1 | Relevance |
| Welch, Joseph | 02/28/2011 | 104:19-105:8 | |
| Welch, Joseph | 02/28/2011 | 121:8-122:10 | |
| Welch, Joseph | 02/28/2011 | 122:14-19 | |
| Welch, Joseph | 02/28/2011 | 122:20-123:12 | |
| Welch, Joseph | 02/28/2011 | 138:3-142:8 | Relevance |
| Welch, Joseph | 02/28/2011 | 142:14-21 | |

In addition to the objections identified herein, Defendants object to Lennar's deposition designations for any witness who is not an "Unavailable Witness" within the meaning of Fed. R. Civ. Pro. 32(a)(4).

Lennar also intends to offer discovery responses of Settlers Crossing, WPE, Bevard Development, and iStar, other than solely for the purposes of impeachment or rebuttal, as follows:  Bevard Development's response to Interrogatory No. 5 of U.S. Home's First Set of Interrogatories; Bevard Development's response to Interrogatory No. 8 of Lennar Corporation's First Set of Interrogatories; Settlers Crossing's response to Interrogatory No. 6 of U.S. Home's First Set of Interrogatories; Steven Sandler's response to Interrogatory No. 8 of U.S. Home's First Set of Interrogatories; Steven Sandler's response to Interrogatory No. 13 of U.S. Home's First Set of Interrogatories; and WPE's response to Interrogatory No. 20 of U.S. Home's First Set of Interrogatories.

B./C.   <u>Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial, Inc.</u>

See attached chart (Tab C).

In addition to the objections identified in the attached chart, Lennar objects to deposition designations for Martin Collier, Daniel Colton, Thomas Hardy, Bruce Harvey, Stephen Kight, Joseph King, Frederick Kunkle, Christopher Lannin, Nishan Topjian, Joel Simon,

Michael Snyder, and Alejandro Villegas because these witnesses are not adverse parties, officers, directors, or managing agents of adverse parties, or unavailable to testify in person at trial, Defendants have included each of these witnesses their witness list.

**XII.**   **Other Pretrial Relief Requested**

        A.        <u>U.S. Home Corporation and Lennar Corporation</u>

        Lennar intends to file motions *in limine* seeking to prohibit defendants from offering certain evidence at trial on March 5, 2014 pursuant to the Court's February 14, 2014 letter Order (ECF No. 633).

        B./C.    <u>Settlers Crossing, LLC, Washington Park Estates, LLC, Bevard Development Company, Steven B. Sandler, and iStar Financial</u>

        Defendants intend to file motions *in limine* seeking to prohibit plaintiffs from offering certain evidence at trial on March 5, 2014 pursuant to the Court's February 14, 2014 letter Order (ECF No. 633).

        Defendants request that the trial be bifurcated, with liability tried first. Bifurcation would shorten the length of trial and shorten the subsequent presentation of damages evidence, given that only one side, rather than both, will have to present evidence of its damages. Lennar objects to this request.

**XIII.**   **Other Matters Added By The Court**

Respectfully submitted,

_____
K. Nichole Nesbitt (MSB #26137)
M. Peggy Chu (MSB #18507)
GOODELL, DeVRIES, LEECH & DANN LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4026
knn@GDLDLAW.com

David L. Harris (admitted pro hac vice)
David S. Sager (admitted pro hac vice)
Jason Halper (admitted pro hac vice)
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey  07068
(973) 597-2500
dharris@lowenstein.com
dsager@lowenstein.com
jhalper@lowenstein.com

Attorneys for U.S. Home Corporation
and Lennar Corporation

_____
Thomas R. Folk (admitted pro hac vice)
Stephen T. Fowler (MSB #16881)
3110 Fairview Park Drive, Suite 1400
Falls Church, VA 22042
(703) 641-4270
tfolk@reedsmith.com
sfowler@reedsmith.com

Timothy F. Maloney (MSB #03381)
Joseph Greenwald & Laake P.A.
Capital Office Park
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Phone 240.553.1206
tmaloney@jgllaw.com

Attorneys for Settlers Crossing, LLC,
Washington Park Estates, LLC, Bevard
Development Company, and Steven B. Sandler

_____
Eric A. Kuwana (Bar No. 25398)
John A. Rosans
Katten Muchin Rosenman LLP
2900 K Street NW
North Tower – Suite 200
Washington, DC 20007-5118
Phone: (202) 625-3705
Fax: (202) 295-1107
eric.kuwana@kattenlaw.com
john.rosans@kattenlaw.com

Attorneys for iStar Financial, Inc.