IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

U.S. HOME CORPORATION

:

v.                                : Civil Action No. DKC 08-1863

:

SETTLERS CROSSING, LLC, et al.

:

**MEMORANDUM OPINION**

After more than six years of litigation, in a case generating over 700 docket entries, this contract dispute involving the proposed sale of 1,250 acres of land in Prince George's County, Maryland, has narrowed to two basic issues: whether there are materials present on the property of a type, from a source, and to a degree sufficient to breach the environmental representations and warranties of the parties' contract, and whether the seller's conduct in responding to a formal request for entry constituted a material breach.  In order to resolve those issues, a bench trial was held from March 31 to April 15, 2014.  Upon consideration of the evidence adduced at trial, and the parties' arguments with respect thereto, the court now issues findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law

## I.   Background

On November 15, 2005, Plaintiff/Counter-Defendant U.S. Home Corporation ("U.S. Home"), a subsidiary of Counter-Defendant Lennar Corporation ("Lennar"; together with U.S. Home, "Purchaser"), entered into an agreement to purchase the sole membership interest in Defendant/Counter-Plaintiff Washington Park Estates, LLC ("WPE"), held by Defendant/Counter-Plaintiff Settlers Crossing, LLC ("Settlers Crossing").   The agreement ("Purchase Agreement") contemplated that, at the time of settlement, WPE would hold title to approximately 1,250 acres of undeveloped real estate in Prince George's County, Maryland, known as the Bevard property ("the Property").   Thus, by acquiring Settlers Crossing's membership interest in WPE, U.S. Home would acquire the Property, upon which it planned to build a large residential community.   Concomitantly with the Purchase Agreement, U.S. Home entered into a contract with Defendant/Counter-Plaintiff Bevard Development Company ("BDC"), pursuant to which BDC was to complete certain development work on the Property ("Contract for Services").   The combined price of the Purchase Agreement and Contract for Services was $200 million, and U.S. Home paid deposits totaling $20 million. Defendant Steven Sandler ("Mr. Sandler") – who controlled

---

separately.  The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."

Settlers Crossing, WPE, and BDC (collectively, "Seller") – personally guaranteed Seller's obligations under the contracts, promising repayment of the deposits in the event of a breach. (ECF No. 649, stipulations).

For several months prior to entering into the agreements, Purchaser was given free access to the Property in order to conduct feasibility testing. As reflected in the Purchase Agreement, Seller provided U.S. Home with "all site plans, lease agreements, title reports, surveys, environmental reports, soil studies, arch[a]eological studies, geotechnical reports and other tests, studies and documents prepared by third parties pertaining to the Property . . . in [its] possession[.]" (JTX 41 ¶ 9).[2] Those reports included a 2001 Phase I Environmental Site Assessment ("ESA") conducted by Schnabel Engineering North, LLC ("Schnabel"), Schnabel's September 2004 update to the Phase I ESA, a Phase I Archaeological Survey conducted by URS Corporation, Inc. ("URS"), and reports of geotechnical and subsurface investigations prepared by Hardin-Kight Associates, Inc. ("Hardin-Kight"). (ECF No. 649 ¶ 11).

The stated purpose of Schnabel's 2001 Phase I ESA was "to obtain information that would allow the development of an

_____

[2] The designation "JTX" refers to joint trial exhibits; "PTX" refers to exhibits offered by U.S. Home and Lennar; and "DTX" refers to exhibits offered by Seller and iStar. References to trial testimony are designated by "T." followed by the date of the testimony.

opinion regarding the potential for 'recognized environmental conditions' being present on or near the site that could present major development difficulties, liability exposure, or the need for Phase II sampling and testing."   (JTX 25, at SCH0000061). Schnabel defined the term "recognized environmental conditions," in accordance with guidelines set by the American Society for Testing and Materials ("ASTM"), as

> the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum product into structures on the property or into the ground, ground water, or surface water of the property.

(*Id.*).  The report noted that "the site and adjacent properties ha[d] been used agriculturally and mined for sand and gravel since 1957" and that "Area 1 was heavily mined and replenished with fill material that has the potential to contain heavy metals, sludge, and varying debris."   (*Id.* at SCH00000599).[3]

---

[3] At trial, Richard Beckwitt, Lennar's President, described the Property as follows:

> There were three parcels that we were purchasing: Bevard East, Bevard North, and Bevard West. . . . Bevard East is the largest one. . . . It encompassed about 565 acres.  Bevard North . . . was 275 acres, and Bevard West was 410 acres.

(T. 3/31/14, at 88).  Schnabel designated the same three parcels as "Areas 1, 2, and 3" (JTX 25, at SCH00000604), and "Area 1"

Schnabel opined that the "[p]otential fill material throughout Area 1" constituted a "'recognized environmental condition[]' under the ASTM guidelines" (*id.* at SCH00000616), and advised that the "extent and character of the fill material w[ould] be identified upon completion of the geotechnical portion of th[e] investigation" (*id.* at SCH00000599).

Schnabel updated its Phase I ESA in 2004 "to document changes to the site and surrounding area that may have occurred since the previous report was issued." (JTX 29, at ECC 00001129). In initially summarizing its prior work, Schnabel noted the results of its geotechnical investigation:

> According to the original ESA[,] date[d] May 25, 2001, Area 1 was heavily mined for sand and gravel approximately 10 years before the original report. The area was suspected to contain large amounts of fill[,] possibly containing debris, sludge, and heavy metals. Subsequently, a geotechnical study was performed by Schnabel in May and June of 2001 to assess subsurface conditions of Area 1. Twenty-two soil borings were advanced to a maximum depth of twenty-five feet. Fill/possible fill ranges in depth from approximately 2.0 to 18.0 feet

---

corresponds with "Bevard East" (*id.* at SCH00000618). Through an interview with Jerry Terhune, who had "farmed the subject properties for approximately 27 years," Schnabel learned that "Area 1 was heavily mined approximately 100 feet below the current surface elevation" and "replenished with a variety of debris and fill materials." (*Id.* at SCH00000615). Mr. Terhune reported that "Areas 2 and 3 were not mined as heavily as Area 1 and were not filled in after mining activities had ceased." (*Id.*).

> below the surface elevation.   However, no
> debris, sludge, or heavy metals were noted.

(JTX 29, at ECC 00001138).   Schnabel found "[n]o significant changes to the subject properties . . . since the previous assessment" (*id*. at ECC 00001129); identified no "recognized environmental conditions" on the Property (*id*. at ECC 00001150); and recommended "no additional environmental investigations" (*id*. at ECC 00001129).   It cautioned, however, that "[a]ll conclusions are qualified by the fact that no soil or ground water sampling or chemical testing was conducted under this contract." (*Id*. at ECC 00001135).

URS provided a report of its Phase I Archaeological Survey in June 2005, the stated purpose of which was "to evaluate the presence or absence of archaeological resources" on the Property.   (JTX 35, at USH-00029069).   URS noted that the Property was "known to have extensive prehistoric and historic occupations," but that "most of the area is also known to have been mined by the Silver Hill Sand & Gravel Company in the late twentieth century." (*Id*.).   It generally attributed the lack of artifacts found on the Property to "disturbed fill layers" and other "soil characteristics [that] reflected the mining process[.]"   (*Id*.).   This conclusion was supported by information it learned regarding the prior mining operation:

> The largest pieces of the three property
> assemblages are comprised of land purchased

6

from descendants of the Bevard family, who
operated Bevard Farms and the Silver Hill
Sand & Gravel Company. . . .

Despite the name Bevard Farms, much of the
project area is known to have been mined for
sand and gravel under the auspices of the
Silver Hill Sand & Gravel Company.   The
following promotional material for the Mud
Cat Dredge describes what took place at the
project area during the cleaning of the
gravel, and accounts for the ground
conditions observed there during the recent
survey:

> . . . At Silver Hill, the gravel is
> scrubbed to remove a 10% clay content.
> After the gravel is washed, the slurry
> containing suspended clay and mud runs
> into a slurry pond where fines settle
> out.   In the process of running 2,500
> tpd, as much as 500 cu. yds. of the
> clay-mud mixture [is] generated and
> added daily to the slurry pond.

> . . . .

> Originally, the Silver Hill crew
> cleaned the pond with traditional
> dragline and clamshell techniques.
> Then the company installed a Mud Cat[TM]
> portable hydraulic dredge.

> According to [Sonny] Bevard, the Mud
> Cat[TM] sucks and pumps the clay-mud
> mixture a distance of 3,800 ft. through
> an 8-in. discharge pipe.   "We decided
> to reclaim and raise the level of the
> land," said Bevard, "and the only way
> to get the clay substance to dry out
> enough for the land to be stable is to
> spread [it] out in very thin layers.
> We plow furrows, much like forming
> ridges for a row of seeds, and direct
> the Mud Cat's[TM] pipe discharge over the
> furrows, pouring the substance in thin
> layers over the land."

> Once the clay dries, the land is plowed
> again to further aerate it before
> another layer is added to the surface.
> After it is completely reclaimed, the
> land will be sold for building
> development.

(*Id*. at USH-00029077).   The URS report further observed that a

wastewater treatment plant operated on the Property and that

sludge from that plant had been applied to a small portion:

> Running through the project area is the
> Piscataway Wastewater Treatment Plant (PWWT)
> system, which includes 20 buildings spread
> over 300 acres, 15 of which were for water
> treatment purposes. In 1980-81 the
> Environmental Protection Agency [("EPA")]
> landfarmed an 8 acre plot with sludges, in
> the northwest corner of the Bevard Property.
> The process is described as follows:
>
> > From December 1980 until April 1981,
> > pickling liquors from [] Bethlehem
> > Steel's Sparrows Point Plant were
> > transported to the WWTP [*i.e.*,
> > wastewater treatment plant]. The WWTP
> > was conducting experimental tests on
> > the spent pickling liquor to determine
> > the feasibility of using it to remove
> > phosphates from treated sewage. WWTP
> > records indicate [that it] processed
> > 38,000 gallons of pickle liquors during
> > the experimental period. The sludges
> > generated by the WWTP during the influx
> > of the pickling liquors were
> > transported to the Bevard farm where
> > they were landfarmed along Tinkers
> > Creek.
>
> > The EPA conducted a preliminary assessment
> > of soils from the location in 1985. No
> > significant contaminants were detected, and
> > no further remedial action was recommended
> > by the EPA. Nevertheless, the location is

8

> on the state's Master List of potential
> hazardous waste sites.

(*Id.* at USH-00029077, 78).

Hardin-Kight's geotechnical and subsurface studies "consisted of a field investigation, laboratory testing, review of geological literature, [] review of a previous investigation of the site[, and] . . . the performance of . . . standard penetration soil borings that were drilled to depths ranging from 15 to 40 feet." (JTX 32, at HK00001666).   It "identified and logged the soil characteristics during drilling and . . . soil samples were selected and tested in the laboratory for natural moisture content, grain size distribution and plasticity characteristics."  (*Id.*).  Hardin-Kight noted that "[f]ill or possible fill" was "encountered in several of the borings," but that the fill material "appear[ed] to be clean, free of construction debris or deleterious materials[, and] . . . indigenous to the site."  (*Id.* at HK 00001670).  It advised that "[f]urther investigation of the fill/possible fill areas should be conducted when the proposed final site layout is established if development is proposed in the identified fill areas," including "conducting sufficient test pits and borings to confirm that the fill is as consistent as indicated by the preliminary investigations."  (*Id.*).  Nevertheless, it concluded

that "[t]he site is suitable for the proposed development." (*Id.* at HK 00001663).

After entering into the Purchase Agreement, U.S. Home independently commissioned a number of additional studies. Hardin-Kight was retained to conduct further investigations of soil stability. It drilled "several hundred" soil borings on the Property, encountering areas of "uncontrolled fill" material in the process. (T. 4/4/14, at 73). American Infrastructure was hired "to put some . . . costs together for dealing with . . . the uncontrolled fill" and directed the excavation of "[t]est pits" at certain locations. (*Id.* at 85-86). Dewberry & Davis, LLC, was contracted to complete certain grading and engineering work on the Property. (DTX 585, 586). Additionally, Purchaser retained Environmental Consultants and Contractors, Inc. ("ECC"), to conduct an independent Phase I ESA. When asked at his deposition why Purchaser commissioned another Phase I ESA, U.S. Home Division President Robert Jacoby explained:

> [T]he general policy of Lennar has always been to have a third-party contracted [] by us to do environmental studies on a property and there was a provision for waiving that and taking a reliance letter from someone who had worked for the precurrent owner or the previous owner, and with an investment of this size we thought doing both was probably the prudent thing to do and so we took a reliance letter from [Schnabel] and we had ECC do one for us.

(DTX 614, Jacoby depo., at 142-43).

ECC's Phase I ESA report, issued May 8, 2006, identified three "recognized environmental conditions" on the Property:

- o Five underground storage tanks (USTs) are located on the western portion of Bevard West.  Soil quality in the vicinity of these tanks is not known.

- o A farm dump covering approximately 1,200 square feet is located on the southeastern portion of Bevard East.  It is not known if debris in the farm dump has impacted native soil quality.

- o Sand and gravel mining operations were conducted on the Subject Property until approximately fifteen years ago. Reportedly, excavated soil was combined with soil from off-site sources and used as backfill.

(JTX 52 § 1.0).  To address these issues, ECC recommended that Purchaser take a number of actions:

ECC recommends the performance of a Limited Subsurface Investigation of the Subject Property to assess soil and groundwater quality and address the recognized environmental conditions identified in this report.  This investigation would include excavation of test pits or installation of soil borings in the vicinity of the former mines and in the vicinity of the farm dump. The investigation would evaluate the nature of fill material in the mined areas, characterize debris in the farm dump, and assess native soil quality in both areas. The investigation would also include installation of Geoprobe borings in the vicinity of the USTs.  In lieu of Geoprobe installation, the USTs could be removed in accordance with Federal and State regulations.  If evidence of a release is detected during installation of Geoprobes or following the removal of tanks, the Maryland

11

> Department of the Environment (MDE) should
> be notified.   Following notification, the
> MDE   may   require   additional   site
> investigation.

(*Id.* (internal emphasis removed)).   The ECC report expressly "d[id] not address naturally occurring hazardous substances such as elevated heavy metal concentrations in plants and soil" and indicated that "[n]o soil or groundwater sampling was performed[.]"  (*Id.* at § 2.0).

Purchaser later retained ECC to "abandon potable wells and septic systems, remove underground storage tanks and above-ground storage tanks, and . . . [conduct] asbestos aba[t]ement" on the Property.   (T. 4/4/14, at 28).   At least initially, however, it did not take further steps to assess the soil and groundwater quality; indeed, it believed such measures were not necessary.  (DTX 614, Jacoby depo., at 113).

In or around late 2006, Purchaser sought to renegotiate the Bevard contracts related to a decline in the residential housing market.   According to Mr. Jacoby:

> [T]he market for both homes and land had
> deteriorated significantly since the date of
> the original agreement.
>
> The crisis hit the State of Virginia
> before it hit the State of Maryland, but by
> 2007, . . . it was well on its way to
> impacting both home prices and land prices
> in not just Prince George's County, but all
> over the State of Maryland.

(*Id.* at 49-50).   At around the same time, Seller was experiencing financial difficulties of its own and sought to take out a loan from Defendant/Counter-Plaintiff iStar Financial, Inc. ("iStar"), related to the Property.   (ECF No. 649 ¶ 18; DTX 595, at USH-00005745; T. 4/10/14, at 70-79).

After extensive negotiations, Seller and Purchaser entered into a Second Amendment to the Purchase Agreement on May 16, 2007 ("Second Amendment").   Among other things, the Second Amendment significantly reduced the purchase price of Settlers Crossing's membership interest in WPE in exchange for a guaranty of specific performance by Lennar – *i.e.*, a "provision that [] require[d] Lennar . . . to actually close on the purchase of the [P]roperty, assuming [Seller] had satisfied [its] obligations under the contract." (T. 3/31/14, at 109).[4]   U.S. Home expressly "agree[d] and confirm[ed]" that it "ha[d] no actual knowledge" that any of Seller's initial representations and warranties were not true (JTX 56 ¶ 15), and Seller permitted it to begin pre-closing development work on the Property – *i.e.*, "clearing, grading and other activities desired by Purchaser in connection with its proposed development" (*id.* at ¶ 13).   The Second Agreement also permitted Settlers Crossing to obtain financing in an amount not to exceed $100 million, provided that "any and

---

[4] Under the initial Purchase Agreement, by contrast, U.S. Home could simply abandon the contract and forfeit its $20 million deposit.

all deeds of trust, mortgages, assignments, financing statements or other financing documents . . . that encumber the Property shall be satisfied and released at [s]ettlement at Settlers Crossing's sole expense." (*Id.* at ¶ 34). Settlement under the Second Amendment was scheduled to occur on December 5, 2007, but if "any condition precedent . . . [was] not satisfied or waived in writing by Purchaser at least ten (10) days prior to the [s]ettlement [d]ate[,] . . . then the [s]ettlement [d]ate [was to] be automatically extended to that date which is thirty (30) days after all conditions precedent to [s]ettlement . . . have been satisfied" (*id.* at ¶ 21).

On June 19, 2007, consistent with the terms of the Second Amendment, iStar provided Seller with a $100 million first mortgage bridge loan with repayment contemplated from the Bevard settlement proceeds. (ECF No. 649 ¶ 20). As security, iStar accepted collateral assignments of Seller's interests under the Purchase Agreement and Contract for Services. (*Id.* at ¶ 21). On the same date, Seller and Purchaser entered into a third (and final) amendment to the Purchase Agreement, which provided, in the event of foreclosure by iStar, that the Purchase Agreement would convert from a sale of Settlers Crossing's membership interest in WPE to a sale of the Bevard Property itself. (*Id.* at ¶ 22). Also on June 19, iStar entered into a Consent and Estoppel Agreement with Purchaser ("Consent and Estoppel

14

Agreement"), by which Purchaser acknowledged Seller's assignment of rights and made certain representations regarding the Property and the status of conditions precedent to settlement. As relevant here, Purchaser warranted that,

> [a]s of the date hereof, to the best of [its] knowledge, having made due inquiry, (i) [Purchaser] has no existing defenses, offsets, claims or credits with respect to the performance of its obligations under the [Purchase Agreement or Contract for Services], (ii) neither [Purchaser], nor any other party, [is] in default or breach of any of [its] respective obligations under the [agreements], (iii) there exists no condition or circumstance which, with the giving of notice or the passage of time, or both, would result in a default by [any party] under the [agreements, and] (iv) there exists no condition or circumstance known to [Purchaser] as of the date hereof which, with the giving of notice or the passage of time, or both, would result in a termination right[.]

(DTX 259 § 3).

At around the same time that Purchaser entered into these agreements, it was actively seeking a joint venture partner or land bank to reduce the total asset value of the Bevard transaction on its corporate ledger by the end of its fiscal year. (DTX 591, at USH_00326906). In summarizing a proposed transaction with one joint venture partner, Lennar represented, *inter alia*, that "[i]ndependent environmental assessments have not identified any hazardous conditions [on the Property] requiring extraordinary measures or higher level studies." (T.

3/31/14, at 165; DTX 243).   When initial efforts to find a partner were unsuccessful, Lennar began to investigate strategies to delay the scheduled settlement date, if not to avoid closing altogether.   At the project level, however, Purchaser was engaged in substantial pre-closing development work on the Property, spending approximately $6 million in an effort to "get all of the approvals necessary to develop the [P]roperty and get all of the engineering positions so that 30 days from that point in time [it] could actually have a grading permit in [its] hand." (DTX 614, Jacoby depo., at 59, 142).

At a meeting with regional managers on October 1, 2007, Lennar Chief Executive Officer Stuart Miller ordered that all spending related to the Property be stopped immediately, that general counsel scrutinize the Purchase Agreement and develop a strategy to delay closing, and that other managers continue to search for a partner to take the Bevard contracts off of Lennar's corporate books.   (DTX 589, at USH_00324625; DTX 614, Jacoby depo., at 57-62).   Mr. Jacoby, who had been primarily responsible for managing the Bevard project up to that point, strongly disagreed with this decision, but was told by Mr. Miller, "essentially[,] . . . 'I am the boss.  I don't care what your position is on this.   Stop spending money." (DTX 614, Jacoby depo., at 147).

Following that meeting, there was a shift in management on Purchaser's side of the transaction from the local project managers at U.S. Home to Lennar's corporate officers. Lennar Executive Vice President Richard Beckwitt had previously directed Lennar's land divisions to "put together . . . various reports" related to Lennar's contracts, one of which was "a core and hit list report." (T. 3/31/14, at 124).[5] He explained that if a given project was designated as "core," it meant that it did not "need any adjustment to it, the product [wa]s working, the . . . contract ma[de] sense." (*Id.*). Transactions on the "hit list," on the other hand, were those that "needed some sort of review or adjustment[.]" (*Id.*). Lennar's Chief Operating Officer, Jon Jaffe, had a somewhat different understanding of the "hit list" designation:

> Hit List were communities to identify that were cash-flow negative or not making any financial sense[;] didn't make sense to Mothball,[6] didn't make sense to keep moving forward on the current plan that we were moving forward on to identify what alternative strategies there were. Do you sell the asset? Do you hold it? Can you stop development? What are the strategies

---

[5] Mr. Beckwitt was Lennar's president at the time of trial. Prior to 2011, he was an executive vice president. (T. 3/31/14, at 77).

[6] Mr. Jaffe testified at his deposition that the term "Mothball" meant "[to] put[] the asset on a shelf and delay[] any work on it[,] . . . [s]hutting it down so you limit the amount of capital being put into it." (DTX. 614, Jaffe depo., at 111).

> and tactics to put that asset in a better
> position?

(DTX. 614, Jaffe depo., at 110-11).  As of September 30, 2007, the Bevard contracts were on Lennar's corporate "hit list," with its strategy being to "[s]top all engineering and other consulting expenditures" and to "[r]e-review [the] contract for [an] escape clause[.]"  (DTX 328; T. 3/31/14, at 184).  Lennar retained "a team of high priced lawyers and consultants [to] work feverishly at . . . making a case for delaying . . . the Bevard closing."  (DTX 380).  By October 15, 2007, Lennar's general counsel, Mark Sustana, was specially assigned to the Bevard transaction to "analyz[e] the agreements" and another Lennar executive was charged with "looking at ways to off-load the deal."  (DTX 351; T. 3/31/14, at 187).

Seller perceived that something was amiss.  In addition to observing that Purchaser's development work on the Property had ground to a halt, Seller's principals – namely, Mr. Sandler, Nathan Benson, and Daniel Colton – learned from Purchaser's departing project manager that Lennar was seeking to get out of the contract.  (T. 4/10/14, at 55-57).  When Mr. Sandler attempted to inquire further, Mr. Jacoby advised that he would "get back to [him], and that was the extent of it."  (*Id*. at 57).  At around the same time, Seller began transmitting closing documents in advance of the scheduled December 5 settlement date

18

(DTX 445, 452), but received no response from Purchaser (T. 4/3/14, at 60). Concerned about Purchaser's non-responsiveness, Seller's counsel, James Brennan, contacted transactional counsel for Purchaser, Matthew Wineman, to inquire as to whether "U.S. Home was going to look to get out of the contract and whether they were going to come to . . . settlement[.]" (*Id.* at 49). Mr. Wineman "wouldn't give [him] an answer one way or another and he said he couldn't talk about it[.]" (*Id.*).

A clearer indication of Purchaser's intention was communicated by a letter from Mr. Wineman dated November 21, 2007, in which he advised of Purchaser's position that Seller had "failed to satisfy the conditions precedent to Settlement in accordance with the provisions of the [Purchase Agreement,] . . . including but not limited to those conditions relating to certain off-site easements[.]" (JTX 63, at 1-2).[7] "As a

---

[7] As discussed at length in a prior opinion addressing post-discovery cross-motions for summary judgment (ECF No. 624), the Purchase Agreement set forth certain conditions precedent to U.S. Home's obligation to proceed to settlement. Issues regarding the extent to which those conditions had been satisfied at various dates consistently arose from 2006 until U.S. Home commenced the instant action in July 2008. The Purchase Agreement was silent on the question of how the parties would determine whether and when those obstacles had been cleared and, at all times, U.S. Home resisted providing a definitive list of allegedly unsatisfied conditions. In its amended complaint, however, it settled on four: (1) the acquisition of certain off-site easements, (2) the resolution of appeals by members of the community from zoning approvals, (3) the recordation of plats, and (4) the accuracy of Seller's representations and warranties regarding the environmental

result," Purchaser declared, "the Settlement Date is automatically extended as provided in the Agreement." (*Id.* at 2). Seller insisted that all pre-closing conditions had been satisfied and demanded a full accounting of those that Purchaser believed were not. By a letter dated November 27, Purchaser identified four specific problems with off-site easements, but qualified that this "list of unsatisfied conditions precedent to Settlement [wa]s not exclusive, and d[id] not represent U.S. Home['s] . . . final review of all conditions precedent to Settlement." (JTX 64, at 3). Moreover, Purchaser asserted, "[t]he burden to satisfy all of the conditions precedent to Settlement rests upon the Seller, and U.S. Home Corporation cannot and will not be put in a position to rely upon various verbal, unsubstantiated or inaccurate claims regarding the status of the conditions precedent to Settlement." (*Id.* at 3-4).

Purchaser did not attend settlement on December 5, and continued to refuse contact with Seller's principals. The following day, Mr. Jacoby stated in an email to Mr. Beckwitt:

> I am inundated by calls from Nathan [Benson]
> wanting to know where we're coming from and
> where we're going. It is not easy (also not

---

condition of the Property. On summary judgment, the court found that three of these conditions were satisfied in advance of a May 2008 settlement date and that the fourth, related to the environmental representations and warranties, was not a true condition precedent.

> impossible) to stonewall a colleague of 10
> years with only the suggestion that they
> meet the preclosing conditions and no answer
> to the question of what happens after that.

(DTX 401).

On December 6, 2007, Seller commenced an action in the United States District Court for the Eastern District of Virginia ("the initial action"), seeking a declaration as to what conditions precedent, if any, remained unsatisfied. (DTX 590). Notably, the complaint in the initial action did not allege that Purchaser had breached the Purchase Agreement or any duty arising thereunder; rather, Seller sought the court's assistance in identifying any obstacles to closing so that it might address them and proceed to settlement.[8]

On January 3, 2008, Purchaser, through litigation counsel, transmitted a letter to Seller requesting permission "to enter onto the property to perform investigations, studies and tests that [Purchaser] deem[s] necessary or appropriate." (JTX 66, at iStar00019491). The letter set forth a laundry list of issues that Purchaser purportedly sought to investigate – the vast majority of which had previously been addressed by the parties – and cited as the basis of the request a contractual right to

---

[8] The initial action was later transferred to this court and dismissed for failure to present a justiciable case or controversy. (Civ. No. DKC 08-0267, ECF Nos. 97, 98). Seller appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed. *See Settlers Crossing, L.L.C. v. U.S. Home Corp.*, 383 Fed.Appx. 286, 288 (4th Cir. 2010).

access under § 13(a) of the Purchase Agreement and a right to discovery under Fed.R.Civ.P. 34(a)(2). According to Mr. Beckwitt, the request for access was primarily motivated by Seller filing the initial action:

> I have been in this business for 30 years, and this is the first time I have ever seen anything like that. . . . [W]e couldn't understand it, especially given the fact that we had [been] through this dance earlier with regard to . . . closing conditions back in . . . early '07 through June, May of '07. It came as a big surprise to us. It raised all sorts of eyebrows.

(T. 3/31/14, at 130). Asked what Lennar expected that its investigation would find, he testified:

> [W]e didn't know what we'd find. We had just gotten sued, which was very unusual. We knew that we had a right under our contract to inspect the property and do testing. We didn't know whether we were going to find anything. We had, up until that point, no reason to believe that there was anything wrong with the property[, but] . . . the agreement gave us access. So we wanted to see what was going on.

(*Id.* at 132).

Due primarily to residual distrust stemming from the failed settlement on December 5, and believing that Purchaser's request for access was simply pretext for further delay, Seller resolved to deny the request. Its counsel responded on January 4, 2008, addressing each point raised in Purchaser's letter and suggesting that, upon receipt of "a complete statement of

unsatisfied conditions precedent to settlement," the parties would "be in a position to assess what discovery needs to be done in this case." (DTX 417, at 2). When a second request for access was refused, U.S. Home sought relief in the initial action, serving Seller with a motion to compel an inspection of the Property "pursuant to Rule 34 of the Federal Rules of Civil Procedure and/or pursuant to the express terms of the parties' contract." (Civ. No. DKC 08-0267, ECF No. 31, at 2). On April 29, Seller "proposed a compromise . . . that [the parties select] an independent and unaffiliated firm to conduct an agreed upon scope of environmental testing on selected portions of the Property," but Purchaser declined. (DTX 565, at 2). A "core and hit list" report dated March 31, 2008, reflected that Purchaser's strategy for Bevard as of that date was to "[t]erminate [the] contract and get [its] deposit back via legal action." (DTX 443; T. 3/31/14, at 213).

Meanwhile, Seller continued to work toward closing by addressing certain issues that it believed would erase any doubt that all conditions precedent had been satisfied. As Mr. Colton testified, "we made an active decision to knock down every straw man stood up by Lennar as it related to conditions to closing. . . . [W]e felt we would go the extra yard or extra mile to answer every request or every statement we could get from Lennar about the conditions to closing." (T. 4/10/14, at 9). In Seller's

view, any such issue had been resolved by April 28, 2008, when it called for settlement to occur on May 27. (DTX 445). Eleven days prior to that closing date, however – as Seller began forwarding closing documents and with the motion to compel inspection of the Property still pending – U.S. Home served a notice of default related to Seller's refusal to permit access (ECF No. 649 ¶ 30), thereby triggering cure periods by Seller under the Purchase Agreement and by iStar under the Consent and Estoppel Agreement, the latter of which would expire in early July (JTX 41 § 15(b); DTX 259 ¶ 11). By letter dated May 23, 2008, U.S. Home advised Seller of its position that "all conditions precedent to Settlement [were], in fact, not satisfied, and as such, Settlement will not occur on May 27, 2008." (ECF No. 649 ¶ 31).

On May 30, after U.S. Home failed to attend the scheduled settlement, Seller served a default notice of its own, asserting that Purchaser had "wrongfully failed to make [s]ettlement[.]" (DTX 458). On the same date, Seller's counsel responded to U.S. Home's notice of default, characterizing its prior requests for access as a discovery dispute that would be addressed by United States Magistrate Judge William Connelly in due course. Insofar as U.S. Home contended that it had a right to access under the Purchase Agreement, Seller argued that there could be no default because U.S. Home had failed to satisfy its own obligations:

> Section 13(c) of the Agreement expressly
> requires that prior to any entry onto the
> Property, U.S. Home Corporation shall
> provide WPE and Settlers Crossing with
> certificates of insurance evidencing
> insurance coverage as required by that
> paragraph. [Seller's] records indicate that
> U.S. Home Corporation has not provided this
> insurance coverage to WPE and Settlers
> Crossing. Accordingly, under the Agreement,
> U.S. Home Corporation is not entitled to
> enter the Property under any circumstances
> until it complies with Section 13.
> Obviously, Settlers Crossing and WPE cannot
> be in default of the Agreement for the
> alleged refusal of entry since U.S. Home
> Corporation has not complied with the
> Agreement.

(DTX 565, at 2).

On June 27, 2008, prior to expiration of iStar's cure period under the Consent and Estoppel Agreement, Judge Connelly issued an order finding that "U.S. Home has a contractual right to inspect the property" pursuant to § 13(a) of the Purchase Agreement and Fed.R.Civ.P. 34(a)(2). (DTX 460 ¶ 8). The court permitted inspection "for a six week period as detailed in the March 25, 2008[,] Proposed Scope of Work and Schedule [submitted by Purchaser's consultant] Environmental Resources Management, Inc." (*Id.* at ¶ 10). From Purchaser's perspective, this order came too soon. In an email to Lennar corporate officers dated June 25, 2008, Sam Sparks, a regional president, reported that he had "asked [Purchaser's litigation counsel] to file a supplemental brief either Friday [June 27] or Monday [June 30],

25

in the hope that filing will raise additional questions and push an order out past July 3, . . . the date that Sandler and [iStar's] right to cure expires[.]"  (DTX 566).  On June 30, counsel for iStar advised Purchaser that Seller would "comply with the June 27 Order," adding that the order effectively resolved Purchaser's notice of default because there was "nothing for [iStar] to cure." (DTX 461, at 1-2).

Despite the fact that Purchaser had gained the right of access it purportedly sought, it never availed itself of that right.  Instead, Purchaser elected to terminate the Purchase Agreement, as it had planned to do since shortly after the request for access was denied.  (DTX 443; T. 3/31/14, at 213; DTX 566).  By a letter dated July 3, 2008, Purchaser advised:

> [O]n May 16, 2008, U.S. Home Corporation sent a Notice of Default to Seller for failing to give U.S. Home Corporation access to the Property that is the subject of the Agreement for the purpose of conducting certain investigations, studies, and tests as it deems necessary and appropriate. Pursuant to the Agreement, Seller's cure period expired on June 2, 2008[,] [a]nd, pursuant to that certain Consent and Estoppel Agreement . . . dated June 19, 200[7], [iStar's] cure period expired on July 2, 2008.  Neither Seller nor [iStar] has taken action to cure the default. Accordingly, pursuant to Section 15(b)(iii)(1) of the [Purchase Agreement], this letter shall serve as written notice of U.S. Home Corporation's termination of the Agreement effective immediately.

(JTX 73, at 2).   When Seller and Mr. Sandler did not return the deposits upon demand, U.S. Home commenced the instant action on July 17, 2008.[9]

In its initial complaint, U.S. Home alleged that Seller breached the Purchase Agreement when it refused the request for access to investigate the environmental condition of the Property, but Purchaser had not yet finally resolved why further investigation was warranted.   The complaint recited that, in light of the prior sand and gravel mining operations on the Property, such investigation was necessary to shelter Purchaser from any future liability regarding "the release and threatened release of hazardous materials" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (ECF No. 1 ¶ 49).   The express purpose of the Phase I ESAs conducted by Schnabel and ECC, however, was to satisfy these obligations, and Purchaser warranted, in both the Second Amendment and the Consent and Estoppel agreement, that, having made due inquiry, it was unaware of any environmental issue.   Thus, even after requesting access and serving a notice of default when permission was

---

[9] By a memorandum opinion and order issued March 19, 2009, the court granted U.S. Home's motion to dismiss the initial action; denied as moot Seller's motion to consolidate the initial action and the instant case; and denied pre-discovery cross-motions for summary judgment in the instant case.   (ECF Nos. 41, 42).

denied, Purchaser was, in effect, searching for a firmer basis upon which to justify its request.

Purchaser's *post hoc* strategy began to crystalize in mid-2008.  In seeking to avoid the May 27 closing date, Purchaser "reached out to [local] earthwork contractors in hopes of locating someone who may have [firsthand] knowledge of the [historic sand and gravel mining] operations" on the Property. (DTX 568).  One of those contractors advised that previous owners, before WPE, "had a contract with Maryland Environmental Services . . . to haul treated sludge from the Blue Plains sewage treatment plant to the Bevard site." (*Id.*).  Although the parties' environmental consultants had searched all relevant databases, conducted interviews, and made requests for information from appropriate agencies, they did not discover that sewage sludge (also known as "biosolids") had been applied to the Property.  Upon further investigation, Purchaser learned that this practice was extensive – from the mid-1970s to the late 1980s, thousands of tons of treated sewage sludge was transported from various regional wastewater treatment plants and applied to the Bevard Property.

After an internal report of the sludging operation was initially circulated among Purchaser's corporate officers, Mr. Jacoby "couldn't sleep . . . thinking about whether or not [Purchaser] could have caught this earlier." (DTX 570, at

USH_02035516).   The next day, he reported to Lennar's managers
that he had "reviewed all the environmental reports and
discover[ed] . . . [that] [t]he 2001 Schnabel Phase 1 . . .
contains a statement that [t]he fill material may have the
potential to contain heavy metals, sludge, and varying debris"
and that "[v]arious chemical tests may be required on the fill
material to determine if contamination exists."   (*Id.* (internal
marks omitted)).   Mr. Jacoby further observed that although
Schnabel's geotechnical investigation did not find evidence of
"debris, sludge, or heavy metals[,] . . . [t]he report does not
disclose whether or not the boring samples were tested or just
observed" and "[t]here are no lab results appended to the
report." (*Id.*).[10]

Despite Mr. Jacoby's misgivings, Purchaser resolved to
pursue a "toxic route" in court by late 2008 (DTX 561) – in
other words, to rely on a theory that the land application of
sewage sludge on the Property constituted a breach of Seller's
environmental representations and warranties.   U.S. Home
unveiled this new theory in a pre-discovery motion for summary
judgment, filed on December 23, 2008:

> The irrefutable fact . . . is that, though
> never disclosed to U.S. Home, the Property
> was used for the disposal of sewage sludge

---

[10] In fact, the Schnabel reports clearly stated that "no
soil or ground water sampling or chemical testing was conducted
under this contract." (JTX 29, at ECC 00001135).

for decades, during which period such sludge
was spread over hundreds of acres of the
Property, conclusively establishing that
[the environmental] representation, warranty
and condition precedent simply cannot be
satisfied – *i.e.*, vast portions of the
Property have "been used for the . . .
disposal of Hazardous Material," as that
term is expressly defined in the Agreement.
Furthermore, the sewage sludge itself
contains certain material that [is]
individually "hazardous," as well. Finally,
. . . given the immutable nature of the
material dumped on the Property years ago,
there is not and cannot be any genuine
factual dispute that these individually
hazardous materials remain on the Property
even now.

(ECF No. 32-1, at 6-7).

Shortly after that motion was denied, U.S. Home was permitted to file an amended complaint – its operative pleading in the instant case – in which it added, *inter alia*, claims of fraud, based on Seller's failure to disclose the sludging operation, and breach of environmental representations and warranties. (ECF No. 52). Armed with knowledge of the sludging operation, Purchaser renewed its discovery efforts to gain access to the Property in order to conduct extensive soil sampling and testing. Arrangements were made at a discovery hearing on May 4, 2010, after which Judge Connelly issued an order providing U.S. Home with a right to inspect the Property in June and July 2010. (ECF No. 114). Purchaser retained Environ International Corporation ("Environ") to conduct

30

sampling and testing, and the results of Environ's investigation revealed the presence of what Purchaser believes are "Hazardous Materials," as that term is defined in the Purchase Agreement.

Seller and iStar filed a joint counterclaim on June 30, 2009, seeking declaratory relief and specific performance of Purchaser's obligations under the Purchase Agreement and Contract for Services. (ECF No. 66). iStar subsequently filed an amended counterclaim. (ECF No. 447). When the Bevard transaction did not close on the anticipated date, Seller defaulted on the iStar loan, which permitted iStar to exercise its rights under collateral assignments of the agreements. iStar later exercised those rights by initiating a foreclosure action in the Circuit Court for Prince George's County, Maryland.[11]  On November 17, 2009, the Bevard Property was sold to Piscataway Road – Clinton MD LLC ("Piscataway"), a limited liability company of which iStar is the sole member.[12]

---

[11] Because Seller no longer has any interest in the Property and iStar's claims are presented in the amended counterclaim, the joint counterclaim has been rendered moot and will be dismissed. *See Otter Point Dev. Corp. v. U.S. Army Corps of Engineers*, 116 F.Supp.2d 648, 651 (D.Md. 2000) ("A case becomes moot 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome'" (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

[12] Despite the court's suggestion that Piscataway is a necessary party in this case, iStar has resisted naming it, insisting that, as the sole member, it will cause Piscataway to take any necessary action.

## II.   Findings of Fact and Conclusions of Law

Following the court's ruling on post-discovery cross-motions for summary judgment (ECF Nos. 624, 625), two primary issues remained for trial: (1) whether, in light of the requirements of § 11(a) of the Purchase Agreement, Seller breached the environmental representations and warranties set forth in § 12.2(d), and (2) whether Seller breached § 13(a) of the Purchase Agreement by denying U.S. Home's request for access.  If the answer to either of these questions is in the affirmative, U.S. Home will prevail and is entitled to the return of its deposits pursuant to § 15(b).  If both questions are answered in the negative, iStar wins and may be entitled – pending resolution of an issue regarding lapsed zoning on a portion of the Property – to specific performance of Purchaser's obligations under the Purchase Agreement pursuant to §§ 15(a) and (d), as modified by the Second Amendment.

Both questions present claims for breach of contract under Maryland law.[13]   Under the objective theory of contract interpretation, which applies in Maryland, a court must "give effect to the plain meaning of an unambiguous term, and will evaluate a specific provision in light of the language of the entire contract."  *Weichert Co. of Md., Inc. v. Faust*, 419 Md.

---

[13]  Pursuant to § 18(B), the Purchase Agreement "shall be construed and enforced in accordance with the laws of the State of Maryland."  (JTX 41 § 18(B)).

32

306, 324 (2011). Contract terms must be construed according to their "customary, ordinary and accepted meaning," regardless of the parties' intentions at the time the contract was formed. *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008). Therefore, when interpreting a contract, the court's task is to "[d]etermine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Calomiris v. Woods*, 353 Md. 425, 436 (1999) (internal quotation marks omitted); *see also Capital Select Realtors, LLC v. NRT Mid-Atl., LLC*, 197 Md.App. 698, 711 (2011) ("The [objective theory of contract interpretation] thus encourages parties to use language as precisely as possible, so as to forestall costly inquiries into their subjective intentions").

## A. Breach of Environmental Representations and Warranties

In Count VI of its amended complaint, U.S. Home alleges that Seller breached the environmental representations and warranties set forth in § 12.2(d) of the Purchase Agreement by failing to disclose that "a massive sewage sludge disposal operation had been conducted on the Property in the 1970s and 1980s," and that, as a result, "the Property has been used for the disposal of Hazardous Materials and contains Hazardous Materials, as that term is defined in . . . the Agreement." (ECF No. 52 ¶ 143). In Count VII, it seeks a declaration that

it was not obligated to proceed to settlement on May 27, 2008, because Seller had not satisfied a condition precedent to U.S. Home's obligation to close – namely, § 11(a) of the Purchase Agreement, which provided that Seller's representations and warranties had to be true and correct as of the date of settlement. (*Id*. at ¶ 153). In Purchaser's view, because the environmental representations and warranties contained in § 12.2(d) were not accurate, it was not required to settle on that date and its failure to do so did not constitute a default. (*Id*. at 38).

In § 12.2(d), Settlers Crossing and WPE made the following representations and warranties concerning the environmental condition of the Property:

> Prior to the date hereof, WPE has delivered to Purchaser a copy of its existing environmental report(s). To the best of WPE's and Settlers Crossing's knowledge, except as disclosed in the environmental report(s) delivered to Purchaser, (i) there are not "Hazardous Materials" (defined below) located on or within the Property; (ii) no portion of the Property has been used for the storage, use, generation, treatment or disposal of Hazardous Materials; and (iii) there are no underground fuel tanks located upon the Property. The term "Hazardous Materials" means (A) hazardous wastes, hazardous substances, and toxic materials prohibited or regulated by federal, state or local law, regulation, or order, (B) asbestos, (C) oil petroleum products and their byproducts, and (D) polychlorinated [biphenyls] ("PCBs").

34

(JTX 41 § 12.2.d).[14]

While the accuracy of Seller's representations and warranties under § 12.2(d) is expressly based on its knowledge, another provision of the Purchase Agreement, § 11(a), purported to make it a condition precedent to Purchaser's obligation to settle that all representations and warranties be "actual[ly] correct[]" as of the time of [s]ettlement[.]" (*Id*. at § 11(a)). On summary judgment, however, the court found that the "actual correctness" of Seller's representations and warranties was not a true condition precedent:

> The final sentence of § 11(a) – *i.e.*, that "the condition precedent to Purchaser's obligation to settle . . . shall depend upon the actual correctness as of the time of Settlement of the facts stated in all such representations and warranties" – does not mean, as Purchaser argues, that Purchaser's obligation to settle was contingent on Seller showing the actual truth of all representations at settlement. Indeed, such an interpretation would lead to an absurd result, as it would be practically impossible for Seller to make a showing that, for example, the entire 1,200-acre property was free of all "hazardous materials." Furthermore, it would vest Purchaser with virtually unbridled discretion to withhold performance. Purchaser at least tacitly acknowledges in its reply papers that virtually all property in Maryland contains at least some degree of what might be deemed "hazardous materials", and the purchase agreement itself

---

[14] Seller was required to recertify as to the truth of its representations and warranties at the time of settlement, and did so on May 27, 2008. (DTX 454, 455).

> contemplates, in § 10(f), that Purchaser might, in its pre-closing development work, encounter such materials in amounts insufficient to constitute a breach of warranty. If Seller were to be required to demonstrate at settlement that there were, in fact, no "hazardous materials" on the property as a condition precedent, the presence of even de minimus amounts of such materials would permit Purchaser to avoid closing. A reasonable person in the parties' position at the time they entered into the purchase agreement would not have understood it to mean this. . . .
>
> Such a rigid interpretation would also give rise to a conflict in the terms of the agreement insofar as Seller's representation at settlement concerning the environmental condition of the property could be made "[t]o the best of [its] knowledge," under § 12.2(d), while its satisfaction of the condition precedent to Purchaser's obligation to settle would depend on its ability to show the "actual correctness" of the same representation under § 11(a). . . . What the last sentence of § 11(a) does, in effect, is create a right of Purchaser to test the accuracy of Seller's representations and warranties. In other words, Seller was required to represent that, to the best of its knowledge, other than what was disclosed in the environmental reports it had provided to Purchaser, the property contained no "hazardous materials," but Purchaser was entitled to verify the truth of that representation prior to being obligated to close.

(ECF No. 624, at 67-68 (internal citations omitted)). Because the condition set forth in § 11(a) related to Seller's representations and warranties, the court determined that satisfaction "must be assessed in terms of whether there was a

material breach" and "[a]ny breach could only be material if the environmental condition of the property in some way would have affected Purchaser's intended use for the land – *i.e.*, the construction of a residential community." (*Id*. at 82).

In light of that interpretation of §§ 11(a) and 12.2(d), the burden at trial fell on Purchaser to prove that Seller's environmental representations and warranties were not true in fact. Therefore, it was incumbent upon U.S. Home to demonstrate, by a preponderance of the evidence: (1) that there are "Hazardous Materials" on the Property, as that term is defined in the Purchase Agreement; (2) that the source of those "Hazardous Materials" was something other than what was disclosed in the environmental reports provided by Seller; and (3) that those "Hazardous Materials" are present in amounts such that remediation of the Property is required.

At trial, Purchaser's theory was that elevated concentrations of "heavy metals" found on the Property – namely, arsenic, aluminum, iron, and vanadium – constituted "Hazardous Materials"; that the elevated concentration of those elements could only have resulted from the land application of sewage sludge, which was not disclosed in Seller's environmental reports; and that extensive remediation would be required in order to construct the planned residential community. To meet its burden, Purchaser relied principally upon the testimony of

37

two expert witnesses: Robin Richards, the environmental expert from Environ who designed and implemented the sampling and analysis plan for the Property; and Karl Kalbacher, who authored a 2001 document setting forth soil and groundwater cleanup standards for the Maryland Department of the Environment ("MDE").

Ms. Richards testified that Environ was retained by Purchaser in March 2010 "to test the accuracy of the environmental representations and warranties provided in Section 12.2(d) of the [Purchase Agreement]." (T. 4/1/14, at 94). To accomplish that goal, she initially developed a "sampling and analysis plan" for the Property. (*Id.* at 67). Ms. Richards had developed and implemented "hundreds" of sampling and analysis plans over the course of her career, many of which focused on "getting the operating permits for the land farming of industrial sludges; in particular, refinery sludges." (*Id.* at 67-68). She explained that "land farming" is "a term of art" referring the process of "tak[ing] sludge, [] apply[ing] it to the top of the land, spread[ing] it out over the top of the land, com[ing] back and disk[ing] it into a level of about anywhere from three to nine inches, and then [] manag[ing] the soil to maximize the ability of the natural soil bacteria . . . to degrade the organic material in these sludges[.]" (*Id.* at 68). Ms. Richards developed sampling and analysis plans in

accordance with regulations and guidance issued by the United States Environmental Protection Agency ("EPA"), which required "characterizing the land farm site as well as characterizing the land farm operations, including the sl[u]dge characteristics[.]" (*Id*. at 69).  Asked what "characterizing the land farm site" entailed, she testified:

> [W]e had two scenarios.  One was where we had land farm operations that were brand new.  A site had not already been designated for a land farm.  And a second scenario is when we had a land farm operation that had been occurring but we were now putting it into the operating process.
>
> Even though we had two different sites, the guidance that EPA provided on how to characterize those sites was similar.  What they wanted us to be able to do was to look at the impact of sludging on that area; hence, we needed to characterize or conduct sampling analysis of the soils that would represent a background condition, so soils similar to our land farm site, but in an upgraded, undisturbed area where we could go in and define what would be the background levels for a whole plethora of constituents, including metals and some organics.
>
> At the land farm site itself, we conducted a similar sampling analysis plan, but because we were needing to do a statistical comparison between the land farm conditions to the background conditions, the [EPA] provided specific guidance how we ought to do that so we generate a database that can be statistically analyzed.
>
> It's called a . . . random sampling method.  So we basically lay out a grid, looks a bit like a bingo card, over the site and at the background area, so each grid has

> a number.   And then we use a random number
> generator off of a program and we say, Hey,
> we need ten samples at our land farm site,
> ten samples for our background, give me ten
> numbers.   And we sample the grid that the
> Random Number Generator ends up identifying.

(*Id.* at 69-71).

Not all of the sampling and analysis plans Ms. Richards developed involved an assessment of "background" conditions. She explained:

> We had another program . . . [applicable
> where] you needed to make sure that you were
> operating your land farm appropriately.   So
> we are no longer trying to determine whether
> our land farm was having the impact on the
> environment through the detection monitoring
> program, which is what I described earlier.
>
> We were now looking just internal to
> the land farm itself, and saying, how well
> are we treating the sludges and are any
> releases from the sludges occurring in an
> unexpected or unsatisfactory manner, so that
> we could go in and change operations of the
> land farm.
>
> So that program was a very focused,
> targeted program where we were looking
> specifically at the areas or the cells that
> we had sludged to then go in and say, What
> are we seeing? . . .
>
> So it was a very targeted program.   We
> weren't comparing to background.   We were
> looking at, once again, the fate of
> chemicals that we put on the land farm to
> make sure the land farm was doing what it
> was supposed to do, which was degrade and
> immobilize samples.

(*Id*. at 72-73).   She developed similar "focused, targeted, [and] biased" plans in circumstances in which she was investigating "a suspected source of contamination," such as when she "knew either from interviews or . . . from historical documents where a spill or a release had occurred, and we were trying to . . . find the hot spot and then be able to sample from that hot spot to determine how far the plume went out so that we could then figure out what needed to be done for assessing the risk and how to remediate." (*Id*. at 73).

The sampling and analysis plan that Ms. Richards designed for Bevard primarily involved "tak[ing] soil samples in locations where [she] had strong indication that sludge had been applied . . . and analyz[ing] them for chemicals that [she] believed were indicative of the presence of sludge." (*Id*. at 94).   She acknowledged that this was a "biased" sampling plan and that she was "just trying to find the . . . evidence of sludge and the release of hazardous substances from the sludge." (T. 4/2/14, at 66).   In other words, none of the samples that Environ tested were "from undisturbed, unsludged areas." (T. 4/1/14, at 200).   In determining where to test, Ms. Richards relied primarily on historical sludge permitting documents – based on an assumption that, if the land application of sludge was permitted in an area, it was likely applied there – and

interpretation of aerial photography and mapping provided by Aero-Data, a private consulting firm retained by Purchaser.

Ms. Richards said that she tested for "hazardous substances that [she] felt were indicative of the presence of sludge." (*Id*. at 95). She opined that "PCBs [*i.e.*, polychlorinated biphenyls] . . . were going to be one of [her] best indicators of whether sludges had been applied to this land and whether there had been a release of hazardous substances from those sludges":

> The reason being is that PCBs, during this time period from 1974 to 1983, were . . . still being allowed to be in use, and what I mean by "in use," is that around 1979, there was a ban on using PCBs. So the only presence of PCBs in equipment was through being grandfathered in. And the significance of that is PCBs [are] found in transformers, hydraulic fluids, oil-based paints during this time period, caulking, and those sources of PCBs get into domestic wastewater through industrial sources, commercial sources, as [] well as just storm water runoff that's treated by the POTWs [*i.e.*, publicly owned treatment works].
>
> When PCBs come into a POTW, they don't really like water. They like binding to particles, whether those particles are soil and sediment or whether it's the bacteria themselves. As the wastewater is treated through the wastewater treatment plant, the PCBs will settle or precipitate down into the sludge, whether [in the] primary treatment or in the secondary treatment, and these are the sludges that are then managed by the [wastewater treatment plants] . . . and were sent off to the Bevard Properties for land disposal.

> The nice thing about PCBs, for the work we were undertaking, is that because of their persistence, they tend to stay where they are placed.  They do not volatilize[;] they are not biodegraded.  There is not a way the soil chemistry changes to make them mobilize down into the groundwater.  They basically stayed put.
>
> So they were going to be a very good indicator or signature of sludge disposal at the Bevard Properties.

(*Id*. at 100-01).

She also believed that aluminum and iron were "signatures for sludge":

> [O]nce again, between 1974 and 1984, '85, Blue Plains [Wastewater Treatment Plant], [which] was the major contributor of sludge to the Bevard Properties, and later on Piscataway [Wastewater Treatment Plant], were both being challenged to generate cleaner effluent to, in the case of Blue Plains, to the Potomac River.  And in doing so, one of the major focuses was to try to reduce the nutrient loading, in particular, phosphorus.
>
> During this time period, one of the techniques to reduce phosphorus . . . in a wastewater treatment plant was to add iron salts, iron chloride, or to add alum.  Blue Plains, during this time period, added one or the other.  Alum is aluminum salt.
>
> The way the chemistry works is that the iron binds with phosphorus, which makes phosphorus insoluble, and it precipitates out into the sludge so you get an . . . iron/phosphate precipitating into the sludge.

> Similarly, with aluminum, the aluminum reacts with the phosphorus precipitating out as aluminum phosphate into the sludge, both insoluble, both end up adding aluminum iron to the sludge.

(*Id.* at 102).

Ms. Richards tested for other elements – such as vanadium and arsenic – simply because they are "hazardous substances" that "were found at elevated levels in the primary soil investigations throughout the area . . . as well as at depth." (*Id.* at 95). She "was not expecting" to find elevated arsenic levels on the Property, but historical data she subsequently received "for the sludges from Blue Plains and Piscataway, [as well as] Western Branch and Parkway [*i.e.*, two other regional wastewater treatment plants that contributed sludge to the Bevard Property], . . . [showed] that arsenic was present in the sludges." (*Id.* at 96).[15]

Ms. Richards summarized Environ's findings as follows:

> There were 33 soil borings that I took as part of . . . what we called the "primary investigation." The results from those 33 soil borings showed wide-spread and elevated concentrations of arsenic, aluminum, iron,

---

[15] Ms. Richards also testified that she found elevated levels of manganese, chromium, and copper on the Property. (T. 4/1/14, at 95, 185-86). Mr. Kalbacher later testified that manganese was a concern to "a lesser degree," but did not include chromium and copper. (T. 4/2/14, at 151). During closing argument, counsel for Purchaser was concerned only with "arsenic, aluminum, iron, and vanadium" (T. 4/15/14, at 6), and did not mention any other element; thus, those four elements are the focus here.

> vanadium, and PCBs, and in some cases, when
> I say "elevated," I mean above residential
> clean-up standards.   Other cases I mean
> elevated above what Maryland defines as an
> anticipated typical concentration for this
> region of the state[.] . . . And [in] other
> cases, "elevated" means above what would be
> anticipated to be in surficial soils.

(*Id.* at 93; PTX 274, 517).   She opined that "[t]he only way there could be elevated levels of those substances was . . . due to the release from sludging activities, [and] the elevation of those concentrations indicates hazardous substances are present at the site."   (*Id.*).   Asked by counsel for iStar whether she "made [any] effort at all to find" background levels – *i.e.* "what naturally occurring levels were on the Bevard Property" – Ms. Richards responded, "I didn't need to because the Maryland Department of the Environment has already defined what a background concentration would be for this area in the ATCs." (*Id.* at 187).

The term "ATCs," or Anticipated Typical Concentrations, refers to the background levels of various chemical elements found naturally in the soils of Maryland.   These levels were initially set forth in a 2001 MDE document entitled "Cleanup Standards for Soil and Groundwater, Interim Final Guidance." (PTX 214).   The principal author of that document was Karl Kalbacher, who testified at trial that the ATCs were derived from a "natural background study that was undertaken by [his]

45

staff and [him]self to determine natural background concentration of metals in soil in geologic areas of the state of Maryland." (T. 4/2/14, at 99). This study was useful to the environmental community because "there were several metals whose human health risk-based calculated concentration was lower than the natural background concentration for metals in soil," such that "it would be impossible for anyone to clean up to the human health risk-based concentration because the natural concentration was higher." (Id. at 113). "Prior to the issuance of the guidelines," he explained, "there was no established provision for calculation of background outside of an individual conducting a site-specific background study." (Id. at 115). The guidelines addressed this problem by providing an indication as to what naturally-occurring background levels of certain elements an environmental consultant would expect to find at a given location, thereby eliminating the need for determining what the background levels actually were at the site prior to any contamination. According to Mr. Kalbacher, "[t]he Soil and Groundwater Cleanup Standards document is almost exclusively used by the regulated community to investigate and remediate sites"; the guidelines "are applied internally as well as externally, and they are used by multiple divisions within the Maryland Department of the Environment." (Id. at 101).

The study upon which the ATCs were based consisted of gathering "analytical data" from "federal and state Superfund sites" – *i.e.*, contaminated sites that had been remediated by MDE – and "aggregat[ing] [the data] to calculate an arithmetic mean of the background metal concentrations, and then [] appl[ying] a standard deviation[.]" (*Id.* at 100). The results were then divided among three regions due to differing concentrations of metals found in the soils:

> The uniqueness of the geologic provinces from west to east are that soil, by definition, is the result of the weathering of parent crystalline bedrock.
>
> Bedrock is derived from mountains. Mountains are located in the west, near Cumberland, the Appalachians. And so there is a different soil concentration in the western part of the state than there is in the coastal plain portion of the state, which is also analogous to the beach environment.

(*Id.* at 115). Because mountainous soils are generally less-weathered, substantially higher concentrations of metals were found to occur naturally in the soils in the western region of the state, lower concentrations were found in the central region, and the lowest concentrations were found in the eastern region. Mr. Kalbacher explained that the Bevard Property is located in the eastern geologic region (T. 4/2/14, at 115), meaning that the Anticipated Typical Concentrations of

47

naturally-occurring metals were the lowest of any region in the State of Maryland.

In comparing the levels of arsenic, vanadium, iron, and aluminum found by Environ on the Property to the ATCs for the eastern region of Maryland, Mr. Kalbacher opined that "the site is contaminated with the release of controlled hazardous substances[.]"    (*Id*. at 104).    Asked the basis for characterizing these elements as "hazardous substances," he testified:

> Arsenic is defined in the federal law under the regulations to the Clean Water Act, 40 [C.F.R.] 116.4, as a hazardous substance. And it has been detected at the site at concentrations that also exceed risk-based cleanup standards.[16]   In fact, there is one sample location where there is extremely high elevated concentration of arsenic.
>
>          . . . .
>
> Vanadium's characterization of a hazardous substance is found in the same location of the Clean Water Act. . . . It has also been detected at elevated concentrations relative to background values for the eastern Maryland province, almost uniformly distributed exceedances of the vanadium samples taken across . . . this site.
>
>          . . . .
>
> Iron is classified as a hazardous substance pursuant to the same regulation that I

---

[16]   He explained that "risk-based cleanup standards" means "the cleanup standards that were provided . . . by the EPA . . . that was adopted by the Maryland Department of the Environment." (T. 4/2/14, at 105).

> described, the Clean Water Act. . . . Iron
> was used as an additive in the production of
> sludge that was ultimately applied at this
> site, and, therefore, the concentration of
> iron is elevated at the site at similar
> percentages to that of vanadium.
>
>                . . . .
>
> Aluminum, again, is a hazardous substance as
> defined under the Clean Water Act
> regulation. Aluminum, alum, which is the
> common industry term, was added to sludge,
> to thicken the sludge. Alum contains
> aluminum. Aluminum is concentrated in
> sludge; sludge was applied at this site.
> There are elevated concentrations of
> aluminum throughout the site in a similar
> distribution that exists for vanadium and
> iron.

(*Id.* at 105-07). Asked, hypothetically, how he would advise a client who found the levels of these elements that Environ found on the Bevard Property, Mr. Kalbacher testified, "[m]y recommendation would be to report the results to the Maryland Department of the Environment and to seek consultation on how to effectuate a comprehensive investigation and subsequent remediation of the property." (*Id.* at 128).

The court does not find the testimony of Ms. Richards or Mr. Kalbacher to be persuasive and, in the case of Ms. Richards, it does not find it credible.[17]   Ms. Richards' testimony

---

[17] iStar moved *in limine* to exclude Ms. Richards' testimony on the ground that it failed to satisfy the requirements for admissibility set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. (ECF No. 645). The court declined to rule on that motion prior to trial and advised that

consisted essentially of the following syllogism: Environ tested

---

it would hear the testimony and consider its admissibility in rendering an ultimate decision. (T. 4/1/14, at 89).

Under Federal Rule of Evidence 702, the district court has "a special obligation . . . to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the United States Court of Appeals for the Fourth Circuit has explained:

> The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable – that is, whether it is supported by adequate validation to render it trustworthy. *See* [*Daubert*, 509 U.S.] at 590 n. 9. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. *See id.* at 591-92.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999).

As will be seen, after considering all of the facts and evidence, the court does not find that Ms. Richards' opinion that sludge is the source of the elevated levels of heavy metals on the Property is reliable.

soil samples exclusively from areas of the Property where sewage sludge was applied and those tests found elevated concentrations of heavy metals; therefore, the elevated concentrations of heavy metals were caused by a release from sewage sludge.   The conclusion does not follow logically from the premises, relying instead upon the expert's *ipse dixit* opinion that "[t]he only way there could be elevated levels of those substances was . . . due to the release from sludging activities[.]"   (T. 4/1/14, at 93).[18]   An initial problem with this construct is that what Ms. Richards found on the Property was often not what she expected to find.   According to Ms. Richards, PCBs "were going to be a very good indicator or signature of sludge disposal at the Bevard Properties" (T. 4/1/14, at 101), but she also

_____

[18]  Purchaser's counsel highlighted this point at a bench conference related to iStar's objection that Ms. Richards' testimony regarding a sludge management "crisis" in the region in the early 1970s was beyond the scope of her expertise.   When the court inquired as to the purpose of this testimony, counsel clarified that the witness was offering "two opinions":

> One is that she found the hazardous substances on the site through the analytical testing she did; and second, she has the opinion that the . . . substances discovered in the same soil columns are indicative of sludge . . . [and] that the property was sludged so much because of the crisis in and around that area.

(4/1/14, at 109).   In other words, Ms. Richards testified that she sampled areas she knew to have been sludged and found hazardous substances; thus, *ipso facto*, the hazardous substances resulted from sludge.

acknowledged that PCBs are "ubiquitous in the environment" (*id.* at 155); none of the PCB levels she found exceeded cleanup standards (*id.* at 154); and she could only speculate as to why many of the PCB levels detected occurred at depths lower than where the sludge was expected to have been applied (*id.* at 188-90). Ms. Richards did not expect to find other elements, such as arsenic and vanadium, in sewage sludge, but when she found elevated levels on the Property, she simply assumed the cause was accumulated sludge based on very limited historical data. The historical testing data of the contributing wastewater treatment plants, moreover, showed that these elements were only sometimes detected and then only in minute amounts. (PTX 128, at EPA00004444-56; PTX 154; PTX 161; PTX 162; PTX 179; PTX 182; PTX 541; DTX 578; DTX 605; DTX 606, at PISC00045373). The court credits the testimony of Dr. Sally Brown, iStar's biosolids expert, who opined that, "in order for arsenic to be elevated in biosolids, there would need to be a source for arsenic. In all the treatment plants in question, there was no source for arsenic." (T. 4/8/14, at 74).[19]  Indeed, the testing data for arsenic at wastewater treatment plants showed levels "close to

---

[19] This memorandum opinion does not provide a detailed summary of the testimony of iStar's scientific experts – namely, Dr. Brown, Lisa Williams, Dr. Walter Lee Daniels, and Dr. Shahrokh Rouhani – but those witnesses were highly credible and informative, overwhelmingly so in comparison with Purchaser's experts.

zero" or "effectively at zero," and many data points were below a detection limit of five parts per billion. (*Id.* at 57; PTX 128, at EPA00004444).

Dr. Brown and iStar's soil science expert, Dr. Walter Lee Daniels, agreed that, like PCBs, arsenic and vanadium were often found at depths not suggestive of a release from the surface application of sewage sludge. (T. 4/8/14, at 75; T. 4/9/14, at 206-07). With respect to vanadium, Dr. Brown testified that current regulations of biosolids do not limit that element because it "was never considered to be a risk in a soil system, and vanadium was never considered as a major contaminant in the biosolids . . . in the U.S." (T. 4/8/14, at 49). In her review of historical documents related to the application of sewage sludge at the Property, moreover, she did "not see[] any evidence of a source of vanadium." (*Id.* at 83). Ms. Richards, by comparison, merely speculated that wastewater associated with "printing operations" of the Washington Post was "probably a major source" of vanadium. (T. 4/2/14, at 48). Lisa Williams, another highly credible iStar expert who had worked with the land application of biosolids from the same wastewater treatment plants for many years, testified that she had no understanding of vanadium content in sewage sludge because "we haven't tested or been required to test for vanadium in sewage sludge." (T. 4/9/14, at 83).

While the parties' experts generally agreed that
contributing wastewater treatment plants added aluminum and iron
to the sludges that were applied to the Property, Dr. Brown
testified that aluminum is "ubiquitous and a major constituent
of soil" (T. 4/8/14, at 83); Ms. Williams explained that "iron
and aluminum are naturally in the soils" and that "[h]igh levels
of that are actually added [to the sludge] because it's a good
thing" (T. 4/9/14, at 99); and Dr. Daniels opined that "[t]he
levels of aluminum and iron . . . in these soils are typical of
soils of this region" and "do not reflect contamination or
excessive levels" (*id.* at 195-96).  The court credits the
testimony of Ms. Williams that quality controls at the
wastewater treatment plants in question have remained fairly
consistent over time (T. 4/8/14, at 175-77), and the testing
data demonstrated that aluminum and iron levels were
consistently monitored.  The court further credits the testimony
of Dr. Daniels that "iron and aluminum oxides . . . are well
documented in their affinity to specifically bind and absorb
arsenic and vanadium," which "would be beneficial to any soil
over time[.]"  (T. 4/9/14, at 198).  As explained in a 1985
report of metals found in the sludge produced by regional
wastewater treatment plants, iron and aluminum do not represent
"a potentially serious hazard . . . to plants, animals, or
humans" and, although they were added to the sludge, such that

54

the sludge itself often "contain[ed] high levels of iron and/or aluminum, these elements do not pose a problem [in terms of crop production or plant accumulation] provided that the application site is well managed." (DTX 606, at PISC00045353, 54). The evidence generally reflected that the Bevard application was well managed, under the supervision of on-site inspectors and in compliance with permits. (DTX 612A, J. Bevard depo.).[20] Thus, aside from the fact that the concentration of these elements exceeded ATC levels, there is little to suggest that aluminum and iron pose any real concern.

It is difficult to know what to make of Mr. Kalbacher's testimony. iStar did not specifically rebut this witness, and neither party asked any of the Maryland environmental

---

[20] Some of the historical sludge documents related to the Bevard Property referenced the Property as a "landfill" (PTX 16), which Purchaser interpreted to mean that it was essentially a dumping site, rather than a site where sludge was systematically applied. Ms. Williams dispelled this notion, testifying that, regardless of the use of the word "landfill," the data itself supported that the Property was a land application site. (T. 4/8/14, at 202-03). Various documents referenced the disposal of "grit" on site and one mentioned the excavation of "10-by-10-by-6-foot" pits in which grit was to be deposited. (PTX 18). Ms. Williams explained that "[g]rit is the sand, the solids, the inorganic fragment that comes into the wastewater treatment plant." (T. 4/9/14, at 71). Over Purchaser's objection, Seller was permitted to introduce a supplemental portion of John Bevard's videotaped deposition in which he testified that no grit was disposed of on the Property and that "grit pits" were never excavated. (T. 4/10/14, at 115-16; DTX 612C). No evidence that "grit" was found on the Property was presented at trial and the court credits Mr. Bevard's testimony that none was applied.

consultants who testified if they had a similar understanding of the import of ATCs.  There is, however, ample reason to conclude that the ATCs for the eastern region of Maryland cannot serve as a viable substitute for naturally-occurring background levels on the Property.  For one thing, the ATCs have never been adopted by statute or regulation in Maryland, nor is the term mentioned in case law.  Mr. Kalbacher acknowledged on cross-examination that the 2001 document setting forth the ATCs merely provides "guidance" and "is not compulsory."  (T. 4/2/14, at 164).  The guidance document itself recognized that the investigation upon which the ATCs were based "does not constitute a rigorous scientific analysis conducted in a controlled experimental setting" and that "ATC reference levels" were intended to "serve as general indicators of background levels of metals and trace elements in soil until a more rigorous and thorough background investigation can be completed."  (T. 4/2/14, at 158; PTX 214, at 47).  To date, no subsequent investigation has been completed.  Moreover, Mr. Kalbacher agreed that the Maryland Department of the Environment "endorses, runs, and oversees the Maryland state biosolids program."  (*Id*. at 153).  Thus, if sewage sludge contains elevated levels of heavy metals, MDE could potentially "endorse the inappropriate land application of hazardous materials," a result that he agreed would be anomalous.  (T. 4/2/14, at 153).  Additionally, due to

substantial differences in the concentrations of elements that Mr. Kalbacher's study found in different geological regions of the state, levels that are presumed to be naturally occurring in the western and central regions would, according to his testimony, require remediation in the eastern region where the Bevard Property is located. (*Id*. at 160-61). As Dr. Daniels explained, metal concentrations in soil can vary widely at a given property (T. 4/9/14, at 196-97); thus, ATCs, based on a mean of limited testing data across an entire region of the state, would seem a poor substitute for site-specific testing to determine background levels.

The 2001 guidance document authored by Mr. Kalbacher also points to a more fundamental problem with Purchaser's evidence. The document suggests that "to determine if more than one population of data exists at a property" - such as, for example, sewage sludge and background soils - "[t]he data collected from any sampling approach must be evaluated by statistical means[.]" (PTX 214, at 14; T. 4/2/14, at 15). Ms. Richards similarly testified that, in "look[ing] at the impact of sludging" at a given site, EPA guidance provided that a sampling and analysis plan should involve "a statistical comparison between the land farm conditions to the background conditions." (T. 4/1/14, at 7). But that is not what the sampling and analysis plan implemented at the Bevard Property did. While the stated

purpose of the plan was to test the accuracy of Seller's environmental representations and warranties, Environ's methodology did not factor in critical language of § 12.2(d) - namely, that conditions "disclosed in Seller's environmental reports" were specifically excepted.  (JTX 41 § 12.2(d)).  Those reports revealed that from approximately 1957 to 1991, the Property was extensively mined for sand and gravel and that large portions were replenished with fill material of unknown quality.  (JTX 25, at SCH00000599).  Indeed, sewage sludge was applied to the Property with the intent of improving the quality of the soil, which had been diminished due to decades of mining activities.  (DTX 612A, J. Bevard depo.).  The URS report noted that mining operations had depleted the soil, that the Piscataway Wastewater Treatment Plant system ran through 300 acres of the Property, and that a small portion of the Property was on the State's master list of hazardous sites related to an experimental project by the EPA involving the land application of sludges generated by the wastewater treatment plant.  (JTX 35, at USH-00029077-78).[21]  Schnabel cautioned that neither the Phase I ESA nor the 2004 update included soil sampling or

---

[21] While the URS archaeological survey may not constitute an "environmental report" under the Purchase Agreement, it provided substantial historical detail related to the environmental condition of the Property and Purchaser generally agreed at trial that it was charged with knowledge of what it disclosed. (T. 4/15/14, at 23).

testing (JTX 29, at ECC 00001135), and while it did not visually observe evidence of questionable materials in the soil, Purchaser either knew or should have known that the chemical content of the soil was an unknown factor, a point alluded to by Mr. Jacoby when the sludging operation was initially discussed at Lennar. (DTX 570, at USH_02035516).

Indeed, Purchaser later retained ECC to conduct an independent Phase I ESA, and that consultant's specific recommendation that Purchaser "assess native soil quality" in certain portions of the Property was largely ignored. (JTX 52 § 1). Asked on cross-examination by Purchaser's counsel whether any of the items listed in the ECC report were "intended to alert Lennar that there was heavy metal contamination on the property," Joseph King, who supervised the ECC environmental site assessment of the Property, responded, "[n]ot specifically heavy metal contamination, but that there were areas of unknown conditions -- soil conditions." (T. 4/4/14, at 59). Nevertheless, Purchaser subsequently represented to Seller (in the Second Amendment), to iStar (in the Consent and Estoppel Agreement), and to at least one potential joint venture partner that it was satisfied with the environmental condition of the Property. As Mr. Beckwitt acknowledged at trial, when Purchaser requested access to the Property in early 2008, it was not seeking to investigate any specific environmental condition.

(T. 3/31/14, at 132).   To the contrary, the evidence strongly supports that this request was essentially a fishing expedition designed to delay closing and to search for a reason to avoid it altogether.

In short, the reports provided by Seller prior to execution of the Purchase Agreement put Purchaser, a sophisticated homebuilder, on inquiry notice of the potential for contamination, at least as it related to the historic mining operation. *See Poffenberger v. Risser*, 290 Md. 631, 637 (1981) (a plaintiff is on inquiry notice when it has "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued"). Thus, to test the environmental representations and warranties, Environ had to demonstrate the presence of "Hazardous Materials" related to some other source.   As set forth in its amended complaint (ECF No. 52 ¶ 143), Purchaser's late-developing theory as to the cause of a "release" of heavy metals on the Property that was not disclosed by Sellers was sewage sludge, but its expert's sampling and analysis plan could not confirm that theory because of its "biased" nature.   There was no credible evidence supporting Ms. Richards' *ipse dixit* conclusion that sewage sludge was the source of any heavy metals on the Property

and substantial evidence suggested otherwise. Counsel for iStar vigorously cross-examined Ms. Richards regarding her disavowal of prior statements that certain sampling sites were outside of the areas where sludge was applied, and two of iStar's experts - Dr. Daniels and Dr. Shahrokh Rouhani - opined that there was essentially no difference between the quality of soils in these areas and those that were believed to have been applied with sludge. (T. 4/9/14, at 188; T. 4/11/15, at 126). Ultimately, however, even assuming that Environ tested only "sludged" areas, it could not establish that sewage sludge released "Hazardous Materials" without conducting a statistical comparison with background soils on the Property. Purchaser suggested that the ATCs served as a valid comparator, but the ATCs, if credited as a substitute for background, could only show that there were excessive levels of heavy metals - not what put them there. Accordingly, Purchaser has not met its burden of demonstrating that the source of "Hazardous Materials" on the Property was something other than what was disclosed in the environmental reports provided by Seller.

In light of that conclusion, the court need not reach the question of whether there were "Hazardous Materials" on the Property in material amounts, but Purchaser fell short in this regard as well. Under § 12.2(d) of the Purchase Agreement, the term "Hazardous Materials" is defined as "hazardous wastes,

hazardous substances, and toxic materials prohibited or regulated by federal, state or local law, regulation, or order, . . . [and] polychlorinated [biphenyls] ("PCBs")." It is undisputed that PCBS were not found on the Property in amounts sufficient to constitute a material breach of Seller's environmental representations and warranties. To establish that the arsenic, vanadium, iron, and aluminum levels constituted "Hazardous Materials," Purchaser seemingly relies on the ATCs, but it has not shown that the non-compulsory guidance constitutes a "federal, state or local law, regulation, or order." In its closing argument, Purchaser asserted that "[e]ach [element] is a hazardous material under Article [7]-201(1) . . . [of] the environmental article" of the Maryland Code. (T. 4/15/14, at 29). That section defines a "hazardous substance" as "any substance . . . [d]efined as a hazardous substance under § 101(14) of the federal act; or . . . [i]dentified as a controlled hazardous substance by the Department in the Code of Maryland Regulations." Pursuant to section 101(14) of CERCLA, "[t]he term 'hazardous substance' means . . . any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [43 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act . . . has been suspended by Act of Congress)[.]" 42 U.S.C. §

9601(14).   Under 40 C.F.R. § 261.4(a)(1), however, "[d]omestic sewage" and "[a]ny mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works" is expressly excluded from the definition of "solid wastes" under CERCLA.   Similarly, in Maryland, COMAR 26.13.02.04 excludes from the State's definition of "solid wastes" "[d]omestic sewage . . . that passes through a sewer system to a publicly owned treatment work for treatment," as well as certain industrial wastewater, and defines "[d]omestic sewage" as "untreated sanitary wastes that pass through a sewer system." Thus, sewage sludge, consisting essentially of wastes that pass through a sewer system that are then treated by publicly owned treatment works and approved for land application by regulatory authorities, appear to be excluded from the definition of hazardous substances under state and federal law.   Counsel for iStar argued as much in closing (T. 4/15/14, at 95-96), and Purchaser did not challenge this argument in its rebuttal.

   **B.   Refusal of Access**

   Resolution of Counts I – III and, to a limited extent, Count VII of U.S. Home's amended complaint turn on the question of whether Seller's refusal of U.S. Home's request for access to the Property constituted a breach of § 13(a) of the Purchase Agreement vis-à-vis § 15(b).   Specifically, Count I alleges breach against Settlers Crossing and WPE related to their

"refusal to allow U.S. Home to inspect the Property" (ECF No. 52 ¶ 99); Count II alleges breach against BDC for failing to return U.S. Home's deposit on the Contract for Services following the alleged breach (*id.* at ¶ 114); Count III alleges breach of guaranty against Mr. Sandler for his failure to return deposits under the parties' agreements upon demand (*id.* at ¶ 122); and Count VII seeks, in relevant part, a declaration that "U.S. Home properly terminated the Agreement on July 3, 2008, based on [] Seller's material breach of Section 13(a) of the Purchase Agreement" (*id.* at 38).

At trial, the parties presented extensive evidence, and argued at length, regarding whether Seller's refusal to permit Purchaser access to the Property to conduct investigations constituted a breach of § 13(a). That section provided, in relevant portion, that "Purchaser shall have the right . . . , with the prior approval of WPE, in each instance, until Settlement, to make such investigations, studies and tests with respect to the Property as Purchaser deems necessary or appropriate." (JTX 41 ¶ 13(a)). Pursuant to § 15(b), "[i]f Settlers Crossing shall . . . breach any of its representations, warranties or covenants . . . in any material respect . . . then Purchaser shall have the right, as its sole and exclusive remedy, . . . [to] terminate this Agreement and receive a return of its Deposit[.]" (*Id.* at ¶ 15(b)). In Purchaser's view, U.S.

Home's request for access to the Property in early 2008 was entirely reasonable and Seller denied permission for no legitimate reason; thus, it is entitled to a refund of its deposits. According to Seller, Purchaser's request for access was an unreasonable "sham request" and it was within its rights to refuse permission.

Purchaser cannot prevail on its claim for breach of contract related to Seller's refusal of access for three reasons. The first relates to the fact that the access issue was resolved prior to expiration of iStar's cure period under the Consent and Estoppel Agreement. Pursuant to § 10 of that contract, Purchaser agreed that "if Settlers Crossing or WPE defaults under the terms of the Purchase [Agreement], [it would] promptly notify [iStar] . . . and, before taking any action against Settlers Crossing or WPE, or terminating the Purchase [Agreement], provide [iStar] with a reasonable period of time to cure such default[.]" (DTX 259 § 10). While the agreement contemplated cure periods of varying duration depending on the circumstances, and it is unclear which applied, there appears to be no dispute that iStar's cure period expired on July 2, 2008. (JTX 73, at 2). Prior to that date – specifically, on June 27, 2008 – Judge Connelly issued an order granting U.S. Home's motion to compel inspection of the Property in the initial action. (DTX 460). Thus, Purchaser was granted the right to

inspect the Property prior to expiration of iStar's right to cure and, as iStar communicated by letter dated June 30, there was "nothing for [it] to cure." (DTX 461, at USH-00004666).

During closing arguments, counsel for Purchaser asserted that "Maryland law is clear" that "a breach cannot be cured by a court order" (T. 4/15/14, at 119), but he cited no case law in support of that proposition, nor is the court aware of any.[22] Notably, at the time Purchaser provided notice of default to Seller and iStar, a fully-briefed motion to compel access in the initial action had been pending for more than two weeks. Thus, Purchaser was aware that the access issue might be resolved by court order prior to expiration of the applicable cure periods. In fact, it actively sought to avoid that possibility by directing counsel "to file a [post-hearing] supplemental brief .

---

[22] In its opposition papers on summary judgment, Purchaser cited two cases – *Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 960 F.Supp. 931, 945 (D.V.I. 1997) ("payment under judicial compulsion can hardly constitute good faith performance and payment under a contract, nor can it excuse or cure . . . payment defaults"), and *VanHaaren v. State Farm Mut. Auto Ins. Co.*, 989 F.2d 1, 7 (1st Cir. 1993) ("Nor is [Appellant] saved by his eventual submission to the *court order* compelling his attendance at the January 14 IME" because, "[w]ere it otherwise, IME clauses would be reduced to little more than invitations to litigate IME requests" (emphasis in original)) – in support of this general proposition. (ECF No. 593, at 43-44). Neither of those cases involved the application of Maryland law, remotely similar facts, or circumstances in which a breach was declared while a motion was pending that would effectively resolve the issue. Moreover, in neither case was a contractual cure period still in effect at the time the issue was resolved by the court.

. . in the hope that filing will raise additional questions and push an order out past July 3[,] . . . the date that Sandler and [iStar's] right to cure expires[.]"  (DTX 566).  As it happened, Judge Connelly resolved the issue before that date and iStar promptly gave notice advising that Seller would comply the court's order.  (DTX 361, at USH-00004666).  At best, Purchaser has shown that its request for access was delayed from January 3 to June 27, 2008, a time period when, the evidence overwhelmingly supports, it had not yet resolved why access was necessary or what it would look for if it gained access to the Property.  Section 15(b) of the Purchase Agreement authorized Purchaser to terminate the agreement for a breach of Seller's representations, warranties, or covenants "in any material respect[.]"  (JTX 41 § 15(b)).  To the extent Seller's refusal of access was a breach, Judge Connelly's order, issued prior to expiration of iStar's right to cure, rendered that breach immaterial.  *See Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) ("A breach is material 'if it affects the purpose of the contract in an important or vital way.'" (quoting *Sachs v. Regal Sav. Bank, FSB*, 119 Md.App. 276, 283 (1998)).

U.S. Home's breach of contract claim also fails because it did not satisfy a precondition to its right of access under §

13(c) of the Purchase Agreement. That section provided, in relevant part:

> Purchaser shall [] maintain, in full force and effect, a policy or policies of comprehensive general liability insurance, with limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, issued by one or more carriers admitted and licensed to do business in Maryland, and naming WPE and Settlers Crossing as an additional insured against liability for injury to or death of persons and loss of or damage to property occurring in, on or about the Property caused by Purchaser or Purchaser's agents, consultants, contractor, employees or representative. . . . Prior to any entry on the Property, Purchaser shall provide WPE and Settlers Crossing with original certificates (or a fax of same), evidencing all such insurance coverage as required under this paragraph.

(*Id.* at § 13(c)).

In response to U.S. Home's notice of default, Seller asserted that Purchaser was not entitled to enter the Property without providing the required certificate of insurance. (DTX 656, at 2). In an email dated June 4, 2008, Mr. Jacoby confirmed to several colleagues at Lennar that "[w]e never provided [Seller] with any Certificate of Insurance because we were never asked to." (DTX. 644). While it is true, as Mr. Jacoby further noted, that Seller gave Purchaser "free and unsupervised access to the property throughout the contract period until [Purchaser's] formal request" (*id.*), the § 13(a) request for access in early 2008 was of a fundamentally

68

different character than the parties' prior dealings. This request was made at a time when the parties had essentially ceased all communications, other than through attorneys. Unlike prior occasions in which Purchaser accessed the Property, this request was formal, in writing, and specifically pointed to a contractual right that required Seller's approval. Moreover, this request was made in the context of litigation; in fact, it was couched in terms of both a contractual right and a discovery right to inspect the Property. (JTX 66, at iStar00019491). To the extent Purchaser suggests that Seller waived a right to require a Certificate of Insurance, § 18(G) of the parties' agreement provides that "[n]o waiver of any of the provisions of this Agreement shall be valid unless the same is in writing and is signed by the party against [] which it is [s]ought to be enforced." (JTX 41 ¶ 18(G)). The evidence does not reflect that any such waiver was ever signed by Seller.

According to the Restatement (Second) of Contracts, "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." *See generally Sherwood Brands, Inc. v. Great American Ins. Co.*, 418 Md. 300, (2011) (applying Restatement (Second) of Contracts § 225). Much like U.S. Home was not obligated to close until Seller had satisfied certain conditions precedent to settlement, Seller was under no obligation to permit U.S. Home

to enter the Property until Purchaser produced a Certificate of Insurance.  Because Purchaser never satisfied that condition, there could be no breach.

Finally, Seller acted within its rights in withholding permission.  While the conduct of both parties related to the request for access is reminiscent of children throwing sand at each other in a sandbox, the touchstone for the court's analysis is reasonableness.  As explained in the opinion deciding pre-discovery summary judgment motions:

> [I]n 7-Eleven, Inc. v. McEvoy, 300 F.Supp.2d 352, 361 (D.Md. 2004) (citing Julian v. Christopher, 320 Md. 1, 9 (1990)), [the court recognized] that "[w]hen a party to a contract is granted discretion to make decisions without an express standard to guide its use, [c]ourts will infer that the parties intended the discretion to be used reasonably as opposed to arbitrarily or capriciously."  This principle is derived from the general implied covenant of good faith that inheres in every contract[.]

(ECF No. 41, at 27).  Thus, the critical question with regard to the access issue is whether Seller's refusal of access was reasonable.  In deciding the initial summary judgment motion, the court found there were "genuine issues of material fact regarding the underlying reason for U.S. Home's request and whether Seller's rejection of the request was reasonable." (Id. at 29).  Upon consideration of the evidence at trial, the court concludes that U.S. Home's request for access was not made in

good faith and, under the particular circumstances of this case, that Seller's refusal of access was reasonable.

The evidence demonstrated that, by at least October 1, 2007, Purchaser viewed the Bevard transaction as a financial albatross and actively sought to relieve itself of this burden. In the Second Amendment, executed less than five months earlier, Purchaser had already extracted significant concessions from Seller in light of the contracting housing market, resulting in a substantially reduced purchase price in exchange for a corporate guaranty by Lennar. (JTX 56). At the same time Lennar guaranteed to Seller that U.S. Home would go to settlement, it was actively searching for a joint venture partner to purchase the Property – a result that would have been prohibited, absent Seller's consent, under § 18(F) of the Purchase Agreement. (JTX 41 ¶ 18(F)). When Purchaser was unable to find a joint venture partner or land bank to assume its contractual obligations, it retained "a team of high priced lawyers and consultants" (DTX 380) to search for an "escape clause" in the Purchase Agreement (T. 3/31/14, at 184). When Seller began forwarding closing documents in advance of the December 5, 2007, settlement date, it received no response from Purchaser (T. 4/3/14, at 60); in fact, as the settlement date approached, project-level managers at U.S. Home were directed to have no contact with Seller's principals (DTX 401). Having

learned that Purchaser was seeking to avoid the contract (T. 4/10/14, at 55-57), Seller was understandably concerned and commenced the initial action in response.

Thus, by January 3, 2008, when U.S. Home transmitted its request for access, there was good reason for Seller to be skeptical of Purchaser's motives. This skepticism was only amplified by the content of the letter itself, which cited various issues that had been specifically addressed by the parties over the prior two-plus years since the inception of the project. (T. 4/3/14, at 55). Mr. Beckwitt's testimony that the filing of the initial action was the impetus for requesting access to inspect the Property (T. 3/31/14, at 132), is belied by the fact that a draft letter requesting access had been circulated among Lennar executives before the law suit was commenced (DTX 399). Mr. Beckwitt acknowledged that Purchaser had "no reason to believe that there was anything wrong with the property" at the time of the request and that it "didn't know what [it would] find" if it gained access. (T. 3/31/14, at 132). The evidence shows that the purpose of Purchaser's request for access was to delay closing while it settled on a strategy to avoid its obligations under the Bevard contracts. This conclusion is supported by the fact that Purchaser later rejected Seller's offer of compromise as to the access issue (DTX 565, at 2) and that, after gaining a right of access to the

Property through the court, Purchaser never exercised that right. Rather, as reflected in a March 31, 2008, "core and hit list report," Purchaser was determined to "[t]erminate [the] contract and get [its] deposit back via legal action." (DTX 443; T. 3/31/14, at 213).

Based on these facts, the court concludes that U.S. Home's request for access was not made in good faith and, consequently, that Seller's denial of that request was reasonable. Accordingly, Seller did not breach its obligations under § 13(a) of the Purchase Agreement.

### III. Conclusion

For the foregoing reasons, the court concludes that Purchaser has not met its burden at trial as to any of the remaining claims in its amended complaint. Insofar as iStar's amended counterclaim seeks a declaration that Purchaser was "obligat[ed] to settle . . . and pay the considerations due under the [Purchase Agreement] and the Contract for Services on May 27, 2008" (ECF No. 447 ¶ 82.a(2)), which is essentially the converse of the declaratory relief sought by U.S. Home, iStar appears to be entitled to relief under the Purchase Agreement upon Purchaser's default. Pursuant to § 15(a), as modified by the Second Amendment, upon default by U.S. Home, "Settlers Crossing shall be entitled to specific performance . . . to complete the Settlement in accordance with the Agreement and pay

the Purchase Price to Settlers Crossing." (JTX 56 ¶ 27 (modifying § 15(a)). Moreover, under § 15(d), also as modified by the Second Amendment, Lennar is liable as U.S. Home's corporate guarantor. (*Id.* at ¶ 28 (adding § 15(d)). As iStar now stands in the shoes of Settler's Crossing, it is entitled to specific performance under the Purchase Agreement.[23]

Before judgment may be entered, however, a question remains as to whether iStar can deliver the Property that was promised in the Purchase Agreement. Prior to the court's decision on the parties' cross-motions for summary judgment, Purchaser moved for leave to file a supplemental memorandum related to the alleged fact that zoning for a portion of the Property has lapsed. (ECF No. 611). The court denied that motion, without prejudice to renewal, finding that "[t]he rezoning is only relevant insofar as it might affect an award of damages if iStar were ultimately

---

[23] Several motions *in limine* are still pending and may be dispensed with summarily. Seller's motion to preclude evidence of development costs (ECF No. 637); Purchaser's motions to preclude expert testimony of James Brennan and Daniel Colton (ECF No. 639), to preclude iStar's experts from testifying regarding the application of the EPA Part 503 rule (ECF No. 640), and to preclude evidence of bad faith (ECF No. 641); and iStar's motions to bar testimony and evidence related to Mr. Jacoby (ECF No. 642) and to preclude expert testimony of B. Tod Delaney (ECF No. 644) will be denied as moot. iStar's motion to preclude the expert testimony of Robin Richards (ECF No. 645) and iStar's motion for judgment on partial findings (ECF No. 678) will be denied. Additionally, Purchaser's objection to the court's consideration of certain documents produced just before trial related to Steven Engle will be sustained. The court has not relied on any such document in rendering this opinion.

prevail." (ECF No. 624, at 2 n. 1). Further proceedings will be necessary to determine whether, or to what extent, the lapsed zoning affects iStar's remedy and the measure of damages in this case.

A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge