IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

U.S. HOME CORPORATION

:

v.                              :    Civil Action No. DKC 08-1863

:

SETTLERS CROSSING, LLC, et al.

:

**MEMORANDUM OPINION**

In this continuing litigation involving a contract dispute over the sale of 1,250 acres of land in Prince George's County, Maryland (the "Property"), several narrow issues relating primarily to 2013 zoning changes that impacted the Property remained after the bench trial that resolved the primary issues.[1] The parties submitted post-trial briefs and a hearing was held. After considering the parties' arguments, the parties' Agreement,[2] and the evidence adduced at trial, the court now

---

[1] This memorandum opinion includes only the facts and arguments relevant to the narrow issues remaining in this case. A full factual description of the dispute between the parties can be found in previous opinions. (ECF Nos. 41, 95, 433, 445, 484, 493, 548, 603, 624, and 707).

[2] The parties' Purchase Agreement (JTX 41) and Second Amendment to the Purchase Agreement (JTX 56), capture the major terms of their agreement. The parties also executed a Contract for Services (JTX 42), Consent and Estoppel Agreement (DTX 259), and several other documents and amendments, which provide other relevant details of their bargain.

issues findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[3]

## I.   Background

On July 18, 2014, the undersigned found that Plaintiff/Counter-Defendant U.S. Home Corporation, a subsidiary of Counter-Defendant Lennar Corporation (collectively "Purchaser"), had not met its burden at trial of proving its claims.  It was also found that Defendant/Counter-Plaintiff iStar Financial, Inc. was entitled to declaratory relief, namely that "Purchaser was 'obligat[ed] to settle . . . and pay the considerations due under the [Purchase Agreement] and the Contract for Services on May 27, 2008[.]'"  (ECF No. 707, at 73).  In addition, the opinion noted that:

> iStar appears to be entitled to relief under the Purchase Agreement upon Purchaser's default.  Pursuant to § 15(a), as modified by the Second Amendment, upon default by U.S. Home, "Settlers Crossing shall be entitled to specific performance . . . to complete the Settlement in accordance with the Agreement and pay the Purchase Price to Settlers Crossing.  (JTX 56 ¶ 27 (modifying § 15(a)).

(*Id.* at 73-74).

---

[3] Rule 52(a) provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."

Finally, the opinion concluded that "[b]efore judgment may be entered, . . . a question remains as to whether iStar can deliver the Property that was promised in the Purchase Agreement." (*Id.* at 74). Prince George's County passed new zoning regulations in April and July 2013 that may impact development on the Property. (ECF No. 611). Purchaser was previously denied the opportunity to file supplemental briefing regarding the rezoning of the Property because the court found that "rezoning is only relevant insofar as it might affect an award of damages if iStar were ultimately to prevail." (ECF No. 624, at 2 n.1). Accordingly, the parties were informed in the opinion that "[f]urther proceedings will be necessary to determine whether, or to what extent, the lapsed zoning affects iStar's remedy and the measure of damages in this case." (ECF No. 707, at 75).

Following the issuance of the July 18, 2014 memorandum opinion, a teleconference was held with the parties on July 31, 2014, during which the remaining issues related to zoning were discussed and a briefing schedule was set. Pursuant to this briefing schedule, Purchaser submitted its brief on the remaining issues on September 12, 2014. (ECF No. 720). On October 3, 2014, iStar submitted its opposition (ECF No. 724), along with a motion to strike portions of Purchaser's brief (ECF No. 723). On October 17, 2014, Purchaser filed a reply (ECF No.

3

726), along with an opposition to iStar's motion to strike (ECF No. 725).  iStar replied to Purchaser's opposition to the motion to strike on October 29, 2014.  (ECF No. 727).  Further argument was heard on November 3, 2014.  (ECF No. 728).

## II.  Findings of Fact and Conclusions of Law

### A.  The Impact of 2013 Zoning Regulations on iStar's Remedy

The first issue concerns which party bears the risk of loss for zoning changes occurring in 2013 based on the language of the Agreement, and the related issues of whether the rezoning of the Property has changed the condition of the Property such that specific performance is not warranted or whether Purchaser is entitled to a reduction in the Purchase Price.

### 1.  The PSA's Risk of Loss Provision Does Not Place Risk of Plat Density Changes on Seller through Settlement

Purchaser argues that under the Purchase and Sale Agreement's ("PSA") risk of loss provision, Seller bears the risk of loss for any decreases in the Property's value resulting from the 2013 changes in zoning and 2007 changes in stormwater management regulations.[4]  Purchaser alleges that due to these changes, the maximum plat density allowed on the Property under the current zoning has been reduced from 1867 to 900, "a

---

[4] Purchaser's arguments regarding the impact of stormwater management regulation changes on the Property's condition are addressed *infra* in part II.B.

fraction of what the parties contemplated in the PSA."[5]   (ECF No. 720, at 18).   Purchaser asserts that it will not be able to use its already-approved development plan due to the regulation changes, but will be required to obtain new plan approvals that comply with current zoning, which may be costly.   (*Id.*).   Purchaser argues that the parties shifted risk for these changes to Seller under the PSA by allocating risk of loss to Seller until "Settlement," which is defined in Section 5 of the PSA as "[t]he consummation of the purchase and sale."   (JTX 41 § 5; JTX 56 § 5).[6]   Purchaser contends that because Settlement has not yet occurred, the risk of loss remains with Seller and any zoning changes that have impacted the Property's value are "losses" — falling within the PSA's risk of loss provision — for which Seller is accountable.   Purchaser asserts that because "loss" is not defined in the PSA, it is not subject to any limitations.

---

[5] The term plat density refers to the number of units that may be built on each portion of the Property.   (ECF No. 720, at 15).   Purchaser argues that due to the zoning changes, plat density potentially will be reduced, meaning the total number of units that can be built in the development will be reduced, which will decrease the value of the project.   (*Id.* at 15-18).   According to Purchaser, plat density was a material consideration under the PSA, and because it has been altered the "Court must reduce the purchase price to honor the terms of the agreement."   (*Id.* at 29 n.13).

[6] The designation "JTX" refers to joint trial exhibits; "PTX" refers to exhibits offered by Purchaser (U.S. Home and Lennar); and "DTX" refers to exhibits offered by Seller (iStar). References to trial testimony are designated by "T." followed by the date of the testimony.

It contends that the court should give "loss" its ordinary meaning, which it states is: "the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way." (ECF No. 720, at 22) (*citing Black's Law Dictionary* 1087 (10th ed. 2014)). Purchaser asserts that under this definition and in accordance with custom in the industry, "changes in zoning and entitlements that decrease permitted density and increase development costs of a property that is being sold for development" are "losses" covered by most risk of loss provisions including that in the parties' PSA.

In addition, Purchaser asserts that if the PSA is read as a whole it supports the conclusion that any losses resulting from zoning changes are Seller's responsibility until Settlement occurs. It points to the language in Section 18(H) — the Risk of Loss provision — which keeps risk of loss on Sellers "[e]xcept as otherwise provided herein." Purchaser states that the parties provided for different risk allocations in several other sections of the PSA, namely:

> Section 14 in the event of condemnation; and Section 3 in the event that Sellers failed to initially record plats for Bevard East, Bevard North, and Bevard West. *See* PSA §§ 14, 3(d). But neither of these provisions, nor any other provision in the contract, provides a special risk allocation of risk for losses related to zoning or other regulations affecting the permitted density of the property subsequent to recordation of plats.

(*Id.* at 23-24).   Purchaser argues that because the PSA does not otherwise provide for risk of loss for zoning changes but specifically accounts for other losses, losses attributable to zoning should be covered by the general risk of loss provision.

iStar counters that the PSA, when evaluated as a whole, does not place the risk of 2013 zoning-related changes on Seller.   iStar contends that the intent of the parties with regard to zoning changes is not demonstrated through the risk of loss provision, but through several other PSA provisions:

> [First,] the PSA required [] Sellers [to make] an accurate certification [to] WPE that, as of November 15, 2005, it had 'no knowledge of any published preliminary or adopted land use plan (or adopted zoning Map Amendment) which may result in condemnation or taking of any part of the Land.' JTX 41, § 19(B).   It also required that, as a condition precedent to closing, Sellers obtain and record certain plats that reflected agreed-upon lot densities.   JTX 56 ¶ 4 (amending PSA Section 3(d)).   The Court has already held that Sellers satisfied that condition well in advance of the May 27, 2008 settlement date.   The PSA only called for a reduction in the Purchase Price if the lots dipped below threshold levels in those recorded plats.   *Id.*   Once Sellers accomplished plat recordation, Sellers['] density-related obligations were complete. The PSA is silent as to subsequent zoning changes — except where it places the onus on Lennar to monitor publicly available information regarding same.   JTX 41, § 19(B).

(ECF No. 724, at 19-20). iStar argues that the parties' intent with regard to plat density obligations on the Property, which may be affected by zoning, is demonstrated by Seller's PSA obligation to obtain and record certain plat densities by March 15, 2009. Seller's requirements to obtain approval for and to record certain plat densities were conditions precedent to Settlement, conditions which the court found had been satisfied by May 27, 2008. (*Id.* at 20). Seller contends that at the time the contract was entered, the parties' intent could not have been for risk of loss for zoning and plat density changes to remain with Sellers through 2013, as the PSA contemplated that "Sellers would satisfy all conditions precedent no later than March 15, 2009 and that Settlement, at the latest, would be thirty days thereafter."[7] (*Id.*). Accordingly, iStar argues that the risk of loss provision was not meant to cover plat density changes caused by zoning regulations passed in 2013, as its obligations surrounding plat density were time sensitive and its responsibility for any plat changes ended at the latest in March 2009.

---

[7] Seller points to the "time is of the essence" provision in Section 18(D) of the PSA to emphasize that under the parties' Agreement it was essential that all matters were completed within the appropriate timeframes.

Furthermore, iStar takes issue with Purchaser's argument regarding when risk of loss was due to shift to Purchaser.[8] Seller argues that even though it bore the risk of loss through "Settlement," the "Court has already held that Settlement was to occur on May 27, 2008." (ECF No. 724, at 21). iStar contends that because the "PSA did not contemplate the possibility of 'Settlement' beyond 2009, and certainly never into 2013, purported losses occurring over four years later could not and did not remain with Sellers and iStar." (*Id.*). iStar adds that because the court found that Purchaser was in default as of May 27, 2008 for failing to settle, Purchaser thereafter does not get to enforce the risk of loss provision which shifted risk to Purchaser upon settlement. (*Id.* at 22). In sum, iStar argues that the "parties allocated risk [for possible zoning changes] by creating the condition precedent requiring Sellers to obtain and record the record plats. Having done so, and having obtained all necessary approvals, the risk shifted back to

---

[8] Purchaser has distinguished that under the PSA, risk of loss remained with Seller through "Settlement" rather than the "Settlement Date." iStar notes that while the PSA defines the "Settlement Date" as (A) thirty days after all conditions precedent have been met by Sellers, or (B) the "Outside Settlement Date," the PSA also makes Settlement mandatory on the earlier of (A) or (B), noting that "Settlement shall take place on that date[.]" (ECF No. 20-21). iStar argues that "the avoidance of Settlement on the Settlement Date was Lennar's own doing, and Sellers held Lennar accountable for it with a timely notice of default." (ECF No. 724, at 21).

Lennar to put those plats and approvals to actual use in a timely fashion." (*Id.* at 22-23).

Purchaser responds that regardless of whether it was in default under the PSA and despite Seller's argument that it had no affirmative contract obligation to maintain zoning after May 27, 2008, the risk of loss provision prevails because it "allocates risk among parties without regard to contractual duties." (ECF No. 726, at 9). Purchaser argues that "[w]hen an event for which the parties have allocated risk occurs, the risk-bearing party bears the losses occasioned by the event, irrespective of either party's breach." (*Id.*). It cites *Geist v. Lehmann,* 19 Ill.App.3d 557 (1974), as supporting the proposition that "where a property's value was affected by events outside the parties' control — [] risk of loss principles rather than obligation and breach analysis [applies.]" (ECF No. 726, at 9).

When read as a whole, the parties' Agreement does not place risk of loss on Sellers for zoning changes occurring after the "Settlement Date." Both parties acknowledge that when evaluating the meaning of a specific contract provision, it must be read "in light of the language of the entire contract." *Weichert Co. of Md., Inc. v. Faust,* 419 Md. 306, 324 (2011). Here, the PSA's risk of loss provision in Section 18(H) does not specifically address which risks are covered; rather, it states

10

only that "[e]xcept as otherwise provided herein, the risk of loss shall remain with WPE and shall pass to Purchaser simultaneously at Settlement."[9]   PSA § 18(H).   This provision alone does not clarify the parties' intent regarding which party bears the risk of loss for zoning changes.   The parties highlight several other sections in the PSA, however, which provide additional guidance.

Purchaser highlights Sections 3 and 14, stating that they exemplify where risks were "otherwise provided" for, and that all other risks not specifically addressed, including zoning changes, are covered by the general risk of loss provision. Both Sections 3 and 14, however, relate to zoning and plat density on the Property and provide insight into the parties' intentions with regard to land use changes.   Section 3(d) of the original and of the Second Amended PSA encompasses the parties'

---

[9] Purchaser points to *Geist,* 19 Ill.App.3d 557, stating that courts "[i]nterpreting analogous [risk of loss] provisions in similar circumstances . . . have concluded that risk of loss remains with a seller — including during the pendency of a legal dispute." (ECF No. 720, at 20).   The provision allocating risk of loss for fire damage in *Geist,* which provided that "if prior to closing, improvements on said premises shall be destroyed, materially damaged by fire or other casualty, this contract at the option of Purchaser shall become null and void[,]" is easily distinguishable from the allocation of risk for plat density changes in the present case.   In *Geist,* material losses due to fire damage between the date the contract was executed and closing were expressly addressed in the risk of loss provision, whereas here, the boilerplate risk of loss provision does not address losses due to zoning changes; rather, these risks are addressed elsewhere in the PSA.

expectations regarding any Purchase Price adjustments due to plat density changes. In the original PSA, section 3(d) provided for a Purchase Price reimbursement schedule, under which Settlers Crossing would reimburse Purchaser part of the Purchase Price "[i]f, and only if, the Record Plat(s) Approval for the . . . Property [were] collectively approved for less [than] one thousand eight hundred fifty (1,850) Units[.]"[10] (JTX 41). The Second Amended PSA maintained a similar Purchase Price reduction schedule based on the number of Record Plats initially *approved*. (JTX 56 § 3(d)). Thus, the original and the amended Section 3(d) provide a specific bargained-for mechanism for reducing the Purchase Price under a *singular* condition — "if, and only if" the number of record plats originally *approved* was less than the required density. Seller met its obligations by getting the requisite number of Record Plats approved and recorded within the required timeframe, satisfying its plat density obligations.[11]

---

[10] Furthermore, Section 3(d) of the Second Amended PSA adds a requirement that "Settlers Crossing and WPE shall not cause the number of Units contained on the Record Plat(s) for the Property to be reduced[.]" (JTX 56). Any plat reductions on the Property following the Settlement Date, however, have been due to actions of the County government, not Seller.

[11] In the last two paragraphs of Section 11, as altered by the Second Amendment, all Conditions Precedent to Settlement — including Plats Recordation (§ 11(l)) — were required to have been satisfied at the latest by March 15, 2009, otherwise Purchaser had the right to waive the unsatisfied conditions and

Section 14 of the PSA, like Section 3, does not support Purchaser's argument that the PSA's risk of loss provision requires Seller to cover losses due to zoning changes that occurred in 2013, years after the Agreement's required Settlement Date.  Section 14 provides the parties' rights in the event that a "governmental or quasi-governmental authority" condemns or takes the Property pursuant to its eminent domain powers.  Specifically, if a "taking of all of the Land or any material portion thereof occurs[,]" Seller was required promptly to notify Purchaser and Purchaser had twenty days to decide whether to terminate the Agreement and get back its deposit or to continue with the transaction.[12]  Government regulation of private property, including zoning, if it deprives the property owner of "all economically beneficial us[e]" of the property, is considered a "regulatory taking" under the Fifth Amendment's Takings Clause.  *See Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 537-40 (2005) (describing what constitutes a regulatory taking under the Fifth Amendment) (alteration in original).  Neither party has argued that the zoning changes at issue are a

proceed to Settlement or terminate the agreement.  Seller met its deadline, as it has been found that all Conditions Precedent were satisfied and Purchaser was obligated to settle on May 27, 2008.  (ECF No. 707, at 73).

[12]  Following a government taking of the Property, if Purchaser elected to continue with the agreement, Section 14 of the PSA provided the parties a financial fallout plan, including how the Purchase Price would be calculated and paid.

taking of the property, nor could they.  The PSA addresses the allocation of financial risk for both minor plat density changes in Section 3(d) (Purchase Price reductions due to minor plat changes) via zoning or otherwise, and a complete taking of the Property in Section 14 (Purchase Price calculation and the parties' other rights following extreme zoning changes) via zoning or otherwise.  Thus, the parties considered the full range of possible land use changes when drafting the PSA and addressed them via specific provisions rather than in the general risk of loss provision.

iStar points to several additional PSA provisions that similarly reflect that the risk of loss provision was not meant to address zoning changes occurring after the PSA's required Settlement Date.  As iStar points out, its plat density obligations were part of the Conditions Precedent to Settlement, which it was required to satisfy by the Settlement Date, or at the latest, the outside Settlement Date of March 15, 2009.  (JTX 56 § 11).  At the hearing, however, Purchaser argued that section 11(i) — a Condition Precedent which placed the risk of future government moratoriums on Seller — contradicts Seller's argument that the recording of the plats terminated all of its plat density obligations.[13]  Purchaser is correct that the risk

_____

[13] Section 11(i) placed the risk on Seller that, prior to the Settlement Date, no government moratoriums on construction

of a government moratorium remained with Seller beyond the time when it recorded the Plats, but 11(i) still does not support Purchaser's ultimate argument that Seller's plat density obligations extend beyond the Settlement Date. Indeed, based on the plain language in the introductory statement to the Conditions Precedent Section (Second Amended Section 11), Seller's accountability for the Conditions Precedent was that "all such conditions must, in fact, be and remain satisfied as of the Settlement Date." Importantly, the Conditions Precedent section included multiple conditions related to plat density on the Property.[14] Thus, Seller was required initially to satisfy these conditions, then ensure they remained satisfied until the Settlement Date, but Seller had no obligation to maintain the Conditions Precedent following the Settlement Date.

iStar also points to PSA Section 19(B) ("Prince George's County Disclosures"), wherein Seller was required to make an initial disclosure on the Agreement's original Effective Date,

---

or development would occur delaying or prohibiting Purchaser's project. If the risk transpired prior to the Settlement Date, then Seller would have been unable to satisfy the Conditions Precedent, and Purchaser could have terminated the deal. Thus, as with the parties' allocation of risk for the record plats, Seller was only on-the-hook for the occurrence of government moratoriums *prior to* the Settlement Date.

[14] Section 11 of the original PSA and Second Amended PSA, includes multiple provisions related to zoning and plat density: 11(e) Record Plat Approvals; 11(g) Zoning for Bevard East Land; 11(i) government moratoriums on construction; and 11(L) Plat Recordation.

November 15, 2005, concerning any future land use plans on the Property. Following this disclosure, however, Purchaser acknowledged that it was "aware that information relating to (a) government plans for land use, roads, highways, parks, transportation and other matters, and (b) rezoning, is available for inspection [in] the County[.]" PSA § 19(B). Thus, after Seller's initial disclosure of its knowledge of future land use plans for the Property, Purchaser was charged with monitoring the County's future zoning plans.

Section 19(B) along with the aforementioned provisions specifically address the parties' expectations for plat density changes due to zoning changes. In contrast, the boilerplate risk of loss provision says nothing about plat density or losses due to zoning changes. A common principle of contract interpretation is that when two contract provisions conflict, the specific contract provision controls the more general provision. *See Heist v. E. Sav. Bank, FSB,* 165 Md.App. 144, 151 (2005) (*quoting Fed. Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 472 (1975)) ("[W]here two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it.); *see also Macke Laundry Serv. Ltd. P'ship v. Alleco Inc.,* 743 F.Supp. 382, 386 (D.Md. 1989) (noting the "well-settled rule of contract

16

construction that a specific provision will control over a general provision where such provisions are arguably in conflict"). Accordingly, the PSA's provisions that directly address plat density changes control the general risk of loss provision, meaning risk was allocated to Seller for any plat density or zoning changes occurring prior to the Settlement Date according to Sections 5(a) and 11, and any Purchase Price adjustments based on plat density changes are controlled by Sections 3(d) and 14.

The PSA also includes a "time is of the essence" provision (Section 18(D)) as well as several explicit timeframes within which the parties were required to fulfill their PSA obligations that demonstrate when the risk of plat density changes remained with Seller and when it shifted to Purchaser. *See Williams v. Fed. Home Loan Mortg. Corp.*, No. PWG-13-2453, 2013 WL 6713278, at *1 (D.Md. Dec. 18, 2013) (finding that plaintiff breached by failing to perform (making full payment) by the date specified in the contract, which had a "time is of the essence" provision). The parties appreciated the time sensitivity for certain PSA obligations, which is why they expressly built timeframes into their Agreement. These timeframes further clarify whether Seller was responsible for retaining all zoning requirements in the Conditions Precedent section, including plat densities, through 2013. Seller's major deadline was to meet

all Conditions Precedent in Section 11, including receiving approval for the Record Plats and obtaining category R-L Zoning for Bevard East, by May 15, 2009. Once Seller satisfied all Conditions Precedent, Purchaser's obligation to proceed to settlement was activated. As noted in Section 5(a) of the Second Amended PSA, "[s]ubject to the terms and conditions contained in the last paragraph of Section 11, and provided all conditions precedent to Settlement contained in Section 11 of this Agreement are satisfied, Settlement *shall* take place on December 5, 2007 ("the Settlement Date")[.]" (emphasis added). These provisions show that the parties contemplated that prompt action on the part of Purchaser was necessary once the Conditions Precedent were met due to the potential variability of conditions on the Property.[15] Moreover, Section 5(a) sets a mandatory and finite Settlement Date, memorializing the parties' intent that Purchaser proceed to Settlement promptly within 30 days of Seller's satisfaction of the Conditions Precedent. PSA §§ 5(A), 11. Accordingly, Purchaser's argument that the risk of loss for rezoning remained with Seller through 2013 because "Settlement," as defined by the PSA, has not yet occurred is insidious. Purchaser holds tightly to the PSA's language to

---

[15] For instance, both parties acknowledged at the hearing that development plan approvals and construction permits do not last forever, rather the developer must reach certain development milestones to vest zoning and entitlements.

distinguish that risk of loss passes to it at "Settlement" rather than the "Settlement Date." Purchaser, however, glosses over the fact that the PSA's language also *required* that it proceed to "Settlement" on the contractually-fixed "Settlement Date." The parties' intention, as expressed through the PSA, was that Purchaser settle once Seller's Conditions Precedent were met, which was also when the risk of any plat density changes — due to rezoning or otherwise — was to shift to Purchaser. Had Purchaser settled when required, not only would it be accountable for any losses caused by the 2013 zoning changes, but the 2013 zoning changes would likely be a non-issue because construction of Purchaser's development would have already begun or been completed, grandfathering Purchaser's desired zoning specifications.[16] When the parties' Agreement provides that Settlement is to occur timely due to changing land use regulations, Purchaser's failure to settle does not entitle it to a reduced purchase price for plat density changes caused by rezoning of the Property that occurred six years after the risk of plat density changes should have shifted to Purchaser.

---

[16] As Seller points out, "while this litigation was pending, iStar could not begin its own build-out of the Bevard property 'with the intention to continue with the construction and to carry it through to completion,' which is the *only* way that entitlements and zoning may vest." (ECF No. 724, at 36 n.15) (*quoting Trinity outdoor, L.L.C. v. City of Rockville, Md.,* No. JFM-03-2372, 2004 WL 78054, at *3 (D.Md. Jan. 15, 2004)).

**2.   iStar is Entitled to Specific Performance without Any Reduction in the Purchase Price Under the Terms of the PSA and Consistent with Equitable Principles**

Although specific performance is generally an equitable remedy, in this case the parties included specific performance in the PSA as a contract remedy.   Seller's entitlement to specific performance under the PSA was discussed in the July 18, 2014 memorandum opinion, and Purchaser's entitlement to a reduction in the Purchase Price based on the PSA's risk of loss provision is discussed above in part II.A.1.   Some of Purchaser's arguments and supporting case law — involving whether specific performance is warranted or a reduction in the purchase price is necessary due to the *changed condition* of the property — are based on equitable principles, however.   Although it has been found that specific performance is warranted based on the terms of the PSA, granting specific performance is always within the discretion of the court, thus Purchaser's equitable arguments will briefly be considered.[17]   *See Data Consultants,*

---

[17]   When parties pursue equitable relief, the court is not held to a narrow reading of the record; rather, it must "look to all the facts and circumstances of the case and weigh the equities of the parties."   *Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed. Cir. 1995); *see also State Ctr., LLC v. Lexington Charles Ltd. P'Ship,* 438 Md. 451, 608 (2014) ("Equity is not limited, however, to such a tunneled vision of the circumstances.   Instead, we are permitted to weigh all the facts.   In doing so, the motivations of the parties matter[.]").   Accordingly, the issue of whether the court should refuse an award of specific performance or reduce the Purchase Price due to zoning changes that occurred in 2013 will not be

*Inc. v. Traywick,* 593 F.Supp. 447, 453 (D.Md. 1983) ("Specific performance of a contract is a matter of sound judicial discretion controlled by established principles of equity.") (internal citations omitted); *see also Namleb Corp. v. Garrett,* 149 Md.App. 163, 174 (2002) ("Specific performance may be granted in an appropriate case on the basis of the strength of the circumstances and equities of each party.").

Purchaser argues that in order for Seller to be entitled to specific performance, it must show that there has been no "adverse material change that affects the seller's ability to convey the property [as] contemplated by the agreement[.]" (ECF No. 720, at 24).  Purchaser asserts that because the new zoning regulations prohibit it from developing the Property according to its original development plan, the court should terminate the contract and give Seller the alternative contract remedy of retaining Purchaser's deposit.  In the alternative, Purchaser argues that if the court orders specific performance, it must reduce the Purchase Price to account for the changed condition of the Property due to rezoning. (*Id.* at 25-26).

Seller counters that the 2013 zoning regulations did not change the permissible use of the Property in any material way. iStar distinguishes the current situation from the cases relied

---

viewed in isolation, but in conjunction with all relevant facts and circumstances in this case.

upon by Purchaser, noting that this is not a situation "where drastic zoning changes have occurred, rendering the anticipated uses impossible or illegal" (ECF No. 724, at 23), nor is it a situation where the Property has undergone substantial damages due to a casualty event or due to any fault of Seller (*Id.* at 33-35). Seller cites *Archway Motors, Inc. v. Herman,* 37 Md.App. 674, 683-87 (1977), for the proposition that "no subsequent change [in law] which may make [a contract] less beneficial to one of the parties is material 'unless the change is in some way the fault of the party seeking its specific execution.'" (ECF Nos. 612, at 9 and 724, at 16). iStar also argues that when a party defaults by wrongfully failing to settle on a certain date as required by the parties' contract, zoning regulations that are passed years later that impact the condition of the Property are not relevant to the non-breaching party's remedy. Based on equitable principles, it argues that Purchaser's own delay should not be converted to its advantage. (ECF No. 724, at 18-19) (*citing Nat'l Waste Managers, Inc. v. Anne Arundel County,* 135 Md.App. 585 (2000)).

Although the 2013 zoning regulations may impact the condition and ultimately the value of the Property, the zoning occurred long-after iStar had already met its contractual obligations and after Purchaser was contractually obligated to settle but failed to do so. As Seller points out, in *Archway*

*Motors,* 37 Md.App. at 686, the court clarified that "[t]he fairness or hardship of a contract is to be judged as of the time when it was made and no subsequent change which may make it less beneficial to one of the parties is material unless the change is in some way the fault of the party seeking its specific execution."[18] *Id.* (*citing Glendale Corp. v. Crawford,* 114 A.2d 33, 36 (Md. 1954)) (finding that any potential hardship caused to the land purchaser based on notices, issued by the city government subsequent to the execution of the purchase agreement, that the property was in violation of the city code were not a bar to specific performance); *see also Latipac Corp. v. BMH Realty LLC,* 93 A.D.3d 115, 129-30 (Ny. App. Div. 2012) (holding that an adverse change in the law, occurring between the time the contract was entered and closing, that impacted the

---

[18] Purchaser's request for additional discovery on the issue of Seller's fault for the changed zoning of the Property is also not warranted, as rezoning is not something that was within iStar's control. *See Archway,* 37 Md.App. at 686 (finding that seller was in no way at "fault" when the city government issued violation notices post execution of the contract regarding the property's compliance with the city code); *see also Schneider v. Saul,* 224 Md. 454, 461 (1961) (indicating that a seller is "not in any way responsible for the delays occurring after the date of settlement" caused by the county's *sua sponte* revocation of a special exception to a zoning ordinance). Moreover, to the extent it could influence zoning of the Property, iStar sought to retain the zoning specified in the PSA. (ECF No. 724, at 14-16) (providing evidence that iStar's counsel appeared before the County Council to argue against zoning changes on Bevard North, and successfully sought judicial review of zoning changes the Council passed for Bevard East).

value of the apartments to be purchased did not alter purchaser's obligation to close).

Furthermore, if Purchaser had settled when it was required to on May 27, 2008, it would have obtained exactly what it bargained for under the PSA, which was the Property with the specific zoning specifications that met its then-approved development plan. Purchaser's delay in proceeding to settlement requires that it absorb any losses incurred during its delay.[19]

---

[19] Purchaser and Seller in this case are similarly situated to the buyer and seller in *Latipac*. The *Latipac* court found that when a buyer refuses to proceed to closing for a "time-is-of-the-essence" closing date, as required under its contract, and instead institutes a court proceeding, there is no reason to shift to seller "the risk of an adverse change in the law or other development that would excuse [purchaser's] performance as buyer" when the proceeding is ultimately found to be meritless. 93 A.D.3d at 129-30. Although *Latipac* involved a buyer filing a temporary restraining order ("TRO") rather than seeking a declaratory judgment to resolve a dispute, the principles behind the *Latipac* court's decision are equally applicable here:

> Latipac [the buyer] — which, but for the TRO, plainly would have been in default had it refused to close on January 30 [the closing date] — now asks this Court to reward it for having delayed the closing by making a meritless motion. Latipac was entitled to make the motion . . . but, the motion having been denied and the denial having been affirmed on appeal, there is no reason, in equity and good conscience, to allow dilatory tactics of this sort to shift to [seller] . . . the risk of an adverse change in the law or other development that would excuse Latipac's performance as buyer.

*Id.*

*Cf. Nat'l Waste Managers,* 135 Md.App. at 607-08 (tolling a developer's two-year period to commence construction under a zoning special exception due to the county's repeated attempts to thwart the developer's construction of its landfill by filing litigation, reasoning that "a developer facing a time-related condition could almost always be thwarted in its efforts by the inevitable delay resulting from litigation, regardless of the merits"); *Latipac,* 93 A.D.3d at 129-30 (finding that a buyer's delay tactic in refusing to close and instead filing a TRO to avoid closing, would not permit the buyer to shift the risk of an adverse change in the law that occurred after the required closing date to the seller); *cf. Tinker v. McLellan,* 165 Cal.App.2d 291, 293-96 (1958) (finding that purchasers were estopped from claiming the benefit from the risk of loss provision when the property was damaged by a flood after the date on which closing was to occur, when purchasers had delayed closing by failing to honor their promise to pay closing costs).

Purchaser will receive the Property in substantially the same condition it bargained for,[20] except it will be required to

---

[20] Contrary to Purchaser's assertions, iStar can still deliver the same Property that was promised in the PSA — there have not been any substantial or material changes to the condition of the Property that would render specific performance inequitable. Although the new zoning regulations may impact the value of the property by reducing the number of residential units that may be built, they do not prohibit Purchaser from pursuing its main purpose. Unlike in the cases cited by

seek special exceptions from the County in order to pursue its
previously approved development plan.   In the alternative, it
could continue development under the current zoning, but may be
unable to develop the same density of residential units that it
originally planned.   Either way, specific performance is
warranted based on the facts and circumstances of this case.
Moreover, neither the contractual allocation of risk for plat
density changes, nor equitable factors support a reduction in
the Purchase Price.[21]

---

Purchaser, the rezoning in this case does not render Purchaser's
purpose for the Property — residential development — impossible.
*See Anderson v. Steinway & Sons,* 178 A.D. 507, 512-15 (Ny. App.
Div. 1917) (refusing to compel specific performance when the
subject property was rezoned for solely residential use between
the date the contract was executed and closing, prohibiting the
purchaser's intended purpose for the property of building a
factory for his business); *see also Clay v. Landreth,* 187 Va.
169, 172-80 (1948) (affirming the lower court's decision to deny
a decree of specific performance when the purpose for which the
land was sold — to build a storage plant — was defeated by a
subsequent unanticipated zoning ordinance changing the lot from
a business use property to a residential use property); *see also
Kend v. Crestwood Realty Co.,* 246 N.W. 311, 312-13 (Wis. 1933)
(finding that the "equitable relief of specific performance
[was] unfair or unjust" where a purchaser entered into a land
contract in which seller warranted that the premises were zoned
for business purposes, but subsequently the premises were
rezoned for exclusively residential purposes).

[21] Under Maryland law, when a court orders specific
performance of a land sale contract, equitable abatement of the
purchase price may be warranted but only to compensate purchaser
for a minor breach by the seller.   *See, e.g., Senick v. Lucas,*
234 Md. 373, 378-81 (1964) (holding that purchaser was not
entitled to rescind the land sale contract, but could receive
compensation for seller's slight breach in reducing the size of
a tool shed on the property).   Here, Purchaser is not entitled

**B.    The Impact of 2007 Stormwater Management Regulations on iStar's Remedy**

In addition to Purchaser's concerns over the impact of the 2013 zoning changes on the Property, Purchaser also raised similar concerns regarding 2007 changes to Maryland's stormwater management regulations.    Purchaser argues that "while the parties litigated their dispute . . . Maryland promulgated new storm water regulations affecting the entire property.    These changes prevent the owner of the property from obtaining construction permits and proceeding with the previously-recorded development plan for the Property." (ECF No. 720, at 14-15). Purchaser asserts that these new regulations may increase costs of the project and delay construction by requiring it to seek approval of new site plans.  (*Id.*).

iStar asserts that this never-before-raised argument by Purchaser is untimely and irrelevant to iStar's entitlement to specific performance.    iStar moved to strike this argument, asserting that Purchaser waived it by never raising it, "in any operative pleading, not during summary judgment, not in the pretrial order, and not during trial." (ECF No. 724, at 37). iStar emphasizes that Purchaser had ample opportunity to address this issue as the new regulations were passed on April 24, 2007,

---

to any reduction in the Purchase Price because there was no default by Seller, as it fully satisfied the PSA's Conditions Precedent and was prepared to deliver the Property with Purchaser's specified zoning by the Settlement Date.

became effective on May 5, 2009, were brought to Purchaser's attention by its engineers in 2009, and were specifically discussed in a deposition in 2011.

Purchaser contends that it is not arguing that specific performance is improper because of the stormwater regulations, but that these regulations should be "factored into the reduced purchase price[.]" (ECF No. 725, at 14). Purchaser asserts that the stormwater management argument was "not ripe until the zoning changes came to light, and it would make little legal or practical sense for the Court to ignore these actual, real-world developments when calculating the real value of the property." (*Id.*).

Purchaser treats the zoning and stormwater regulations changes as if they are one and the same, combining these issues in several parts of its brief. (ECF No. 720, at 19). Unlike Purchaser's efforts to raise and preserve the issue regarding zoning regulations (*see* ECF Nos. 611 and 614), however, Purchaser raised stormwater management regulations for the first time post-trial and therefore has waived this issue. *See McLean Contracting Co. v. Waterman Steamship Corp.,* 277 F.3d 477, 480 (4th Cir. 2002); *see also Westfarm Assocs. Ltd. P'ship v. Int'l Fabricare Inst.,* 846 F.Supp. 439, 441 (D.Md. 1993) (holding that a party's failure to plead a liability cap in its answer or raise it at any time until after the trial constituted a waiver

of that defense).  Purchaser was aware of the 2007 stormwater
management changes as early as May 20, 2009, when Mr. Alejandro
Villegas of Dewberry & Davis, the engineering firm hired by
Purchaser and Seller, contacted U.S. Home and Lennar regarding
the changes in the stormwater regulations.  At the latest,
Purchaser was aware of the 2007 stormwater regulation changes on
October 12, 2011, when Mr. Villegas was deposed and he described
in detail to Purchaser's counsel what impact the stormwater
regulations could have on the project if the project was not
grandfathered under the prior regulations.[22]  (ECF No. 723-5, at
3).  If Purchaser believed that these regulations would have a
material impact on the Property, then it could have performed
more extensive discovery on this issue and included it in its
summary judgment briefs or addressed it at trial.  Unlike the
April 2013 zoning regulation changes, which Purchaser allegedly
did not discover until October 2013 (after the summary judgment
briefing had already been submitted), Purchaser had knowledge of
the stormwater management regulations for years prior to

---

[22]  Mr. Villegas's statements during his October 12, 2011
deposition should have put Purchaser on notice that the
regulatory changes would make stormwater management more
expensive if the project could not be grandfathered.  For
instance, he noted that due to the regulation changes,
"[Purchaser] probably would have to reassign and review a lot of
the entitlements, construction drawings, and potentially lose
the entity."  (ECF No. 723-5, at 3).

submitting its pre-trial motions.[23]   There is no reason post-trial to address this issue when it could have been timely raised by Purchaser.[24]

Furthermore, Purchaser implicitly acknowledges in its brief that, at least for the stormwater management regulations, its development plan could have been "grandfathered" under the prior more favorable stormwater regulations if the developer had achieved certain milestones by the necessary dates.[25]   (ECF No.

---

[23] In Purchaser's October 31, 2013 motion requesting leave to file a supplement regarding the 2013 zoning changes, Purchaser never mentions the 2007 stormwater management regulations.   The court denied this motion and tabled the issue of zoning for later resolution.   Although the zoning issue is now ripe for review, this does not necessarily open up all issues impacting the Property's value for litigation.

[24] Purchaser's attempt to lump together stormwater management regulations and zoning regulations because they both potentially impact the Property's permitted plat density and ultimately its value, is unpersuasive.   The regulations themselves are separate:   stormwater management regulations are environmental regulations which are overseen by the Department of the Environment, whereas zoning regulations are land use regulations which are overseen the Prince George's County Council.   Moreover, under the PSA, the parties' obligations, representations, and warranties regarding environmental conditions on the Property and zoning conditions on the Property were separate.   There is no reason to group together these separate issues under the same umbrella of "zoning issues."

[25] Purchaser argues that due to Seller's failure to grandfather the previous stormwater management plans, the plans lapsed.   By Purchaser's own admission, however, in order to "grandfather" the original plans, Seller would have been required to, among other things, commence and complete construction of the previously approved stormwater maintenance facilities.   (ECF No. 720, at 17–18).   Under PSA Section 12.3(c) ("Raw Land"), Purchaser acknowledged that "[Seller] ha[s] no

720, at 17).  Accordingly, Purchaser cannot seek to benefit from a price reduction for the stormwater regulation changes, when it could have grandfathered its original plans under the more favorable regulations had it timely proceeded to settlement.

### C.  iStar's Entitlement to Contractual Interest as Part of the Purchase Price

Purchaser contends that under Section 3(a) of the Second Amended PSA, Seller is only entitled to 12% interest on the Purchase Price if it proves that Purchaser *wrongfully* fails to make Settlement."[26]   (ECF No. 720, at 31).   It asserts that "wrongful" was a bargained for term in this provision and must be given effect, otherwise its inclusion in the PSA would be rendered superfluous.   It argues that because "wrongful" is not

---

development or construction obligations under this Agreement." It would be unreasonable to reduce Seller's Purchase Price for failing to commence construction, when Seller had no obligation to construct anything and Seller has been uncertain since 2007 whether Purchaser would even proceed to Settlement.

[26] Section 3(a) of the PSA expressly states that:

> If Purchaser wrongfully fails to make Settlement hereunder for any reason, other than a default by Settlers Crossing or WPE under the terms of this Agreement, and such failure of Purchaser is not cured within any applicable notice and cure period, then the Purchase Price shall accrue interest at a rate of twelve percent (12%) per annum to be calculated on a per diem basis from the Settlement Date until Purchaser proceeds to Settlement in accordance with this Agreement.

defined in the PSA, it should be interpreted as asking whether Purchaser's conduct was "objectively unreasonable."[27]   (ECF No. 720, at 32).   Purchaser contends that its conduct, given the facts and circumstances surrounding its failure to settle on May 27, 2008, was not wrongful; instead, it asserts that its failure to settle in May 2008 was objectively reasonable because it was seeking adjudication of legitimate contract disputes, namely, whether the Seller's failure to provide access to the Property was a default under the PSA and whether the Seller was in breach of its environmental representations and warranties.   Purchaser argues that the reasonableness of its legal positions is evidenced by the court's denial of Seller's motion for summary judgment and the subsequent trial that was required to resolve these disputed issues.   Thus, it argues that despite the court's ultimate ruling in favor of Seller, Purchaser's refusal to make Settlement in May 2008 while its dispute with Seller was pending was not wrongful, and therefore, should not trigger the accrual of interest under the PSA.

---

[27]   Purchaser argues that when "imprecise normative standard[s] ha[ve] not been specifically defined, Maryland courts ask whether the conduct was objectively unreasonable." (ECF No. 720, at 32).   Purchaser cites *Galloway v. State,* 130 Md. App. 89, 94-95 (2000), and *Eanes v. State,* 318 Md. 436, 461-62 (1990) for the proposition that "[t]he objective reasonable test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct."   (*Id.*) (internal quotation marks omitted).

iStar responds that Purchaser's argument, regarding iStar's entitlement to contractual interest, is unrelated to the 2013 zoning changes that the court asked the parties to brief.  iStar contends that Purchaser is barred from raising this argument because it was never raised at trial and cannot be raised for the first time post-trial and has moved to strike this argument. iStar asserts that raising this issue post-trial is "litigation gamesmanship at its worst because, first and foremost, the parties tried both liability and the underlying damages claims and defenses in April [2014], *and the Court ruled on the matter*." (ECF No 724, at 37) (emphasis in original). Accordingly, iStar argues that Purchaser's argument that iStar is required to show Purchaser's "wrongfulness" in order to be entitled to contractual interest, is waived.[28]

iStar adds that Purchaser's argument regarding its right to contractual interest is not only untimely but also meritless, as it contradicts the unambiguous terms of the PSA. (ECF No. 724, at 40-42).  iStar contends that "[t]he language of the PSA is clear — if Lennar wrongfully fails to close *for any reason*,

---

[28]   iStar contends that "[a] party cannot raise an affirmative defense after trial for the first time as such a delay 'prejudices both the plaintiffs and the adjudicatory process.'"  (ECF No. 724, at 39) (*quoting Sufi Network Servs., Inc. v. United States,* 113 Fed.Cl. 140, 145 (2013)).  iStar argues that Purchaser chose to "abandon[] many issues, arguments, and theories when it voluntarily elected to shorten its case in chief to days rather than weeks and effectively waived any rebuttal case." (ECF No. 724, at 42).

other than the limited, enumerated *rightful* reason [a default by Seller], then it must pay the Purchase Price, a clearly defined term that includes interest." (ECF No. 724, at 40) (emphasis in original). iStar asserts that "[t]here is no reason to give a different meaning to the word 'wrongfully' when there is no indication that the parties meant for it to carry a unique or technical meaning [such as objectively unreasonable.]" (*Id.* at 40-41). iStar also argues that in the previous opinion it was found that Purchaser "wrongfully fail[ed] to make Settlement" under Section 15(a)(i). iStar points to the parallel language in PSA Sections 15(a)(i) and 3(a), which it contends, when read together logically require the grant of the contractual 12% interest: "The predicate language in Section 15(a)(i) — 'If Purchaser . . . wrongfully fail[s] to make Settlement hereunder for any reason other than a default by [Sellers]' — is the same predicate language that appears in Section 3(a), which defines the 'Purchase Price' as including the 12% interest rate."[29] (ECF No. 724, at 38) (alteration in original). iStar also challenges Purchaser's assertion — that it acted reasonably in exercising its rights under the contract and filing suit — stating that

---

[29] iStar argues that "[i]f Lennar's wrongful failure to make Settlement under Section 15(a) entitled iStar to specific performance and payment of the Purchase Price, then the same wrongful failure to make Settlement entitles iStar to the Purchase Price as unambiguously defined, with the requisite interest, as set forth in Section 3(a) [of the PSA]." (*Id.* at 38-39).

34

Purchaser's reasonableness is "belied by the myriad findings by this Court that Lennar acted in bad faith and schemed to avoid performing under the PSA and related contracts." (ECF No. 724, at 41-42).   iStar concludes that "[t]hough the PSA by its plain terms does not equate 'wrongful' with 'objectively unreasonable,' even under Lennar's half-baked standard, it would fail." (*Id.* at 42).

In response, Purchaser argues that the court previously found that it defaulted under PSA Section 15(a), but did not specify that its default was due to a wrongful failure to settle under 15(a)(i).   Accordingly, Purchaser contends that "Seller['s] entitlement to interest is a material issue that remains unsolved[,]" as the court's July 18, 2014 decision did not analyze PSA Section 3(a), nor did it address entitlement to interest or fix the amount of interest due.[30]   Purchaser reiterates that because its "refusal to settle on May 27, 2008 was objectively reasonable — i.e., not wrongful — Sellers have not satisfied their burden of establishing entitlement to interest." (ECF No. 726, at 30).

---

[30] Purchaser argues that specific performance could be awarded for its default for "incorrectly" failing to settle under Section 15(a)(ii) or (iii), which unlike a default under 15(a)(i), would not require an award of interest under Section 3(a).   At the hearing, however, Purchaser could not point to a PSA provision supporting this supposed default.

Based on the language and construction of the PSA, iStar is entitled to the contractual interest rate set forth in Section 3(a) of the Second Amended PSA.  Although the court did not specify in its July 18, 2014 opinion that Purchaser's default was under Section 15(a)(i), when the opinion is read in its entirety and in conjunction with the court's prior opinions and the operative pleadings, it is clear that Purchaser's default was for "wrongfully fail[ing] to make Settlement" under 15(a)(i).  For instance, Seller's initial notice of default sent to Purchaser on May 30, 2008 asserted that it had "wrongfully failed to make [s]ettlement[.]"  (ECF No. 707, at 24; DTX 458).  Seller's first amended counterclaim also expressly stated that iStar was bringing an action due to Purchaser's "bad-faith refusal to 'settle'" and requested interest on the Purchase Price at a rate of 12%.  (ECF No. 447 ¶¶ 1, 84).  Furthermore, the entire trial involved resolving the disputed issue of which party was truly in default under the PSA, requiring the court to choose:  (1) whether Seller had defaulted under the PSA by failing to grant Purchaser access to the Property or breaching its environmental representations and warranties, permitting Purchaser to exercise its right to terminate the Agreement and get back its deposit, or (2) whether Purchaser's failure to settle was wrongful (i.e., unjustified based on the parties obligations under the PSA), permitting Seller to exercise its

right to select a remedy of Specific Performance. (ECF No. 707, at 32). The court expressly found for Seller, holding that Seller was not in default of its environmental representations and warranties (ECF No. 707, at 61-63), nor did it default by refusing to grant Purchaser access to the Property as Purchaser's request was not made in good faith (*Id.* at 71-73). Because Seller was not in default and had performed its contractual obligation to satisfy the Conditions Precedent, it was Purchaser who was found to be in default for failing to settle after it was required to under the PSA. Moreover, based on the evidence presented at trial, it was also found that Purchaser, from October 1, 2007 onwards, was actively trying to back out of its contractual obligations with Seller despite the fact that it received a substantially reduced purchase price in exchange for its promise to settle upon satisfaction of the Conditions Precedent.[31] Accordingly, the court declared that under the parties' Agreement, Purchaser had defaulted because it was "obligat[ed] to settle . . . and pay the considerations due under the [Purchase Agreement] and the Contract for Services on May 27, 2008 (ECF No. 447 ¶ 82.a(2))" (ECF No. 707, at 73)

---

[31]  Indeed, Purchaser "retained 'a team of high priced lawyers and consultants' (DTX 380) to search for an 'escape clause' in the Purchase Agreement (T. 3/31/14, at 184)." (*Id.* at 71). As part of this endeavor, Purchaser requested access to the Property "to delay closing while it settled on a strategy to avoid its obligations under the Bevard contracts." (*Id.* at 72).

(internal quotation marks omitted) (alterations in original). Although the exact default provision under Section 15(a) of the Second Amended PSA was not expressly provided in the prior decision, it is clear that Purchaser's default was for "wrongfully fail[ing] to make Settlement" under 15(a)(i). Seller did not allege any other default besides Purchaser's wrongful failure to settle, nor could Purchaser point to a single contractual provision at the hearing to support its argument that its default was under Section 15(a)(iii).[32]

Furthermore, Purchaser's argument that "wrongful" should be interpreted as meaning "objectively unreasonable" is contrary to contract interpretation principles under Maryland law. Although "wrongful" is not defined within the PSA, there is no reason to reference Maryland courts' interpretations of other "normative standards" in order to determine the meaning of the word

---

[32] Purchaser argues that its default was under 15(a)(iii) for failing to settle based on an "incorrect" legal stance regarding whether Seller was in default. Purchaser's assertion — that it could be "incorrect" concerning Seller's default without its conduct in failing to settle being deemed "wrongful" — would be more persuasive had Purchaser's refusal to settle been based on an honest, good-faith belief that Seller was actually in default. The evidence adduced at trial shows that Purchaser sought to avoid its contractual duties starting in September 2007 at which point there was no indication Seller was in default. As part of this effort, it made an official request to access the Property in January 2008 with the purpose of delaying settlement and contriving a technical default on Seller's part in order to terminate the Agreement. (ECF No. 707, at 16–21).

"wrongful" within the PSA. Instead, under the objective theory of contract interpretation that applies in Maryland, a court must "give effect to the plain meaning of an unambiguous term, and will evaluate a specific provision in light of the language of the entire contract." *Weichert Co. of Md., Inc.,* 419 Md. at 324. Contract terms must be construed according to their "customary, ordinary and accepted meaning," regardless of the parties' intentions at the time the contract was formed. *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448 (2008). Therefore, when interpreting a contract, the court's task is to "[d]etermine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Calomiris v. Woods,* 353 Md. 425, 436 (1999) (internal quotation marks omitted).

The ordinary meaning of "wrongful" as applied to actions is something "[p]erformed, executed, or done unjustly, unfairly, or harmfully[.]" Oxford English Dictionary, http://www.oed.com (last visited Nov. 7, 2014). The use and meaning of this term is further elucidated through the facts and circumstances surrounding the execution of the Second Amended PSA, and what reasonable persons in the position of the parties would have meant. At the time the parties executed the Second Amended PSA, the residential housing market was in decline. The Agreement

was heavily negotiated in order to preserve the transaction, and among some of the bargains made by the parties, Seller agreed to a substantially reduced purchase price in exchange for a guaranty of specific performance from Purchaser to proceed to settlement and pay the Purchase Price if Seller satisfied all conditions under the contract. (ECF No. 707, at 12-13). Accordingly, if Seller performed its part of the bargain — satisfied all conditions precedent, requiring it to expend substantial effort and resources — a reasonable person in the position of the parties would think it "wrongful" (*i.e.,* unjust, unfair, or inequitable) for Purchaser then to refuse to settle as was required under its part of the bargain. The parties seem to have contemplated this exact situation, which is undoubtedly why they altered the interest provision in the Second Amended PSA to protect Seller should such a scenario occur.[33] The new interest provision added to the Second Amended PSA only requires Purchaser to pay interest on the Purchase Price from the "Settlement Date" until "Settlement" (JTX 56 § 3(a)), meaning Purchaser could have avoided paying interest altogether if it proceeded to settlement on the "Settlement Date" as required

---

[33] Under the original PSA, Purchaser was required to pay interest accruing at "the rate of seven percent (7%) per annum, to be calculated on a per diem basis and interest to [be] paid on a quarterly basis[,]" on the portion of the Purchase Price secured by promissory notes ($135,025,000). (JTX 41, at § 3(b)-(c)).

under the PSA.[34] (*Id.* § 5(a)). Because Purchaser defaulted by "wrongfully fail[ing] to make Settlement for [a] reason other than a default by [Seller}" (JTX 56 § 15(a)(i)), Seller is entitled to the 12% contractual interest that was added to the parties' bargain in contemplation of the exact default by Seller that actually transpired.[35]

### D. Total Amount Purchaser Owes Seller as Specified By the Parties' Agreement

Parties to a contract are permitted to limit their contractual remedies to exclude an award of damages. For

---

[34] The Second Amended PSA states that as long as "all conditions precedent to Settlement contained in Section 11 of this Agreement are satisfied, Settlement *shall* take place on December 5, 2007 (the "Settlement Date")." (JTX 56 § 5(a)). Therefore, based on the structure of the interest provision in Section 3(a) of the Second Amended PSA, the parties contemplated that there may be a situation where the parties were obligated to settle based on the contractually fixed "Settlement Date," but where Settlement did not actually occur. The interest provision was added to compensate Seller for this time period, and more importantly, to entice Purchaser to proceed to Settlement to avoid paying interest.

[35] Because the prior opinion did not expressly state which Section of the PSA Purchaser's default fell under, the court has resolved this alleged ambiguity as well as the corresponding interest issue on the merits to foreclose any further debate. As iStar points out, however, Purchaser's argument, challenging iStar's entitlement to the contractual interest rate, should have been raised prior to trial and addressed at trial. The interpretation of "wrongfully" within PSA Section 3(a) relates to Purchasers' liability for interest, and the interest calculation greatly impacts the total Purchase Price Seller will be awarded. At trial, the interest issue was briefly raised by iStar's witness, Executive Vice President Steven Magee. Purchaser did not raise any contractual or other arguments regarding interest at that time. (ECF No. 723-1, at 16).

instance, in a land sale transaction, the parties may agree to limit the non-breaching seller to the exclusive remedies of retaining the purchaser's deposit or seeking specific performance, as the parties have done in this case.[36] *See Leet v. Totah,* 329 Md. 645, 660-62 (1993) (holding that the parties' contract provision, which limited purchaser's remedies for seller's default to specific performance or rescission and return of the purchaser's deposit, was enforceable). "[U]nless clearly prohibited by statute, contractual limitations on judicial remedies will be enforced, absent a positive showing of fraud, misrepresentation, overreaching, or other unconscionable conduct on the part of the party seeking enforcement." *Id.* at 660 (*quoting Maryland-Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 611 (1978)) (alteration in original).

Pursuant to the parties' Second Amended PSA, once Purchaser defaulted by "wrongfully fail[ing] to make Settlement" under Section 15(a)(i),[37] iStar exercised its right "as its sole and

---

[36] The parties limited Seller's remedies under the Second Amended PSA Section 15(a) to either: (1) termination of the Agreement and retention of the deposit fee as liquidated damages, or (2) specific performance and injunctive relief, including a court order requiring Purchaser to proceed to settlement and pay the Purchase Price.

[37] As noted in the March 11, 2010 memorandum opinion, by granting Seller's requested declaratory relief in this case — that Purchaser defaulted by "wrongfully fail[ing] to make

exclusive remedy" to select specific performance and injunctive relief against Purchaser by requesting a court order, a remedy that requires Purchaser to "complete Settlement in accordance with the Agreement and pay the Purchase Price" to Seller. PSA § 15(a)(2). Because Seller selected this remedy, Purchaser is required to pay $114,000,000, the principal amount due under the PSA and Contract for Services.[38] As discussed above, Purchaser defaulted under Section 15(a)(i), therefore, Seller is also entitled to interest on the Purchase Price and Development Fee at a rate of "twelve percent (12%) per annum to be calculated on

---

Settlement" on May 27, 2008 — it settles all aspects of this controversy, because Seller's rights and Purchaser's obligations upon Purchaser's default are clearly defined in the PSA. (ECF No. 95, at 24-25). Seller's claim for declaratory relief is closely tied to its claim for injunctive relief based on the terms of the parties' Agreement, because once Purchaser is found to be in default, the PSA entitles Seller to a court order requiring Purchaser to perform its PSA obligations, including "to complete the Settlement in accordance with the Agreement and pay the Purchase Price to [Seller]." (JTX 56 § 15(a)(2)). Accordingly, Seller will be granted declaratory and injunctive relief in order fully to resolve the rights and obligations of the parties.

[38] The Purchase Price, which is defined in Section 3(a) of the Second Amended PSA, is $103,000,000. Purchaser owes Seller an additional $4,200,000 for the Kalapacha Property as noted in Section 5(b). (JTX 55, exhibit P § 2). In addition to the PSA Purchase Price, Purchaser is required to pay Seller the Development Fee under the First Amended Contract for Services in the amount of $26,800,000. (JTX 55 § 1). The total amount Purchaser is required to pay Seller under the PSA and Contract for Services is $134,000,000. Purchaser already paid Seller a deposit of $20,000,000, however, bringing the outstanding amount due to $114,000,000. (ECF No. 649 ¶ 15).

a per diem basis" from May 27, 2008, the required "Settlement

Date" under the PSA, until Purchaser proceeds to Settlement.[39]

(JTX 56 § 3(a); JTX 55 § 1).  In addition, Seller is entitled to

reimbursement for the real estate taxes it paid on the Property

under Section 10(b) of the PSA.[40]  Finally, under Section 18(K)

---

[39] Section 3(a) of the Second Amended PSA, clarifies that "any interest accrued on the Purchase Price shall be deemed to be an addition to the Purchase Price hereunder."  The interest provisions that were added to the Second Amended PSA (JTX 56 § 3(a)) and the First Amended Contract for Services (JTX 55 § 1), both executed on May 16, 2007, mirror one another, calling for 12% interest in the event Purchaser "wrongfully fails to make Settlement" under the PSA.

[40] Section 10(b) requires Purchaser to pay any Increased Real Estate Taxes incurred by Seller after the Plats were recorded.  In relevant part, it states that:

> If, after Plat(s) Recordation and prior to Settlement, [Seller] receives an increased real property assessment and is required to pay an increase in the real property taxes for the Property . . . , then [Seller] shall provide Purchaser with a copy of such increased assessment and shall pay any such increased real property taxes (in addition to any other real property taxes due and payable). . . .  At Settlement hereunder, Purchaser agrees to reimburse [Seller] for the Increased Real Estate Taxes actually paid by [Seller] to Prince George's County pro rated from the date of Plat(s) Recordation until the Settlement Date[.]

At trial, Seller presented evidence verifying the real estate taxes it has paid on the Property since 2008.  (ECF No. 702, T. 4/11/14, at 10-11).  Seller's evidence shows that it paid: $618,348.47 from 2008-2009 (DTX 487); $278,584.82 in 2011 (DTX 517); $278,425.13 in 2012 (DTX 526); and $380,844.90 in 2013 (DTX 544).  These expenses, totaling $1,556,203.32, will be awarded to Seller as they were not challenged by Purchaser.

of the PSA and Section 8 of the Contract for Services, iStar is entitled, as the prevailing party, to recover "costs, fees and expenses incurred in [] litigation, including actual and reasonable attorneys' fees and court costs."[41]

## III. Conclusion

Judgment will be entered in favor of iStar and against U.S. Home and Lennar on Counts I-III of iStar's amended counterclaim (ECF No. 447), in the amount of $114,000,000 plus interest at a rate of 12% per annum, calculated on a per diem basis from May 27, 2008 until Purchaser proceeds to Settlement, plus real estate taxes in the amount of $1,556,203.32.  A separate order will follow.


_____ /s/
DEBORAH K. CHASANOW
United States District Judge

---

[41] Under Local Rule 109.2(a), motions "requesting the award of attorneys' fees must be filed within fourteen (14) days of the entry of judgment."  The memorandum supporting such a request "must be filed within thirty-five (35) days from the date the motion is filed," except in the event that an appeal is filed.  Local Rule 109.2(a).