U.S. HOME CORPORATION,   \*

Plaintiff/Counterdefendant  \*

   and      \*

LENNAR CORPORATION,   \*

   Counterdefendant  \*

   v.       \*   Civil Action No.  PX-08-1863

*SETTLERS CROSSING, L.L.C., et. al.,* \*

  Defendants/CounterPlaintiff \*

and         \*

STEVEN B. SANDLER,   \*

   Defendant   \*

         \*\*\*\*\*\*

## REPORT AND RECOMMENDATIONS RELATED TO MOTION FOR ATTORNEY'S FEES AND COSTS BY DEFENDANT STEVEN B. SANDLER

This "Report and Recommendations" addresses the petitions for attorneys' fees and costs filed by Defendant Steven B. Sandler ("Sandler")(ECF Nos. 735, 786,  804).

Pursuant to 28 U.S.C. § 636, and Local Rule 301.5(b), the Honorable Paula Xinis referred this matter to me to issue a report and make recommendations (ECF No. 795).  The parties have submitted numerous memoranda and supporting documentation, thoroughly arguing their respective positions. (ECF Nos. 735, 786, 789, 791, 792, 804, 820, 823, 829, 839, 831, 846). I believe that the issues have been fully briefed, and do not believe that any additional hearings are

necessary.[1]  Local Rule 105.6.  As set forth more fully below, I ultimately recommend that the Court grant the motions for attorneys' fees and award costs, however, reduce the amounts sought as set forth more fully herein.

## I.  FACTUAL & PROCEDURAL BACKGROUND

This is a case about a commercial real estate transaction that was never consummated, which led to approximately nine years of heated, protracted litigation between the parties. Detailed descriptions of the facts can be found in the comprehensive memorandum opinions issued by the Honorable Deborah K. Chasanow in 2009, 2014 and 2015 (*See, e.g.,* ECF Nos. 41, 624 707, 730, 765). This report includes a, relatively-speaking, shorter summary of facts which I believe are relevant to the issues raised in Sandler's attorney fee petition. The summary is culled from Judge Chasanow's opinions, and from my review of more than 700 docket sheet entries and many of the corresponding pleadings filed.

In 2005, Plaintiff/Counter-defendant U.S. Home Corporation, a subsidiary of Counter-Defendant Lennar Corporation ("U.S. Home," "Lennar," or "Purchaser"), agreed to purchase from Defendant/Counter-Plaintiff Settler's Crossing, LLC ("SC") its entire membership interest in Defendant/Counter-Plaintiff Washington Park Estates, LLC ("WPE").  WPE held title to approximately 1,250 acres of undeveloped farmland in Prince George's County, Maryland ("Bevard Property") that was of interest to U.S. Home for residential development.  Thus, through the membership interest transaction, U.S. Home would acquire the Bevard Property, and erect single family homes upon it. (ECF No. 707).

_____

[1] On April 19, 2018, I conducted a hearing in this case (ECF No. 822). I entertained oral argument from the parties in response to my questions regarding the following documents, which the Defendants purportedly submitted to the court for *in camera* review. *See* ECF No. 822.

To effectuate the transaction, on November 15, 2005 U.S. Home entered into an agreement of purchase and sale of the WPE membership interests ("Purchase Agreement") with SC and WPE ("the Sellers"). Simultaneously, U.S. Home and Defendant/Counter-Plaintiff Bevard Development Company ("BDC") executed a "Contract for Services," pursuant to which BDC would perform certain development work on the Bevard Property. In total, U.S. Home agreed to pay $200 million for these contracts, and made deposits totaling $20 million. In early December 2005, Defendant Sandler, who controlled the Sellers and BDC, signed two guaranty agreements, personally promising the return of U.S. Home's deposit money should Sellers breach the contracts. (ECF No. 707).

Between late 2005 until at least the Spring 2006, the Purchaser and Sellers cooperated with each other in their development-related efforts, with Seller granting Purchaser and its engineering or environmental consultants access to the Bevard Property to conduct investigations and analyses. (ECF No. 624). U.S. Home learned that some of the land contained heavy metals and sludge. U.S. Home also contracted someone to engage in remediation work on the property. *Id.*

According to the Purchase Agreement, several conditions precedent needed to be satisfied before U.S. Home was obligated to go to settlement. By the Summer of 2006, at least one or two conditions remained unsatisfied; a closing date of March 30, 2007 was set. *Id.* When the residential housing market showed signs of softening in 2006, U.S. Home sought to renegotiate the Purchase Agreement. (ECF No. 707). In May 2017, U.S. Home, its parent, Lennar, and Sellers executed a Second Amendment to the Purchase Agreement and a First Amendment to the Contract for Services. The price for these contracts was about $134 million. The conditions precedent to closing were modified, one of which was that U.S. Home had to

certify that it had no actual knowledge that the Sellers' initial representations and warranties (including related to the environmental condition of the property) were untrue. *Id.* Another condition was that U.S. Home would guarantee specific performance under the contract. *Id.*

At or about the same time that U.S. Home and Sellers sought to renegotiate the Purchase Agreement, Sellers experienced financial difficulties and sought a mortgage bridge loan form Defendant/Counter-Plaintiff iStar Financial, Inc. ("iStar Financial"). On June 19, 2007, iStar Financial made a $100 million loan to Sellers, using the Bevard Property as security, with the idea that it would be repaid at the time of closing. In addition, Sellers collaterally assigned their respective rights, title, and interests under the Second Amendment to the Purchase Agreement and under Contract for Services to iStar Financial. *Id.* The collateral assignments included Defendant Sandler's consent as guarantor. (ECF No. 649). Settlement was to occur on December 5, 2007.

Also on that same day, U.S. Home and Sellers executed a Third Amendment to the Purchase Agreement, which provided that if iStar had to foreclose on the property then the Purchase Agreement would be modified such that the Bevard Property would be sold instead of the WPE membership interest being sold. *Id.* Finally, on June 19, 2007, U.S. Home entered into a "Consent and Estoppel Agreement" with iStar Financial, acknowledging Sellers' assignment of rights to iStar Financial. By this agreement, U.S. Home also made certain representations about the Bevard property, including that "to the best of [Purchaser's] knowledge, having made due inquiry," U.S. Home had "no existing defenses, offsets claims or credits with respect to the performance of its obligations [under the two contracts]," and that neither party was in "breach of any of [its] respective obligations under the [agreements]." (ECF No. 707, p. 13).

Concomitant with the signing of the above-referenced agreements, Lennar began seeking a joint venture partner for the Bevard-related transaction to alleviate some of Lennar's financial concerns as U.S. housing market conditions continued to decline. (ECF 707). Lennar represented to at least one potential partner that it was unaware of any hazardous conditions on the Bevard Property. Id. Later, when its efforts to locate a financial partner were unsuccessful, "Lennar began to investigate strategies to delay the [December 5, 2017] settlement date, if not avoid closing altogether." (ECF No. 707, p.16). Documents and testimony later adduced at trial showed that Lennar was analyzing the agreements and was actively "looking at ways to off-load the deal," including looking for an "escape clause" in the contract. (*Id.*, at 18).

After Sellers noted that development work had ceased on the Bevard Property, they made inquiries of Purchaser as to the status, which were ignored. *Id.* On November 21, 2007, Lennar notified Sellers that Sellers had failed to satisfy conditions precedent to closing; however, it did not identify those deficiencies. Thereafter, on December 5, 2007, Purchaser failed to appear for settlement.

On December 6, 2007, the Sellers filed an action for declaratory judgement in U.S. District Court for the Eastern District of Virginia ("ED VA Action"). In that action, Sellers did not allege breach of the Purchase Agreement by U.S. Home, but, rather, sought that court's assistance in identifying U.S. Home's list of unsatisfied conditions precedent that were a barrier to the sale occurring. (ECF No. 707). Following Sellers' initiation of suit against Purchaser on December 6, 2007, U.S. Home filed a motion to transfer that case to U.S. District Court in Maryland on December 26, 2007. On January 25, 2008, U.S. District Judge Claude Hilton granted U.S. Home's request, and the Eastern District of Virginia case was transferred to U.S.

District Court-Maryland and assigned to Judge Chasanow, Case No. DKC 08-267 ("First Maryland Action" or "FMA") (FMA, ECF Nos. 15, 16).

In January 2008, U.S. Home sought permission to "enter" the Bevard Property to conduct "investigations, studies and tests [that it deemed] necessary or appropriate." (ECF No. 707). U.S. Home asserted that a provision in the Purchase Agreement gave them the right to such access. Sellers, suspicious of U.S. Home, denied access. *Id.*

Between January 2008 – March 2008, Sellers continued to work to resolve questions regarding whether the conditions precedent to the sale were satisfied so that settlement could occur. (ECF No. 707). On March 12, 2008, the First Maryland Action was referred to U.S. Magistrate Judge William Connelly for discovery and scheduling (FMA ECF No. 29). In April 2008, U.S. Home filed a motion to compel inspect of the Bevard Property, and also called for settlement to occur on May 27, 2008. (ECF Nos. 649, 707).

On May 16, 2008, U.S. Home notified Sellers that they were in default because of an alleged refusal to grant U.S. Home access to the Bevard property. *Id.* This default triggered contractual cure obligations for Seller and iStar Financial under their respective agreements. (ECF No. 707). Subsequently, U.S. Home notified Sellers that it was not obligated to proceed to settlement, which Sellers responded to by serving a May 30, 2008 notice of default on U.S. Home. (ECF Nos. 649, 707).

On June 24, 2008, U.S. Magistrate Judge William Connelly held a motions hearing in the First Maryland Action, addressing issues including U.S. Home's motion to compel inspection of the Bevard Property. (FMA ECF No. 64). Thereafter, by Order dated June 27, 2008, Judge Connelly found that U.S. Home had the right to inspect the Bevard Property, and gave them a given a six-week period to accomplish this. *Id.* Despite Judge Connelly's June 27, 2008 Order,

U.S. Home never availed itself of its right to inspect the Bevard Property (ECF No. 707). Instead, on July 3, 2008, it terminated the Purchase Agreement and Contract for Services "as it had planned to do since shortly after [Sellers denied its request for access]." (ECF No. 707, p. 26). U.S. Home demanded the refund of the $20 million deposits, which Sellers and Sander refused to honor.

Thereafter, on July 17, 2008, U.S. Home filed a four-count Complaint against iStar Financial, Sandler and the three entities that he controlled, Case No. PX-08-1863 ("the Instant Case"). The complaint contained several breach of contract claims related to Sellers "refusal" to grant Lennar access to the Bevard Property. U.S. Home sought return of its $20 million deposit.

On May 18, 2009, U.S. Home filed its First Amended Complaint which contained seven counts. Counts I, IV, V and VI related to two entities that Sandler controlled: WPE and Settler's Crossing. Counts II and III, related to Defendants BDC and Sandler, respectively. Count VII related to all Defendants. In brief, the First Amended Complaint added fraud claims based on the Sellers' alleged failure to disclose certain environmental conditions on the property (e.g., sewage sludge), as well as breach of environmental representations and warranties. The First Amended Complaint also alleged breaches of the duties to return the deposits equaling $20 million. Sandler and the entities that he controlled-- BDC, Settler's Crossing and WPE-- were identified in various counts. (ECF. No. 52). iStar Financial was also named in the First Amended Complaint.

On June 30, 2009, iStar Financial and Sandler-controlled entities WPE, Settler's Crossing and BDE filed a joint counterclaim for declaratory relief and seeking specific performance of U.S. Home's obligations under the Purchase Agreement and Contract for Services (ECF No. 66).

A consequence of the May 27, 2008 Bevard Property sale not occurring was that Sellers defaulted on their mortgage bridge loan with iStar Financial. Thus, on September 24, 2009, iStar Financial exercised its rights under the collateral assignments to the Purchase Agreement and Contract for Services by initiating a foreclosure action in the Circuit Court of Prince George's County. (ECF No. 649). In November 2009, the Bevard Property was sold to a limited liability company formed by iStar Financial. *Id.*

On December 22, 2011, iStar Financial filed a motion for leave to separately amend its counterclaim, alleging that new facts and claims had been unearthed during discovery. (ECF Nos. 294, 447). iStar Financial's First Amended Counterclaim had a total of six claims: three of which sought injunctive relief identical to that sought by WPE, SC, and BDC in the Joint Counterclaim; and the other three raised claims against U.S. Home for fraudulent inducement, negligent misrepresentation, and fraudulent concealment related to the consent and estoppel agreement. *Id.* iStar Financial was the only party to the Amended Counterclaim.[2]

## II. ADDITIONAL PROCEDURAL BACKGROUND: OFTEN SIMULTANEOUS & PROTRACTED LITIGATION

### A. First Maryland Action

On February 8, 2008, a scheduling order was entered, which set June 23, 2008 as the deadline for the close of discovery (ECF No. 41). Between February 2008 – July 2008, before the Instant Case was filed, SC, WPE, and U.S. Home vigorously litigated the First Maryland Action. For example, in May 2008, SC and WPE moved for summary judgment, asserting that all conditions precedent to the settlement had been satisfied and seeking specific performance of U.S. Home under the Purchase Agreement. (FMA ECF No. 36). Later in May 2008, U.S. Home moved to

---

[2] WPE, SC, and BDC remained in the litigation in the form of the Joint Counterclaim until after the 2014 bench trial in the Instant Case. *See* Section II.B.3, *infra.*

dismiss the First Maryland Action on jurisdictional grounds (FMA ECF No. 45). In addition, U.S. Home filed a motion for leave to file an amended Answer (FMA ECF. No. 51). Moreover, the parties filed various discovery-related motions cross motions for protective orders, and a motion to compel inspection of the property (FMA, ECF No. 33, 35).[3]

On August 11, 2008, Settler's Crossing, WPE, Sandler, and iStar Financial filed a motion to consolidate the First Maryland Action with the Instant Case.

Between mid-August 2008 – November 2008, the parties continued to vigorously litigate the First Maryland Action, while, as outlined below in Section II.B., simultaneously litigating issues in the Instant Case. In the First Maryland Action, the parties also engaged in supplemental briefing related to the dispositive motions, and filed additional discovery-related motions.

B.  The Instant Case

After the August 2008 filing of the motion to consolidate the First Maryland Action with the Instant Case, SC, WPE, BDC, Sandler and iStar Financial, Inc. ("Defendants") filed a motion for summary judgment in the Instant Case. (ECF No. 14). Between September 2008 – February 2009, U.S. Home ("Plaintiff") opposed the Defendant's summary judgement motion and filed its own summary judgement motion.

By Memorandum Opinion and Order issued on March 19, 2009, Judge Chasanow granted U.S. Home's motion to dismiss the First Maryland Action, finding that Sellers' complaint had failed to set forth a ripe case or controversy. (ECF No. 41 at 3).[4] Judge Chasanow denied as moot the motion to consolidate the First Maryland Action and the Instant Action, and denied as moot Sellers' motion for summary judgement in the First Maryland Action. (FMA, ECF Nos. 97,

---

[3] At the June 27, 2018 discovery hearing referenced previously, in light of the pendency of the dispositive motions, Judge Connelly limited the discovery to just the inspection of the Bevard Property. (FMA, ECF No. 64).

[4] Sellers appealed Judge Chasanow's Order dismissing the First Maryland Action. The Fourth Circuit affirmed her decision in June 2010 (FMA, ECF No. 105).

98). Also in that Opinion, Judge Chasanow resolved pre-discovery cross motions for summary judgement, denying Defendants' and Plaintiff's summary judgment motions, which allowed the litigation to continue. (ECF No. 42).

1. *Long and Litigious Discovery Phase*

March 20, 2009 was a significant marker in the Instant Case: it was the day that Judge Connelly began presiding over what would become a lengthy, highly-contentious, discovery process that lasted approximately 4 years.

During a roughly four-year period, more than 500 docket entries were generated. Motions to compel documents, motion to compel depositions, motions to quash subpoenas, motions for protective orders, motions for clarifications of orders, motions to increase the number of fact witness depositions, motions to stay the proceedings, and motions to seal were just a few of the myriad of pleadings filed. There were also two evidentiary disputes related to attorney client privilege; attorney-client privilege and work product issues later became the subject of an appeal to the Fourth Circuit. All of these pleadings were fully briefed, and in some cases these motions resulted in hearings, followed by orders issued by Judge Chasanow or Judge Connelly (some of which were appealed to Judge Chasanow).[5]

Also during discovery in the Instant Case, Judge Connelly another order directing that U.S. Home must "commence and conclude" its inspection of the Bevard Property during June 2010 – July 2010. U.S. Home never availed itself of this second opportunity, (ECF. No. 114). Furthermore, during this protracted litigation, there were interrogatories, requests for production of documents, numerous document subpoenas (some served on third parties), depositions of

---

[5] To characterize the litigation as extremely contentious would be an understatement. Indeed and unfortunately, the tone of several of the pleadings can only be described as corrosive or acerbic.

more than 60 people were taken. Moreover, at one point, Judge Connelly required weekly status reports regarding discovery disputes.

During the lives of both the First Maryland Action and the Instant Case, U.S. Home/Lennar employed seven law firms, which handled the myriad of discovery-related, and later, trial and appellate issues. In contrast, the law firms representing Defendants/Counter-Plaintiffs Sandler, the Sandler-related entities and iStar Financial remained virtually the same. What is abundantly clear is that counsel for all parties dedicated a substantial amount of time and resources to this litigation.

*2. Pre-trial Rulings*

August 2013, U.S. Home filed a motion for summary judgment as to all breach of contract and breach of guaranty claims, the fraud and negligent misrepresentation claims, and all claims for injunctive relief. (ECF No. 558). Sandler opposed the summary judgment motions, and also filed a cross-motion for summary judgment as to U.S. Homes' breach of guaranty claims lodged against him (ECF Nos. 571, 572). WPE, SC, and BDC also opposed U.S. motion, and sought partial summary judgment on U.S. Homes' fraud-related claims against them (ECF Nos., 573, 574). iStar Financial also filed a motion for partial summary judgment ( breach of contract, breach of environmental representations and warranties, declaratory judgment claims), and also sought injunctive relief (ECF No. 575).

In January 2014, Judge Chasanow issued a memorandum opinion and order on all of the post-discovery summary judgment and cross summary judgment motions that were filed (ECF Nos. 624, 625). With respect to Sandler, Judge Chasanow denied its cross motion for summary judgment, and denied U.S. Homes' summary judgment motion. Regarding WPE, SC, and BDC, Judge Chasanow entered judgment in their favor against U.S. Home as to the fraud claims

advanced in U.S. Homes' First Amended Complaint. Judge Chasanow also entered judgment in favor of U.S. Homes against iStar Financial as to the fraud and negligent misrepresentation claims in iStar Financial's Amended Counterclaim, and granted iStar Financial summary judgment motion on U.S. Homes' fraud claims. (*Id*.).

Following Judge Chasanow's rulings, then, two issues remained for trial, namely: (a) whether Sellers breached the environmental representations and warranties provision in the Purchase Agreement; and (b) whether Sellers breached the Purchase Agreement by denying U.S. Home's request for access to the Bevard Property. (ECF No. 707 at 32).[6] If Sellers were in breach under either of these two theories, then U.S. Home would be entitled to the return of its deposits. If Sellers were not in breach under either of these two theories, then iStar Financial could have been entitled to specific performance- sale of Property (depending on the outcome of some zoning issues). *Id*.

WPE, SC, and BDC remained in the litigation in the form of the Joint Counterclaim until after the 2014 bench trial in the Instant Case, when Judge Chasanow issued her memorandum opinion containing her findings of fact and conclusions of law. (ECF Nos. 707, 708).

### 3. *Bench Trial and Post- Trial Litigation*

From March 31, 2014- April 15, 2014, Judge Chasanow conducted a bench trial in the Instant Case. The evidence adduced at trial included more than 100 exhibits and testimony by environmental experts called by both parties. (ECF Nos. 675-692). Regarding Sellers' environmental representations, Judge Chasanow found "highly credible" the testimony of iStar Financial's four scientific expert witnesses (ECF No. 70 at 52). Judge Chasanow also found the testimony of U.S. Home's experts non-persuasive, and in the case of one expert, she found it to

---

[6] If U.S. Home prevailed at trial on either of these issues, then it was entitled to the return of its deposits. If U.S. Home lost at trial on both issues, then iStar Financial could have been entitled to specific performance (sale of Property). *Id*.

be not credible. (*Id* at 49). Judge Chasanow held that U.S. Home failed to demonstrate, *inter alia*, that the source of the hazardous materials " was something other than what was disclosed in the environmental reports provided by seller." (*Id.* at 61). [7] Furthermore, Judge Chasanow held that Sellers' denial of property access to U.S. Home did not constitute a breach of the contract for a myriad of reasons. (ECF No. 707 at 65-73). For instance, Judge Chasanow found that U.S. Home acted in bad faith in its access request; it was merely a tactic to delay purchasing the property, which made Sellers' denial of that request reasonable, and Seller was had not breached its obligations under the Purchase Agreement:

> The evidence demonstrated that, by at least October 1, 2007, Purchaser viewed the Bevard transaction as a financial albatross and actively sought to relieve itself of this burden. . . . When Purchaser was unable to find a joint venture partner. . .to assume its contractual obligations, it retained a 'team of high priced lawyers and consultants' to search for an "escape clause" in the Purchase Agreement. . . . The evidence shows that the purpose of Purchaser's request for access was to delay closing while it settled on a strategy to avoid its obligations under the Bevard contracts. This conclusion is supported by the fact that Purchaser later rejected Seller's offer of compromise as to the access issue and that, after gaining a right of access to the Property through the court, Purchaser never exercised that right. . . Purchaser was determined to 'terminate [the] contract and get [its] deposit back via legal action.'

(ECF No. 707 at 71-73).

Judge Chasanow found that iStar Financial was entitled to relief under the Purchase Agreement because of U.S. Home's default because it "[stood] in the shoes of [Sellers]." (*Id.* at 73-74). The Second Amendment to the Purchase Agreement required specific performance in the form of proceeding to settlement with the purchase price to be paid to iStar Financial. *Id.*

Regarding the Joint Counterclaim, Judge Chasanow dismissed it as moot, ruling that the November 2009 foreclosure sale meant that the Sandler-controlled entities no longer had an interest in the Bevard property. (ECF Nos. 707, at 31, 708).

---

[7] ECF No. 707 is Judge Chasanow's memorandum opinion chronicling her findings of fact and conclusions of law after the two-week bench trial in this case.

Before judgment could be entered in favor of iStar Financial on Counts I-III of its amended counterclaim, and before the amount of damages could be quantified, issues related to 2013 zoning regulations and their potential impact on the Bevard Property had to be resolved, which required additional briefing. (ECF No. 730 at 2-3). The parties submitted post-trial briefs, and following a November 2014 hearing, Judge Chasanow issued another comprehensive memorandum opinion and Order. (ECF Nos. 730, 731). Ultimately, Judge Chasanow entered Judgment in favor of iStar Financial and Sandler against U.S. Home on Counts I-III of its First Amended Complaint. She directed U.S. Home to proceed to settlement within 30 days. Judge Chasanow further held that iStar Financial be paid $114 million, plus interest, at the rate of 12% per year, calculated on a per diem basis from May 27, 2008 until U.S. Home proceeded to Settlement. (ECF No. 730 at 45, 731).

*4. Appeal*

U.S. Home did not proceed to settlement; instead, it noted its appeal in this case on February 4, 2015, identifying iStar Financial, Sandler, and the Sandler-controlled Sellers as parties (ECF No. 734).[8] On March 12, 2015, the Fourth Circuit remanded the case back to Judge Chasanow for clarification of her findings related to the judgment entered (ECF No. 746). On June 29, 2015, Judge Chasanow issued an order clarifying the judgment, and thereafter, Lennar filed an amended notice of appeal (ECF Nos., 756, 770, respectively). Oral argument was held on March 23, 2017. By unpublished, per curiam opinion, the Fourth Circuit affirmed the district court's judgment in favor of iStar Financial. (ECF No. 778). Thereafter, U.S. Home filed a petition for rehearing and rehearing en banc, which was denied. U.S. Home's petition for writ of certiorari was denied on December 4, 2017. (ECF Nos. 780, 794).

---

[8] U.S. Home also filed post-judgment motions. *See, e.g.,* ECF Nos. 732, 733.

The ultimate outcome of this litigation was that U.S. Home owes iStar Financial more than $235 million.

## III. DISCUSSION

A. <u>The Guaranty Agreements</u>

The Guaranty Agreements signed by Defendant Sandler contain identical language regarding attorney's fees and costs:

> In the event of any litigation between [Sandler, the Guarantor] and [U.S. Home/Lennar, the Purchaser] under this Guaranty, the party prevailing in such preceding(sic) such be entitled to an award against the non-prevailing party for reasonable attorney's fees and costs of suit.

Paragraph 6, Trial Exhibits 225 & 226 (ECF No. 692).

B. <u>Legal Standards- Contract Provisions</u>

While a contract provision providing for the award of attorney's fees to the prevailing party is valid and enforceable in Maryland, courts must examine fee award requests for "reasonableness." *Myers v. Kahoe*, 391Md. 188, 207, 892 A.2d 520, 532 (2006); *see also SunTrust Bank v. Goldman*, 201 Md. App. 390, 401, 29 A.3d 724, 730 (2011)("Current law allows a court to grant only those attorney's fees it finds reasonable."); *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010).

When calculating fee awards under contractual fee-shifting provisions, courts "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8. MRPC 1.5(a) identifies eight factors for a court to consider:

> 1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> 2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

3) the fee customarily charged in the locality for similar legal services;

4) the amount involved and the results obtained;

5) the time limitations imposed by the client or by the circumstances;

6) the nature and length of the professional relationship with the client;

7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

8) whether the fee is fixed or contingent.

A court does not need to evaluate each factor separately, nor does it need to "make explicit findings with respect to Rule 1.5," as long as the court "utilizes the rule as its guiding principle" for deciding reasonableness. *Monmouth Meadows*, 416 Md. at 340 n.13, 7 A.3d at 10 n. 13. In addition, a court may consider any other factor "reasonably related to a fair award of attorney's fees." *Id.*, at 337-38.

Determination of the facts supporting reasonableness lies within the sound discretion of the court. *Myers*, 391 Md. At 207, 892 A.2d at 532. I believe that this means that a court should try to reach a practical and reasonable result.

C. <u>Sandler's Initial Petition for Attorney's Fees and Costs</u>

*1. Procedural History*

Sandler timely e-filed filed his motion for attorney's fees and costs. (ECF Nos. 735, 786). Thereafter, Sandler supplemented his petition with additional declarations from his counsel, which referred to two "Exhibits A" that counsel claimed would be filed under seal within 24 hours. (ECF No. 789-1, 789-2). The two "Exhibits A" were purportedly detailed daily time entry billing records from both law firms. Sandler's counsel stated that the documents were going to be filed under seal, "due to, among other reasons, concerns about the waiver of [attorney-client privilege] and the past practice in this case by [U.S. Home], when they sought

fees in connection with a motion for sanctions, not to provide such detailed time entries based upon privilege." (ECF No. 789-1, p.2). Despite representing that the Exhibits A would be filed under seal, Sandler's counsel did not e-file them at that time. Instead, Sandler reportedly provided the exhibits only to Judge Connelly for his *in camera* review and refused to provide them to counsel for U.S. Home.

Sandler followed practices that had arisen during prior attorney fee award requests made by U.S. Home and iStar Financial in the Instant Case, namely: not filing a motion to seal the billing records, not providing the records to opposing counsel, and providing a paper copy of said records to the Clerk's Office for delivery to Judge Connelly. *See,* ECF Nos. 131, 139, 154-156, 583, 597, 609. In those prior instances, petitioning counsel asserted concerns re: safeguarding the attorney-client privilege as the basis for this conduct. The prior fee requests sought, relatively speaking, smaller monetary awards that the instant fee petitions. Judge Connelly conducted *in camera* review of the billing records in the earlier petitions, and reduced the amounts sought. (ECF No. 141, 169, 706).

Even though U.S. Home had engaged in identical conduct for its earlier fee petition, it raised due process concerns about being able to meaningfully challenge Sandler's request without the billing records. (ECF No. 791).[9] In April 2018, I held a hearing on this issue, during which Sandler reasserted ongoing attorney-client privilege concerns related to the records, yet also asserted an interest in getting his fees paid sooner rather than later (ECF No. 822). Thus, Sandler's counsel had made minor redactions to the billing records and was prepared to turn them over to U.S. Home. By order dated June 22, 2018, I found that U.S. Home needed the billing records to meaningfully challenge the reasonableness of the petitions. (ECF No. 802). I

---

[9] U.S. Home also advanced additional objections to the fee and costs award requests, which are set forth below in Section III. D.

also found that because counsel had been permitted to submit documents *in camera* for prior fee petitions, fairness dictated that I not penalize the parties for following this procedure for the current fee petitions. *Id*. Furthermore, I directed Sandler's counsel to e-file the redacted billing records and file a privilege log related to the redactions, which Sandler subsequently did. (ECF No. 804-13). The billing records were subsequently sealed, ECF Nos. 808, after I found that they do raise attorney-client privilege and work-product concerns.[10]

During the April 2018 hearing, Sandler requested permission to file a supplemental petition for attorney's fees and costs, which Sandler expressly reserved his right to do, and to which U.S. Home did not object. (ECF Nos. 735, 822). Sandler timely filed his supplemental motion, and U.S. Home filed its response. (ECF Nos. 804, 823). Sandler filed a reply brief, and U.S. Home was permitted to file a final response. (ECF Nos. 831, 846).

2.  *The Evidence Supporting the Petition*

Two law firms represented Sandler throughout the life of the First Maryland Action and the Instant Case: attorneys from a Virginia office of Reed Smith, LLP, and attorneys from Joseph Greenwald & Laake, P.A. ("JGL"), who served as local counsel.

Citing to the provisions in the Guaranty Agreements, counsel for Sandler seeks $2,366,051.36 in legal fees and $58,277.01 in costs. (ECF Nos. 786, 831). The fee request is predicated on approximately 7,200 hours of work, broken down by litigation phases, as required by the Local Rules. *See* ¶1.b.i, Local R. App. B: Rules and Guidelines for Determining Attorneys' Fees in Certain Cases, July 1, 2016 ("*the Guidelines*"). The request also includes less than 250 hours for preparation of both fee petitions. The petitions are supported by multiple

---

[10] *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 402–03 (4th Cir. 1999) ("Typically, the attorney-client privilege does not extend to billing records and expense reports . . . However, . . . time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege") (internal quotations and citations omitted).

exhibits, including: billing records,[11] timekeeper summaries, declarations from primary and local counsel, invoices, receipts, and cost detail and summary reports. In the aggregate, these exhibits amount to several hundred pages. The billing records, which I will refer to as Exhibits A, provide detailed descriptions of the work performed by each attorney at both law firms. (ECF Nos. 806, 806-1).

The records reflect that 16 Reed Smith attorneys worked on this matter during the nine-year period. For the first two years of litigation, John Sabourin was the primary partner responsible for the matter, followed by Thomas Folk acting as such. Mr. Sabourin had more than 40 years at the Bar, and Mr. Folk has more than 39 years of legal experience. *See* ECF Nos. 786, at 7; 804-2, at 4). Mr. Sabourin billed for 1,646.55 hours of work, and Mr. Folk billed for approximately 2,400 hours at average blended hourly rates. The remaining Reed Smith partners, associates, and paralegals worked during various phases or on discrete projects. *See* ECF No. 806. Miriam Castano and Benjamin Holmes served as non-attorney E-Discovery/IT Specialists, working 502.40 hours and 122.45 hours, respectively. Their billing rates were as paralegals. Holly Nomura was a research specialist, also billed out as a paralegal. Most people's actual hourly rates generally fell within the parameters of the Guidelines; a few people's actual hourly rates exceeded the Guidelines. *See, e.g.,* ECF Nos. 786-1, at 7; 804-2 at 4; 806 at 10, 21-22, 74, 82.[12]

---

[11] Counsel submitted redacted versions of billing records under seal (ECF Nos. 806, 806-1) and non-redacted billing records to me for *in camera* review. I have reviewed all of the records, and I do not find any prejudice to U.S. Home in receiving only the redacted records.

[12] Two Reed Smith attorneys had rates that exceeded the Guidelines by a significant amount, given their experience. I reviewed the corresponding time entry records and could not find anything unique or remarkable about the work that they performed that would justify a rate outside of the Guidelines. Their rates will be reduced to the rate at the high end of the Guidelines. Attorney #1, with 14 years' experience, billed a total of 4 hours. *See* ECF No. 804-2 at 4. Thus, the total amount reimbursed will be reduced by **$1,120** to a total of **$1,400**. Attorney#2, a first-year associate, billed 3.7 hours. Her rate will be reduced by **$832.50** to a total of **$647.50**.

The records also reflect that the three JGL Attorneys primarily worked on this matter were Timothy Maloney, Veronica Nannis, and Karen Fischer. Mr. Maloney had more than 31 years' legal experience, Ms. Mannis had more than 15 years' legal experience through most of this litigation, and Ms. Fischer had more than 7 years' experience. (ECF No. 786-2). Occasionally, Larry Holzman (more than 25 years' experience) worked on this matter, as did Katie Krametbauer (10 years' experience). Scott Kraft's 2 years of experience was billed out at a law clerk rate. (ECF Nos. 786-2, 806-1). In the aggregate, all JGL attorneys spent just a bit more than 200 hours working on this litigation. All of their billing rates were well within the Guidelines based on their experience. *See* ECF No. 806-1..

D. <u>U.S. Home's Responses to Sandler's Motions for Attorney's Fees and Costs</u>

U.S. Home does not dispute its obligation to pay Sandler's attorney's reasonable fees and costs.

**Costs of Suit**

Regarding costs, U.S. Home made only one objection, namely that Sandler improperly sought costs related to its appeal (ECF No. 791). Sandler responded to this allegation by denying that it sought appeal-related costs (specifically docketing fees and costs of reproducing briefs). (ECF No. 792). I have reviewed Sandler's requests and make the following findings. First, Sandler did not seek fees in violation of the Fourth Circuit Local Rules. Second, the expenses sought by Sandler are amply supported by detailed invoices, statements and other documents. (ECF Nos. 786-1, Enclosures 6-32, 786-2, 786-3). Third, I find that reimbursement is sought for reasonable, foreseeable, and necessary expenses typically incurred in preparing this case for litigation (e.g., copying, legal research, filing fees, transcripts), and are consistent with the Guidelines. *See, e.g.*, §§ 2e., 4. *Compare Berkeley Trace, LLC v. Food Lion, LLC*, Civ. No.

RDB-11-3207, 2013 WL 5718867, at *10 (D. Md. Oct. 18, 2013), Fourth, I did not see any duplicate billing. Fifth, reimbursement is sought relate to attorneys' fees for services rendered by local counsel JGL. These amounts were captured by Reed Smith's billing system as costs. ECF No. 786-1, Enclosures 5 and 22. As explicated more fully below in Sections III.D.3, 4 and 5, I ultimately find JGL's attorney's fees to be reasonable because the fees/hour requested are: within the Guidelines (*See §2*); appropriate, given the work performed by local counsel; and consistent with MRPC 1.5(a)(1), (a)(3), and (a)(7).

**Attorney's Fee Petition**

U.S. Home advances several arguments in support of a reduction in the amount of attorney's fees sought.  First, that Sandler's attorney's billed excessively "throughout the nine years of litigation." Second, because Sandler's attorneys' billable hour rates exceeded the Guidelines, a reduction is warranted. Third, Sandler's attorneys should not receive fees for fee petition-related work performed in March 2018-April 2018. Fourth, Sandler should not receive reimbursement for work performed for his business entities. Fifth, Sandler should not receive legal fees related to the ED VA Action/First Maryland Action.

I analyzed U.S. Home's arguments by considering the factors related to the time and labor required, the novelty and difficulty of the various issues in this case, the facts at issue and the corresponding results obtained, and the fee customarily charged in Maryland.  I also assessed what was reasonable given the nature of this protracted litigation.

*1.  Allegedly Excessive Billing*

U.S. Home makes a sweeping assertion that Sandler's counsel billed excessively over nine years, however, does not offer support for this generalization. Instead, U.S. Home focuses solely on the period of time after July 18, 2014, claiming that after Sandler prevailed on the

merits only "minimal" billing for post-trial motions or appeal was appropriate. (ECF Nos. 791 at 13, 823 at 8). According to U.S. Home: (a) Sandler did not file or join any post-trial motions filed by iStar Financial, and none of the post-trial motions impacted Sandler; and (b)U.S. Homes' appeal did not discuss Sandler or the Guaranty Agreements. (ECF No. 823 at 9). Ultimately, U.S. Home contends that Sandler seeks $124,000 for just north of 300 hours of work, and says a 50% reduction is appropriate (ECF Nos. 823 at 9, 846 at 3).

I reviewed the post-trial docket entries in this case. I found that U.S. Home and iStar Financial filed motions (*e.g.*, ECF Nos.723-726); that Judge Chasanow conducted a post-trial hearing, and authored memorandum opinions, included related to clarifying the judgment; and that attorney's fees/cost petition was filed, including by Defendant Sandler (*e.g.*, ECF Nos. 730, 73, 733, 738, 765). I also reviewed Sandler's attorney's billing records for the period of July 2014 onward. The entries reflect Sandler's counsel spent some time reading Judge Chasanow's July 18, memorandum opinions, communicating with iStar Financial's counsel and the client. However, most of the entries relate to the direct appeal, to opposing U.S. Home's petition for certiorari to the U.S. Supreme Court, with the bulk of time spent by Reed Smith and local counsel preparing the fee petition (ECF Nos. 806, at 1-4; 806-1 at 12-15). Sandler seeks about $92,000 for preparing the fee petition. Sandler argues that various discounts/reductions of pre-billing and post-billing attorney's fees were made, and that average hourly billing rates, not actual billing rates, were frequently used. *See, e.g.*, ECF No. 786-1, pp. 5-6. Regarding the appeal, the billing records reflect that Sandler's counsel reviewed the record, discussed the contents of the joint brief with appellate counsel, reviewed materials for inclusion in the joint appendix, and attended oral argument.

As a preliminary matter, I note that Sandler's counsel argued that the practice of writing off pre-billing and post-billing fees somehow showed that the fee request was reasonable. While this business practice clearly benefitted the clients, I did not consider it when determining the reasonableness of the petition because I do not think that a reasonable award of attorney's fees includes amounts that clients could have been charged; it should only relate to fees actually paid by the client.

While U.S. Home is correct that Sandler's attorneys did not join any of the post-trial motions filed, I did not find a significant amount of time billed for these items; only a small dollar amount, and I do not find it unreasonable for Sandler's counsel to have kept apprised of developments in the case before the appeal was filed because had the outcome of those post-trial motions been different, it would have likely impacted the appeal that was ultimately filed.

In addition, I do not find persuasive U.S. Home's argument that Sandler was a party to the appeal in name only. I find that Sandler was directly impacted by the outcome of the appeal. On appeal, U.S. Home alleged that Judge Chasanow erred in finding that Sellers' refusal to grant it access to the Bevard Property, and, as a corollary, erred in finding U.S. Home breached its contractual obligations. U.S. Home did not say that it was not challenging judgment in favor of Sandler. Thus, Judge Chasanow's finding that U.S. Home materially breached the contracts ultimately meant that Mr. Sandler would not be obligated under the Guaranty Agreements to repay U.S. Home its $20 million deposit. Had the Fourth Circuit found Judge Chasanow's factual findings clearly erroneous, U.S Home would have been entitled to its $20 million deposit from Mr. Sandler: the personal guarantor to those agreements.

In sum, analyzing the MRPC 1.5(a) factors, I find the fees requested for the appeal and fee petition for the Instant Case to be reasonable. I recommend that the entire amount be awarded, reduced by **$1,120**. *See Footnote 12, supra.*

Below in Section III.D.2.b., I explain why, for the most part, the average hourly rate charged by Sandler's counsel is reasonable, given the nature of this case. I did make some further reductions to the rate as noted therein.

### 2. *Hourly Rates*

#### a. Rates of JGL Attorneys

As a preliminary matter, U.S. Home does not object to the rates charged by local counsel JGL. I reviewed all of JGL's billing records and found that the attorney's hourly rates fell squarely within the Guidelines, except for on a few instances where one attorney's rate in 2017 was about $5.00 above the high end of the rate customarily allowed. *See* ECF No. 806-1 at 1-15. I do not find this minor variance to be significant given the contentious nature of the litigation, the experience of the attorney, and the amount at stake in this controversy. *See* MRPC 1.5(a)(1), (a)(3), and (a)(7).

#### b. Rates of Reed Smith Attorneys

In brief, U.S. Home complains about the average hourly billing rate charged by Sandler's counsel at Reed Smith.

In the Fourth Circuit, an analysis of the fee "customarily charged in the locality for similar legal services" requires a court to consider the "community in which the court sits [as] the first place [to evaluate] prevailing market rate." *Thompson v. U.S. Dep't of Hous. & Urban Dev.,* Civ. No. MGJ-95-309, 2002 WL 31777631, at *12 (D. Md. Nov. 21, 2002) (quoting *Montcalm. Pub. Corp. v. Commonwealth of Va.,* 199 F.3d 168, 173 (4th Cir. 1999)). Thus, I

recommend that you find the relevant market is Maryland, where this court sits, and not another location. *See Costar Grp., Inc. v. Loopnet, Inc.,* 106 F.Supp.2d 789, 788 (D. Md. 2000); *see also Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009) (relevant market was Eastern District of Virginia).

In this district, that knowledge of the prevailing market rate "is embedded within [the Guidelines]." *Manning v. Mercatanti*, Civ. Nos. ELH-11-2964, ELH-12-0195, 2014 WL 1418322, at *5 (D. Md. Apr. 10, 20140) (*quoting Gonzales v. Caron*, Civ. No. CBD-10-2188, 2011 WL 3886979, at *2 (D. Md. Sept. 2, 2011)). The Guidelines, while not binding, presumptively set forth ranges of reasonable hourly rates based on an attorney's years of experience. *Gonzales*, 2011 WL 3886979, at *2.

Moreover, even though the fees sought for 2008-2015 are based on current hourly Guidelines rates rather than historic ones, I find it appropriate to use the current Guidelines. *See Hyland v. Xerox Corp.*, Case No. PJM-03-116, 2011 WL 806419, *6-7 (D. Md. Feb. 4, 2014)(in cases involving lengthy litigation that results in a delay of payment, a court has discretion use historic rates plus interest or current rate).

As stated previously in Section III.C.2, for the Reed Smith personnel, an average blended hourly rate was used. I reviewed the Reed Smith time entry records and find the use of an average blended hourly rate reasonable in large measure. By way of example, the rate for Mr. Folk, who worked the greatest number of hours on the litigation, was well within the Guidelines for his experience level (§3.e.) for part of 2012 and for 2013-2018. For the years 2008-2011, his hourly rate was within the Guidelines or for a couple of years, it was only about $50.00 above the Guidelines. *See* ECF No. 806 at 1-51, 65; *see also* ECF 786-1. For Mr. Sabourin, his hourly rate for 2008-2010 ranged between $25-55 more than the Guidelines for his experience level

(§3.e.).  Given the convoluted and involved nature of the litigation, its length, the novelty of some of the issues, and the outcome, *see* MRPC 1.5(a)(1), (a)(3), I find it reasonable to use a blended average hourly rate for Messrs. Folk and Sabourin, who served as lead counsel during the life of this case.

### 3. *Fees Associated with 2018 Release of Additional Detailed Billing Records to U.S. Home*

U.S. Home contends that Sandler's fee award should be reduced by approximately $9,000 due to what it characterizes as a "dilatory tacti[c]" in refusing to provide sufficient evidence in support of Sandler's original fee petition in 2017. (ECF No. 823 at 18). Put another way, U.S. Home believes that Sandler's claim of privilege/work product protection for its billing logs was specious.

As I stated earlier, after reviewing the records, I found that Sandler's assertion of attorney-client privilege and work-product concerns was not baseless. I also find that because counsel for U.S. Home was permitted to submit documents for its prior fee petition only to Judge Connelly for his *in camera* review, fairness dictates that Sandler not be penalized for following this procedure for the current fee petition. It was entirely logical for Sandler to await this court's decision that the practice prevented U.S. Home from being able to meaningfully challenge this substantial fee petition.  Accordingly, I recommend that no reduction is warranted for the March-April 2018 fees for either Reed Smith or JGL.

### 4. *Fees for Defending Sandler Against Liability*

U.S. Home does not contend that Defendant Sandler is a prevailing party in the Instant Case.  Rather, U.S. Home asserts that only Defendant Sandler is a party to guaranty agreements with "prevailing party" provisions that would permit recovery of attorney's fees.  (ECF No. 791 at 18-21).  According to U.S. Home,  only Sandler can recover fees, and "only in relation to the

litigation over the guaranty agreements," which is embodied in Count III of U.S. Home's First Amended Complaint. In other words, Sandler's ability to recover attorney's fees and costs is solely linked to the "only claim related to [his agreements]," and not to any of the other claims, which relate to the Sellers and to a "separate agreement." *Id*. at 18-20. Moreover, U.S. Home contends that "as of [ July 18, 2008, when U.S. Home's complaint was filed]," WPE, SC and BDC had no "extant contractual right to attorneys' fees" because it was the day that iStar Financial assumed Sellers' rights under the Purchase Agreement and Contract for Services. *Id.* at 20. Furthermore, U.S. Home avers, in a scenario where a claim by one party allows fee shifting (Party A, Claim #1), exits with other parties' claims that do not allow fee shifting (Party B, Claims # 2 & 3), a fee petition must establish how much time should be allocated to Claim #1 versus to Claims # 2 & 3. ECF No. 823 at 11-13, citing to *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 760, 929 A.2d 932, 957 (2007). Because Sandler's attorneys' fees are "improperly block billed" (combine the fees associated with work performed on the Sellers' behalf with work performed on Sandler's behalf), a reduction is warranted for the "non-compensable work." ECF No. 823 at 16.

Even though not entirely clear from the pleadings, I inferred that, by this argument, U.S. Home questions the fees incurred **after 7/17/08** that relate to Mr. Sandler.

The case that I find instructive for this scenario is *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Hensley* is a leading Supreme Court case on the "common core of facts doctrine." *Hensley* involved plaintiffs in a 42 U.S.C. §1988 action who prevailed at trial on one claim, yet did not prevail on other claims. Justice Powell opined that in in such scenarios, a party may be able to recover for attorneys' fees where the claims are related and based on a "common core of facts." 461 U.S. at 435-36. Claims are "unrelated" if "distinctly different" and "based on

**different facts** and legal theories." 461 U.S. at 435 (emphasis supplied). In addition, in cases involving a "common core of facts," counsel's time will be "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id*. Furthermore, in awarding attorney's fees, a court must also focus on the success achieved. *Id*.

I recognize that the Instant Case is different from *Hensley* in that there are two different parties here. I also recognize that Sandler and the Sandler-controlled entities had the same counsel representing them. I have also not found any other cases that present the unusual factual scenario present here.

What I find significant in the Instant Case are the unique circumstances and interconnectedness of facts that exist. First, U.S. Home's theory throughout the life of the Instant Case has been that the Sandler-controlled entities were liable for breaches of contract and that, by extension and interrelatedly, Sandler as a personal guarantor was liable to the tune of, at minimum, the return of U.S. Home's $20 million deposit. Sandler's liability and his entities' liability have always been linked by U.S. Home. U.S. Home persisted in this argument: (a) after the Bevard transaction did not close and iStar Financial became able to exercise its rights under collateral assignment of the Purchase Agreement and Contract for Services; (b) after July 2008 when the complaint was filed and during the time that U.S. Home filed various summary judgment motions; (c) in the Fall of 2009, when iStar Financial exercised its rights by instituting foreclosure proceedings in Maryland related to the Bevard Property; (d) during the appeal of the Instant Case. Second, the breach of contract issues in the Instant Case have always involved the same players, and the same set of facts. Third, the issue has always been whether the facts establish that the Sandler-controlled Sellers breached the agreements in this case; by the time of trial, the issues were narrowed to understanding whether the Sellers breached the contract by

denying U.S. Home access to the Bevard Property and/or whether Sellers breached environmental representations and warranties. If Judge Chasanow had found the Sellers in breach, then the conduct of the Sellers (set of facts) would have led to liability for Mr. Sandler as the personal guarantor. The fact that the legal elements of the claims against the Sellers may have been literally different from the elements for the claim against Sandler does not serve to create "unrelated claims." This is not a case where the claims are predicated on different facts; the claims have the same common core of facts. This is a case where counsel for Sandler had to understand the same common core set of facts at play that implicated both Sandler and WPE, SC and BDC in order to develop a strategy to defend Sandler against any liability. The fact that some actions undertaken by counsel to get at the facts to help Sandler also had an impact on the case related to WPE, SC, and BDC is not relevant.

I understand that, as a general matter, in cases where there is a mixture of claims that allow fee-shifting and those that do not, "block billing" is disfavored. *Diamond Point Plaza Ltd. P'ship v. Wells* Fargo, 400 Md. 718, 760, 929.A.2d, 932, 934 (2007). However, I do not find that counsel improperly "block billed" in this case. I do not believe that the law limits Sandler's recovery because there happened to be other claims here that do not relate to Sandler, and for which the Sandler-related entities were unsuccessful. In sum, analyzing the MRPC 1.5(a) factors, I find that Sandler as a prevailing party is entitled to his fees. I do not find unreasonable the fees sought based on the common core of facts present in the unique circumstances of this case I do not recommend a reduction in fees.

5. *Fees Related to the Eastern District of VA/First Maryland Action*

U.S. Home questions the fees incurred **after 7/17/08** that relate to WPE, SC, and BDC in the First Virginia Action(what I've renamed the "First Maryland Action").

In his fee petition, Sandler's counsel stated that he excluded from his petition approximately $147,000 from the total reimbursement sought for what he described as fees exclusively for the First Virginia Action (what I've renamed the "First Maryland Action"). (ECF No 786-1 at 6). This deduction relates to the period of December 6, 2007 (the date that the Sandler-controlled entities filed their declaratory judgment complaint in Virginia) through July 18, 2008, the date that U.S. Home sued Sandler in the Instant Case. *Id*.

U.S. Home seeks an additional reduction of $106, 943 for what it characterizes as "non-compensable" fees "incurred related to the Virginia Action." (ECF Nos. 823 at 8, 846 at 3). U.S. Home cites to several billing entries that it states are related to solely to the First Maryland Action, including a motion to compel, a motion to consolidate the actions, a motion to dismiss, and entries related to the Sellers' appeal of Judge Chasanow's March 19, 2009 order. (ECF No. 823 at 8, n. 3). Sandler responds that no additional deductions are necessary because U.S. Home mischaracterizes the entries related to work performed after July 17, 2008 as being related to the First Maryland Action. (ECF No. 831 at 9).

First, I note that Sandler was not a party to the First Maryland Action; only WPE, SC, and BDC were parties to that action.

Second, I note that, as I stated above, Sandler is entitled to reimbursement for attorney work related to the Instant Case; the fact that the conduct undertaken by Sandler's counsel also impacted the First Maryland Action is not material.

Third, WPE, SC and BDC were not prevailing parties in the First Maryland Action, their rights having been assumed by iStar Financial by no later than the Fall of 2009. Thus, Sandler is not entitled to compensation based on work performed **exclusively** for the Sandler-controlled entities in the First Maryland Action after September 2009 (the date iStar Financial exercised its

rights). For instance the appeal of Judge Chasanow's March 19, 2009 order granting U.S. Home's motion to dismiss should not be allowed. Because Sandler's counsel has "block billed" many of the entries after July 17, 2008, it is difficult to determine exactly which entries are exclusively related to the First Maryland Action and which are, if you will, a hybrid of both Actions. While it is not proper to exclude all block billed fees, *see, e.g., Miller v. U.S. Foodservice, Inc.,* CIV No. CCB 04-1129, 2006 WL 2547212, at *2-3 (when an attorney block bills, court need only make a reasonable estimate of what is compensable versus non compensable), I do believe that some further reduction is warranted.

Fourth, I reviewed the time entry records submitted by Reed Smith and JGL. (ECF Nos 806, 806-1 at 1-15). I did not see any JGL entries that were solely related to the First Maryland Action **after** July 17, 2018. Thus, no deductions will be made to the JGL fees sought, either as costs to Sandler or as fees separately itemized by JGL. [13]

Fifth, I do not believe that a reduction is appropriate for time spent on the motion to consolidate the First Maryland Action with the Instant Case. The motion to consolidate was denied as moot on March 19, 2009. Technically, Judge Chasanow's denial of the motion to consolidate made it "unsuccessful," but because of the common core of factual questions to be resolved, and, because of the interest in judicial economy, I do not recommend that fees for the entries related to this motion be disallowed.

In sum, my reasonable estimate of what is non-compensable yields an additional reduction of **$53,000**.

---

[13] Joseph Greenwald & Laake deducted fees from the Virginia Action/First Maryland Action for the period of time of December 6, 2007-May 15, 2017. (ECF No. 786-2 at 5).

*6. Joseph Greenwald & Laake, PC Fees*

In this section, I make a few additional findings related to the JGL attorney fees sought.

I find that Local Rule 101 required the presence of a JGL attorney at all hearings, status conferences, and trial in this matter, thus it was appropriate for one JGL to appear at these proceedings while one Reed Smith attorney also appeared. I found it imminently reasonable for the JGL attorneys to be reimbursed for their time. Regarding conferences, *see* the Guidelines, Paragraph 2d, I did find a few instances where both a JGL attorney and a Reed Smith attorney participated. (ECF Nos. 806, and 806-1). However, they were not a large number of such occurrences, and, given the protracted nature of this case, I do not find the fees billed attendant to them to be unreasonable. Finally, as set forth above in Section III.D.3, because of the prior history in this case of submitting documents for *in camera* review, I do not find it unreasonable for JGL to have claimed attorney's fees associated with litigating before me whether to withhold detailed time entry records.

In sum, taking into account the MRPC 1.5(a) factors, I ultimately recommend that you award attorney's fees for services rendered by Joseph, Greenwald, and Laake in the amount of **$54,784.**

## IV. CONCLUSION

In sum, I respectfully recommend that the Court:

1) Award costs, further broken down as follows:

    a. **Reed Smith**                 **$52,223.30**

    b. **Joseph Greenwald & Laake**     **$487.26**

    c. **Direct Paid Client Costs**        **$5,566.45**

2) Award attorney's fees as follows:

    a. **Reed Smith**          **$2,311,098.86**

    b. **Joseph Greenwald & Laake**    **$54,784.00**

         **TOTAL:**         **$2,424,159.87**

Date:   October 1, 2018                 /s/
                                           Gina L. Simms
                                           United States Magistrate Judge