## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **U.S. HOME CORPORATION,** | * | |
| | * | |
| **Plaintiff/Counter-Defendant** | * | |
| | * | |
| **and** | * | |
| | * | |
| **LENNAR CORPORATION,** | * | |
| | * | |
| **Counter-Defendant** | * | |
| | * | |
| **v.** | * | **Civil Action No. PX-08-1863** |
| | * | |
| **SETTLER'S CROSSING, LLC,** *et al.*, | * | |
| | * | |
| **Defendants/Counter-Plaintiff** | * | |
| | * | |
| **and** | * | |
| | * | |
| **STEVEN B. SANDLER,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

## REPORT AND RECOMMENDATIONS RELATED TO MOTION FOR ATTORNEYS' FEES BY DEFENDANT iSTAR FINANCIAL, INC.

This "Report and Recommendations" addresses the petitions for attorneys' fees and costs filed by Defendant/Counter-Plaintiff iStar Financial, Inc. ("iStar Financial"). (ECF Nos. 736, 787, 796).

Pursuant to 28 U.S.C. § 636, and Local Rule 301.5(b), the Honorable Paula Xinis referred this matter to me to issue a report and make recommendations. (ECF No. 795). The parties have submitted numerous memoranda and supporting documentation, thoroughly arguing their respective positions. (ECF Nos. 735, 786, 789, 791, 792, 804, 820, 823, 829, 839, 831, 846). I believe that the issues have been fully briefed, and do not believe that any additional hearings are

necessary.[1]  L.R. 105.6.  As set forth more fully below, I ultimately recommend that the Court **GRANT IN PART, DENY IN PART** the motion for attorneys' fees, costs, and expenses, with the reductions as set forth more fully herein.

## I.      FACTUAL & PROCEDURAL BACKGROUND

This is a case about a commercial real estate transaction that was never consummated, which led to approximately nine years of heated, protracted litigation between the parties. Detailed descriptions of the facts can be found in the comprehensive memorandum opinions issued by the Honorable Deborah K. Chasanow in 2009, 2014, and 2015. (*See, e.g.,* ECF Nos. 41, 624, 707, 730, 765).  This report includes a, relatively-speaking, shorter summary of facts which I believe are relevant to the issues raised in Sandler's attorney fee petition.  The summary is culled from Judge Chasanow's opinions, and from my review of more than 700 docket sheet entries and many of the corresponding pleadings filed.

In 2005, Plaintiff/Counter-Defendant U.S. Home Corporation, a subsidiary of Counter-Defendant Lennar Corporation ("U.S. Home," "Lennar," or "Purchaser"), agreed to purchase from Defendant/Counter-Plaintiff Settler's Crossing, LLC ("SC") its entire membership interest in Defendant/Counter-Plaintiff Washington Park Estates, LLC ("WPE").  WPE held title to approximately 1,250 acres of undeveloped farmland in Prince George's County, Maryland ("Bevard Property") that was of interest to U.S. Home for residential development.  Thus, through the membership interest transaction, U.S. Home would acquire the Bevard Property, and erect single-family homes upon it. (ECF No. 707).

---

[1] On April 19, 2018, I conducted a hearing in this case (ECF No. 822). I entertained oral argument from the parties in response to my questions regarding the following documents, which the Defendants purportedly submitted to the court for *in camera* review. *See* ECF No. 822.

To effectuate the transaction, on November 15, 2005 U.S. Home entered into an agreement of purchase and sale of the WPE membership interests ("Purchase Agreement") with SC and WPE ("the Sellers"). Simultaneously, U.S. Home and Defendant/Counter-Plaintiff Bevard Development Company ("BDC") executed a "Contract for Services," pursuant to which BDC would perform certain development work on the Bevard Property. In total, U.S. Home agreed to pay $200 million for these contracts, and made deposits totaling $20 million. In early December 2005, Defendant Sandler, who controlled the Sellers and BDC, signed two guaranty agreements, personally promising the return of U.S. Home's deposit money should Sellers breach the contracts. (ECF No. 707).

Between late 2005 until at least the Spring 2006, the Purchaser and Sellers cooperated with each other in their development-related efforts, with Seller granting Purchaser and its engineering or environmental consultants access to the Bevard Property to conduct investigations and analyses. (ECF No. 624). U.S. Home learned that some of the land contained heavy metals and sludge. U.S. Home also contracted someone to engage in remediation work on the property. (*Id.*).

According to the Purchase Agreement, several conditions precedent needed to be satisfied before U.S. Home was obligated to go to settlement. By the Summer of 2006, at least one or two conditions remained unsatisfied; a closing date of March 30, 2007 was set. (*Id.*). When the residential housing market showed signs of softening in 2006, U.S. Home sought to renegotiate the Purchase Agreement. (ECF No. 707). In May 2007, U.S. Home, its parent, Lennar, and Sellers executed a Second Amendment to the Purchase Agreement and a First Amendment to the Contract for Services. The price for these contracts was about $134 million. The conditions precedent to closing were modified, one of which was that U.S. Home had to

certify that it had no actual knowledge that the Sellers' initial representations and warranties (including related to the environmental condition of the property) were untrue. (*Id*.).   Another condition was that U.S. Home would guarantee specific performance under the contract. (*Id*.).

At or about the same time that U.S. Home and Sellers sought to renegotiate the Purchase Agreement, Sellers experienced financial difficulties and sought a mortgage bridge loan form Defendant/Counter-Plaintiff iStar Financial, Inc. ("iStar Financial"). On June 19, 2007, iStar Financial made a $100 million loan to Sellers, using the Bevard Property as security, with the idea that it would be repaid at the time of closing.  In addition, Sellers collaterally assigned their respective rights, title, and interests under the Second Amendment to the Purchase Agreement and under Contract for Services to iStar Financial ("Collateral Assignment"). (ECF No. 691). Settlement was to occur on December 5, 2007.

Also, on that same day, U.S. Home and Sellers executed a Third Amendment to the Purchase Agreement, which provided that if iStar had to foreclose on the property then the Purchase Agreement would be modified such that the Bevard Property would be sold instead of the WPE membership interest being sold. (*Id*.). Finally, on June 19, 2007, U.S. Home entered into a "Consent and Estoppel Agreement" with iStar Financial, acknowledging Sellers' assignment of rights to iStar Financial.   By this agreement, U.S. Home also made certain representations about the Bevard Property, including that "to the best of [Purchaser's] knowledge, having made due inquiry," U.S. Home had "no existing defenses, offsets claims or credits with respect to the performance of its obligations [under the two contracts]," and that neither party was in "breach of any of [its] respective obligations under the [agreements]."  (ECF No. 707, p. 13).

Concomitant with the signing of the above-referenced agreements, Lennar began seeking a joint venture partner for the Bevard-related transaction to alleviate some of Lennar's financial concerns as U.S. housing market conditions continued to decline. (ECF 707). Lennar represented to at least one potential partner that it was unaware of any hazardous conditions on the Bevard Property. (*Id*.). Later, when its efforts to locate a financial partner were unsuccessful, "Lennar began to investigate strategies to delay the [December 5, 2017] settlement date, if not avoid closing altogether." (ECF No. 707, p.16). Documents and testimony later adduced at trial showed that Lennar was analyzing the agreements and was actively "looking at ways to off-load the deal," including looking for an "escape clause" in the contract. (ECF No. 707, p. 18).

After Sellers noted that development work had ceased on the Bevard Property, they made inquiries of Purchaser as to the status, which were ignored. (*Id*.). On November 21, 2007, Lennar notified Sellers that Sellers had failed to satisfy conditions precedent to closing; however, it did not identify those deficiencies. Thereafter, on December 5, 2007, Purchaser failed to appear for settlement.

On December 6, 2007, the Sellers filed an action for declaratory judgment in U.S. District Court for the Eastern District of Virginia ("ED VA Action"). In this Action, Sellers did not allege breach of the Purchase Agreement by U.S. Home, but, rather, sought that court's assistance in identifying U.S. Home's list of unsatisfied conditions precedent that were a barrier to the sale occurring. (ECF No. 707). Following Sellers' initiation of suit against Purchaser on December 6, 2007, U.S. Home filed a motion to transfer that case to U.S. District Court in Maryland on December 26, 2007. On January 25, 2008, U.S. District Judge Claude Hilton granted U.S. Home's request, and the Eastern District of Virginia case was transferred to U.S.

District Court for the District of Maryland and assigned to Judge Chasanow, Case No. DKC 08-267 ("First Maryland Action" or "FMA") (FMA, ECF Nos. 15, 16).

In January 2008, U.S. Home sought permission to "enter" the Bevard Property to conduct "investigations, studies and tests [that it deemed] necessary or appropriate." (ECF No. 707). U.S. Home asserted that a provision in the Purchase Agreement gave them the right to such access. Sellers, suspicious of U.S. Home, denied access. (*Id.*).

Between January 2008 – March 2008, Sellers continued to work to resolve questions regarding whether the conditions precedent to the sale were satisfied so that settlement could occur. (ECF No. 707). On March 12, 2008, the First Maryland Action was referred to U.S. Magistrate Judge William Connelly for discovery and scheduling. (FMA ECF No. 29). In April 2008, U.S. Home filed a motion to compel inspect of the Bevard Property, and also called for settlement to occur on May 27, 2008. (ECF Nos. 649, 707).

On May 16, 2008, U.S. Home notified Sellers that they were in default because of an alleged refusal to grant U.S. Home access to the Bevard property. (*Id.*). This default triggered contractual cure obligations for Sellers and iStar Financial under their respective agreements. (ECF No. 707). Subsequently, U.S. Home notified Sellers that it was not obligated to proceed to settlement, which Sellers responded to by serving a May 30, 2008 notice of default on U.S. Home. (ECF Nos. 649, 707).

A consequence of the May 27, 2008 Bevard Property sale not occurring was that Sellers defaulted on their mortgage bridge loan with iStar Financial.

On June 24, 2008, U.S. Magistrate Judge William Connelly held a motions hearing in the First Maryland Action, addressing issues including U.S. Home's motion to compel inspection of the Bevard Property. (FMA ECF No. 64). By Order dated June 27, 2008, Judge Connelly found

that U.S. Home had the right to inspect the Bevard Property, and gave them a given a six-week period to accomplish this. (*Id.*).  Despite Judge Connelly's June 27, 2008 Order, U.S. Home never availed itself of its right to inspect the Bevard Property. (ECF No. 707).  Instead, on July 3, 2008, it terminated the Purchase Agreement and Contract for Services "as it had planned to do since shortly after [Sellers denied its request for access]." (ECF No. 707, p. 26).  U.S. Home demanded the refund of the $20 million deposits, which Sellers and Sandler refused to honor.

By July 2008, iStar Financial had assumed the rights under the Collateral Assignment. Thereafter, on July 17, 2008, U.S. Home filed a four-count Complaint against iStar Financial, Sandler and the three entities that he controlled, Case No. PX-08-1863 ("the Instant Case").  The complaint contained several breach of contract claims related to Sellers "refusal" to grant Lennar access to the Bevard Property. U.S. Home sought return of its $20 million deposit.[2]

On August 11, 2008, Settler's Crossing, WPE, Sandler, and iStar Financial filed a motion to consolidate the First Maryland Action with the Instant Case.

On September 16, 2008, iStar Financial, SC, WPE, BDC, Sandler ("Defendants") filed a motion for summary judgment in the Instant Case. (ECF No. 14).  Between September 2008 – February 2009, U.S. Home ("Plaintiff") opposed the Defendants' summary judgment motion and filed its own summary judgment motion.

By Memorandum Opinion and Order issued on March 19, 2009, Judge Chasanow granted U.S. Home's motion to dismiss the First Maryland Action, finding that Sellers' complaint had failed to set forth a ripe case or controversy. (ECF No. 41, p. 3).  Judge Chasanow denied as moot the motion to consolidate the First Maryland Action and the Instant Action, and denied as

---

[2] As I set forth in the Report and Recommendations related to Defendant Steven B. Sandler ("Sandler"), between February 2008 and August 2008, U.S. Home, Sandler and the Sellers vigorously litigated the First Maryland Action.  (ECF No. 855, pp. 8-9).  iStar Financial was not a party to that action.

moot Sellers' motion for summary judgment in the First Maryland Action. (FMA, ECF Nos. 97, 98). Also in that Opinion, Judge Chasanow resolved pre-discovery cross motions for summary judgment, denying Defendants' and Plaintiff's summary judgment motions, which allowed the litigation to continue. (ECF No. 42).

On May 18, 2009, U.S. Home filed its First Amended Complaint. In brief, the First Amended Complaint added fraud claims based on the Sellers' alleged failure to disclose certain environmental conditions on the property (e.g., sewage sludge), as well as breach of environmental representations and warranties. Only Count VII related to all Defendants, including iStar Financial. In Count VII, U.S. Home sought a declaratory judgment that it was under no obligation to sell the Bevard Property based on the alleged failure of the Sellers to satisfy various conditions precedent; thus, it was entitled to the return of the $20 million deposit, as well as interest, attorney's fees, and costs. (ECF No. 52).[3]

On June 30, 2009, iStar Financial and Sandler-controlled entities WPE, Settler's Crossing, and BDC filed a joint counterclaim for declaratory relief and seeking specific performance of U.S. Home's obligations under the Purchase Agreement and Contract for Services. (ECF No. 66).

Thereafter, on September 24, 2009, iStar Financial exercised its rights under the Collateral Assignment by initiating a foreclosure action in the Circuit Court for Prince George's County. (ECF No. 649). In November 2009, the Bevard Property was sold to a limited liability company formed by iStar Financial. (*Id*.).

On December 22, 2011, iStar Financial filed a motion for leave to separately amend its counterclaim, alleging that new facts and claims had been unearthed during discovery. (ECF

---

[33] Counts I, IV, V and VI related only to WPE and Settler's Crossing. Counts II and III, related only to Defendants BDC and Sandler, respectively.

Nos. 294, 447). iStar Financial's First Amended Counterclaim had a total of six claims: three of which sought injunctive relief identical to that sought by WPE, SC, and BDC in the Joint Counterclaim; and the other three raised claims against U.S. Home for fraudulent inducement, negligent misrepresentation, and fraudulent concealment related to the consent and estoppel agreement. (*Id.*). iStar Financial was the only party to the Amended Counterclaim.[4]

## II. ADDITIONAL PROCEDURAL BACKGROUND RELEVANT TO DETERMINING REASONABLENESS OF PETITION

A. Long and Litigious Discovery Phase

March 20, 2009, represented a significant marker in the Instant Case: it was the day that Judge Connelly began presiding over what would become a lengthy, highly-contentious, discovery process that lasted approximately four years.

During a roughly four-year period, more than 500 docket entries were generated. Motions to compel documents, motion to compel depositions, motions to quash subpoenas, motions for protective orders, motions for clarifications of orders, motions to increase the number of fact witness depositions, motions to stay the proceedings, and motions to seal were just a few of the myriad of pleadings filed. There were also two evidentiary disputes related to attorney client privilege; attorney-client privilege and work product issues later became the subject of an appeal to the Fourth Circuit. All of these pleadings were fully briefed, and in some cases these motions resulted in hearings, followed by orders issued by Judge Chasanow or Judge Connelly (some of which were appealed to Judge Chasanow).[5]

---

[4] WPE, SC, and BDC remained in the litigation in the form of the Joint Counterclaim until after the 2014 bench trial in the Instant Case.

[5] To characterize the litigation as extremely contentious would be an understatement. Indeed, and unfortunately, the tone of several of the pleadings can only be described as caustic or acerbic.

Also during discovery in the Instant Case, Judge Connelly issued another order directing that U.S. Home must "commence and conclude" its inspection of the Bevard Property between June 2010 – July 2010. U.S. Home never availed itself of this second opportunity. (ECF. No. 114). Furthermore, during this protracted litigation, there were interrogatories, requests for production of documents, numerous document subpoenas (some served on third parties), depositions of more than 60 people were taken. Moreover, at one point, Judge Connelly required weekly status reports regarding discovery disputes.

During the life of the Instant Case, U.S. Home/Lennar employed seven law firms, which handled the myriad of discovery-related, and later, trial and appellate issues. In contrast, the same law firm primarily represented Defendant/Counter-Plaintiff iStar Financial. A second law firm also represented iStar Financial in connection with the appeal. What is abundantly clear is that counsel for all parties dedicated a substantial amount of time and resources to this litigation.

1. *Pre-trial Rulings*

In August 2013, U.S. Home filed a motion for summary judgment as to all breach of contract and breach of guaranty claims, the fraud and negligent misrepresentation claims, and all claims for injunctive relief. (ECF No. 558). iStar Financial opposed the summary judgment motion, and also filed a cross-motion for partial summary judgment (breach of contract, breach of environmental representations and warranties, declaratory judgment claims), and also sought injunctive relief. (ECF Nos. 575, 579, 605). Sandler, WPE, SC, and BDC also opposed U.S. Home's motion, and sought partial summary judgment on U.S. Home's fraud-related claims against them. (ECF Nos. 571 - 574).

In January 2014, Judge Chasanow issued a memorandum opinion and order on all of the post-discovery summary judgment and cross summary judgment motions that were filed. (ECF

Nos. 624, 625). Judge Chasanow entered judgment in favor of U.S. Home against iStar Financial as to the fraud and negligent misrepresentation claims in iStar Financial's Amended Counterclaim. (*Id*.). With respect to Sandler, Judge Chasanow denied its cross motion for summary judgment, and denied U.S. Home's summary judgment motion. Regarding WPE, SC, and BDC, Judge Chasanow entered judgment in their favor against U.S. Home as to the fraud claims advanced in U.S. Home's First Amended Complaint.

Following Judge Chasanow's rulings, then, two issues remained for trial, namely: (a) whether Sellers breached the environmental representations and warranties provision in the Purchase Agreement; and (b) whether Sellers breached the Purchase Agreement by denying U.S. Home's request for access to the Bevard Property. (ECF No. 707, p.32). If Sellers were in breach under either of these two theories, then U.S. Home would be entitled to the return of its deposits. If Sellers were not in breach under either of these two theories, then iStar Financial could have been entitled to specific performance – sale of the Property (depending on the outcome of some zoning issues). (*Id*.). [6]

### 2. Bench Trial and Post- Trial Litigation

From March 31, 2014 – April 15, 2014, Judge Chasanow conducted a bench trial in the Instant Case. The evidence adduced at trial included more than 100 exhibits and testimony by environmental experts called by both parties. (ECF Nos. 675-692). Regarding Sellers' environmental representations, Judge Chasanow found "highly credible" the testimony of iStar Financial's four scientific expert witnesses. (ECF No. 707, p. 52). [7] Judge Chasanow also found the testimony of U.S. Home's experts non-persuasive, and in the case of one expert, she found

---

[6] WPE, SC, and BDC remained in the litigation in the form of the Joint Counterclaim until after the 2014 bench trial in the Instant Case, when Judge Chasanow issued her memorandum opinion containing her findings of fact and conclusions of law. (ECF Nos. 707, 708).

[7] ECF No. 707 is Judge Chasanow's memorandum opinion chronicling her findings of fact and conclusions of law after the two-week bench trial in this case.

the expert to be not credible. (*Id.*, p. 49). Judge Chasanow held that U.S. Home failed to demonstrate, *inter alia*, that the source of the hazardous materials "was something other than what was disclosed in the environmental reports provided by seller." (*Id.,* p. 61). Furthermore, Judge Chasanow held that Sellers' denial of property access to U.S. Home did not constitute a breach of the contract for a myriad of reasons. (ECF No.707, pp. 65-73). For instance, Judge Chasanow found that U.S. Home acted in bad faith in its access request; it was merely a tactic to delay purchasing the property, which made Sellers' denial of that request reasonable, and Sellers had not breached its obligations under the Purchase Agreement:

> The evidence demonstrated that, by at least October 1, 2007, Purchaser viewed the Bevard transaction as a financial albatross and actively sought to relieve itself of this burden. . . . When Purchaser was unable to find a joint venture partner. . .to assume its contractual obligations, it retained a 'team of high priced lawyers and consultants' to search for an "escape clause" in the Purchase Agreement. . . . The evidence shows that the purpose of Purchaser's request for access was to delay closing while it settled on a strategy to avoid its obligations under the Bevard contracts. This conclusion is supported by the fact that Purchaser later rejected Seller's offer of compromise as to the access issue and that, after gaining a right of access to the Property through the court, Purchaser never exercised that right. . . Purchaser was  determined to 'terminate [the] contract and get [its] deposit back via legal action.'

(ECF No. 707, pp. 71-73).

Judge Chasanow found that iStar Financial was entitled to relief under the Purchase Agreement because of U.S. Home's default because it "[stood] in the shoes of [Sellers]." (ECF No. 707, pp. 73-74). The Second Amendment to the Purchase Agreement required specific performance in the form of proceeding to settlement with the purchase price to be paid to iStar Financial. (*Id.*).

Regarding the Joint Counterclaim, Judge Chasanow dismissed it as moot, ruling that the November 2009 foreclosure sale meant that the Sellers no longer had an interest in the Bevard property. (ECF Nos. 707, p.31; 708).

Before judgment could be entered in favor of iStar Financial on Counts I-III of its amended counterclaim, and before the amount of damages could be quantified, issues related to 2013 zoning regulations and their potential impact on the Bevard Property had to be resolved, which required additional briefing. (ECF No. 730, pp. 2-3). iStar Financial and U.S. Home submitted post-trial briefs, and following a November 2014 hearing, Judge Chasanow issued another comprehensive memorandum opinion and order. (ECF Nos. 730, 731). Ultimately, Judge Chasanow entered judgment in favor of iStar Financial and Sandler against U.S. Home on Counts I-III of its First Amended Complaint. She directed U.S. Home to proceed to settlement within 30 days. Judge Chasanow further held that iStar Financial should be awarded $114 million, plus interest, at the rate of 12% per year, calculated on a per diem basis, from May 27, 2008, until U.S. Home proceeded to Settlement. (ECF Nos. 730, p. 45; 731).

### 3. Appeal

U.S. Home did not proceed to settlement, instead, it noted its appeal in this case on February 4, 2015, identifying iStar Financial, Sandler, and the Sellers as parties. (ECF No. 734).[8] On March 12, 2015, the Fourth Circuit remanded the case back to Judge Chasanow for clarification of her findings related to the judgment entered. (ECF No. 746). On June 29, 2015, Judge Chasanow issued an order clarifying the judgment, and thereafter, Lennar filed an amended notice of appeal. (ECF Nos. 756, 770, respectively). Oral argument was initially scheduled for October 26, 2016, but was rescheduled and later occurred on March 23, 2017.

By an unpublished, per curiam opinion, the Fourth Circuit affirmed the district court's judgment in favor of iStar Financial. (ECF No. 778). Thereafter, U.S. Home filed a petition for rehearing and rehearing en banc, which was denied. U.S. Home's petition for writ of certiorari was denied on December 4, 2017. (ECF Nos. 780, 794).

---

[8] U.S. Home also filed post-judgment motions. (*See, e.g.,* ECF Nos. 732, 733).

The ultimate outcome of this litigation was that U.S. Home owed iStar Financial more than $235 million.

## III.    DISCUSSION

### A.    The Operative Contractual Provision Related to Attorney's Fees, Costs & Expenses

Paragraph 18(K) of the Purchase & Sale Agreement provides that:

> In the event of any litigation arising under or pursuant to this agreement or the transaction contemplated hereby, the parties hereby agree that such matter shall be heard by a judge and not by a jury, and that the prevailing party in such matter shall be entitled to recover from the non-prevailing party such party's costs, fees, and expenses incurred in such litigation, including actual and reasonable attorney's fees and court costs. Each party hereby waives its rights to a jury trial.

Joint Trial Exhibit 59.  (ECF No. 691).

### B.    Legal Standards- Contract Provision

While a contract provision providing for the award of attorney's fees to the prevailing party is valid and enforceable in Maryland, courts must examine fee award requests for "reasonableness." *Myers v. Kahoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006); *see also SunTrust Bank v. Goldman*, 201 Md. App. 390, 401, 29 A.3d 724, 730 (2011) ("Current law allows a court to grant only those attorney's fees it finds reasonable."); *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010).

When calculating fee awards under contractual fee-shifting provisions, courts "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8. MRPC 1.5(a) identifies eight factors for a court to consider:

1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

3) the fee customarily charged in the locality for similar legal services;

4) the amount involved and the results obtained;

5) the time limitations imposed by the client or by the circumstances;

6) the nature and length of the professional relationship with the client;

7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

8) whether the fee is fixed or contingent.

A court does not need to evaluate each factor separately, nor does it need to "make explicit findings with respect to Rule 1.5," as long as the court "utilizes the rule as its guiding principle" for deciding reasonableness. *Monmouth Meadows*, 416 Md. at 340 n.13, 7 A.3d at 10 n. 13. In addition, a court may consider any other factor "reasonably related to a fair award of attorney's fees." *Id.* at 337-38.

Determination of the facts supporting reasonableness lies within the sound discretion of the court. *Myers*, 391 Md. At 207, 892 A.2d at 532. I do not believe that I am required to do a full accounting of each and every fee or expense generated. To do this would turn the fee and costs request into a mini trial. I believe that a court should try to reach a practical and reasonable result.

C.  iStar Financial's Petition for Attorney's Fees, Costs & Expenses

*1.    Procedural History*

iStar Financial timely e-filed filed its motion for attorney's fees, costs, and expenses. (ECF Nos. 736, 787). iStar Financial's motion referenced Exhibits B & C related to the declaration of one of its counsel, which were summaries of billing entries and of expenses. (ECF No. 787-1). The motion also referenced other exhibits, which were a summary chart of billing

entries for appellate work performed by one of its law firms, and a declaration with information about some of the law firm's client billing practices and procedures. (ECF Nos. 787, p. 11; 787-2). iStar Financial's counsel represented that all of the aforementioned documents were to be filed under seal within 24 hours after the motion was filed, "in an abundance of caution to preserve privilege, as Lennar has sought to pierce privilege multiple times during this action." (ECF No. 787, p.6 n4). As part of its Reply to U.S. Home's opposition, iStar Financial supplemented its original petition, seeking additional fees and again referencing exhibits to be filed under seal. (ECF No. 793, p.2 n.1). Approximately six months later, iStar Financial supplemented its original petition with additional declarations from its counsel, which referred to supplemental exhibits that counsel claimed would be filed under seal within 24 hours. (ECF Nos. 796-1, 796-2). The supplements were time entry billing records from two law firms. iStar Financial's counsel stated that the documents were "being filed for *in camera* review for the same privilege reasons discussed in the Memo and Reply." (ECF No. 796-1 at 2).

Despite representing that all of the abovementioned exhibits would be filed under seal, iStar Financial's counsel neither moved to seal the records, nor did it e-file them at that time. Instead, iStar Financial reportedly provided the exhibits only to Judge Connelly for his *in camera* review and refused to provide them to counsel for U.S. Home. iStar Financial followed practices that had arisen during prior attorney fee award requests made by it and U.S. Home in the Instant Case, namely: not filing a motion to seal the billing records, not providing the records to opposing counsel, and providing a paper copy of said records to the Clerk's Office for delivery to Judge Connelly. (ECF Nos. 131, 139, 154-156, 583, 597, 609). In those prior instances, petitioning counsel asserted concerns regarding safeguarding the attorney-client privilege as the basis for this conduct. The prior fee requests sought, relatively speaking, smaller monetary

awards than the instant fee petition. Judge Connelly conducted *in camera* review of the billing records in the earlier petitions, and reduced the amounts sought. (ECF Nos. 141, 169, 706).[9]

Even though U.S. Home had engaged in identical conduct for its earlier fee petition, it raised due process concerns about being able to meaningfully challenge iStar Financial's request without the billing records. (ECF No. 790).[10] In April 2018, I held a hearing on this issue, during which iStar Financial generally claimed attorney-client privilege concerns related to the records (ECF No. 822). By order dated June 22, 2018, I found that U.S. Home needed the billing records to able to meaningfully challenge the reasonableness of the petitions. (ECF No. 802). I also found that because counsel had been permitted to submit documents *in camera* for prior fee petitions, without filing a motion to seal, fairness dictated that I not penalize the parties for following this procedure for the current fee petitions. (*Id.).* Furthermore, I directed iStar Financial's counsel to e-file the redacted billing records and to file a privilege log related to the redactions.[11] Despite its April 2018 claims of wanting to safeguard privilege, iStar Financial never redacted documents, nor did it file a privilege log.[12]

---

[9] Judge Connelly previously awarded iStar Financial attorney's fees in connection with motions for sanctions filed. (ECF No. 706). U.S. Home objected to Judge Connelly's findings, principally because it did not have the benefit of viewing the time entry/billing documents that had been submitted for *in camera* review. (ECF No. 711). I reviewed the docket sheet and I do not see a resolution of this issue. iStar Financial has included, as a part of the instant fee petition, the total amount of fees sought previously. U.S. Home has now had an opportunity to review and object to the previously-withheld billing records in responding to iStar Financial's current fee petition. I find the award of attorney's fees to iStar Financial appropriate; however, I recommend that you reduce the amount as set forth below. I note that I award a requested hourly rate for some attorneys that is higher than what Judge Connelly recommended in ECF No. 706. I also note that there is no double counting. (ECF No. 785, p.6 n.5).

[10] U.S. Home also advanced additional objections to the fee and costs award requests, which are set forth below in Section III. D.

[11] Instead, iStar Financial dropped of a binder of materials to the Clerk of the Court without filing the materials under seal. (ECF No. 819). Following an additional order, iStar Financial properly filed the exhibits. (ECF Nos. 810-816, 818).

[12] I believe that iStar Financial had thus waived any claim of attorney-client privilege related to the records, so I did not review them with an eye toward determining and protecting from disclosure the records filed under seal. Nonetheless, I ultimately granted iStar Financial's motion to seal exhibits because they contain sensitive fee information. (ECF Nos. 839, 839, 854).

Subsequently, iStar Financial and U.S. Home were granted leave to file supplemental briefing related to the attorney's fees, costs, and expenses sought by iStar Financial. (ECF Nos. 836, 847, 849, 852, 853).

2. *The Evidence Supporting the Petition*

One law firm represented iStar Financial during most of the Instant Case: attorneys from the D.C. office of Katten Muchin Rosenman, LLP ("Katten"). For the appeal, attorneys from the law firm of Sidley Austin, LLP ("Sidley") also represented iStar Financial. Citing to Paragraph 18(K) of the PSA, counsel for iStar Financial seeks $16,048,353.84[13] in legal fees, and $1,209,714.68 in costs and expenses. (ECF Nos. 787,793,796).

a. The Fee Request

The fee request is broken down by litigation phases, as required by the Local Rules. *See* ¶1.b.i, L. R. App. B: Rules and Guidelines for Determining Attorneys' Fees in Certain Cases ("*the Guidelines*"). The fee request is spread out amongst three pleadings: ECF Nos. 787, 793, and 796, and their respective attachments. The hours of work and corresponding amounts sought are:

**ECF NO. 787: July 21, 2008 through July 14, 2017 (KATTEN MUCHIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Phase I: Case Development, Background Investigation and Case Administration | 5981.20 | $2,226,392.40 |
| Phase II: Pleadings | 626.70 | $243,072.00 |
| Phase III: Interrogatories, Document Production and Other Written Discovery | 8894.10 | $3,085,236.72 |
| Phase IV: Depositions (Including Time Spent Preparing for Depositions) | 8471.00 | $2,901,169.80 |

---

[13] iStar Financial says that the total amount of attorneys' fees sought is $17,258,068.02, (ECF Nos. 787, p.18; 793, p.2 n.1; 796, p.2), while U.S. Home says that the total amount is $16,048,353.39. (ECF No. 840, p.8). I am using my figure as reflected in the charts herein.

| | | |
|---|---|---|
| Phase V: Motions Practice | 8113.00 | $3,232,201.50 |
| Phase VI: Attending Court Hearings | 132.10 | $38,676.60 |
| Phase VII: Trial Preparation and Post-Trial Motions | 6899.50 | $2,434,321.80 |
| Phase VIII: Attending Trial | 335.30 | $137,965.05 |
| Phase IX: ADR | 28.60 | $20,022.30 |
| Phase X:  Appeal | 439.80 | $220,257.00 |
| Phase XI:  Fee Petition Preparation | 1026.90 | $340,912.65 |
| **TOTAL** | 40,948.20 | $14,880,227.82 |

**ECF NO. 793: July 14, 2017 through October 1, 2017 (KATTEN MUCHIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Reply Motion | 85.0 | $34,573.56 |
| Phase X: Appeal | 9.5 | $6,894.01 |
| **TOTAL** | 94.5 | $41,467.57 |

**ECF NO. 796: October 1, 2017 through January 1, 2018 (KATTEN MUCHIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Supplemental Motion | 18.70 | $9,013.50 |
| Phase X: Appeal | 4.6 | $3,436.20 |
| **TOTAL** | 23.3 | $12,449.70 |

**ECF NO. 787: March 9, 2015 through May 31, 2017 (SIDLEY AUSTIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Phase X: Appeal | 1,136.75 | $1,023,221.25 |

**ECF NO. 793: June 29, 2017 through September 29, 2017 (SIDLEY AUSTIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Phase X: Appeal | 71.5 | $56,257.50 |

**ECF NO. 796: October 2, 2017 through November 9, 2017 (SIDLEY AUSTIN)**

| Litigation Phase | Billed Hours | Fees Requested |
|---|---|---|
| Phase X: Appeal | 60.0 | $34,730.00 |

| TOTAL (FROM ALL 3 PETITIONS) | 1,268.25  HOURS | $1,114,208.75 |
|---|---|---|

The fee request is supported by exhibits, including: non-redacted time entry/billing records for the Washington, D.C.-based and Chicago-based professionals who worked on this case (ECF Nos. 811, 813-816, 818);   declarations from the Washington, D.C.-based and Chicago-based Katten Muchin and Sidley professionals (ECF Nos. 787-1, 787-2, 812); and charts setting forth the experience level of each attorney who recorded time on this case—the charts do not show the years' experience for the numerous non-attorney professionals who worked on this case. (ECF Nos. 787-1, 787-2).  The billing records provide detailed descriptions of the work performed by professionals at both law firms.

The records reflect that at least 62 Katten attorneys worked on this matter at different points during the nine-year period: at least 18 of which were partners; at least 38 of which were associates; at least four of which were staff attorneys; and at least two of which were summer associates. (ECF No. 787-1, pp.5-6).  Thirteen paralegals, three reference librarians, and other support staff also worked on this matter at different times. (ECF No. 787-1, p.7).

Eric Kuwana and John Rosans were the primary partner and associate-then-partner, respectively, responsible for the matter.  During this case, Mr. Kuwana had between 17-26 years

of legal experience, and Mr. Rosans had between 8-16 years of legal experience. (ECF Nos. 787-1). Neither attorneys' requested hourly rate ever fell within §3 of the Guidelines, commensurate with their experience; indeed, they always exceeded the highest acceptable rate. (*Id.*).[14] According to iStar Financial's counsel, one or two associates and a paralegal also formed part of the "core team" working on this matter. (ECF No. 787, p.5). The remaining Katten partners, associates, paralegals, and other staff worked during various phases or on discrete projects. (ECF Nos. 787, p. 5; 787-1). I do not think that any of the attorneys' requested hourly rates fell within the parameters of the Guidelines, except for one staff attorney. (ECF No. 787-1, p.6).

Nine Sidley attorneys worked on the appeal: seven partners, one counsel, and one associate. Three legal assistants, one senior paralegal, and one project assistant also worked on the appeal. (ECF No. 787-2, p.4). Peter Keisler, a partner, was the lead appellate attorney for Sidley. Mr. Keisler had more than 30 years of legal experience, including clerkships with the U.S. Supreme Court and D.C. Circuit. (ECF Nos. 787, p.12; 787-2, p.4). Mr. Keisler's requested hourly rate never fell within the Guidelines; indeed, it exceeded the high end of the Guidelines by more than 2.5 times. (ECF No. 787-2, p.4). None of the requested hourly rates for the remaining eight attorneys ever fell within the Guidelines. (*Id.*). For the legal assistants and paralegal, the requested hourly rates exceeded the top end of the applicable Guidelines by 1 to 2.5 times. (ECF No. 787-2, p. 4).

As set forth more fully below, several Katten professionals worked on the appeal at the same time that Sidley professionals worked on the appeal.

---

[14] Using the 2016 Guidelines rates (the relevant market) rather than the historic ones applicable for part of the litigation, I find that the hourly rates for lawyers with Mr. Kuwana's experience level would be $425.00/hour or $475.00/hour, at the **high end**. For Mr. Rosans, the hourly rates at the high end would be $350.00/hour or $425.00/hour.

### b. The Costs/Expenses Request

The request for costs and expenses seeks reimbursement for many items, including: court costs, witness fees, legal research, telephone, transcript and deposition costs and exemplification. The request also includes $656,002.12 in expert witness fees. (ECF No. 787, pp. 15-16). iStar Financial supports its request with costs and expenses detail reports. (ECF No. 810).

U.S. Home only objects to the expert witness fee reimbursement request, which I discuss below. *See* Section III.D., *infra*.[15]  Regarding the other costs and expenses sought, I have reviewed iStar Financial's supporting materials and make the following findings. First, that U.S. Home does not object to iStar Financial's costs request. As I set forth more fully below, I do find an inconsistency in U.S. Home's objecting to expert witness fees but not objecting to one cost that is not specifically provided for in the contract (nor for that matter by the Guidelines or by 28 U.S.C. §§ 1821, 1920 or Fed.R.Civ.P. 54(d)). Second, Paragraph 18(K) provides for the award of "costs, fees, and expenses." Third, iStar Financial has demonstrated that these costs were actually incurred in connection with the Instant Case. (ECF Nos. 787-1, 810). Fourth, these out-of-pocket expenses appear to be reasonable in light of the MRPC 1.5(a) factors, the Guidelines (*See* §4), and 28 U.S.C. §§ 1821, 1920. Fifth, I find that the costs relate to expenses typically incurred in preparing this case for litigation (e.g., copying, legal research, filing fees, transcripts), *compare Berkley Trace, LLC v. Food Lion, LLC,* Civ. No. RDB-11-3207, 2013 WL 5718867, at *10 (D.Md. Oct. 18, 2013) and *Niagara Transformer Corp. v. Baldwin Technologies, Inc.*, Civ. No. DKC-11-3415, 2013 WL 4442042, at *4 (D.Md. Aug. 15, 2013) (citations omitted). Accordingly, I recommend that you award **$553,712.56** in requested costs.

---

[15] Initially, U.S. Home also objected to iStar Financial's claims of taxable costs on appeal, which iStar Financial denied claiming. (ECF Nos. 790, p. 34; 793, p. 19). U.S. Home abandoned this argument in subsequent pleadings, (ECF Nos. 840, 853), and I could not readily identify any such costs in the materials submitted by iStar Financial. (ECF No. 810).

3.    *General Arguments in Support of the Attorney's Fees*

iStar Financial advances several arguments in support of its position that the attorneys' fees sought are reasonable. Its arguments primarily rely on the first, third, and fourth of the MRPC 1.5(a) factors.  First, iStar Financial avers that this was a complex, "expert heavy" case in which U.S. Home engaged in bad faith in pursuing discovery. Second, iStar Financial asserts that the fee request is reasonable because it only amounts to "7% of what it recovered in this action." Third, iStar Financial contends that the hourly rates in Washington, D.C. and Chicago are the relevant market rates. Fourth, iStar Financial represents that in all instances where multiple attorneys participated at a hearing or deposition, it has reviewed the entries and "struck any duplicative time," and that where "a junior attorney assisted a partner, the junior attorney's time was billed at a paralegal rate." (ECF No. 787, pp. 8-14).[16]

D.  U.S. Home's Responses to iStar Financial's Motion

U.S. Home does not dispute its obligation to pay iStar Financial reasonable attorneys' fees, costs, and expenses. It complains that the amounts sought by iStar Financial are patently unreasonable.

---

[16] In March 2015, iStar Financial subpoenaed the seven law firms that have represented U.S. Home during the Instant Action, claiming that the non-prevailing party's records are relevant to its burden to establish the reasonableness of its attorney fee request. (ECF Nos. 752, 757). The seven law firms moved to quash the subpoenas, alleging that they sought privilege information, were overbroad, irrelevant, and would pose an undue burden to comply with them. (*Id.*). By order dated September 10, 2015, Judge Connelly granted the motions to quash, finding them premature. (ECF No. 774).  His order allowed iStar financial to re-serve the law firms in the future if Judge Chasanow's judgment against U.S. Home/Lennar was affirmed on appeal. (*Id.*). In July 2018, iStar Financial again served subpoenas upon U.S. Home's law firms, which the firms moved to quash in U.S. District Court in the District of Columbia. That case was transferred to the District of Maryland in August 2018. Civ. No. PX18-2428. On August 21, 2018, I issued a paperless order suspending briefing in that case.  (*Id.,* ECF No. 13).  I do not believe that the Guidelines and relevant case law entitle iStar Financial to these records so that it can use them to establish their relevance to its petition for attorney's fee.  I have so previously ordered because, exercising my discretion, I rely upon, *e.g., Marks Constr. Co. v. Huntington Nat'l Bank,* Civ. No. 1:05-cv-73, 2010 WL 1836785, at *4 (N.D. W. Va. 2010) (citation omitted). (*See, e.g.,* ECF Nos. 836, 845).

1.    *Expert Witness Fees*

Regarding costs, fees, and expenses, U.S. Home made only one objection, namely that iStar Financial improperly sought expert witness fees. Specifically, U.S Home argues that Maryland law requires that attorney's fee provisions in contracts must be strictly construed "to avoid inferring duties that the parties did not intend to create." (ECF No. 790, pp.33-34). U.S. Home cites to several cases in support of its argument, including *Bainbridge St. Elmo Bethesda Apartments, LLC v. White Flint Express Realty Grp. Ltd. P'ship, LLLP*, 454 Md. 475, 487-90, 164 A.3d 978, 985-87 (2017), and *Berkley Trace*, *supra*. iStar Financial counters that: (1) "the plain language [of Paragraph 18(K)] provides, in the same sentence, for both 'fees' and 'attorneys' fees' to be awarded" (ECF No. 793, p. 19); (2) Maryland law recognizes that a prevailing party entitled to attorney's fees is also entitled to expenses "reasonably incurred in preparation of [its] case" (ECF No. 787, pp. 16-17); and (3) the expert witness testimony was "crucial" or "indispensable" to the case. (*Id.*). iStar Financial relies upon *Gionfroddo v. Jason Zinc, LLC,* Case No. RDB09-1733, 2013 WL 1222350, at *8 and *In re: Mid-Atl. Toyota Antitrust Litig.*, 605 F.Supp. 440, 448 (D.Md. 1984).

I have reviewed iStar Financial's documentation in support of the expert witness fees requested as well as the relevant caselaw and I make the following findings. First, the contract says "such party's costs, fees, and expenses incurred in such litigation, **including** attorney's fees. . . ." Thus, I can understand the view that the contract allows for fees, including attorney's fees, with the latter being a subset of the type of fees allowed and "including attorney's fees" to suggest a non-exhaustive list of fees, because of the word "including." Second, U.S. Home argues for strict construction of Paragraph 18(K), and only objects to the item that is the most expensive of the fees and costs sought: expert witness fees. It does not object to a less expensive

item sought, e.g., e-discovery costs, which are also not explicitly identified in the plain language of the contract. Third, however, despite my views on the English language, I do believe that the law in Maryland is clear that absent explicit contractual authority—or statutory authority—expert witness fees are not recoverable. *Bainbridge*, *supra,* at\*6-7 (express language required, otherwise the "American Rule" that all parties must bear their own costs would be meaningless); *Berkley Trace*, *supra*, at \*12-13 (while a prevailing party is entitled to expenses "reasonably incurred in preparation of [its] case," the absence of "explicit contractual or statutory authority" makes expert witness fees non-recoverable). Fourth, *In re: Mid-Atl. Toyota*, *supra*, is not inconsistent with the law, as that case involved an explicit statute that allowed for fee-shifting versus our scenario here. Fifth, I do recognize that the experts' testimony was crucial to this case. Indeed, Judge Chasanow found "highly credible" the testimony of iStar Financial's four expert witnesses. (ECF No. 707, p.52). Ultimately, then, while I do not recommend that you impose the $656,002.12 sought because it is not consistent with the explicit language of the contract, I do believe that an award of expert witness fees for each day that the experts appeared at trial are appropriate. *See* 28 U.S.C. §§ 1821(b), 1920(3); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987). However, because iStar Financial has "block billed" these expert fees, *see* ECF No. 810, pp. 14-16, I cannot discern which part of the fees are related to trial attendance. I did see two entries that relate to deposition attendance, however, they are not explicit enough to tell me, e.g., whether deposition was just one day. I recommend that you award no expert witness fees. *Compare Berkley Trace*, *supra*, at \*10 n. 14.

2.    *Summary of Arguments Related to Reductions Sought for Attorneys' Fees*

U.S. Home advances several arguments in support of a reduction in the amount of attorney's fees sought. First, that because iStar Financial's attorneys' billable hour rates

exceeded the Guidelines, a reduction is warranted. Second, that the attorneys billed "excessive hours" throughout the litigation. Third, that iStar Financial seeks reimbursement for fees for non-compensable work. Fourth, that an overall reduction is appropriate due to "improper block billing." (ECF Nos. 790, 840, 853).

I analyzed the parties' arguments by considering the MRPC 1.5(a) factors, including relating to the time and labor required, the novelty and difficulty of the various issues in this case, the facts at issue and corresponding results obtained, and the fee customarily charged in Maryland. I also assessed what was reasonable, given the nature of this protracted litigation.

As a preliminary matter, iStar Financial's counsel claims that I can infer reasonableness about the attorney fee amount sought because they gave their client a 10% discount of the firm's customary rates. (ECF No. 787-1, p.2). Although, this business practice clearly benefitted the client, I did not consider it when determining the reasonableness of the petition, because I do not think that a reasonable award of attorneys' fees includes amounts that client could have been charged; it should only relate to fees actually paid by the client. I also found unpersuasive iStar Financial's argument that its counsel's write-off of approximately $213,000 for fees that it was "forced to incur" related to "ancillary matters." (ECF No. 787, pp. 5, 13-14). This "discount" did not persuade me as being reasonable because, as set forth more fully below, I do not find it appropriate to recover for time spent on separate lawsuits because the language of Paragraph 18(K) of the contract is to be construed literally; and these collateral matters were not clearly a necessary step to iStar Financial's victory.

### 3. Hourly Rates

In brief, U.S. Home complains about the hourly billing rate charged by the attorneys and other professionals at both law firms.

In the Fourth Circuit, an analysis of the fee "customarily charged in the locality for similar legal services" requires a court to consider the "community in which the court sits [as] the first place [to evaluate] prevailing market rate." *Thompson v. U.S. Dep't of Hous. & Urban Dev.,* Civ. No. MGJ-95-309, 2002 WL 31777631, at *12 (D.Md. Nov. 21, 2002) (*quoting Montcalm. Pub. Corp. v. Commonwealth of Va.,* 199 F.3d 168, 173 (4th Cir. 1999)). It is well established that the hourly rates charged by attorneys from Washington, D.C. do not serve as a "reliable indicator of the hourly rates of litigation attorneys" in the suburbs of Washington, D.C. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009) (internal quotation marks omitted). Thus, I recommend that you find the relevant market is Maryland, where this court sits, and not another location. *See Costar Grp., Inc. v. Loopnet, Inc.,* 106 F.Supp.2d 780, 788-90 (D.Md. 2000).

Because counsel for iStar Financial contends only that counsel's rates are typical of those charged in Washington, D.C. and Chicago, their declarations are not a reliable indicator of the rates charged by litigation attorneys in the District of Maryland. *Costar*, *supra*, at 788 (usually evidence of rates is captured in affidavits from local Maryland lawyers familiar with "skills of the fee applicants and more generally the type of work in the relevant community."). In this district, that knowledge of the prevailing market rate "is embedded within [the Guidelines]." *Manning v. Mercatanti*, Civ. Nos. ELH-11-2964, ELH-12-0195, 2014 WL 1418322, at *5 (D.Md. Apr. 10, 20140) (*quoting Gonzales v. Caron*, Civ. No. CBD-10-2188, 2011 WL 3886979, at *2 (D.Md. Sept. 2, 2011)). The Guidelines, although not binding, presumptively set forth ranges of reasonable hourly rates based on an attorney's years of experience. *Gonzales*, 2011 WL 3886979, at *2.

Moreover, even though the fees sought for 2008-2015 are based on numbers at least somewhat linked to the current hourly Guidelines rates rather than the historic ones, I find it appropriate to use the current Guidelines. *See Hyland v. Xerox Corp.*, Civ. No. PJM-03-116, 2011 WL 806419, at *6-7 (D.Md. Feb. 4, 2014) (in cases involving lengthy litigation that results in delay of payment, a court has discretion to sue historic rates plus interest or to use the current rate).

I reviewed the time billing entries for services provided by Katten and Sidley. (ECF Nos. 811, 818). As stated previously in Section III.C.2., for the Katten attorneys and professionals, I did not find that their hourly rates ever fell within the Guidelines, except for a few exceptions (ex: a staff attorney and at least one paralegal). By way of example, Mr. Kuwana's hourly billing rate for every year that he worked on this case exceeded the upper end of the Guidelines applicable to his level of experience in an amount ranging from $55.00/hour to more than $300.00/hour. (ECF No. 787-1). For Mr. Rosans, his hourly billing rate for every year that he worked on the Instant Case exceed the high end of the Guidelines in amount ranging from $28.00/hour to more than $175.00/hour. (*Id*.). For Mr. Keisler, his requested hourly billing rate was at least 2.5 times higher than the high end of the applicable Guidelines range. (ECF No. 787-2).

Given the convoluted and protracted nature of the litigation, the novelty of some of the issues, the outcome, and the relevant legal market rates, *see* MRPC 1.5(a)(1), (a)(3), (a)(4), I do find that it would be reasonable for some upward adjustments so that the professionals on this matter can receive a requested hourly rate **above** the applicable Guidelines. I believe that the following adjustments are reasonable. First, for Messrs. Kuwana and Rosans, key attorneys on this case, an additional adjustment for the years 2014 – 2017 so that their rates equal

$650.00/hour and $600.00/hour, respectively. Second, for Mr. Keisler, an additional adjustment for the years 2015 – 2017 so that his rate equals $800.00/hour. Regarding these adjustments, I note that for Mr. Kuwana his adjusted rate for the years 2014 – 2017 would be between $16.00/hour to more than $150.00/hour higher than the Guidelines and what Katten seeks. For Mr. Keisler, the adjusted rate would still be more than $300.00/higher than the Guidelines and what Sidley seeks. U.S. Home had suggested as one possibility a rate at the **high end** of the applicable Guidelines range for **all** of the professionals on this case. I believe that these aforementioned adjustments are appropriate. Because the hourly rates of all the Katten and Sidley professionals consistently exceeded the Guidelines, for nine years and two years, respectively, an overall downward adjustment is needed. I propose that **$4 million** be deducted, which is roughly a **25%** reduction of the total fees sought. Thus, the total, without further reductions, is **$12,048,353.84**.

4. *Excessive Hours*

U.S. Home contends that iStar Financial has engaged in a "pattern of excessive, duplicative billing across multiple phases of this litigation," which warrants an "across-the-board" reduction. (ECF No. 840, pp. 10-11). I note that U.S. Home does not cite to specific examples of this alleged pattern in **all** of the phases of the litigation. However, it does point specifically to excessive hours billed for written discovery, depositions, appeal, and fee petition preparation. (ECF No. 840, pp. 11-17).

a. Discovery: Depositions

U.S. Home objects to the 8,471 hours of deposition time for what it says are approximately 70 depositions. U.S. Home asserts that mathematically that would amount to approximately 120 hours to prepare for and attend each deposition. U.S. Home further states that

this number does not consider the time iStar Financial billed separately for document review, which was captured as part of the 8,894.10 hours claimed as part of Phase III. (ECF No. 840, pp. 13-15). iStar Financial responds by saying that it billed fewer than 120 hours preparing for/taking each deposition, and that it has included sufficient documentation that shows that time was spent on strategizing, reviewing materials, and summarizing depositions for trial. (ECF No. 848, p. 9).

iStar Financial seeks reimbursement for approximately $2.9 million for this kind of work. I have reviewed a significant sampling of records related to Phase IV, looking at entries for the years 2009, 2010, and 2013, and also a sampling of records from Phase III. (ECF No. 818, pp. 282-320; 423-448; 451-460, 501-579). It is difficult to say how much time is needed to prepare for a particular deposition; it is reasonable to infer that some depositions require more preparation than others, given the subject matter. What my review showed was that Katten did have multiple conferences or strategic discussions amongst attorneys or it had two partners prepare for and/or attending more than one deposition, without a reduction in the rate of one attorney's fee/hour. (*Id*.). While the Guidelines do allow for multiple attorney participation in these ways, *see* §2.d., it is only if such conferences are "reasonably necessary," or if, where two attorneys attend a deposition and there is a reduction in fees. Because that did not occur here, I do find that some reduction is warranted. I also find that the billing records do not help me to fully understand the differences in the type of work that more than one attorney contributed, which could mean that there was duplication of effort. *Compare Hudson v. Pittsylvania Cty.,* Civ. No 4:11CV00043, 2013 WL 4520023, at *6 (W.D. Va. Aug. 26, 2013) ("Awards for time expended by two or more counsel are proper, provided they reflect the distinct contribution of each lawyer to the case."); *Goodwin v. Metts*, 973 F.2d 378, 384 (4th Cir. 1992) (four attorneys

amounted to "overstaffing" where court found that two attorneys could have completed the work). This further reduction is incorporated into the overall reduction that I recommend below.

> b. Discovery: Phase III

U.S. Home objects to the 8,894.10 hours expended on written discovery, claiming that the amount of staffing is "atypical and unreasonable," and that three "high-priced partners [Kuwana, Rosans, and Wood]" billed nearly 50% of the total hours and over 60 percent of the total fees. (ECF No. 840, pp. 12-13). iStar Financial responds by arguing that the amount sought is spread out over five years, up until and including the time just before trial. (ECF No. 848, pp.8-9).

iStar Financial seeks reimbursement for approximately $3 million for this kind of work. I have reviewed a significant sampling of records related to Phase III, and also Phase VII, the trial preparation phase. (ECF No. 818, pp. 250-450; 873-894). I did find that Wood, Kuwana and Rosans, more senior attorneys, did spend a significant amount of time in this phase, in addition to time spent by junior attorneys and multiple paralegals. I also find that the billing records do not help me to understand why three partners were required to do the kind of document review that occurred here. Thus, a further reduction is warranted. This reduction is incorporated into the overall reduction that I recommend below.

> c. Appeal

U.S. Home asserts that iStar Financial's counsel billed excessively for appeal; it cites to an "unwarranted" number of hours spent preparing for appeal both times, and also notes that the rates of the attorneys are too high. (ECF No. 840, p.15).

I have reviewed all of the records from both firms related to the appeal: ECF Nos. 811; 813-816; 818, pp. 932-943. I find that the billing/time entries fail to establish that the full award

sought is appropriate and reasonable.  In addition to the requested fee amount/hour greatly exceeding the applicable Guidelines range, *see* Section III. D.3., *supra*, I find that at least **nine** Sidley attorneys worked on the appeal, and at least **five** Katten attorneys worked on the appeal during overlapping times. The billing records do not clearly reflect how the work was divided between the two firms, nor do the records explain why both firms were necessary.  Furthermore, the billing records do not demonstrate what is unique about the services each of these attorneys provided to justify the number.  Although, I am not troubled by the fact that two rounds of preparation were required in 2016 and again in 2017.  I do wonder about the number of hours expended to prepare for the argument, given the level of experience of the primary Sidley attorney.  It is not clear why so many Sidley and Katten attorneys were needed to help him prepare for oral argument. (ECF Nos. 811; 813-816; 818, pp. 932-943).  I find that this practice was unreasonable, as it led to an inflated number of billable hours. This is excessive.  I find that a further reduction is appropriate.  *Compare Dause v. Broadway Servs., Inc.*  Case No. JKB-11-3136, 2012 WL 1131524, at *2(D. Md. Apr. 3, 2012) (reduction made to limit attorneys' fees to a collective amount given the experience of the attorneys and the complexity of the matter); *compare Schlacher v. Law Offices of Phillip J. Rotche & Associates, P.C.*, 574 F.3d 852, 858 (7th Cir. 2009) ("[O]verstaffing cases inefficiently is common, and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees."). This reduction is incorporated into the overall reduction that I recommend below.

    d.  <u>Fee Petition</u>

U.S. Home maintains that iStar Financial's counsel billed "redundant and excessive hours" in preparing its fee petition, citing to the hours that Katten billed in 2015, 2016, and 2017. (ECF No. 840, pp. 16-17). U.S. Home further avers that the work required to assemble the

materials to support this fee petition as required by the local rules should have been done by a paralegal, and not associates. (*Id*.). iStar Financial responds that U.S. Home "underestimates the complexity of and judgment required to compile fee charts for years of complex litigation." (ECF No. 848, pp. 11-12).

I have reviewed the records from related to the fee petition preparation: ECF Nos. 811, pp. 944-963; 813-816. I do not find that counsel exercised appropriate billing judgment. I find that a reduction is warranted for several reasons. First, I do not understand why approximately 1,053 hours were required to prepare the fee petitions; neither counsel's pleadings nor the supporting documentation thereto support the idea that the time expended was reasonable. As just one example, I reviewed ECF No. 796, which is the supplemental motion for additional fees sought for writing the motions and for fees for the period of October 1, 2017, through January 2018. Katten seeks reimbursement for about 18 hours for time that a partner, Mr. Kuwana, spent writing a petition that is about 1.5 pages in length, and for time that an associate and another attorney spent on this effort. (ECF No. 815, pp. 1-3). This is unreasonable. Second, I do not understand why most of the time billed for assembling the supporting materials could not have been done by paralegals, with, e.g., a more senior attorney occasionally reviewing/quality checking that work. Third, the general billing entries do not make it clear why work was done on the fee petition, e.g., in August 2013, before this matter even headed to trial. (ECF No. 818, p. 944). In sum, because they used associates, and not paralegals, to do some of the work, a further reduction is appropriate. This further reduction is incorporated into the overall reduction that I recommend below.

U.S. Home seeks a further reduction for what "non-compensable" work for collateral matters, namely for: (a) fees incurred in relation to the ED VA Action/First Maryland Action; (b) fees incurred related to the foreclosure; and (c) fees related to third-party lawsuits.  U.S. Home also avers that iStar Financial's billing records show that it seeks fees for occasions where multiple attorneys participate in the same meeting or call.  Furthermore, U.S. Home says that a reduction is appropriate for iStar Financial's failed tort claims, i.e., all work related to the fraud and negligent misrepresentation claims, for which Judge Chasanow granted summary judgment in favor of U.S. Home. (ECF No. 840, pp. 19-26). Finally, U.S. Home seeks an additional reduction for block billing by iStar Financial's counsel. (*Id.*).

I reviewed all of the billing records, and find that a reduction is warranted for several reasons. First, I find that iStar Financial was not a party to ED VA Action/First Maryland Action. Second, iStar Financial does not hide from the fact that it engages in block billing, admitting that some of the entries for the ED VA Action/First Maryland Action are related to work done "**primarily**" (not exclusively) for the Instant Case. Third, I do not think that iStar Financial can recover attorneys' fees for its "failed tort claims," because I do not find their lack of success on these claims (summary judgment in favor of U.S. Home) to be a necessary step to the ultimate victory here. Indeed, Judge Chasanow found different reasons for iStar Financial to be a prevailing party, namely the Sellers were not in breach of the contracts, and U.S. Home acted in bad faith in delaying the sale of the property.  It was not because she found that U.S. Home made fraudulent representations. Fourth, I do not find persuasive iStar Financial's argument that the entries included for the ED VA Action/First Maryland Action or the third-party litigation or the foreclosure action are compensable under *Hensley v. Eckerhart.* 461 U.S. 424 (1983).  I do not

find that doctrine applies in the manner that iStar Financial argues. I believe that *Hensley* can be interpreted to allow for different claims in the same lawsuit that are truly based on the same common core of facts. I do not believe that it stands for the proposition that different lawsuits with different claims that are only indirectly related to some of the facts at issue in the Instant Case are compensable. Fifth, Katten's block billing prevents me from specifically identifying what is compensable and what is not. Thus, by way of example, I cannot always tell which entries are exclusively for the Instant Case or which entries are for the Instant Case and the third-party lawsuits or for the ED VA Action/First Maryland Action. In cases where there is a mixture of claims that allow fee shifting and others that do not, "block billing" is disfavored. *See, e.g., Diamond Point Plaza Ltd. P'ship v. Wells Fargo*, 400 Md. 718, 760, 929 A.2d. 932, 934 (2007).

Finally, I note that I found several instances when Katten billed for multiple attorneys and/or other professionals in connection with the same event. **By way of example only**, iStar Financial's counsel represents that in all instances where multiple attorneys participated at a court proceeding, it had reviewed entries and "struck any duplicative time," and that where a "junior associate assisted a partner, the junior attorney's time was billed at a paralegal rate." (ECF No. 787). I found that this was not correct. For instance, on April 15, 2014, Katten billed for **five** attorneys who were in court for the exact same amount: 4.6 hours. The associates were billed at rates that exceeded the Guidelines for **attorneys' rates**, not paralegal rates. (ECF No. 818, pp. 930-31). U.S. Home should not have to pay for Katten's decision to send more than the necessary number of attorneys to a closing argument. I found several other entries throughout the other Phases that appear to be "overlawyering" or billing for too many lawyers. In sum, parties may not recover fees for "time that is excessive, redundant or unnecessary." *Plasterers*

*Local Union No. 96 Pension Plan v. Perry*, 711 F.Supp.2d 472, 475, 2010 WL 686694, at \*3 (D.Md. 2010).

Accordingly, based on my analysis of the MPRC 1.5(a) factors, and for the reasons articulated above in Sections D.3. through D.5, I recommend that an additional **10% further reduction** is warranted, which is a deduction of $1.2 million.

## IV.    CONCLUSION

In sum, I respectfully recommend that the Court **GRANT IN PART AND DENY IN PART** the request as follows:

1)  Award Costs and Expenses in the amount of **$553,712.56**;

2)  Make the reductions set forth in **Sections III.D.3 through III.D.5**;

3)  Award Attorneys' Fees in the amount of **$10,848,353.84**.


October 16, 2018                           _____/s/_____
                                           Gina L. Simms
                                           United States Magistrate Judge